UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DAMILOLA ANIMASHAUN,

                         Plaintiff,

                                        9:21-cv-00372-MAD-TWD

v.

J.J. TOOHILL et al.,

                         Defendants.

_____

APPEARANCES:                         OF COUNSEL:

DAMILOLA ANIMASHAUN
14-A-0061
Great Meadow Correctional Facility
Box 51
Comstock, NY 12821
*Plaintiff, pro se*

LETITIA JAMES                       STEVE NGUYEN, ESQ.
Attorney General of the State of New York      Assistant Attorney General
The Capitol
Albany, NY 12224
*Attorney for Defendants*

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**ORDER AND REPORT-RECOMMENDATION**</u>

## I.    INTRODUCTION

      This matter has been referred for a report and recommendation by the Hon. Mae A.

D'Agostino, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

At all times relevant, Plaintiff was an incarcerated individual in the custody of the New York

State Department of Corrections and Community Supervision ("DOCCS") at Upstate

Correctional Facility ("Upstate").  (Dkt. No. 1.)  On April 1, 2021, Plaintiff commenced this

action pursuant to 42 U.S.C. § 1983. *Id*. Plaintiff's second amended complaint was accepted for filing on November 18, 2021, which alleged Eighth Amendment excessive force and failure to intervene claims against Corrections Officer ("CO") Tourville, CO J.J. Toohill, CO Davey, CO Patrick, CO B. Chevier, CO Z. Holmes, and CO W. Hoffnagle.[1] (Dkt. No. 21.)

Currently before the Court is Defendants' motion for summary judgment. (Dkt. No. 54.) For the reasons set forth below, the Court recommends Defendants' motion be granted in part and denied in part.

## II.    LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Salahuddin v. Gourd*, 467 F.3d 263, 272-73 (2d Cir. 2006). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). The movant may meet this burden by showing the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

---

[1] The defendants will be referenced henceforth by their last names. Hoffnagle indicates he was employed by DOCCS as a Sergeant at all relevant times. (Dkt. No. 54-11, ¶ 1.) The Court will refer to him as Sgt. Hoffnagle.

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing there is a genuine issue for trial. *Salahuddin*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

The Second Circuit instructs that on summary judgment motions, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys*, 426 F.3d at 554 (emphasis in original). In other words, "a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Accordingly, statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003).

In applying the summary judgment standard, the district court should not weigh evidence or assess the credibility of witnesses. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment").

## III.   BACKGROUND

### A.   Plaintiff's Contentions

Plaintiff's claims stem from an incident on April 9, 2018, at Upstate.  He alleges that on April 9, 2018, at around 3:35AM, he became involved in an incident with his cellmate, which resulted in the cellmate having "a hold on" Plaintiff.  (Dkt. No. 21 at 6.)  At his deposition, Plaintiff testified he got up in the middle of the night to stretch for about eight to ten minutes. (Dkt. No. 54-3 at 75-76.)  At some point, his cellmate came up and "grabbed" him in a hug-like fashion.  *Id.* at 77.  The cellmate kept him there until Plaintiff called out to the CO doing rounds, who turned out to be CO Toohill.  *Id.*  Plaintiff claims he protected himself by "watching his [cellmate's] hands" to ensure his cellmate did not punch him.  *Id.* at 77-78.  After he got CO Toohill's attention, CO Toohill called other officers to come to the cell and help separate Plaintiff and his cellmate.  *Id.* at 85.  CO Toohill then asked Plaintiff and his cellmate to separate "several times."  *Id.* at 86.  Plaintiff claimed he could not separate from his cellmate because his cellmate was still holding on to him and he wanted the COs to come in and get his cellmate off of him.  *Id.* at 86-87.  Plaintiff explained that if someone started an altercation with him and he tried to protect himself, "some officers will . . . write that down as a fight or two inmates exchanging blows."  *Id.* at 87.

Plaintiff testified he did not remember being struck in the chest when the COs entered his cell. *Id.* at 90. Plaintiff claimed the only thing he remembered was the COs pulling him and his cellmate apart. *Id.* at 90-91. The COs had to use "more force" on the cellmate when he attempted to "jump over" the COs and "attack" Plaintiff—ending the incident. *Id.* at 90-91. Plaintiff testified once he was on the floor, one CO, who he later identified as CO Tourville, grabbed his left hand and "slammed it so hard" on the floor, he "felt it crack" and it was "unbearable." *Id.* at 91.

A nurse examined Plaintiff at around 4:15AM and observed scrapes on Plaintiff's left-hand and right-hand knuckles, a round scrape on the left center of Plaintiff's forehead, a red spot on Plaintiff's back, and a split upper and lower lip. (Dkt. No. 21 at 7; Dkt. No. 54-3 at 8-9.) Two hours after he returned to his cell, Plaintiff's left hand swelled to the point where he could not move it. (Dkt. No. 54-3 at 98.) Plaintiff was taken to the hospital at Clinton Correctional Facility for a day where an x-ray was ordered for his hand. *Id.* at 102-03. He underwent surgery for his hand on or about April 20, 2018. *Id.* at 103. Plaintiff claims he did not sustain these injuries from his cellmate, as his cellmate only had a "tight hold" on him. (Dkt. No. 21 at 7.)

Plaintiff testified the pain in his left hand persists but has gotten better over time. (Dkt. No. 54-3 at 108.) He takes ibuprofen or Tylenol for the pain but also reported his psychiatric medications help with the physical and emotional pain resulting from the incident. (Dkt. No. 54-3 at 112-13, 122; Dkt. No. 21 at 15.) His left arm began going numb or feeling "paralyzed" about a year after the incident which Plaintiff claims did not occur prior to the incident. (Dkt. No. 54-3 at 115.) He also reported it is difficult to grab anything or write with his left hand but claimed he could lift weights and do pushups at the time of his deposition. *Id.* at 115-17.

Plaintiff further testified he continues to have constant chest pain from being hit with the shield on April 9, 2018. *Id.* at 123-24.

### B.      Plaintiff's Tier III Disciplinary Hearing

Plaintiff was sanctioned for the April 9, 2018, incident on April 20, 2018. (Dkt. No. 21 at 8; Dkt. No. at 34.) At his Tier III Disciplinary Hearing, Plaintiff pled guilty to violent conduct and fighting. (Dkt. No. 54-3 at 36-37.)[2] However, Plaintiff later testified at his deposition that he pled guilty to two charges at his Tier III Disciplinary Hearing because the Hearing Officer told Plaintiff off the record that if he pled guilty, he would receive less time in the SHU. *Id.* at 126-28.

The Hearing Officer also ultimately found Plaintiff guilty of refusing a direct order but found him not guilty of interference. *Id.* at 50. At the hearing, Plaintiff stated he and his cellmate got into a fight but at some point, his cellmate began holding him tightly. *Id.* at 45, 46. Plaintiff then called out to CO Toohill to break up the fight but claimed he physically could not comply with CO Toohill's orders to break up, or "lock out," because his cellmate was "holding on to" him. *Id.* at 45-47. Plaintiff asserted he "was already on the floor" when the COs entered his cell and, while handcuffing him, one of the COs, who he later identified as CO Tourville, "slammed [his] hand[] so hard on the floor that night [he] had to go to the hospital." *Id.* at 48. At the end of the hearing, after Capt. Gravlin issued his opinion, Plaintiff continued to argue he could not lock out and therefore did not "refuse" to follow the order. *Id.* at 52-54. Capt. Gravlin explained he found this to be a "mitigating" circumstance and Plaintiff received a "considerable amount less [time in the SHU]" because he took ownership of his actions and "the other inmate

---

[2] The Court notes it is difficult to glean information from the Tier III Hearing transcript as much of the testimony is transcribed as "inaudible." *See generally* Dkt. No. 54-3 at 34-54.

(inaudible) [from Plaintiff's] point of view . . . didn't allow [him] (inaudible)" and that is why Capt. Gravlin "put the sanction in there like [he] did." *Id.* at 52, 53.

### C.  Use Of Force Report

Sgt. Hoffnagle documented the April 9, 2018, incident in a Use of Force Report.  (Dkt. No. 54-3 at 8-9.)  The report describes the events leading up to the application of force as follows.  "INMATE ANIMSHAUN . . . WAS INVOLVED IN A CELL FIGHT WITH INMATE [REDACTED]  THEY REFUSED TO COMPLY WITH STAFF DIRECTIONS TO STOP FIGHTING AND LOCK OUT.  STAFF ENTERED THE CELL AND USED FORCE TO GAIN COMPLIANCE."[3]  *Id.* at 8.

Sgt. Hoffnagle described the "actual force used" as follows:

> OFFICER PATRICK ENTERED THE CELL WITH THE
> SHIELD STRIKING INMATE ANIMSHAUN IN THE UPPER
> TORSO FORCING HIM TO THE FLOOR.  OFFICER TOOHILL
> ENTERED THE CELL USING BOTH HANDS TO
> ANIMSHAUN'S SHOULDERS, HELD HIM TO THE FLOOR.
> OFFICER DAVEY ENTERED THE CELL USING BOTH
> HANDS SECURED THE INMATES RIGHT ARM.  OFFICER
> TOURVILLE ENTERED THE CELL USING BOTH HANDS
> FORCED THE INMATES LEFT ARM BEHIND HIS BACK
> AND APPLIED MECHANICAL RESTRAINTS.  ALL FORCE
> ENDED.

(Dkt. No. 54-3 at 8.)

The same report includes a physical examination/treatment report.  *Id.* at 9.  Sgt. Hoffnagle noted on April 9, 2018, "AT APPROXIMATELY 4:15AM INMATE ANIMSHAUN WAS VIEWED IN LOWER HOLDING PEN ON 10 BLOCK.  APPROXIMATELY 1 CM ROUND SCRAPE ON LEFT CENTER FOREHEAD, SCRAPES ON LEFT HAND-

---

[3]  Unless otherwise indicated, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

KNUCKLES, SCRAPES ON RIGHT HAND-KNUCKLES, A 2 CM RED SPOT ON BACK AND A SPLIT UPPER AND LOWER LIP.  INMATE ADVISED TO CLEAN SCRAPES WITH SOAP AND WATER." *Id.*

Sgt. Hoffnagle submitted the report on April 9, 2018, and it was reviewed by Lt. J. Mitchell the same day. *Id.* On July 10, 2018, Superintendent D. Uhler reviewed and evaluated the report and determined the force used was "appropriate." *Id.*

### D.    Hallway Footage of April 9, 2018, Incident

Defendants provided the Court with footage of the hallway outside of Plaintiff's cell. (*See* Dkt. No. 56 containing Exhibit ("Ex.") L.)[4]  The video lasts about 15 minutes.  Although the video contains audio, it is not always clear what is being said.  The Court will therefore describe the footage as accurately as possible given the audio limitations.  At around the 1:45 timestamp mark ("mark"), CO Toohill stops and shines a flashlight into Plaintiff's cell. *Id.*  As he walks away, someone from inside the cell calls him back, seemingly saying "get him out of here." *Id.*  At the 2:30 mark, CO Toohill radios someone about a fight. *Id.*  A little less than a minute later, two more COs appear and ask "what's up?" into the cell. *Id.*  The first CO, standing closest to the cell, then says "one of you come here" and "one of you's gotta lock out" while a second CO stands behind him shining a flashlight into the cell. *Id.*  The first CO then goes "Break up or lock out right now.  We're gonna come in there and break it off." *Id.*  The second CO leaves at around the 4 minute mark. *Id.*  The first CO repeatedly states "break up or lock out" and "break it off, we're coming in there." *Id.*  There appears to be a dialogue of sorts between the first CO and those inside the cell, but it is not entirely clear what is being said.

---

[4]  It is unclear to the Court whether Defendants have provided Ex. L to Plaintiff to review.

At the 5:29 mark, CO Patrick brings over a shield and at the 6:04 mark the first CO says "let him go and lock out." *Id.* A third CO comes into view and attaches handcuffs to the first CO's waistband. *Id.* At the 6:20 mark, the lights in the hallway go on and from the 6:30 to 7:30 mark CO Patrick and the third CO take turns speaking into the cell, saying "break it up," "lock out . . . or we're coming in," "hurry up," "let him go and let him lock out," and "let him go." *Id.*

At the 7:35 mark, Sgt. Hoffnagle arrives and looks into the cell. *Id.* Sgt. Hoffnagle seemingly tells them to "Go lock out [inaudible] Hear me? Full lock out." *Id.* Someone inside the cell says something back to Sgt. Hoffnagle and he replies "What's up?" *Id.* At around the 8 minute mark, either Sgt. Hoffnagle or CO Patrick says "just let him go before we'll have to come in there." *Id.* Around 30 seconds later, either Sgt. Hoffnagle or CO Patrick again warns they will come into the cell. *Id.* Sgt. Hoffnagle or CO Patrick then has an exchange with someone inside the cell. *Id.* At the 9:08 mark, they again warn they will come into the cell. *Id.* At the 9:30 mark, six COs line up outside the cell door and at the 9:40 mark, the doors to the cell open. *Id.* Someone yells "get on the ground" and at around the 9:45 mark, the COs enter the cell. *Id.* There is yelling and banging coming from inside the cell. *Id.* At the 9:50 mark, Sgt. Hoffnagle stands just inside of the cell. *Id.* At the 10 minute mark, Sgt. Hoffnagle removes the shield from the cell while yelling continues coming from inside the cell. *Id.* At the 10:21 mark, Sgt. Hoffnagle backs up and stands right outside the doorway of the cell. *Id.* At the 10:48 mark, Plaintiff is taken out of his cell by three officers and frisked against the wall. *Id.* Plaintiff's shirt appears to be covered in blood. *Id.* He is then escorted out of the view of the camera. *Id.* At the 11:45 mark, Plaintiff's cellmate is taken outside of the cell and frisked against the wall. *Id.* The video ends a few minutes later with no further activity. *Id.*

### E.    Defendants' Contentions

Defendants argue the Court should grant summary judgment as to the Eighth Amendment excessive force and failure to intervene claims because Plaintiff cannot meet the subjective prong of the Eighth Amendment analysis.  (Dkt. No 54-1 at 12-19.)  Defendants claim the "force used was not malicious or sadistically inflicted, nor does any action demonstrate wantonness . . . ."  *Id.* at 14.  Because certain Defendants witnessed "the Plaintiff and his cellmate exchanging close[d] fist punches," force "became necessary in order to gain control of the Plaintiff and his cellmate and force was ceased after compliance was gained."  *Id.*  Further, Plaintiff "was given ample opportunities to step away from the cellmate, as exhibited in the surveillance video, yet he chose not to."  *Id.* at 15.  Moreover, Plaintiff "was not struck, punched, kicked, or hit by any Defendant while attempting to quell the fighting happening in the cell."  *Id.*

According to Defendants, because the "alleged force occurred in the span of 60 seconds," they "had no real opportunity to prevent the incident."  *Id.* at 17.  Defendants further contend that "[a]part from simply placing the Plaintiff in mechanical restraints, Defendants did nothing other than secure the safety of the Plaintiff in the span of 60 seconds."  *Id.* at 19.

Defendants also assert Plaintiff's Eighth Amendment failure to intervene claims against CO Chevier, CO Holmes, and Sgt. Hoffnagle fail for lack of personal involvement.  *Id.* at 19-25.  Finally, in the alternative, Defendants argue they are entitled to qualified immunity.  *Id.* at 25-28.

## IV.    DISCUSSION

Plaintiff asserts Eighth Amendment excessive force and failure to intervene claims against CO Tourville, CO Toohill, CO Davey, CO Patrick, CO Chevier, CO Holmes, and Sgt. Hoffnagle stemming from the April 9, 2018, incident.

A.      **Eighth Amendment Excessive Force Claims and Personal Involvement**

"The Eighth Amendment prohibits the infliction of cruel and unusual punishments . . .

including the unnecessary and wanton infliction of pain." *Giffen v. Crispen*, 193 F.3d 89, 91 (2d

Cir. 1999) (citation and quotation marks omitted).  An Eighth Amendment excessive force claim

has two elements—"one subjective focusing on the defendant's motive for his conduct, and the

other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir.

2009) (citing *Hudson v. McMillian*, 503 U.S. 1, 7-8 (1992)).

"The subjective component of the claim requires a showing that the defendant had the

necessary level of culpability, shown by actions characterized by wantonness in light of the

particular circumstances surrounding the challenged conduct." *Harris v. Miller*, 818 F.3d 49, 63

(2d Cir. 2016) (quoting *Wright*, 554 F.3d at 268) (internal quotation marks omitted).  The test for

wantonness on an excessive force claim "is whether the force was used in a good-faith effort to

maintain or restore discipline, or maliciously and sadistically to cause harm. *Id*. (quoting *Scott v.

Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (in determining whether defendants acted

maliciously or wantonly, "a court must examine several factors including: the extent of the injury

and mental state of the defendant, as well as the need for the application of force; the correlation

between that need and the amount of force used; the threat reasonably perceived by the

defendants; and any efforts made by the defendants to temper the severity of a forceful

response.") (citation and quotation marks omitted)).  The objective component requires a

showing that the "conduct was objectively 'harmful enough' or 'sufficiently serious' to reach

constitutional dimensions." *Harris*, 818 F.3d at 64 (citation omitted).

In addition, a corrections officer who is present while an assault upon an inmate occurs

may bear responsibility for any resulting constitutional deprivation, even if he did not directly

participate in the use of force.  *See Tafari v. McCarthy*, 714 F. Supp. 2d 317, 342 (N.D.N.Y.

2010); *Cicio*, 2010 WL 980272, at *13.  Indeed, an official has an affirmative duty to intervene

on behalf of an individual whose constitutional rights are being violated by other officers in his

or her presence.  *Cicio*, 2010 WL 980272, at *13.  In order to establish liability under this theory,

a plaintiff must prove that the defendant in question (1) possessed actual knowledge of the use by

another correction officer of excessive force; (2) had a realistic opportunity to intervene and

prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally

refusing or failing to take reasonable measures to end the use of excessive force.  *Tafari*, 714 F.

Supp. 2d at 342; *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008).

### B.    Analysis

The Court recommends (1) granting summary judgment as to the excessive force and

failure to intervene claims against CO Chevier; (2) denying summary judgment as to the

excessive force and failure to intervene claims against CO Toohill, CO Davey, and CO Patrick;

(3) granting summary judgment as to the excessive force claims against CO Holmes and Sgt.

Hoffnagle; (4) denying summary judgment as to the failure to intervene claims against CO

Holmes and Sgt. Hoffnagle; and (5) denying summary judgment as to the excessive force claim

against CO Tourville.

### 1.  CO Chevier

The Court recommends granting summary judgment as to the excessive force and failure

to intervene claims against CO Chevier for lack of personal involvement.  CO Chevier stated that

upon entering Plaintiff's cell, he used both hands to restrain Plaintiff's cellmate's left arm and

applied mechanical restraints, ending the use of force.  (Dkt. No. 54-9 at 2; Dkt. No. 54-3 at 23.)

*Id.* CO Chevier brought the cellmate to his feet and, along with CO Patrick, escorted the cellmate to a holding pen to be seen by medical. (Dkt. No. 54-9 at 2.)

At his deposition, Plaintiff testified "I don't believe . . . Chevier touched me." (Dkt. No. 54-3 at 139.) When asked how CO Chevier was involved in the use of force, Plaintiff responded "Chevier was there at the scene but he basically failed to . . . prevent the injury from happening by seeing that the officers . . . were extremely forceful upon me . . . . He didn't do anything to actually . . . prevent [that] from happening." *Id.*

The record demonstrates CO Chevier never touched Plaintiff, and therefore he could not have been personally involved in any alleged use of excessive force on Plaintiff. *See Columna*, 2022 WL 767103, at *4 (granting summary judgment on excessive force claim where the defendants had no involvement in the force alleged); *Vann*, 2020 WL 3001072, at *5 (granting summary judgment on excessive force claim where the defendant "did not directly participate in the frisk" at issue and therefore "had no personal involvement in the alleged constitutional violation"). Therefore, as there is no question of material fact that CO Chevier was not personally involved in the alleged use of excessive force against Plaintiff, the Court recommends granting summary judgment as to this claim.

The Court also recommends granting summary judgment as to the failure to intervene claim against CO Chevier. As noted above, in order to establish liability for failure to intervene, a plaintiff must show that the defendant in question (1) possessed actual knowledge of the use by another correction officer of excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *Tafari*, 714 F. Supp. 2d at 342. "'Whether an officer had sufficient time to intercede or was capable of

preventing the harm being caused by another officer is a question of fact,' unless the evidence shows that 'a reasonable jury could not possibly conclude otherwise.'" *Toliver v. City of New York*, No. 10 CIV. 5806 SHS JCF, 2013 WL 6476791, at *3 (S.D.N.Y. Dec. 10, 2013), *report and recommendation adopted*, No. 10 CIV. 5806 SHS, 2014 WL 549402 (S.D.N.Y. Feb. 11, 2014) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). Moreover, "[w]hether a defendant had a realistic chance to intercede will turn on such factors as the number of officers present, their relative placement, the environment in which they acted, the nature of the assault, and a dozen other considerations." *Figueroa v. Mazza*, 825 F.3d 89, 107 (2d Cir. 2016).

Plaintiff alleges CO Chevier "failed to prevent the injury from happening" but did not provide any more detail. (Dkt. No 54-3 at 139.) CO Chevier reported that he went into Plaintiff's cell, restrained and handcuffed his cellmate, and escorted the cellmate out of the cell. (Dkt. No. 54-9 at 2; Dkt. No. 54-3 at 23.)

Plaintiff has failed to demonstrate that there is sufficient evidence to permit a jury to conclude CO Chevier had a realistic opportunity to intervene and prevent the harm to Plaintiff while he was restraining Plaintiff's cellmate and escorting him out of the cell. (Dkt. No. 54-3 at 23, 139.) Therefore, in this instance, the court recommends granting summary judgment as to the failure to intervene claim against CO Chevier. *See Caravalho, et al. v. City of New York, et al.*, 13-cv-4174 (PKC)(MHD), 2016 WL 1274575, at *10 (S.D.N.Y. Mar. 31, 2016) (finding no personal involvement and granting summary judgment as to failure to intervene claims against defendants because plaintiffs did not "present facts showing that any of the named defendants directly participated in, or were in a position to effectively intercede in, the alleged uses of force").

### 2. COs Toohill, Davey, and Patrick

#### i. CO Toohill

The Court recommends denying summary judgment as to the excessive force and failure to intervene claims against CO Toohill.  Plaintiff alleges CO Toohill "had [him] on the ground face to the floor" with his hands on Plaintiff's shoulders.  (Dkt. No. 57 at 5.)  Plaintiff testified at his deposition, and has maintained in his submissions, he was on the floor and not resisting when he was handcuffed.  (Dkt. No. 54-3 at 94-96; Dkt. No. 57 at 12-13.)

CO Toohill reported when he arrived at Plaintiff's cell, Plaintiff and his cellmate were "exchanging closed fist punches."  (Dkt. No. 54-5 at 2; Dkt. No. 54-3 at 10.)  He "gave several direct orders" for the inmates to separate and they did not comply.  (Dkt No. 54-5 at 2; Dkt. No. 54-3 at 10.)  After Sgt. Hoffnagle arrived, "[s]everal more orders were given" and "they did not comply."  (Dkt. No. 54-3 at 10; Dkt. No. 54-5 at 2.)  CO Toohill reported that "[a]t that time force was necessary to gain compliance."  (Dkt. No. 54-5 at 2.)  Upon entering Plaintiff's cell, CO Toohill placed both of his hands on Plaintiff's shoulders holding him to the floor while "other officers put restraints on the Plaintiff."  (Dkt. No. 54-5 at 2; Dkt. No. 54-3 at 11.)  He then assisted escorting Plaintiff and his cellmate to separate holding pens.  (Dkt. No. 54-5 at 2; Dkt. No. 54-3 at 11.)

There is no dispute force was used to restrain Plaintiff on April 9, 2018, and that CO Toohill participated in the use of force.  (Dkt. No. 54-3 at 8-9; Dkt. No. 54-5 at 2; Dkt. No. 54-3 at 11.)  The DOCCS Use of Force Report describes the kind of force allegedly used to restrain Plaintiff and notes the resulting injuries to his forehead, lips, back, and hands.  *Id.*  Plaintiff also testified he sustained broken metacarpal bones in his left hand from the use of force.  *Id.* at 97.

However, Plaintiff and Defendants have different accounts of what was occurring prior to the COs entering Plaintiff's cell and what happened after they entered the cell. For instance, Plaintiff claims his cellmate was holding onto him by the time the COs arrived at his cell. (Dkt. No. 54-3 at 86-87.) However, all of the Defendants reported either Plaintiff and his cellmate were in a fight (Dkt. No. 54-6 at 2; Dkt. No. 54-7 at 2; Dkt. No. 54-8 at 2; Dkt. No. 54-9 at 2; Dkt. No. 54-10 at 2) or were exchanging "closed fist" punches when they arrived at the scene. (Dkt. No. 54-5 at 2; Dkt. No. 54-11 at 2.) Yet, at the same time, multiple COs can be heard saying "let him go" into Plaintiff's cell throughout the video footage provided by Defendants. (Dkt. No. 56 at marks 6:30-7:30, 8.) CO Tourville, CO Davey, and Sgt. Hoffnagle all reported Plaintiff was on the ground by the time he was handcuffed. (Dkt. No. 54-6 at 2; Dkt. No. 54-7 at 2; Dkt. No. 54-11 at 2.) None of the Defendants claim Plaintiff was resisting while on the ground being handcuffed. Likewise, none of the Defendants, including CO Toohill, reported Plaintiff's left hand being slammed onto the floor while being handcuffed, whereas Plaintiff testified CO Tourville slammed his hand so hard onto the floor that he broke the metacarpal bones in his left hand. (Dkt. No. 54-3 at 91-93.) Moreover, while the footage provided by Defendants demonstrates what went on in the hallway outside the cell, it does not show any activity inside the cell. (*See* Dkt. No. 56.) It is therefore unclear what exactly occurred in Plaintiff's cell before and after the COs entered it; whether Plaintiff was resisting when he was restrained; and how he sustained his reported injuries. *Id.*

As a result of these differing accounts, questions of fact exist as to "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992); *see Henry v. City of New York*, No. 02 CIV. 4824 (JSM), 2003 WL 22077469, at *2 (S.D.N.Y. Sept. 8, 2003) ("[W]hen there is a

factual dispute about the circumstances surrounding . . . the degree of force used, the Second Circuit requires a jury determination of the reasonableness of that force."). Furthermore, the fact that CO Toohill "was physically involved in handcuffing plaintiff . . . gives rise to a plausible inference that he was the one who . . . broke plaintiff's hand." *Laster v. Mancini*, No. 07 CIV. 8265 DAB, 2013 WL 5405468, at *29 (S.D.N.Y. Sept. 25, 2013) (quoting *Jeffreys*, 275 F. Supp. 2d at 474) (denying summary judgment as to excessive force claim against officer involved in handcuffing plaintiff which allegedly resulted in plaintiff's broken hand.) Therefore, the Court recommends denying summary judgment to the extent it seeks to dismiss an excessive force claim against CO Toohill. *See generally Abreu v. Farley*, No. 6:11-CV-06251 EAW, 2019 WL 1230778, at *18 (W.D.N.Y. Mar. 15, 2019).

The Court also recommends denying summary judgment as to the failure to intervene claim against CO Toohill. *See Buchy v. City of White Plains*, No. 14 CV 1806 (VB), 2015 WL 8207492, at *3 (S.D.N.Y. Dec. 7, 2015) (allowing failure to intervene claim as an alternative to excessive force claim because a reasonable jury could find the defendant did not use excessive force against the plaintiff but failed to prevent another officer from doing so). "'Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is a question of fact,' unless the evidence shows that 'a reasonable jury could not possibly conclude otherwise.'" *Toliver*, 2013 WL 6476791, at *3. Moreover, as noted above, "[w]hether a defendant had a realistic chance to intercede will turn on such factors as the number of officers present, their relative placement, the environment in which they acted, the nature of the assault, and a dozen other considerations." *Figueroa*, 825 F.3d at 107.

Plaintiff and CO Toohill have differing accounts of what occurred in Plaintiff's cell on April 9, 2018, and it is unclear what exactly occurred in Plaintiff's cell and whether CO Toohill

had a chance to intervene in and prevent any harm from the alleged use of excessive force while Plaintiff was being handcuffed.  (Dkt. No. 54-5 at 1-3; Dkt. No. 54-3 at 91-93; Dkt. No. 56.)  As this Court has held, "the weighing of such competing evidence, no matter how weak plaintiff's claim may appear, presents a question of credibility that must be left to the trier of fact." *Cirio v. Lamora*, No. 08-CV-431 (GLS/DEP), 2010 WL 1063875, at *8 (N.D.N.Y. Feb. 24, 2010), *report-recommendation adopted*, 2010 WL 1063864 (N.D.N.Y. Mar. 22, 2010).  "And while it is true that the only piece of evidence [Plaintiff] offers on this score is his own self-serving testimony, that 'can establish a genuine dispute of fact so long as [it] does not contradict the witness's prior testimony.'" *Waters v. Prack*, No. 9:13-CV-1437 (LEK/DEP), 2017 WL 1187871, at *1 (N.D.N.Y. Mar. 30, 2017) (quoting *Dye v. Kopiec*, No. 16-CV-2952, 2016 WL 7351810, at *3 (S.D.N.Y. Dec. 16, 2016) (collecting cases)).  Moreover, "Plaintiff 'need not establish who, among a group of officers, directly participated in the attack and who failed to intervene' . . . to survive summary judgment." *Laster*, 2013 WL 5405468, at *29 (quoting *Jeffreys*, 275 F. Supp. 2d at 474).  Drawing all reasonable inferences in Plaintiff's favor, Defendants have failed to demonstrate that a reasonable jury could not possibly conclude CO Toohill was not capable of or did not have time to intervene in the alleged use of excessive force against Plaintiff.  *See Toliver*, 2013 WL 6476791, at *3; *Major League Baseball Props., Inc.*, 542 F.3d at 309.  Thus, the Court recommends denying summary judgment as to this claim.

### ii.    CO Davey

The Court recommends denying summary judgment as to the excessive force and failure to intervene claims against CO Davey.  Plaintiff testified CO Davey "participated in the use of force" and "caused the injuries" Plaintiff sustained.  (Dkt. No. 54-3 at 136.)  CO Davey reported when he arrived at Plaintiff's cell, Sgt. Hoffnagle was giving Plaintiff and his cellmate several

direct orders to break and cease fighting.  (Dkt. No. 54-7 at 2; Dkt. No. 54.3 at 16.)  However, neither Plaintiff nor his cellmate complied, and Sgt. Hoffnagle ordered CO Davey and the other responding COs to go into the cell.  (Dkt. No. 54-7 at 2.)  Upon entering the cell, Plaintiff "was on the ground."  (Dkt. No. 54-7 at 2; Dkt. No. 54-3 at 17.)  CO Davey secured Plaintiff's right arm "using a body hold with [his] right and left hands until mechanical restraints were applied" at which point "all force ceased."  (Dkt. No. 54-7 at 2; Dkt. No. 54-3 at 17.)  He then stood Plaintiff up; escorted Plaintiff out of the cell where he was pat and frisked against the wall; and brought him to a holding pen to be seen by medical.  (Dkt. No. 54-7 at 2; Dkt. No. 54-3 at 17.)

There is no dispute CO Davey participated in the use of force against Plaintiff on that day, and Plaintiff sustained injuries.  (Dkt. No. 54-7 at 2; Dkt. No. 54-3 at 8-9; Dkt. No. 21 at 35-38, 97.)  However, as described above and in Section IV.B.2(i), *supra*, Plaintiff and Defendant have differing accounts of what occurred before and after the COs entered Plaintiff's cell.  Thus, questions of fact exist as to "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson*, 503 U.S. at 7; *see Henry*, 2003 WL 22077469, at *2 ("[W]hen there is a factual dispute about the circumstances surrounding . . . the degree of force used, the Second Circuit requires a jury determination of the reasonableness of that force.").  As with CO Toohill, the fact that CO Davey "was physically involved in handcuffing plaintiff . . . gives rise to a plausible inference that he was the one who . . . broke plaintiff's hand."  *Laster*, 2013 WL 5405468, at *29 (quoting *Jeffreys*, 275 F. Supp. 2d at 474) (denying summary judgment as to excessive force claim against officer involved in handcuffing Plaintiff which allegedly resulted in Plaintiff's broken hand.)  Therefore, the Court recommends denying the motion for summary judgment to the extent it seeks to dismiss the excessive force claim against CO Davey.  *See generally Abreu*, 2019 WL 1230778, at *18.

In the alternative, for the same reasons as CO Toohill, the Court recommends denying summary judgment as to the failure to intervene claim against CO Davey.  *See Buchy*, 2015 WL 8207492, at *3 (allowing failure to intervene claim as an alternative to excessive force claim); *see also Toliver*, 2013 WL 6476791, at *3 (finding whether an officer had sufficient time to intercede or was capable of preventing harm is a question of fact); *Figueroa*, 825 F.3d at 107 (finding whether a defendant had a realistic chance to intercede will turn on a number of different factors).

As referenced above, CO Davey held Plaintiff's right arm with a body hold as he was handcuffed.  (Dkt. No. 54-7 at 2; Dkt. No. 54-3 at 11.)  However, Plaintiff and CO Davey have differing accounts of what occurred before and after the COs entered his cell.  *See supra* Section IV.B.2(i).  Additionally, as noted above, it is unclear from the camera footage what exactly occurred in Plaintiff's cell and whether CO Davey had a chance to intervene in and prevent any harm from the alleged use of excessive force.  (*See generally* Dkt. No. 56.)  Thus, the Court recommends denying summary judgment as to this claim.  *See Cirio*, 2010 WL 1063875, at *8 (finding the weighing of competing evidence presents a question of credibility for the trier of fact); *Waters*, 2017 WL 1187871, at *1 (finding plaintiff's self-serving testimony can establish a genuine issue of fact so long as it does not contradict his prior testimony) (citations and quotations omitted); *Laster*, 2013 WL 5405468, at *29 (finding it is not necessary for plaintiff to establish which officer participated in attack and who failed to intervene to survive summary judgment) (cleaned up); *see also Toliver*, 2013 WL 6476791, at *3; *Major League Baseball Props., Inc.*, 542 F.3d at 309.

### iii.    CO Patrick

The Court recommends denying summary judgment as to the excessive force and failure to intervene claims against CO Patrick for similar reasons as COs Toohill and Davey.  Plaintiff claims CO Patrick "entered the cell" and "struck [him] on the chest with the shield."  (Dkt. No. 54-3 at 137.)  CO Patrick reported he responded to a cell fight at Plaintiff's cell on April 9, 2018, at approximately at 3:35AM.  (Dkt. No. 54-8 at 2; Dkt. No. 54-3 at 19.)  Sgt. Hoffnagle was present and gave "several direct orders for the individuals to cease fighting."  (Dkt. No. 54-8 at 2; Dkt. No. 54-3 at 19.)  When "[b]oth individuals failed to comply," Sgt. Hoffnagle ordered the officers to enter the cell.  (Dkt. No. 54-8 at 2; Dkt. No. 54-3 at 19.)  CO Patrick entered the cell with a shield "and struck the Plaintiff and his cellmate in the upper torso which forced them to the ground."  (Dkt. No. 54-8 at 2; Dkt. No. 54-3 at 20.)  He "then used both hands to secure the right arm of the cellmate while he was on the floor" and CO Chevier applied mechanical restraints, ending the use of force.  (Dkt. No. 54-8 at 2; Dkt. No. 54-3 at 20.)  COs Patrick and Chevier then escorted Plaintiff's cellmate to a holding pen to be seen by medical.  (Dkt. No. 54-8 at 2; Dkt. No. 54-3 at 20.)

There is no dispute CO Patrick used force against Plaintiff on April 9, 2018, when he hit Plaintiff with the shield.  (Dkt. No. 54-8 at 2.)  However, since it is unclear exactly what was happening in Plaintiff's cell before and after the COs entered Plaintiff's cell, questions of fact exist as to "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson*, 503 U.S. at 7; *see Henry*, 2003 WL 22077469, at *2 (factual dispute about the circumstances of the degree of force used requires a jury determination of reasonableness); *see supra* Section IV.B.2(i).  Therefore, the Court

recommends denying the motion for summary judgment to the extent it seeks to dismiss an excessive force claim against CO Patrick. *See generally Abreu*, 2019 WL 1230778, at *18.

In the alternative, the Court also recommends denying summary judgment as to the failure to intervene claim against CO Patrick. *See Buchy*, 2015 WL 8207492, at *3; *see also Toliver*, 2013 WL 6476791, at *3; *Figueroa*, 825 F.3d at 107. As previously described, CO Patrick struck Plaintiff with a shield, forcing him to the floor. (Dkt. No. 54-3 at 20.) However, as mentioned above, Plaintiff and CO Patrick have differing accounts of what occurred before and after the COs entered Plaintiff's cell. *See supra* Section IV.B.2(i). It is also unclear from the footage what exactly occurred in Plaintiff's cell and whether CO Patrick had a chance to intervene in and prevent any harm from the alleged use of excessive force. (*See generally* Dkt. No. 56.) Specifically, it is unclear if CO Patrick witnessed Plaintiff being restrained before he restrained Plaintiff's cellmate. (*See generally* Dkt. No. 54-3.) Thus, the Court recommends denying summary judgment as to this claim. *See Cirio*, 2010 WL 1063875, at *8; *Waters*, 2017 WL 1187871, at *1; *Laster*, 2013 WL 5405468, at *29; *see also Toliver*, 2013 WL 6476791, at *3; *Major League Baseball Props., Inc.*, 542 F.3d at 309; *Figueroa*, 825 F.3d at 107.

### 3. CO Holmes

The Court recommends granting summary judgment as to the excessive force claim and denying summary judgment as to the failure to intervene claim against CO Holmes. Plaintiff alleges CO Holmes failed to intervene when CO Tourville, CO Davey, CO Toohill, and CO Patrick applied "very brutal" force against him. (Dkt. No. 21 at 10.) He further testified CO Holmes "didn't do anything to make sure . . . that no injuries happened." (Dkt. No. 54-3 at 138.) However, Plaintiff admitted he did not "believe Holmes touched [him]." *Id.* at 139.

CO Holmes reported he responded to Plaintiff's cell where Sgt. Hoffnagle was giving "several direct orders" to Plaintiff and his cellmate "to stop fighting." (Dkt. No. 54-10 at 2; Dkt. No. 54-3 at 25.) When "[b]oth individuals failed to comply," Sgt. Hoffnagle ordered the COs into the cell. (Dkt. No. 54-10 at 2; Dkt. No. 54-3 at 25.) When CO Holmes entered the cell "the other officers had control of each incarcerated individual" and at that point, he "secured the shield used by C.O. Patrick and observed C.O. Chevier and C.O. Patrick restraining the cellmate." (Dkt. No. 54-10 at 2; Dkt. No. 54-3 at 26.) After both inmates were removed from the cell, CO Holmes conducted a cell search where he found "drag lines"[5] and disposed of them. (Dkt. No. 54-10 at 2; Dkt. No. 54-3 at 26.)

First, the Court recommends granting summary judgment as to the excessive force claim against CO Holmes. CO Holmes and Plaintiff have both indicated that CO Holmes never touched Plaintiff, and therefore he could not have participated in any alleged use of excessive force against Plaintiff. *See Columna*, 2022 WL 767103, at *4 (granting summary judgment on excessive force claim where the defendants had no involvement in the force alleged); *Vann*, 2020 WL 3001072, at *5 (granting summary judgment on excessive force claim where the defendant "did not directly participate in the frisk" at issue and therefore "had no personal involvement in the alleged constitutional violation"). Therefore, as there is no question of material fact that CO Holmes was not personally involved in the alleged use of excessive force against Plaintiff, the Court recommends granting summary judgment as to this claim.

However, the Court recommends denying summary judgment as to the failure to intervene claim against CO Holmes. As previously described, when CO Holmes entered the cell,

---

[5] "Drag lines are made by incarcerated individuals and used to exchange materials between each other and their cells." (Dkt. No. 54-1 at 4, n 2.)

23

"the other officers had control of each incarcerated individual." (Dkt. No. 54-10 at 2; Dkt. No. 54-3 at 26.) Moreover, he had time to observe "C.O. Chevier and C.O. Patrick restraining the cellmate." (Dkt. No. 54-10 at 2; Dkt. No. 54-3 at 26.) However, as previously noted, it is unclear what exactly occurred in Plaintiff's cell, what CO Holmes observed, and whether CO Holmes had a chance to intervene in and prevent any harm from the alleged use of excessive force. (*See generally* Dkt. No. 56.) More specifically, it is unclear if CO Holmes witnessed Plaintiff being handcuffed, because CO Holmes did not elaborate on what he meant when he stated he saw that the other officers "had control" of Plaintiff and his cellmate and if this observation occurred before, after, or during Plaintiff being handcuffed. (Dkt. No. 54-10 at 2.) Drawing all reasonable inferences in Plaintiff's favor, Defendants have failed to demonstrate that a reasonable jury could not possibly conclude CO Holmes was not capable of or did not have time to intervene in the alleged use of excessive force against Plaintiff. *See Toliver*, 2013 WL 6476791, at *3; *Major League Baseball Props., Inc.*, 542 F.3d at 309; *Figueroa*, 825 F.3d at 107. Thus, the Court recommends denying summary judgment as to this claim.

The Court also finds Defendants' argument that Plaintiff's failure to intervene claim against CO Holmes fails for lack of personal involvement to be unavailing. There is no dispute CO Holmes was physically present at the scene when the April 9, 2018, incident occurred. (Dkt. No. 54-10 at 2; Dkt. No. 54-3 at 25.) Further, Defendants have not presented undisputed evidence that no reasonable jury could conclude CO Holmes had a realistic opportunity to intervene while present at the incident. *See, e.g., Snead v. City of New York*, 463 F. Supp. 3d 386, 400 (S.D.N.Y. 2020) (denying summary judgment where involvement in plaintiff's stop and arrest was disputed and officers not personally involved in arrest were "mere feet away" when plaintiff was arrested because defendants did not present undisputed evidence such that no

reasonable jury could conclude they had a realistic opportunity to intervene), *reconsideration denied sub nom. Snead v. LoBianco*, No. 16-CV-09528, 2021 WL 861060 (S.D.N.Y. Mar. 8, 2021).

The Court likewise finds Defendants' argument that CO Holmes "had no real opportunity to prevent the incident" because the alleged use of force occurred in the span of 60 seconds to be unavailing.  (Dkt. No. 54-1 at 17.)  Although "officers generally 'cannot be held liable for failure to intervene in incidents that happen in a matter of seconds,'" the issue of whether an officer had a reasonable opportunity to intervene "can be decided as a matter of law only if 'considering all the evidence, a reasonable jury could not possibly conclude' that the officer had a reasonable opportunity to intervene." *Stroman v. Ranze*, 18-CV-0149, 2019 WL 7494384, at *7-8 (N.D.N.Y. Dec. 13, 2019) *report-recommendation adopted* by 2020 WL 68610 (N.D.N.Y. Jan. 7, 2020) (citations and quotations omitted).

This Court and others within the Circuit have denied summary judgment on failure to intervene claims for assaults and other alleged unconstitutional incidents that occurred in less than 60 seconds.  *See Figueroa*, 825 F.3d at 108 (finding that failure-to-intervene claims were for the jury to decide despite the fact that the assault in question lasted less than 20 seconds based on the close proximity of the defendant officers to the plaintiff at the time of the alleged assault in the back of a police cruiser); *West v. Harkness*, No. 9:17-CV-0621 (GTS/DJS), 2021 WL 4289515, at *14-15 (N.D.N.Y. Sept. 21, 2021) (finding an alleged illegal search that took place over a "short period" of only a few seconds and as long as 20 seconds "could permit a reasonable factfinder to conclude that the relevant defendant had a reasonable opportunity to intervene") (cleaned up); *Dollard v. City of New York*, 408 F. Supp. 3d 231, 236 (E.D.N.Y. 2019) (finding summary judgment to be inappropriate where a reasonable juror could find that an officer had a

realistic opportunity to intervene to stop at least some of the alleged conduct in a physical
encounter that lasted for approximately nine seconds).

Therefore, drawing all reasonable inferences in Plaintiff's favor, Defendants have failed
to demonstrate that a reasonable jury could not possibly conclude CO Holmes was not capable of
or did not have time to intervene in the alleged use of excessive force against Plaintiff. *See
Toliver*, 2013 WL 6476791, at *3; *Major League Baseball Props., Inc.*, 542 F.3d at 309;
*Figueroa*, 825 F.3d at 107. Thus, the Court recommends denying summary judgment as to this
claim.

### 4. Sgt. Hoffnagle

The Court recommends granting summary judgment as to the excessive force claim and
denying summary judgment as to the failure to intervene claim against Sgt. Hoffnagle for similar
reasons as CO Holmes. Plaintiff alleges Sgt. Hoffnagle failed to intervene when other COs
allegedly used excessive force against Plaintiff. (Dkt. No. 21 at 10.) Specifically, Plaintiff
alleges "the supervisor[] present at the incident did not ensure" that "safe techniques" were used
"to avoid injuries since [Plaintiff] was not violent nor resisting during the apprehension." (Dkt.
No. 21 at 13.) Plaintiff testified Sgt. Hoffnagle "was there . . . at the scene of the use of force,"
he "definitely" participated in it, and "he was involved in . . . the cause of the injuries." (Dkt.
No. 54-3 at 137.) However, he later testified he did not believe Hoffnagle touched him during
the incident. *Id.* at 139. Plaintiff also alleges Sgt. Hoffnagle was inside his cell when the alleged
excessive use of force occurred. *Id.* at 137-38.

Sgt. Hoffnagle reported he responded to Plaintiff's cell and observed Plaintiff and his
cellmate "exchanging closed fist blows." (Dkt. No. 54-11 at 2; Dkt. No. 54-3 at 32.) He
"provided several direct orders for each individual to break" but "[a]ll orders were ignored."

(Dkt. No. 54-11 at 2; Dkt. No. 54-3 at 32.)  Sgt. Hoffnagle then "directed staff to enter the cell

and use necessary force to gain compliance."  (Dkt. No. 54-11 at 2; Dkt. No. 54-3 at 32.)  Sgt.

Hoffnagle described the incident as follows.

> 6.  Officer Patrick entered the cell utilizing a state issued shield, he struck both incarcerated individuals in the upper torso forcing that to the floor.  Officer Chevier entered the cell and using both of his hands restrained the cellmates left arm to the floor.  Officer Patrick then used both of his hands to secure the cellmates right arm to the floor.  Officer Chevier then applied mechanical restraints to the cellmate.  Officer Patrick and Officer Chevier escorted the cellmate to the holding pen to be evaluated by medical staff (citation omitted).
>
> 7.  Once the Plaintiff was forced to the floor by Officer Patrick, Officer Toohill entered the cell, using both of his hands forcing the Plaintiff's shoulders to the floor.  Officer Davey entered, using both of his hands he secured the Plaintiff's right arm.  Officer Tourville entered, using both of his hands he forced the Plaintiff's left arm behind his back and applied mechanical restraints.  All necessary force ended at this point.  Officer Tourville and Officer Davey escorted the Plaintiff to the lower holding pen to be seen by medical staff (citation omitted).

(Dkt. No. 54-11 at 2-3.)

Sgt. Hoffnagle interviewed both Plaintiff and his cellmate about the incident.  (Dkt. No.

54-11 at 3; Dkt. No. 54-3 at 32.)  Plaintiff supposedly told Sgt. Hoffnagle "'he fell out of the top

bunk.'"  (Dkt. No. 54-11 at 3; Dkt. No. 54-3 at 32.)  When Sgt. Hoffnagle interviewed Plaintiff's

cellmate, the cellmate said Plaintiff "'can't live with anyone and they had to fight.'"  (Dkt. No.

54-11 at 3; Dkt. No. 54-3 at 32.)  Sgt. Hoffnagle reported digital photos were taken after the

incident and all pertinent documentation was filled out and submitted.  (Dkt. No. 54-3 at 32.)[6]

First, the Court recommends granting summary judgment to Sgt. Hoffnagle as to the

excessive force claim.  Sgt. Hoffnagle and Plaintiff have both indicated that Sgt. Hoffnagle never

---

[6] Plaintiff testified he believed Defendants tried to send him the pictures taken at his medical screening on April 9, 2018, but he only received "a few black pages."  (Dkt. No. 54-3 at 99-100.)

touched Plaintiff.  (Dkt. No. 54-11 at 2-3; Dkt. No. 54-3 at 139.)  Moreover, the hallway footage

shows that Sgt. Hoffnagle took only a few steps into Plaintiff's cell before backing up into the

doorway of the cell.  (*See* Dkt. No. 56.)  Therefore, it is clear from the footage as well as Plaintiff

and Sgt. Hoffnagle's accounts of the incident that Sgt. Hoffnagle was not personally involved in

any alleged use of excessive force against Plaintiff.  (Dkt. No. 54-11 at 2-3; Dkt. No. 54-3 at

139; Dkt. No. 56); *see also Columna*, 2022 WL 767103, at *4 (granting summary judgment on

excessive force claim where the defendants had no involvement in the force alleged); *Vann*, 2020

WL 3001072, at *5 (granting summary judgment on excessive force claim where the defendant

"did not directly participate in the frisk" at issue and therefore "had no personal involvement in

the alleged constitutional violation").  Therefore, as there is no question of material fact that Sgt.

Hoffnagle was not personally involved in the alleged use of excessive force against Plaintiff, the

Court recommends granting summary judgment as to this claim.

However, the Court recommends denying summary judgment as to the failure to

intervene claim against Sgt. Hoffnagle.  As previously described, Sgt. Hoffnagle was in or

around the doorway to Plaintiff's cell for the entirety of the incident.  (*See* Dkt. No. 56.)  While

Sgt. Hoffnagle neatly describes how each CO applied appropriate force to Plaintiff, Plaintiff

claims COs used excessive force against him and broke his hand in the process.  (Dkt. No. 54-11

at 2-3; Dkt. No. 54-3 at 91-93.)  It is also clear from the footage that Sgt. Hoffnagle watched the

whole incident occur from Plaintiff's cell doorway.  (*See* Dkt. No. 56.)  Therefore, drawing all

reasonable inferences in Plaintiff's favor, Defendants have failed to demonstrate that a

reasonable jury could not possibly conclude Sgt. Hoffnagle was not capable of or did not have

time to intervene in the alleged use of excessive force against Plaintiff.  *See Toliver*, 2013 WL

6476791, at *3; *Major League Baseball Props., Inc.*, 542 F.3d at 309; *Figueroa*, 825 F.3d at 107.

Thus, the Court recommends denying summary judgment as to this claim.  Finally, the Court

finds Defendants' arguments regarding Sgt. Hoffnagle's alleged lack of personal involvement

and the timing of the incident to be unavailing for the same reasons as CO Holmes.  *See supra*

Section IV.B.3.

### 5.  CO Tourville

The Court recommends denying summary judgment as to the excessive force claim

against CO Tourville.  Plaintiff alleged after the COs entered his cell and he was on the floor, he

felt CO Tourville slam "the back of [his] left hand on the hard floor of the cell" and "heard a

loud cracking sound" before CO Tourville forced his left arm behind his back and into restraints.

(Dkt. No. 21 at 7; Dkt. No. 57 at 14.)  CO Tourville claims when he entered the cell, Plaintiff

was on the ground and he "used force with both hands to bring the Plaintiff's left arm to the

center of his back and applied mechanical restraints.  At this time use of force ended."  (Dkt. No.

54-6 at 2.)  CO Tourville further claims at all times during the events of April 9, 2018, he "only

used force that was necessary to gain compliance" and at no time did he "use excessive force

against the Plaintiff."  *Id.*

Plaintiff testified about two hours after the incident when he was already back in his cell,

his left hand started swelling "to the point where [he] couldn't move it any longer."  (Dkt. No.

54-3 at 98.)  On the same day, he had a follow up with medical where swelling was noted and an

x-ray was ordered.  *Id.* at 100-01.  Plaintiff received surgery on his left hand at Clinton

Correctional Facility on or around April 20, 2018.  *Id.* at 103.

There is no dispute CO Tourville used force against Plaintiff on April 9, 2018, and

Plaintiff suffered various injuries.  (Dkt. No. 54-6 at 2; Dkt. No. 21 at 35-38; Dkt. No. 54-3 at 8-

9.)  However, Plaintiff and CO Tourville have differing accounts of what occurred on April 9,

2018, before and after the COs entered Plaintiff's cell.  *See supra* Section IV.B.2(i).  Given

Plaintiff's injuries and the differing accounts of what exactly occurred in Plaintiff's cell,

questions of fact exist as to "whether force was applied in a good-faith effort to maintain or

restore discipline, or maliciously and sadistically to cause harm."  *Hudson v. McMillian*, 503

U.S. 1, 7 (1992); *Henry*, 2003 WL 22077469, at *2; *see also Cirio*, 2010 WL 1063875, at *8;

*Waters*, 2017 WL 1187871, at *1.

Therefore, the Court recommends denying the motion for summary judgment to the

extent it seeks to dismiss an excessive force claim against CO Tourville.  *Hughes v. Nemier*, No.

12-CV-6024-FPG, 2016 WL 7056540, at *3-4 (W.D.N.Y. Dec. 5, 2016) (denying summary

judgment where Plaintiff's broken arm and testimony about his experience created a material

issue of fact which could lead a reasonable jury to find the correction officer subjected Plaintiff

to excessive force); *Smalls v. Rathbum*, No. 16-CV-6503-FPG, 2019 WL 2433892, at *3

(W.D.N.Y. June 11, 2019) (denying summary judgment where Plaintiff's two broken bones and

the video depicting the incident established a triable question of fact as to whether the amount of

force used was applied in a good faith effort to maintain or restore discipline); *Laster*, 2013 WL

5405468, at *27 (denying summary judgment as to excessive force claim against officer involved

in handcuffing Plaintiff which allegedly resulted in Plaintiff's broken hand).

C.    **Qualified Immunity**

In the alternative, Defendants assert they are shielded from liability based on qualified

immunity.  (Dkt. No. 54-1 at 19-22.)  "'It is well established that qualified immunity may operate

as a defense to excessive force claims.'"  *Butchino v. City of Plattsburg*, No. 8:20-CV-796

(MAD/CFH), 2022 WL 137721, at *5 (N.D.N.Y. Jan. 14, 2022) (quoting *Betts v. Rodriquez*, No.

15-CV-3836, 2017 WL 2124443, at *4 (S.D.N.Y. May 15, 2017)).

"Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Tracy v. Freshwater*, 623 F.3d 90, 95-96 (2d Cir. 2010) (quoting *Kelsey v. Cty. of Schoharie*, 567 F.3d 54, 60-61 (2d Cir. 2009)) (cleaned up). The Court is mindful that qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation," and that this privilege is "effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

The disputed amount and necessity of force in this case makes summary judgement on qualified immunity inappropriate. *Frost v. New York City Police Dep't*, 980 F.3d 231, 255 (2d Cir. 2020) (because a dispute of facts exists, summary judgment on the defendants' qualified immunity defense is unwarranted); *Kerman v. City of New York*, 261 F.3d 229, 240 (2d. Cir. 2001) (holding "[s]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness") (quotations omitted); *Hemphill v. Schott*, 141 F.3d 412, 418 (2d Cir. 1998) ("[S]ummary judgment based either on the merits or on qualified immunity requires that no dispute about material factual issues remain . . . .").

Construing the facts in Plaintiff's favor, Plaintiff did not resist as Defendants held Plaintiff to the ground and allegedly slammed his left hand so hard against the floor of his cell that they broke the metacarpal bones in Plaintiff's left hand. Even if Plaintiff did initially resist, it is equally well established that "gratuitous force after resistance has stopped and compliance has been secured is unreasonable." *Lee v. City of Troy*, 520 F. Supp. 3d 191, 207 (N.D.N.Y. 2021) (cleaned up). Accordingly, due to the factual dispute over the level of force used by

Defendants and Plaintiff's level of resistance, as well as the timing of the alleged excessive force, the Court recommends denying Defendants' motion for summary judgment on the grounds of qualified immunity.

## V.    CONCLUSION

After carefully reviewing the record, the parties' submissions, and the applicable law, and for the reasons stated herein, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 54-1) be **GRANTED** in part and **DENIED** in part as follows: (1) the Eighth Amendment excessive force and failure to intervene claims against CO Chevier be dismissed; (2) the Eighth Amendment excessive force and failure to intervene claims against CO Toohill, CO Davey, and CO Patrick proceed to trial; (3) the Eighth Amendment excessive force claims against CO Holmes and Sgt. Hoffnagle be dismissed; (4) the Eighth Amendment failure to intervene claims against CO Holmes and Sgt. Hoffnagle proceed to trial; and (5) the Eighth Amendment excessive force claim against CO Tourville proceed to trial; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[7]  Such objections shall be filed with the Clerk of

---

[7]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS**

**WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993)

(citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P. 72.

      **SO ORDERED.**

      Dated: June 22, 2023
            Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

Cicio v. Graham, Not Reported in F.Supp.2d (2010)

2010 WL 980272

2010 WL 980272
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Terry CICIO, Plaintiff,
v.
GRAHAM; Peter M. Sigona; Richard D. Ruston, III;
Phil J. Manna; A. Vega; and Ryerson, Defendants.

No. 9:08-CV-534 (NAM/DEP).
|
March 15, 2010.

**Attorneys and Law Firms**

Terry Cicio, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General, State of New York, Adrienne J. Kerwin, Esq., of Counsel, Albany, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

HON. NORMAN A. MORDUE, Chief Judge.

**\*1** Plaintiff, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brought this action for declaratory and monetary relief under 42 U.S.C. § 1983, claiming excessive use of force, failure to intervene, and denial of adequate medical care stemming from a disturbance involving 17 or more inmates occurring in a "holding pen" or "cage" at Auburn Correctional Facility ("ACF") on March 7, 2006. Plaintiff moved for summary judgment (Dkt. No. 35) and defendants cross-moved for summary judgment (Dkt. No. 38). Upon referral of the motions pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c), United States Magistrate Judge David E. Peebles issued a Report and Recommendation (Dkt. No. 41) recommending that this Court deny plaintiff's motion, grant defendants' motion, and dismiss the action.

Plaintiff has submitted an objection (Dkt. No. 42). Plaintiff states that the Court should have reviewed the transcripts from his disciplinary hearing, because the testimony of defendants

Peter M. Sigona and Richard D. Ruston, III at that hearing "contradicts the reports that [Magistrate Judge Peebles] relied on in making [his] decision." Plaintiff gives no specifics and thus appears to be interposing a general objection directed to the issues of excessive force and failure to intervene. His objection does not refer to the issue of medical indifference.

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court reviews *de novo* those parts of a report and recommendation to which a party specifically objects. Where, as here, a party interposes only general objections to a report and recommendation, the Court reviews for clear error or manifest injustice. *See Davis v. Chapple,* 2010 WL 145298, *2 (N.D.N.Y. Jan.8, 2010), *Brown v. Peters,* 1997 WL 599355,*2-* 3 (N.D.N.Y.), *aff'd without op.,* 175 F.3d 1007 (2d Cir.1999). Failure to object to any portion of a report and recommendation waives further judicial review of the matters therein. *See Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).

The Court accepts and adopts Magistrate Judge Peebles' Report and Recommendation. In view of plaintiff's objection, which, as noted, appears to be directed to the evidence on the issues of excessive force and failure to intervene, the Court briefly revisits these issues. Although plaintiff interposes only a general objection on these issues, in light of his *pro se* status and the nature of the objection, the Court conducts a *de novo* review. Plaintiff requests the Court to obtain the transcript of the disciplinary hearing and contends that the testimony given by Sigona and Ruston at that hearing contradicts the reports relied on by Magistrate Judge Peebles; however, as explained below, the award of summary judgment to defendants is based on plaintiff's own evidence.

The record evidence pertinent to the excessive force and failure to intervene claims is briefly summarized as follows. In a declaration supporting the motion for summary judgment, Sigona, a sergeant at ACF, states:

**\*2** On March 7, 2006, I was supervising the hospital depot area at Auburn. While waiting with a group of inmates in the holding pen in the hospital depot, inmate Baer became disruptive and began threatening staff. Baer ignored several orders by me to cease his behavior. I then entered the holding pen with Officers Manna and Ruston with the intention of removing inmate Baer.

All of the inmates in the pen were ordered to one side of the pen, while Baer remained on the other. Inmate Green refused to move, so I guided him to the side directed.

While I was guiding inmate Green, plaintiff Cicio then lunged at Officer Manna, striking him with a closed fist and knocking him to the ground. I immediately went to Officer Manna's aid and assisted with gaining control of Cicio by taking control of Cicio's right side. Officer Manna and I then escorted a struggling Cicio out of the pen, after which Cicio and Officer Manna fell to the floor. Once Cicio stopped struggling, he was removed from the area and taken to medical for examination.

The declaration from defendant Philip J. Manna, a corrections officer at ACF, is consistent with Sigona's declaration.

Plaintiff's complaint states that defendant Sigona pushed plaintiff into defendant Manna "who then grabbed plaintiff by the hair and began to pull plaintiff towards [the] holding pen door at which point plaintiff was thrown to the floor and kneed in [the] nose." The complaint further states that, after plaintiff was brought to his feet and escorted out of the immediate area, defendant Manna "once again grabbed plaintiff by his hair and pushed plaintiff's face into [the] wall." According to plaintiff, Sigona and Ruston "stood and watched the incident" and did not "intervene[ ] to stop the assault."

Plaintiff testified in his deposition that there were 17 or 18 inmates in the holding pen awaiting transport; that there were no corrections officers in the pen but there were some in the vicinity; that another inmate George Baer started "cursing up a storm" at a corrections officer; and that the sergeant told Baer to "cut it out," to which Baer responded, "No." The sergeant then said, "Take him out of there," ordered Baer to come up front, and ordered everyone else to the back of the pen. Instead of coming up front, Baer "sat down in the middle of the cage." Plaintiff stated that everyone else went to the back of the pen except plaintiff and inmate Green; according to plaintiff, they could not go back because "there was no more room." As plaintiff describes it:

There wasn't any more room. And he [Green] was standing directly in front of Inmate Baer. So they started taking Green out of the holding pen, and that's where everything just a whole jumble of things happened. I ended up getting mixed up in that, because one of officers tried to barge in there and push me into the sergeant, and then I got into a use of force behind it. So a whole lot of events that took place after one move.

**\*3** \* \* \*

Once they started pulling [Green] out [of the pen], other officers barged into the cage. I don't know if done purposely or not, but I was pushed into the sergeant, and from there I was given an assault charge and taken down.

\* \* \*

... [Baer] was sitting there [in the middle of the pen] when Green was being taken out. After I was pushed to the sergeant, I don't know what happened.

Plaintiff's deposition testimony continued:

Q. Was Green eventually taken out?

A. Yes.

Q. Okay. Now, was he still in the cage when you got pushed into the sergeant?

A. I am not sure.

Q. It was all happening at the same time?

A. Yes.

Q. Did you see any officers go to Baer to get him up and out?

A. Not specifically, because by this time it was just chaos in the cage. I was on the floor somewhere. I don't know where.

Q. How many officers were taking out Green?

A. When I first seen, I only saw one before everything just-

Q. When the sergeant said, "Take him of there," meaning Baer, how many officers entered the pen?

A. At the time, there was about five or six.

Q. They entered at the time just to remove Baer because of the goings on?

A. Yes.

Q. Was one of them the sergeant?

A. Yes. There was a sergeant in there.

Q. So the sergeant and/or three or four officers?

A. Quite a few, yes. Something like that.

Q. Okay. So they enter. Then Green is told to move. He doesn't. Somebody, was it one of those officers that entered that tried to remove Green?

A. The first officer that enters, the one that ... talked to him at first trying to remove him. I don't know which officer that was.

Q. Okay. But no additional officers to deal with Green, it was somebody in there from Baer?

A. Right. Once Green, once they saw an officer pulling Green out of the cage, that's when more officers entered the cage.

Q. So I think, and when I try to recap what you just said, I am not trying to put words in your mouth, but tell me if I am doing it wrong. I am trying to make sure I get it right. You said five or six officers came in to deal with Baer; is that right?

A. Something close to, right.

Q. How many more entered once Green became an issue?

A. I have no idea, because by that time I was into the sergeant and on the floor.

Q. Okay. All right. So somebody, as they are rushing in, whether intentional or not, you don't know, pushed you into the sergeant?

A. Right.

Q. Then what happened?

A. From there, I was taken down. I got kneed in the nose.

Q. Do you know who took you to the floor?

A. I am only going by the reports.

Q. Okay.

A. I don't know specifically. Only in the reports that they wrote do I know any names.

Q. Okay.

A. But other than that, at the time of the incident, I didn't know anything.

Q. Okay. At what point in time did you-at some point in time did you see the report?

 **4** A. I saw the reports after I got my misbehavior report, and I got my assistance, and I asked for the use of force report, and the unusual incident report, and everything else.

Q. Okay. Now, once you were taken to the floor, then what happened? Take me through it totally.

A, Once I was taken to the floor, another CO kneed me in the nose. I don't know who.

Q. You don't think it was the same person that took you to the floor? A. I doubt it.

Q. All right. Okay.

A. And once I was lifted, I was pulled [from] the cage by my hair. At the time I had a lot of hair. I was pulled out [of] the cage by my hair, and then I hit the floor again.

Q. Okay. Now when you hit the floor again, were you taken to the floor? Do you know how that happened, the second hitting of the floor?

A. I am not sure.

Q. Okay.

A. I am not sure.

Q. You ended up on the floor?

A. I just ended up on the floor with a couple C.O.s on top of me. I don't know if they fell, if I fell. I have no idea.

Q. There were other officers on the floor with you?

A. Right.

Plaintiff explained that he was then removed from the scene, taken upstairs to "their SHU" and given a ticket. He was placed in a different holding pen where a nurse came to see him within 15 or 20 minutes. According to plaintiff, he told the nurse that his nose hurt, he had pains in his right wrist, which was swollen, and some of his hair "had got pulled out in back." He was not bleeding. He requested and was denied pain medication, although at some later time he was given ibuprofen. He had headaches "off and on" for two or three weeks and his wrist was swollen for a few days, although it did not limit any of his activities.

When the disputed facts are viewed most favorably to plaintiff and considered in combination with the undisputed facts, the record shows the following: a group of 17 or 18 inmates was confined in the pen; one inmate, Baer, became disruptive and refused to comply with Sergeant Sigona's direction to stop; five or six corrections officers entered the pen to remove Baer; the other inmates were directed to move to the back of the pen; there was not room for Green and plaintiff to do so; Green was told to move but did not do so; and corrections officers began removing Green. The evidence further shows that at that point "just a whole jumble of things happened"; more corrections officers entered the pen; as they were entering, one of them-intentionally or not-pushed plaintiff into Sergeant Sigona; it was "chaos" in the pen; a corrections officer took plaintiff to the floor; and plaintiff then "got kneed in the nose," probably by a different corrections officer. Plaintiff was then pulled out of the pen. In his complaint he states that Officer Manna again grabbed him by the hair and pushed his face into the wall, whereas in his deposition, plaintiff stated that he was pulled out of the pen by his hair and "ended up on the floor again" with a couple of corrections officers on top of him, and added: "I don't know if they fell, if I fell." He was then removed and taken to SHU, where a nurse examined him within 20 minutes.

**\*5** The Court agrees with Magistrate Judge Peebles that defendants are entitled to summary judgment dismissing plaintiff's claims of excessive force. It is undisputed that the force used on plaintiff on March 7, 2006 occurred in the context of a disturbance involving 17 or 18 inmates in a holding pen. In plaintiff's own word, it was "chaos." Indeed, plaintiff states that when he was pushed into Sergeant Sindona it may have been unintentional, and that, when he went to the floor a second time, it may have been because he and/or the corrections officers fell. In view of this evidence and the minimal nature of plaintiff's injuries, no rational trier of fact could conclude that plaintiff was subjected to force that was malicious or sadistic for the purpose of causing plaintiff harm and not in a good faith effort to maintain discipline. *See Wright v. Goord,* 554 F.3d 255, 268-69 (2d Cir.2009). For the same reason, there is no basis for a claim of failure to intervene. Moreover, no rational trier of fact could find that plaintiff suffered a serious medical need. As to the other issues raised, the Court agrees with the Report and Recommendation. Accordingly, the Court hold that plaintiff has failed to establish that he is entitled to summary judgment; defendants have demonstrated their entitlement to summary judgment; and plaintiff has failed to show the existence of a material question of fact.

In addition to his objection to the Report and Recommendation (Dkt. No. 42), plaintiff has filed what appears to be an appeal from the Report and Recommendation (Dkt. No. 43). Because Magistrate Judge Peebles did not issue any order which could be the subject of the appeal, the appeal is denied. In the event that plaintiff wishes to appeal from this Memorandum-Decision and Order, he should follow the procedure set forth in the Civil Appeals Packet, which will be provided to him with this decision.

It is therefore

ORDERED that United States Magistrate Judge David E. Peebles's Report and Recommendation (Dkt. No. 41) is accepted and adopted; and it is further

ORDERED that the appeal (Dkt. No. 43) from the Report and Recommendation is denied; and it is further

ORDERED that plaintiff's motion for summary judgment (Dkt. No. 35) is denied; and it is further

ORDERED that defendants' cross motion for summary judgment (Dkt. No. 38) is granted and the complaint dismissed on the merits; and it is further

ORDERED that the Clerk is directed to provide plaintiff with a Civil Appeals Packet.

IT IS SO ORDERED.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Terry Cicio, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983, claiming deprivation of his civil rights. In his complaint plaintiff asserts that he was assaulted by one of the defendants while two others stood by and failed to intervene, and that following the assault medical personnel at the prison facility where the incident took place failed to provide requested medical treatment for his resulting injuries. Plaintiff's complaint seeks both declaratory and monetary relief.

2010 WL 980272

**\*6** Currently pending before the court are cross-motions for summary judgment. Plaintiff initiated the motion process, moving for summary judgment and claiming that the evidence in the record supports a finding in his favor on the issue of liability and that no reasonable factfinder could conclude otherwise. Defendants have responded by both opposing plaintiff's motion and seeking summary judgment dismissing plaintiff's complaint. In their motion defendants assert that based upon the record now before the court no reasonable factfinder could find in plaintiff's favor on any of his claims and that, in any event, they are deserving of qualified immunity from suit under the circumstances presented.

Having carefully reviewed the record considered in light of the arguments of the parties, for the reasons that follow I recommend that defendants' motion be granted and that plaintiff's motion be denied.

I. *BACKGROUND*
The facts forming the basis for plaintiff's claims are not particularly complex, although the parties have given conflicting accounts of the relevant events, particularly with regard to the circumstances surrounding the use of force by prison officials of force against Cicio.

Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"); at the times relevant to his complaint, Cicio was housed at the Auburn Correctional Facility ("Auburn"), located in Auburn, New York. *See generally* Complaint (Dkt. No. 1). On March 7, 2006, while plaintiff was among a group of between sixteen and eighteen inmates confined in the Auburn hospital depot awaiting transfer a disruption occurred involving a fellow prisoner. Complaint (Dkt. No. 1) Statement of Facts ¶ 1; Sigona Decl. (Dkt. No. 38-8) ¶ 3; Manna Decl. (Dkt. No. 38-9) ¶ 3; *see also* Kerwin Aff. (Dkt. No. 38-3) Exh. K (transcript of plaintiff's deposition, conducted on May 15, 2009 and hereinafter cited as "Plaintiff's Dep. Tr." at pp. 8-10). Defendants Sigona, Manna and Ruston, all three of whom are employed as corrections workers at the facility, responded to the incident, entering the cell and ordering all of the inmates to retreat to the back. Complaint (Dkt. No. 1) Statement of Facts ¶ 2, Manna Decl. (Dkt. No. 38-9) ¶ 3; Sigona Decl. (Dkt. No. 38-8) ¶ 3. While those corrections officers attempted to remove the dissident inmate from the cell plaintiff Cicio became involved. It is at this point that the parties' versions of the relevant events significantly diverge.

Plaintiff contends that during the ensuing events he was pushed into defendant Manna, who then grabbed him by the hair and began to pull him toward the cell door, resulting in Cicio being thrown to the floor and kneed in the nose. Complaint (Dkt. No. 1) Statement of Facts ¶ 4; Cicio Decl. (Dkt. No. 40-2) ¶ 4. Plaintiff maintains that after regaining his footing he was again grabbed by the hair and pushed face first into the wall. Complaint (Dkt. No. 1) Statement of Facts ¶ 5. Plaintiff asserts that while this was occurring defendants Sigona and Ruston stood by and watched without coming to his assistance. *Id.*

**\*7** Defendants offer a markedly different version of the relevant events. According to the defendants, while they were attempting to extricate the disruptive inmate from the holding cell Manna issued a direct order to the plaintiff to move to the back of the cage. Plaintiff's Exh. D (Dkt. No. 35-2) Disregarding the order, plaintiff blocked Corrections Officer Manna's path, lunged at him and struck him with a closed fist knocking him to the floor. *Id.; see also,* Manna Decl. (Dkt. No. 38-9) ¶ 4; Sigona Decl. (Dkt. No. 38-8) ¶ 5. Cicio then began yelling to the other inmates in the cage, encouraging them to join in, exclaiming, "let's get them." Plaintiff's Exh. D (Dkt. No. 35-2). At that point, defendants Manna and Sigona attempted to subdue Cicio, who continued to struggle and resist, resulting in Cicio and Officer Manna falling to the floor. Manna Decl. (Dkt. No. 38-9) ¶¶ 4-5; Sigona Decl. (Dkt. No. 38-8) ¶ 5.

As a result of the incident a misbehavior report was subsequently issued by Corrections Officer Manna charging Cicio with disciplinary infractions, including 1) assault on staff; 2) prison takeover; 3) engaging in violent conduct; 4) inciting inmates; 5) disobeying a direct order; 6) physically interfering with an employee; and 7) impeding inmate movement. Mann Decl. (Dkt. No. 38-9) ¶ 7. Following a Tier III disciplinary hearing commenced on March 13, 2006, plaintiff was found guilty of five of the six violations including, *inter alia,* assault on staff. Kerwin Aff. (Dkt. No. 38-3) Exh. I. As a result of that determination plaintiff received a series of sanctions which, after being modified on appeal, included twelve months of confinement in a facility special housing unit ("SHU") with a corresponding loss of packages, commissary, and telephone privileges, and an additional recommendation that plaintiff forfeit twelve months of good time credits. *Id.*

Following the incident plaintiff was immediately removed from the area and taken to be examined by facility medical

personnel. Manna Decl. (Dkt. No. 38-9) ¶ 6. Plaintiff was examined by defendant A. Vega, a registered nurse, within fifteen to twenty minutes after the incident. Cicio Decl. (Dkt. No. 40-2) ¶ 5; Plaintiff's Dep. Tr. at p. 22. During that examination Nurse Vega observed a reddened area on the bridge of plaintiff's nose and noted his reports of minor pain in the nose and head areas. Plaintiff's Dep. Tr. at pp. 25-26; *see also* Kerwin Aff. (Dkt. No. 38-3) Exhs. B and H. Plaintiff was not treated for his injuries nor was he scheduled to see a doctor. Complaint (Dkt. No. 1) Statement of Facts ¶ 8.

Plaintiff claims that following the incident he submitted sick call slips on March 8, 9, 13 and 19, 2006, requesting medical intervention to address his injuries. Complaint (Dkt. No. 1) Statement of Facts ¶¶ 9, 11-12 and 15. Plaintiff contends, however, that those sick call slips were not processed by defendant Ryerson, the nurse administrator at Auburn. *Id.* ¶ 22. Defendant Ryerson denies that allegation and counters that based upon her review of all sick call slips received during the time period involved, there is no record of plaintiff having requested sick call at any time between March 8 and March 20, 2006. Ryerson Decl. (Dkt. No. 38-10) ¶ 4.

 **\*8** As is the case with regard to plaintiff's substantive allegations, the parties disagree over the procedural steps taken by the plaintiff to seek internal review of the relevant events. Plaintiff contends that following the incident he filed two separate grievances, filing the first on March 14, 2006, and both related to the failure of prison officials to permit him to attend sick call. Complaint (Dkt. No. 1) Statement of Facts ¶¶ 14, 16. Plaintiff does not assert in his complaint that he filed a grievance regarding the alleged use of force and failure of prison officials to intervene on his behalf, although in an affirmation in opposition to defendants' summary judgment motion Cicio succinctly states "[p]laintiff filed grievances on both incidents, only one was responded to." *See* Cicio Aff. (Dkt. No. 39) ¶ 3. Plaintiff's motion submission also includes a handwritten memorandum, dated March 14, 2006 and addressed to the facility inmate grievance review committee ("IGRC"), citing the events including the alleged assault by prison officials. *See* Plaintiff's Exhs. (Dkt. No. 35-3) p. 24 of 27.

According to the defendants, the sole grievance filed by plaintiff regarding the incident was submitted on March 24, 2006 and was denied by the facility IGRC on April 3, 2006 after plaintiff was transferred out of Auburn. Graham Decl. (Dkt. No. 38-7) ¶ 6. That denial was subsequently affirmed by defendant Graham, the Superintendent at Auburn,

on April 3, 2006. While plaintiff claims to have appealed that determination on June 12, 2006, presumably to the DOCS Central Office Review Committee ("CORC"), the record contains no further indication of whether that appeal was in fact taken, and if so, the result. *See* Complaint (Dkt. No. 1) Statement of Facts ¶ 18. According to prison officials at Auburn, their research of relevant records at the facility failed to disclose additional documents regarding plaintiff's exhaustion of remedies and, significantly, to show that plaintiff appealed to Superintendent Graham from the disposition of his claimed use of force grievance. *See* Graham Decl. (Dkt. No. 38-7) ¶ 4.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on April 28, 2008.[1] As defendants, plaintiff's complaint names Auburn Superintendent Harold D. Graham; Corrections Sergeant Peter M. Sigona; Corrections Officers Richard D. Ruston and Phil J. Manna; Registered Nurse A. Vega; and Nurse Administrator Ryerson. The complaint alleges varying claims against those defendants including for the alleged use of excessive force and failure to protect the plaintiff from the use of force as well as indifference to his medical needs arising from the incident.[2] *See generally* Complaint (Dkt. No. 1).

[1]    This action was filed in the Western District of New York but was subsequently transferred here by order issued on May 2, 2008 by Chief District Judge Richard J. Arcara. Dkt. Nos. 1, 3.

[2]    In his motion submission, plaintiff also claims to have asserted a cause of action for violation of procedural due process, based upon the defendants' alleged failure to process and investigate his grievances. Plaintiff's Memorandum (Dkt. No. 35-3) at p. 2. Such a claim, if indeed present in this action, is nonetheless subject to dismissal, since it is well established that a prison inmate has no cognizable constitutional right of access to the grievance process or to have grievances which have been filed investigated. *Avent v. Doe,* No. 9:05-CV-1311, 2008 WL 877176, at \*8 (N.D.N.Y. Mar.31, 2008) (Scullin, S.J. & DiBianco, M.J.) (citing *Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003)).

Issue was initially joined in the action by defendant Manna through his filing of an answer on September 25, 2008. Dkt. No. 23. Following the denial of their pre-answer motion

Cicio v. Graham, Not Reported in F.Supp.2d (2010)

2010 WL 980272

seeking dismissal of plaintiff's claims against them on a variety of bases, *see* Dkt. Nos. 29, 32, an answer was filed on behalf of the remaining defendants on February 25, 2009. Dkt. No. 30.

**\*9** On July 15, 2009, following pretrial discovery, plaintiff filed a motion for summary judgment in his favor. Dkt. No. 35. While plaintiff's motion appears to focus on the defendants' use of force, it purports to seek summary judgment on all of his claims. *See id* . On September 28, 2009, defendants responded in opposition to plaintiff's motion and in support of a cross-motion requesting judgment dismissing all of plaintiff's claims against them as a matter of law. Dkt. No. 38. In their motion, defendants argue that 1) plaintiff's deliberate medical indifference claim is legally deficient based both upon his inability to establish the existence of a serious medical need and the lack of evidence of indifference on the part of defendants Vega or Ryerson, the two medical personnel against whom the claim appears to have been lodged; 2) plaintiff's claim surrounding the alleged use of a excessive force and failure to intervene lacks merit; 3) plaintiff's claims against Superintendent Graham are subject to dismissal based upon his lack of personal involvement in the constitutional deprivations alleged; and 4) in any event defendants are entitled to qualified immunity from suit. Plaintiff has since responded in opposition to defendants' motion and in further support of his initial summary judgment motion. Dkt. Nos. 38, 39, 40.

The parties' cross-motions, which are now fully briefed and ripe for determination, have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77,

82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson).* A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**\*10** When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

In a case such as this, where parties have interposed cross-motions for summary judgment, each motion must be independently assessed, using this standard as a backdrop. *See Light Sources, Inc. v. Cosmedico Light, Inc.,* 360 F.Supp.2d 432, 434 (D.Conn.2005).

B. *Excessive Force/ Failure To Intervene*

At the heart of plaintiff's complaint is his claim that on March 7, 2006 he was subjected to an unprovoked attack by defendant Manna and that defendants Sigona and Ruston watched and failed to take any measures to end the assault and that, as a result, he suffered physical injuries. Plaintiff claims that the record supports his excessive force and failure to intervene claims as a matter of law. Defendants counter by arguing that no reasonable factfinder could conclude, based upon the record now before the court, that plaintiff's constitutional rights were violated, even assuming the truth of his version of the relevant events.

*1. Excessive Force*

Plaintiff's excessive force claim must be analyzed under the Eighth Amendment, which proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084 (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 998-999, 117 L.Ed.2d 156 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom ., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

**\*11** Analysis of claims of cruel and unusual punishment requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009)

(citing *Hudson,* 503 U.S. at 7-8, 112 S.Ct. at 999 and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). As was recently emphasized by the United States Supreme Court in *Wilkins v. Gaddy,* however, after *Hudson* the "core judicial inquiry" is focused not upon the extent of the injury sustained, but instead whether the nature of the force applied was nontrivial. --- U.S. - - - -, --- S.Ct. ----, --- L.Ed.2d - - - - , 2010 WL 596513, at *3 (Feb. 22, 2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

> [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) (McAvoy, C.J.) (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140 F.Supp.2d 204, 211 (N.D.N.Y.2001) (Kahn, J.). Even a de *minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9-10, 112 S.Ct. 1000 (citations omitted).

With its focus on the harm done, the objective prong of the inquiry is contextual and relies upon "contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8, 112 S.Ct. at 1000) (internal quotations omitted)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and

what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency are always violated.... This is true whether or not significant injury is evident.' " *Wright,* 554 F.3d at 268-69 (quoting *Hudson,* 503 U.S. at 9, 112 S Ct. at 1000). That is not to say, however, that "every malevolent touch by a prison guard gives rise to a federal cause of action." *Griffen,* 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993)); *see also Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

**\*12** Addressing the objective prong of the Eighth Amendment analysis, the fact that Cicio suffered minor though discernable injuries from the use of force distinguishes this case from others in which the lack of injury has justified summary judgment dismissing excessive force claims under the Eighth Amendment. *See, e.g., Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (the fact that the plaintiff, who claims he was "bumped, grabbed, elbowed, and pushed" by the defendants did not rise to a level of constitutional significance since plaintiff did "not maintain that he experienced any pain or injury as a result of the physical contact"); *Cunningham v. Rodriguez,* No. 01 Civ. 1123, 2002 WL 31654960, at \*5 (S.D.N.Y. Nov. 22, 2002). [3] Under the circumstances now presented it would be inappropriate to find, as a matter of law, that objectively plaintiff's injuries were not sufficiently serious to rise to a constitutionally cognizable level.

[3]      Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Appended decisions deleted for Westlaw purposes.]

Turning to the subjective element, the record is devoid of any evidence from which a reasonable factfinder could conclude that this element of plaintiff's excessive force claim against Manna has been met. Rather than representing an unprovoked use of force, by plaintiff's own version, the use of force against the plaintiff occurred during a period of turmoil when one or more disruptive inmates in a group of between sixteen and eighteen combined in a single holding cell became unruly and were being urged to lash out against corrections officers. Plaintiff alleges in his complaint and states in a sworn declaration that he was pushed into a corrections officer

by Sergeant Sigona, pulled out of the holding pen by his hair, and thrown to the floor and kneed in the nose. During his deposition, however, plaintiff testified that five or six corrections officers rushed into the holding pen directing him to move to the back, which he could not do because there was no room. Plaintiff's Dep. Tr. at pp. 16 and 51. From there, plaintiff is not exactly sure what happened; he does not know whether he was pushed intentionally, only that "[he] was taken down ... [and] ... kneed in the nose." *Id.* at p. 16. Additionally, at the time of the incident, plaintiff did not know who the officers involved were, who "took him down," or who kneed him in the nose, and could not say whether there were also officers on the floor with him. [4] *Id.* at pp. 16-17, 52. Plaintiff further testified that after he fell to the floor, he was lifted and pulled out of the cage by his hair, and then he hit the floor again. *Id.* at p. 18. Again, plaintiff admittedly does not know how he ended up on the floor a second time, or whether he fell or the corrections officers fell on him, although he recalls that he was on the floor with a couple of corrections officers on top of him. *Id.*

[4]      Plaintiff later learned the names of the officers he identified in his complaint when he received a copy of the misbehavior report that was issued to him as a result of the incident. Plaintiff's Dep. Tr. at p. 17.

Under the circumstances presented, even accepting as true plaintiff's version of the events, when considering the four factors informing the subjective analysis no reasonable factfinder could conclude that the force applied was malicious or sadistic for the purpose of causing plaintiff harm and not in a good faith effort to maintain discipline. Moreover, considering the extent of the force applied and the relatively minor injuries suffered even by plaintiff's account, coupled with the lack of evidence of malicious motives on the part of the corrections officers involved, I recommend a finding that the use of force was truly *de minimis* and did not abridge plaintiff's Eighth Amendment rights. [5]

[5]      By plaintiff's own account, the injures suffered as a result of the incident were minor. *See* Plaintiff's Dep. Tr. at pp. 21-26.

### 2. Failure to Intervene

**\*13** A corrections worker who, though not participating, if present when an assault upon an inmate occurs may nonetheless bear responsibility for any resulting constitutional deprivation. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). It is well-established that a law

enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his or her presence by other officers. *See Mowry v. Noone,* No. 02-CV-6257 Fe, 2004 WL 2202645, at *4 (W.D.N.Y. Sept.30, 2004); *see also Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted). In order to establish liability on the part of a defendant under this theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration 1) possessed actual knowledge of the use by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *See Curley,* 268 F.3d at 72; *see also Espada v. Schneider,* 522 F.Supp.2d 544, 555 (S.D.N.Y.2007). Mere inattention or inadvertence, it should be noted, does not rise to a level of deliberate indifference sufficient to support liability for failure to intervene. *See, e.g., Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997) (noting that "liability in a § 1983 'excessive force' action cannot be founded on mere negligence") (citing, *inter alia, Daniels v. Williams,* 474 U.S. 327, 335-36, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986)).

Based upon my finding that plaintiff's Eighth Amendment rights were not violated through the actions of defendant Manna, there can be no cognizable claim for liability on the part of defendants Sigona and Ruston for failure to intervene and protect plaintiff from the constitutional violation. *See Curley,* 268 F.3d at 72. I therefore recommend that plaintiff's claims against those defendants be dismissed as well.

### C. *Medical Indifference*

The second component of plaintiff's complaint alleges that defendants Vega and Ryerson failed to provide him with needed medical treatment. Plaintiff's claim against Nurse Vega apparently stems from her failure, upon examining Cicio immediately following the March 7, 2006 incident, to arrange for him to see a doctor or to prescribe pain medication. The allegations against defendant Nurse Administrator Ryerson result from her alleged failure to process sick call slips submitted on several occasions following the incident by plaintiff. While plaintiff's summary judgment motion does not speak directly to this claim, he apparently seeks summary judgment on the issue of liability on this claim as well. For their part, defendants urge dismissal of plaintiff's medical

indifference claims as a matter of law due to his failure to assert the existence of a serious medical need and additionally for lack of any evidence to satisfy the subjective element of the controlling test.

**\*14** Claims that prison officials have intentionally disregarded an inmate's medical needs are encompassed within the Eighth Amendment's prohibition of cruel and unusual punishment. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291 (1976). The Eighth Amendment's prohibition of cruel and unusual punishment proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.; see also Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084 (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer); Waldo,* 1998 WL 713809, at *2 (same).

### 1. *Serious Medical Need*

In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious' ". *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S.

1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance,* 143 F.3d at 702). Relevant factors informing this determination include whether the plaintiff suffers from an injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or " 'the existence of chronic and substantial pain.' " *Chance,* 143 F.3d at 701 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr.3, 2002) (Sharpe, M.J.) (citation omitted).

**\*15** The record in this case fails to establish that plaintiff experienced a serious medical need of constitutional proportions as a result of the incident complained of. Plaintiff alleges that during the incident he suffered from a swollen and painful wrist as well as head pain. Complaint (Dkt. No. 1) Statement of Facts ¶ 6; *see also* Plaintiff's Dep. Tr. at pp. 21-22, 24-26. The record, including plaintiff's submission in support of his summary judgment motion and later opposition to defendants' motion, fails to provide further elaboration and contains no evidence of any extreme pain or degeneration. Instead, the record discloses only injuries of a transitory nature which are insufficient to establish existence of a serious medical need of constitutional proportions. *Ford v. Phillips,* No. 05 Civ. 6646(NRB), 2007 WL 946703, at *12 (S.D.N.Y. Mar.27, 2007) (finding that minor bruising, slight bleeding, and abrasions are no injuries that may produce death, degeneration or extreme pain and that no reasonable juror could find otherwise).

### 2. *Deliberate Indifference*

In addition to establishing the existence of a serious medical need, to prevail on an Eighth Amendment claim a plaintiff must also establish indifference to that condition on the part of one or more of the defendants. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291. Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that

a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979); *Waldo,* 1998 WL 713809, at *2 (same).

It should be noted that the Eighth Amendment does not afford prisoners a right to medical treatment of their choosing; the question of which diagnostic techniques and treatments should be administered to address an inmate's medical condition is a "classic example of a matter for medical judgment", and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703 (citation omitted); *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998) (citation omitted).

The record now before the court fails to substantiate plaintiff's claims of deliberate indifference. Even if plaintiff could establish the existence of a serious medical need, the record does not provide a basis for a reasonable factfinder to conclude that either defendant Vega or defendant Ryerson was deliberately indifferent to such a need. Plaintiff's claim against Nurse Vega is that on one occasion she failed to provide pain medication or to refer the plaintiff to a physician as a result of his injuries. Such an allegation of a single instance of delayed or denied medical care does not establish constitutional claim of medical deliberate indifference. *See Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir.2003).

**\*16** Turning to the allegations against defendant Ryerson, those stem from an alleged failure to process sick call slips on four or five occasions following the March 7, 2006 incident. Even assuming the existence of a serious medical condition prompting the need for medical care and defendant Ryerson's failure to process sick call slips over a brief period of time, these facts alone do not suffice to establish a deliberate indifference claim as against defendant Ryerson since there is no evidence suggesting that the minimal delay caused any significant adverse effect to plaintiff's health. *See Bumpus v. Canfield,* 495 F.Supp.2d 316, 324 (W.D.N.Y.2007). Accordingly, I recommend dismissal of plaintiff's deliberate indifference claim against defendant Ryerson on this alternative basis.

### D. *Personal Involvement*

In their motion defendants assert that even if plaintiff could establish a cognizable excessive force or deliberate

indifference claim, his cause of action against defendant Graham, the superintendent at Auburn, is legally insufficient based upon his lack of personal involvement in any conduct forming the basis for those claims.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a section 1983 cause of action against an individual a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

Importantly, a supervisor like Superintendent Graham cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability. *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) ("To the extent that [a] complaint attempts to assert a failure-to-supervise claim ... [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights."). Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007), *rev'd on other grounds, sub nom., Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 2931 (2009); *see also Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

**\*17** In my earlier report and recommendation, addressing a pre-answer dismissal motion filed by certain of the defendants including Superintendent Graham, I recommended against dismissing plaintiff's claim against defendant Graham, finding that the proof at trial could potentially establish that defendant Graham learned, through the appeal of plaintiff's grievance denial, that he was deprived of medical care at a point when he had an opportunity to cure that alleged constitutional deficiency. *See* Report and Recommendation dated February 10, 2009 (Dkt. No. 29) at pp. 17-21. The more fully developed record now before the court, however, firmly establishes that this is not the case. There is no indication that defendant Graham was aware of plaintiff's circumstances prior to plaintiff's appeal on April 12, 2006 of the IGRC's grievance denial. *See* Graham Decl. (Dkt. No. 38-7) ¶ 6. By that point, plaintiff had been transferred out of Auburn, and thus even if defendant Graham was placed on notice of a constitutional deprivation in the form of denial of adequate medical treatment, he was no longer in a position to cure that deficiency. *Id.* Accordingly, because the record fails to disclose any basis on which defendant Graham could be held liable for the constitutional violations alleged, there is an independent, alternate basis for dismissing plaintiff's claims against him.

### IV. SUMMARY AND RECOMMENDATION

The record in this case discloses no basis on which a reasonable factfinder could conclude that plaintiff's constitutional right to be free from cruel and unusual punishment was violated by defendant Manna during the course of the March 7, 2006 incident and that defendants Sigona and Ruston failed to intervene to prevent such a violation. The record similarly discloses no basis on which a reasonable factfinder could conclude that plaintiff suffered injuries of constitutional significance as a result of that incident or that the defendants were subjectively indifferent to the medical needs presented by those injuries. Finally, the record discloses no basis on which a reasonable factfinder could assign liability on the part of defendant Graham, as superintendent of the Auburn Correctional Facility. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 38) be GRANTED and that plaintiff's complaint be dismissed in its entirety, and that based upon that determination plaintiff's summary judgment motion (Dkt. No. 35) be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE

TO SO OBJECT TO THIS REPORT WILL PRECLUDE
APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P.
6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a
copy of this report and recommendation upon the parties in
accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 980272

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 767103
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Darwin COLUMNA, Plaintiff,

v.

The CITY OF NEW YORK, Police Officer Genner
Gomez, and Detective Pedro Romero, Defendants.

1:19-cv-3801 (MKV)

|

Signed 03/14/2022

**Attorneys and Law Firms**

Mark Joseph Abate, Goodwin Procter, LLP, New York, NY,
for Plaintiff.

Darwin Columna, Bronx, NY, Pro Se.

Katherine Jane Weall, New York City Law Department, New
York, NY, for Defendants NYPD Officer Genner Gomez,
NYPD Officer Pedro Romero, The City of New York.

### ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

MARY KAY VYSKOCIL, United States District Judge:

 **\*1** Plaintiff Darwin Columna, proceeding *pro se*, brings
this action for alleged violations of his civil rights in
connection with an arrest and prosecution for drug possession.
Defendants the City of New York (the "City"), Officer
Genner Gomez, and Detective Pedro Romero have moved
for summary judgment on all claims except the false arrest
claim against Officer Gomez. [ECF No. 95]. For the reasons
stated herein, the Court grants in part Defendants' motion for
summary judgment.

### BACKGROUND [1]

[1]    The Court cites to Plaintiff's Rule 56.1
counterstatement [ECF No. 103] ("56.1")
throughout because it contains the Parties'
assertions and responses.

On April 26, 2016, Plaintiff was approached by Officer
Gomez and Detective Romero. 56.1 ¶¶ 1-2. As the officers
arrived, an acquaintance standing with Plaintiff "pulled out a
small bag" containing Phencyclidine (PCP) "and threw it on
the ground." 56.1 ¶¶ 3-4. Plaintiff's acquaintance stated that
the bag was his, and Detective Romero "approached, searched
and arrested [him]." 56.1 ¶ 6. Officer Gomez then turned his
attention to Plaintiff, asked him for his identification, and
Plaintiff reached into his pocket to retrieve it. 56.1 ¶¶ 7-9.
After Officer Gomez searched Plaintiff and found nothing on
his person, a third officer arrived at the scene. 56.1 ¶¶ 9-12.
That officer held Plaintiff while Officer Gomez reached down
to pick up the bag. 56.1 ¶ 13. Plaintiff's acquaintance then
said "that's mine," and Officer Gomez said "that's not his."
56.1 ¶ 12. Officer Gomez looked at Detective Romero who
"simply nodded." 56.1 ¶ 12. Officer Gomez then "arrested
and handcuffed [P]laintiff for possession of the bag of PCP."
56.1 ¶ 13.

The third officer then "drove [P]laintiff to the precinct
stationhouse in his car." 56.1 ¶ 14. While en route, Plaintiff
began using his phone, causing the officer to get out and grab
Plaintiff's pinky "while trying to get the phone." 56.1 ¶ 15.

Once at the precinct, Plaintiff was placed in a holding cell.
56.1 ¶ 16. "An unidentified officer" then escorted Plaintiff
for fingerprinting and asked him to remove his rosary. 56.1
¶ 17. He was also told that he may be strip searched. 56.1 ¶
18. "Plaintiff refused to take off his rosary necklace and to
consent to a cavity search." 56.1 ¶ 19. After some back and
forth with the officers at the precinct, the sergeant ordered
that Plaintiff's rosary be cut off. 56.1 ¶¶ 22-25. After a further
struggle, Plaintiff was tased. 56.1 ¶¶ 28-29.

Plaintiff was arraigned the next day on the drug charges
and was released. 56.1 ¶¶ 35-36. On October 19, 2017, the
criminal case was dismissed on New York state speedy trial
grounds. 56.1 ¶ 39.

Plaintiff commenced this case on April 26, 2019, suing the
City of New York, Officer Gomez, and Detective Romero.
56.1 ¶ 41. On September 16, 2019, Plaintiff filed an Amended
Complaint [ECF No. 19] that added as defendants Officer
Josue Perez, Detective Pedro Roche, and a still unidentified
"Officer John Doe 2." 56.1 ¶ 42. On August 25, 2020 the
Court issued an Opinion dismissing then-defendants Josue
Perez and Pedro Roche on statute of limitations grounds.
[ECF No. 65] (the "August 25 Opinion").

## LEGAL STANDARD

**\*2**  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 133 (2d Cir. 2016) (quoting Fed. R. Civ. P. 56(a)). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the burden of demonstrating that no genuine factual dispute exists and that it is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247-49, 106 S.Ct. 2505. It may satisfy this burden "by submitting evidence that negates an essential element of the non-moving party's claim" or "by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (quoting *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988)). If the movant satisfies its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citing *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505).

Local Civil Rule 56.1 requires a party moving for summary judgment to annex to its motion a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civ. R. 56.1(a). The party opposing the motion must then respond to the factual assertions of the movant. Local Civ. R. 56.1(b). If the party opposing summary judgment fails to respond, the factual assertions may be deemed admitted. Local Civ. R. 56.1(c); *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004). *Pro se* litigants are not excused from this rule. *Parker v. Fantasia*, 425 F. Supp. 3d 171, 176 n.2 (S.D.N.Y. 2019) (quoting *Brandever v. Port Imperial Ferry Corp.*, No. 13-CV-2813, 2014 WL 1053774, at \*3 (S.D.N.Y. Mar. 13, 2014)).

## DISCUSSION

As a threshold matter, the Court addresses the Defendants' request to disregard Plaintiff's Rule 56.1 counterstatement and deem abandoned certain claims not addressed in his opposition. *See* Reply at 1-3. On May 27, 2021, the Court entered an order setting a briefing schedule for any motion for summary judgment. [ECF No. 94]. Defendants timely filed their motion [ECF No. 95] and supporting papers, including a memorandum of law in support [ECF No. 98] ("Mem."). Plaintiff then asked that the Court extend his time to respond to the motion, which the Court did. [ECF Nos. 100-102]. A week after the extended deadline had passed, Plaintiff submitted a Rule 56.1 counterstatement [ECF No. 103], and memorandum in opposition [ECF No. 104] ("Opp."). Defendants then filed a reply in further support of their motion. [ECF No. 108] ("Reply").

Plaintiff writes that he "lack[s] resources" and "is unable to articulate specific legal arguments against all those raised by Defendants." Opp. at 1. Plaintiff implores "the Court [to] conduct its own assessment of those arguments" and " 'in its discretion opt to conduct an assiduous review of the record.' " Opp. at 1 (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001)).

**\*3**  Defendants believe that the deficiencies in Plaintiff's submissions are fatal to his case. On reply, Defendants argue that the failure to provide citations to record evidence in his Rule 56.1 counterstatement mean the Court must disregard it. Reply at 1. Defendants further contend that Plaintiff has abandoned his excessive force, free exercise, destruction of property, and *Monell* claims by failing to address them directly in his opposition. Reply at 2-3.

The Court is highly sympathetic to *pro se* plaintiffs, who may find themselves with no recourse but to seek relief— alone—before the Southern District. Plaintiffs who represent themselves may do so for any variety of reasons, including, for example, a "lack [of] resources." Opp. at 1. Indeed, this Court is "ordinarily obligated to afford a special solicitude to *pro se* litigants." [2] *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010).

2

>    At various times during this case Plaintiff has had the limited assistance of counsel. Goodwin Proctor LLP represented Plaintiff on a limited,

2022 WL 767103

*pro bono* basis for the purpose of fact discovery depositions. [ECF Nos. 68, 76, 94]. As Defendants point out, Plaintiff also availed himself of the New York Legal Assistance Group's Legal Clinic for *Pro Se* Litigants to assist him in drafting his opposition. Opp. at 1 n.2. That clinic also assisted in the drafting of Plaintiff's "statement of facts" annexed to his Amended Complaint. *See* Statement of Facts at 1 n.1. The limited assistance Plaintiff has received in this case does not negate the fact that Plaintiff is proceeding *pro se*. *See* ECF No. 94 (noting that Plaintiff's limited representation by Goodwin Proctor LLP had concluded, and he was therefore proceeding *pro se*).

The Court will not disregard Plaintiff's statements in his Rule 56.1 counterstatement as Defendants request. "[W]hile a court 'is not required to consider what the parties fail to point out' in their Local Rule 56.1 statements, it may in its discretion opt to 'conduct an assiduous review of the record.' " *Holtz*, 258 F.3d at 73 (quoting *Monahan v. New York City Dep't of Corrections*, 214 F.3d 275, 292 (2d Cir. 2000)). However, where no citation in the record would support Plaintiff's contentions, and where the record otherwise does not raise a triable issue, the Court cannot deny summary judgment simply because Plaintiff asks the Court to do so. *See id.* at 73-74; *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (a "*pro se* party's bald assertion, completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment.").

Similarly, the Court will not deem Plaintiff's claims abandoned as Defendants urge. Rather, the Court construes the *pro se* Plaintiff's pleadings to raise the strongest arguments possible. *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017). A determination that an opposing party has waived or abandoned a claim is discretionary and the Court opts not to exercise that discretion in this case. *See Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts *may* deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.") (emphasis added).

Following a detailed review of the record in this case, the Court concludes that Defendants are entitled to summary judgment on Plaintiff's federal claims under 42 U.S.C. § 1983 for excessive force, destruction of property, and *Monell*, and his free exercise claims, in addition to Plaintiff's "other pendent state law claims." Am. Compl. at 2. Defendants

are not entitled to summary judgment on Plaintiff's federal malicious prosecution claim, the false arrest claim against Detective Romero, or Plaintiff's first amendment retaliation claim.

## I. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FEDERAL EXCESSIVE FORCE, FREE EXERCISE, DESTRUCTION OF PROPERTY, AND *MONELL* CLAIMS

### A. Plaintiff's Claims of Excessive Force and Free Exercise Fail for Lack of Personal Involvement

**\*4** Plaintiff asserts broad violations of his right to free exercise of religion and his right to be free from excessive force against Detective Romero and Officer Gomez.

"It is well settled in this Circuit that the 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Jones v. Permley*, 714 F. App'x 42, 46 (2d Cir. 2017) (quoting *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)). Personal involvement may be established by a showing of direct participation, namely "personal participation by one who has knowledge of the facts that rendered the conduct illegal," or indirect participation "such as ordering or helping others to do the unlawful acts." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001). Generally, personal involvement is a question of fact, but summary judgment may be granted where no issue of material fact exists and the defendant is entitled to judgment as a matter of law. *Burke*, 449 F.3d at 484. The undisputed facts are that Detective Romero or Officer Gomez did not have personal involvement in the circumstances alleged in support of Plaintiff's excessive force or free exercise claims.

Plaintiff's excessive force claim arises from his post-arrest transport to the precinct. 56.1 ¶ 15 (the "serious injury to Plaintiff's finger" occurred "on route to the precinct stationhouse."). Plaintiff admits that neither Officer Gomez nor Detective Romero drove Plaintiff to the precinct, and neither was the officer who "got out and grabbed [P]laintiff's pinky." 56.1 ¶¶ 14-15. To the extent the Court construes Plaintiff's Amended Complaint to raise an excessive force claim based on him being tasered at the precinct for noncompliance with the officers orders, *see* 56.1 ¶¶ 28-29 (stating Sergeant Perez tasered Plaintiff), it is similarly undisputed that Officer Gomez and Detective Romero had no personal involvement in the tasering. As such, Officer

Gomez and Detective Romero lack the requisite personal involvement in any purported constitutional violation under Section 1983 with respect to Plaintiff's excessive force claim.

Similarly, Plaintiff's free exercise claim does not personally involve Officer Gomez or Detective Romero. At the precinct, an unknown officer told Plaintiff to remove his rosary. 56.1 ¶ 17. Plaintiff refused because it was "a religious expression and did not pose any threat." 56.1 ¶ 19. Ultimately, that unknown officer was directed to "cut [P]laintiff's rosary necklace off." 56.1 ¶ 24. Neither Officer Gomez nor Detective Romero gave that order or otherwise were involved. *See* 56.1 ¶¶ 17-25. As a result, they cannot be held liable under Section 1983 because they lack any personal involvement in the facts and circumstances on which Plaintiff bases his free exercise claim.

In sum, the record does not raise a triable issue of material fact that would preclude summary judgment at this stage, and Defendants Romero and Gomez are entitled to judgment as a matter of law. The Court therefore grants Defendants' motion for summary judgment with respect to Plaintiff's excessive force and free exercise claims.

### B. The Record is Devoid of Support for a Triable Monell Claim

 **\*5** Under the Supreme Court's decision in *Monell v. Department of Social Service*, local governments and individuals in their official capacity may be held liable in Section 1983 actions when it can be shown that "the denial of a constitutional right [ ] was caused by an official municipal policy or custom." *Bellamy v. City of New York*, 914 F.3d 727, 756 (2d Cir. 2019).

The Court construes Plaintiff's Amended Complaint to assert a *Monell* claim against the City of New York (which otherwise does not appear to be related to any other cause of action in this case). Plaintiff alleges no facts, and the record otherwise does not indicate, that any action by any individual Defendant was caused by a policy or practice of the City. Plaintiff does not point to the existence of any policy or custom, much less draw a cognizable nexus between any purported inadequacy and any constitutional violation.

A defendant may be entitled to summary judgment "by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017). Plaintiff

contends in his 56.1 statement that there are "[g]rounds to support Plaintiff's Monell claims," which are "related to a broad policy, arbitrarily applied, of confiscating certain personal property from prisoners prior to incarceration." 56.1 ¶ 50. In that statement, he directs the Court to the depositions of Officer Gomez and Detective Romero. 56.1 ¶ 50. The Court has reviewed the portions of the depositions in the record [ECF No. 96-4] ("Gomez Dep. Tr.") [ECF No. 96-5] ("Romero Dep. Tr.") and has not found anything that would indicate the actions taken were a result of an impermissible policy or custom.

The only reference to a custom in the record on this motion is that during processing at the precinct following arrest, the officers followed a procedure that prohibited detainees from "go[ing] into the cell with any string that you could use to hang [themselves]." And, the record reflects that Plaintiff was asked to remove his rosary. Gomez Dep. Tr. 151:5-21. "[A] challenged prison regulation is judged under a reasonableness test: a regulation that burdens a protected right passes constitutional muster if it is reasonably related to legitimate penological interests." *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006) (internal quotation marks omitted). Plaintiff bears the burden of proving that the disputed procedure is unreasonable. *See Giano v. Senkowski*, 54 F.3d 1050, 1053 (2d Cir. 1995). It is manifestly obvious that preventing detainees from hanging themselves is a legitimate penological interest. Significantly, Plaintiff himself seems to acknowledge that the removal of his rosary may not have been a result of a policy, regulation, or custom at all. *See* 56.1 ¶ 20 (stating that the removal of his rosary was, in his view, "more [a result of] a power struggle over his refusal to cooperate with a strip and cavity search [than a] strict enforcement of any policy.").

At bottom, Plaintiff does not make out a colorable *Monell* claim. Defendants are therefore granted summary judgment on any *Monell* claim, to the extent that Plaintiff's Amended Complaint could be construed to raise one.

### C. Plaintiff's Property Claim Does Not Raise a Constitutional Violation

 **\*6** The Court construes Plaintiff's Amended Complaint to assert a Fourteenth Amendment claim for destruction of property when his rosary necklace was cut. *See* Am. Compl. at 2. "[T]he Due Process Clause of the Fourteenth Amendment is not violated when a state employee intentionally deprives an individual of property or liberty, so long as the State provides a meaningful post deprivation remedy." *Hellenic*

Columna v. City of New York, Slip Copy (2022)

2022 WL 767103

*Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996). "Courts in this Circuit have consistently held that state law causes of action are adequate post-deprivation remedies in the context of § 1983 actions." *Liranzo v. City of New York*, 2012 U.S. Dist. LEXIS 178872, at *33 (S.D.N.Y. Dec. 11, 2012). The failure to pursue those remedies does not convert Plaintiff's property claim into a constitutional violation. *See Dove v. City of New York*, 2000 U.S. Dist. LEXIS 4053, 2000 WL 342682, at *3 (S.D.N.Y. Mar. 30, 2000) ("Because New York provides an adequate post-deprivation remedy in the form of state law causes of action for negligence, replevin, or conversion, [plaintiff's] § 1983 claim for the loss of his property is dismissed.") Accordingly, Defendants are entitled to summary judgment on Plaintiff's destruction of property claim.

## II. PLAINTIFF'S STATE LAW CLAIMS ARE BARRED BY FAILURE TO COMPLY WITH THE STATE NOTICE OF CLAIM LAW AND ARE UNTIMELY

Plaintiff's Amended Complaint alleges "pendent state law claims." Am. Compl. at 2. It is well settled that federal courts presiding over state law claims against municipalities must apply any applicable state law notice-of-claim provisions. *Johnson v. City of New York*, 2019 U.S. Dist. LEXIS 10867, at *34 (S.D.N.Y. Jan. 23, 2019). New York General Municipal Law provides that "[n]o action ... shall be prosecuted or maintained against the city ... or any employee ... unless a notice of a claim shall have been made and served upon the city." N.Y. Gen Mun. Law ("GML") § 50-i(1). A plaintiff bringing tort claims against a municipality or its agent must plead "that (1) the plaintiff has served the notice of claim; (2) at least thirty days have elapsed since the notice was filed (and before the complaint was filed); and (3) in that time the defendant has neglected to or refused to adjust or to satisfy the claim." *Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999). The notice must be served in compliance with New York General Municipal Law § 50-e, which requires that the "[t]he notice shall be served on the public corporation against which the claim is made by delivering a copy thereof personally, or by registered or certified mail, to the person designated by law ..., or to an attorney regularly engaged in representing such public corporation." GML § 50-e(3)(a). Notice of claim requirements are construed strictly by New York state courts and "[f]ailure to comply with [them] ordinarily requires dismissal." *Hardy*, 164 F.3d at 793 (citing *Murray LeRoy Cent. Sch. Dist.*, 67 N.Y.2d 775, 775, 500 N.Y.S.2d 643, 643, 491 N.E.2d 1100, 1100 (1986)).

As a threshold matter, Plaintiff's Amended Complaint is deficient because it does not plead, as required, that a notice of claim was served, that thirty days have elapsed since that service was made, and that the Defendants have neglected to satisfy the claim. *See Hardy*, 164 F.3d at 793; GML § 50-i. A notice of claim is a condition precedent to bringing personal injury actions against municipalities and their agents; failure to comply speaks to the subject matter jurisdiction of this Court to consider the state-law claims. *See id.*

While that failure to plead alone would be fatal to Plaintiff's case, the Court has nonetheless reviewed whether Plaintiff did in fact comply with the notice of claim requirements and concludes that he has not. Plaintiff attempted to serve his notice of claim on the Office of the Comptroller of the City of New York by regular mail. 56.1 ¶¶ 45-46; ECF No. 96-7 ("Notice of Claim"). GML § 50-e requires that service be effectuated either by certified mail or by personal delivery to the Office of the Comptroller. GML § 50-e(3)(a). In response to the deficient service, Defendants sent Plaintiff a notice that directed him to file a notice of claim "by a proper method of service within 10 days of receipt of this letter." Notice of Claim at 7; 56.1 ¶ 46; GML § 50-e(3)(d) (defective notice timely received may be cured if new notice is returned within ten days of notification that it was deficient). Plaintiff does not dispute that he did not respond to the notice to cure letter. Instead, Plaintiff argues there is no proof he ever received it. Opp. at 3; *see also* 56.1 ¶ 46.

**\*7** The Court cannot credit Plaintiff's argument. "It is well settled that proof that a letter was mailed creates a presumption that the letter reached its destination and was actually received by the person to whom it was addressed." *Orix Credit Alliance v. Phillips-Manhen, Inc.*, 1993 WL 183766, at *7 (S.D.N.Y. May 26, 1993); *Osele v. United States Attorney*, 190 Fed. Appx. 96, 97 (2d Cir. 2006) ("A properly addressed piece of mail placed in the care of the Postal service is presumed to have been delivered."); *cf. Duncan v. City of New York*, 2018 U.S. Dist. LEXIS 117126, at *10 (E.D.N.Y. June 19, 2018) (failure to comply with notice of claim requirements are strictly construed, "even where the proffered reason [for non-compliance] is that plaintiff never received the notice, though the City has mailed the demand."). Plaintiff otherwise concedes that he did not properly serve and did not respond to the notice of defective service. 56.1 ¶ 46. The Court cannot exempt Plaintiff from the notice of claim requirements under New York law. *See Bell v. Jendell*, 980 F. Supp. 2d 555, 559, (S.D.N.Y. 2013).

Even if this Court could overlook the issues relating to the notice of claim, Plaintiff's state law claims are time-barred. New York's General Municipal Law requires that claims against municipalities and their employees must be "commenced within one year and ninety days after the happening of the event upon which the claim is based." GML § 50-i(1)(c). "With the expiration of the [50-i(1)] period of limitations comes the bar to any claim." *Pierson v. City of N.Y.*, 56 N.Y.2d 950, 955, 439 N.E.2d 331, 333, 453 N.Y.S.2d 615 (1982). Plaintiff commenced this action on April 26, 2019. *See* ECF No. 1; 56.1 ¶ 49. Plaintiff's (deficient) Notice of Claim states that his claim "arose on April 26, 2016 when he was arrested. Notice of Claim at 5. He was arraigned on the charges underlying the arrest on April 27, 2016. 56.1 ¶ 48; ECF No. 96-8. The criminal charges were ultimately dismissed on October 19, 2017. 56.1 ¶ 49. Therefore, Plaintiff's claims had to be commenced, at the very latest, by January 17, 2019 (*i.e.*, one year and ninety days after his charges were dismissed). Plaintiff does not dispute that this action was not filed within the requisite time period applicable to his claims. *See* 56.1 ¶ 49 (Plaintiff "[a]gree[s]" that this action was filed "more than 1 year and 90 days after the criminal charge against the plaintiff was dismissed" and contends that he "commenced this action as soon as he could after being released from prison.").

In sum, the Plaintiff has not shown, and the record does not otherwise raise, a material dispute of fact that would preclude summary judgment on his state law claims. Defendants are therefore granted summary judgment on Plaintiff's state law claims.

### III. THERE ARE TRIABLE ISSUES OF FACT WITH RESPECT TO PLAINTIFF'S SECTION 1983 CLAIMS FOR MALICIOUS PROSECUTION, FIRST AMENDMENT RETALIATION, AND FALSE ARREST

#### A. Plaintiffs' Malicious Prosecution Claim Survives Because the Underlying Prosecution Terminated in Plaintiff's Favor

In its August 25 Opinion dismissing then-defendants Perez and Roche from the case, the Court determined that the Amended Complaint alleged a malicious prosecution claim against Officer Gomez only. *See* Opinion at 6 n.2. To prevail on a Section 1983 claim for malicious prosecution, Plaintiff must show "a seizure or other perversion of proper legal procedures implicating [his] personal liberty and privacy interests under the Fourth Amendment." *Lanning v. City of*

*Glens Falls*, 908 F.3d 19, 24 (2d Cir. 2018) (internal quotation marks omitted) (alteration in original). Plaintiff must also show that "criminal proceedings were initiated or continued against him, with malice and without probable cause, and were terminated in his favor." *Id.*

**\*8** The underlying criminal prosecution against Plaintiff was dismissed on New York state speedy trial grounds pursuant to Section 30.30 of New York's Criminal Procedure Law. 56.1 ¶ 39; ECF No. 96-6 ("Criminal Court File"). Defendants contend that a "speedy trial dismissal does not constitute favorable termination for § 1983 purposes." Mem. at 7. That is a misstatement of the law.

The Second Circuit has held that "a speedy trial dismissal is generally a favorable termination for purposes of a malicious prosecution claim under Section 1983." *Kee v. City of New York*, 12 F.4th 150, 165 (2d Cir. 2021). Under *Kee*, a speedy trial dismissal creates a rebuttable presumption that a defendant must overcome by presenting evidence of a " 'non-merits-based explanation for the failure to pursue the prosecution' of the plaintiff." *Id.* (quoting *Murphy v. Lynn*, 118 F.3d 938, 951 (2d Cir. 1997)). Here, Officer Gomez point to no evidence in the record to rebut the presumptive favorable termination of the underlying prosecution of Plaintiff.[3] The 56.1 statement contends that "[t]he criminal court files do not contain any information or documents indicating that [sic] plaintiff's innocence or that he was not guilty, but rather reflects that the charges were dismissed on procedural grounds." 56.1 ¶ 40. In support, Officer Gomez cites to the Criminal Court File [ECF No. 96-6] that contains the disposition of Plaintiff's underlying prosecution. *Id.* (citing Criminal Court File). That file simply states that the Government "concede[s] 30.30 – dismissed & sealed." Criminal Court File at 1.

[3]    The Court notes that the Second Circuit's decision in *Kee* is relatively new. Prior to *Kee*, district courts in the Second Circuit disagreed on whether a speedy trial dismissal was a favorable termination for purposes of a Section 1983 claim. *Compare Minus v. City of New York*, 488 F. Supp. 3d 58, 66 (S.D.N.Y. 2020) (speedy trial dismissals not favorable terminations) *with Blount v. City of New York*, 2019 WL 1050994, at *5 (E.D.N.Y. Mar. 5, 2019) (speedy trial dismissals are favorable terminations). Defendant's motion for summary judgment was filed before the Second Circuit's decision in *Kee*. *See* ECF No. 95. However,

Columna v. City of New York, Slip Copy (2022)

2022 WL 767103

*Kee* should not come as a surprise to the Defendants. Plaintiff directly cites *Kee* in his opposition as the principal authority rebutting Defendants' malicious prosecution arguments. Opp. at 2 (noting that *Kee* was decided after Defendants' opening brief). Defendants did not address *Kee* or otherwise respond to Plaintiff's malicious prosecution arguments on reply.

It is the Court's view that *conceding* a speedy trial issue is not the same as a non-merit-based explanation for the failure to pursue the Plaintiff's prosecution. Under *Kee*, Officer Gomez must rebut with evidence the presumption that the speedy trial dismissal was a favorable termination. Noting that the "files do not contain any information ... indicating ... plaintiff's innocence," 56.1 ¶ 40, is not sufficient. *See Kee*, 12 F.4th at 165-66 (because dismissal on speedy trial grounds is "generally (or presumptively) a favorable termination" it is error to dismiss where "there is no evidence in the record to support a non-merits-based reason for the dismissal."). Indeed, a statement that no evidence indicates innocence, and therefore the termination was not in Plaintiff's favor, would improperly shift the burden on summary judgment to the Plaintiff. *See id.* at 158. On the pending motion, the Court resolves all ambiguities and credits all factual inferences that could be rationally drawn in favor of the non-moving party. *See id.*; *Cifra v. General Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001). Officer Gomez's motion for summary judgment on Plaintiff's Section 1983 claim for malicious prosecution is therefore denied.

### B. Plaintiff's False Arrest Claim Raises Material Issues of Fact that Preclude Summary Judgment

**\*9** Defendants concede that Plaintiff's false arrest claim as against Officer Gomez should proceed,[4] but seek summary judgment dismissing that claim against Detective Romero. Plaintiff states that Detective Romero was not the officer who arrested and handcuffed Plaintiff. *See* 56.1 ¶ 13 (Plaintiff "[a]gree[s] that Officer Gomez walked back over to Plaintiff and handcuffed him, but he did not explain why Plaintiff was being arrested at that time."). During his deposition Plaintiff affirmed that Officer "Gomez handcuffed me," and "placed me under arrest." ECF No. 96-3 ("Pl. Dep. Tr.") at 72:18-22.

[4]    *See* Mem. at 14 (arguing "the Court should not hesitate to dismiss this case with prejudice, save for the false arrest claim against Officer Gomez.").

A reasonable jury could find that Detective Romero was personally involved in Plaintiff's purportedly false arrest. As stated previously, the personal involvement requisite for an award of damages under § 1983 may be shown by direct or indirect involvement. Direct participation is the "personal participation by one who has knowledge of the facts that rendered the conduct illegal," and indirect participation may be shown by establishing that the individual "order[ed] or help[ed] others to do the unlawful acts." *Provost*, 262 F.3d at 155.

In his 56.1 counterstatements, Plaintiff contends that after arresting the other individual on the scene, Detective Romero waited while "Officer Gomez picked the plastic bag [containing the drugs found at the scene] off the ground." 56.1 ¶ 12. When Plaintiff's companion said that the bag was his, "Officer Gomez looked at Officer Romero and said 'that's not his.' " 56.1 ¶ 12. Detective Romero then "simply nodded" in a way that Plaintiff believes was "an unspoken understanding," without saying what that understanding was. 56.1 ¶ 12.

In his opposition, Plaintiff notes that Detective Romero, "not [O]fficer Gomez, was listed as the 'arresting officer' on the arrest report filed in connection with Plaintiff's arrest." Opp. at 4. The Court believes the Plaintiff is referring to ECF No. 96-6 at 8, the criminal court complaint signed by Detective Romero that charges Plaintiff with criminal possession of a controlled substance. In that document, Detective Romero swore, under penalty of perjury, that he was "informed by [Officer] Gomez ... that he observed [Plaintiff] with a large plastic bag containing smaller bags of [a controlled substance] in his hand and he observed him throw it to the ground." [ECF No. 96-6 at 8]. Plaintiff may also be referring to the arraignment form in his case, ECF No. 96-8. That form states that "Romero, Pedro" is the "arrest officer" for this case.

The undisputed facts show that Detective Romero was present at the scene during Plaintiff's arrest. Sufficient evidence raises a triable issue of fact as to the personal involvement of Detective Romero in that arrest. Indeed, if Detective Romero knew that Officer Gomez did not have probable cause to arrest Plaintiff, but tacitly approved the arrest and endorsed it later under the penalty of perjury, he may have been personally involved in the arrest for purposes of a Section 1983 claim. *See Arbuckle v. City of New York*, 2016 WL 5793741, at *13, 2016 U.S. Dist. LEXIS 136857, at *37 (S.D.N.Y. Sept. 30, 2016) (while "[s]imply being present at the scene of an arrest does not suffice for personal involvement ... conduct such as

ordering that an arrest be made or filling out arrest paperwork can suffice to demonstrate direct participation.").

Perhaps realizing the deficiencies of his opening brief, Detective Romero argues for the first time on reply that he would otherwise be protected by the "fellow officer rule". Reply at 3-4. That rule provides that "an arresting officer might not be aware of all the underlying facts that provided probable cause or reasonable suspicion, but may nonetheless act reasonably in relying on information received by other law enforcement officials." *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2011). The Court will not consider arguments raised for the first time on reply. *See Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993) ("Arguments may not be made for the first time in a reply brief."). The Court notes, however, that Detective Romero arguing for the first time that his involvement with the arrest was proper because he is shielded by the fellow officer rule underscores that a material dispute of fact exists as to whether he was personally involved in Plaintiff's arrest.

**\*10**  In short, a reasonable jury could find that Detective Romero either directly or indirectly was personally involved in Plaintiff's purportedly false arrest. Detective Romero therefore is not entitled to summary judgment on this claim. [5]

[5]  Plaintiff argues for the first time in his opposition that Detective Romero is also "potentially liable ... for failure to intervene." Opp. at 4. Plaintiff may not assert a new claim, devoid from his Amended Complaint, for the first time in an opposition to summary judgment. *See Bernadotte v. New York Hosp. Med. Ctr. of Queens*, 2016 U.S. Dist. LEXIS 25595, 2016 WL 792399, at \*6 (E.D.N.Y. Feb. 26, 2016) ("[B]ecause Plaintiff did not assert a failure to accommodate claim in the SAC, she may not raise this new claim in opposing summary judgment.") (citing *McCoy v. Morningside at Home*, 601 F. App'x 57, 58 (2d Cir. 2015)).

### C. Defendants Fail to Address Plaintiff's First Amendment Retaliation Claim

The August 25 Opinion construed Plaintiff's Amended Complaint to raise a First Amendment retaliation claim. August 25 Opinion at 4 ("Plaintiff alleges that the officers in the 33rd Police Precinct conspired to retaliate against him for protected actions (*i.e.* [a] previous lawsuit) and that the arrest, detention, excessive force, and prosecution were all such retaliatory efforts."). Defendants completely fail to address this claim, and do not move for summary judgment on it. As a result, the First Amendment retaliation claim, underpinned by the events giving rise to Plaintiff's purportedly false arrest, detention, and prosecution, survives as to Officer Gomez and Detective Romero.

### CONCLUSION

For the reasons stated herein, the Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's federal claims under 42 U.S.C. § 1983 for excessive force, destruction of property, *Monell*, and free exercise claims, and on Plaintiff's "other pendent state law claims." Defendants' Motion for Summary Judgment is DENIED with respect to Plaintiff's federal malicious prosecution claim against Officer Gomez, his false arrest claim against Detective Romero, and Plaintiff's first amendment retaliation claim against Officer Gomez and Detective Romero. The false arrest claim against Officer Gomez is not the subject of Defendants' motion and will also proceed to trial.

The Parties are directed to appear for a pre-trial conference in this matter on April 20, 2022 at 10:00am. The conference will be held telephonically. To join the conference, dial 888-278-0296 and enter access code 5195844.

**SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 767103

---

2020 WL 3001072
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Kouriockein VANN, Plaintiff,
v.
Correction Officer Y. SUDRANSKI
and Lieutenant S. Hann, Defendants.

16 CV 7367 (VB)
|
Signed 06/04/2020

**Attorneys and Law Firms**

Kouriokein Vann, Fallsburg, NY, pro se.

Jennifer Rose Gashi, State of New York Office of the Attorney General, White Plains, NY, Neil Shevlin, New York State Office of the Attorney General, New York, NY, for Defendants.

<u>**OPINION AND ORDER**</u>

Briccetti, J.:

**\*1** Plaintiff Kouriockein Vann, proceeding <u>pro se</u> and <u>in forma pauperis</u>, brings this action under 42 U.S.C. § 1983, alleging Correction Officer ("C.O.") Y. Sudranski and Lieutenant ("Lt.") S. Hann, employees of the New York State Department of Corrections and Community Supervision, violated plaintiff's Eighth Amendment rights while he was incarcerated at Green Haven Correctional Facility ("Green Haven"). [1]

[1]    Plaintiff also brought claims against several other Green Haven employees. By Opinion and Order dated December 20, 2017, the Court dismissed those claims and terminated those defendants from this action. (Doc. #64).

Before the Court is defendants' motion for summary judgment. (Doc. #145).

For the reasons set forth below, the motion is GRANTED IN PART and DENIED IN PART.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

**BACKGROUND**

Defendants have submitted memoranda of law, a statement of material facts pursuant to Local Civil Rule 56.1, declarations, and supporting exhibits. Plaintiff has submitted memoranda of law with an incorporated statement of material facts, and a collection of documents in support of his position. Together, the parties' submissions reflect the following factual background.

On July 12, 2015, in a Green Haven recreational yard, a fight broke out between two inmates, during which one of the two inmates sustained a laceration to his left arm. On-duty medical personnel determined the injury was caused by an unrecovered weapon. Thereafter, for safety and security reasons, the yard was ordered closed and several Green Haven officers performed pat frisks on all inmates who were in the yard, including plaintiff, in an attempt to recover any weapons.

C.O. Sudranski was tasked with frisking plaintiff and several other inmates who were in the yard. According to plaintiff, upon patting plaintiff's clothed inner and outer legs, C.O. Sudranski "struck plaintiff forcefully with a 'reverse karate chop' to his testicle and groin area, and then, reached around and groped plaintiff's penis." (Doc. #158 ("Pl. Mem.") at 1). Plaintiff says C.O. Sudranski told plaintiff to walk to his housing block following the pat frisk.

C.O. Sudranski denies using excessive force against plaintiff, assaulting plaintiff, or touching plaintiff in an inappropriate manner. According to C.O. Sudranski, the frisk was performed without incident, after which plaintiff walked to his housing block.

Lt. Hann supervised the frisks on July 12, 2015, which were performed by several correction officers. Plaintiff claims that while walking toward his housing block, he attempted to speak with Lt. Hann about C.O. Sudranski's alleged misconduct. According to plaintiff, C.O. Sudranski then shouted: "[Y]ou can't stop and talk to her. You must proceed back to your block." (Pl. Mem. at 2). Plaintiff acknowledges Lt. Hann did not directly participate in the frisk of plaintiff, and that because Lt. Hann was supervising several officers

conducting frisks, plaintiff does not know whether Lt. Hann witnessed C.O. Sudranski's allegedly improper frisk.

**\*2** Plaintiff claims that after he returned to his housing unit, he told non-party C.O. Blackmon about the incident with C.O. Sudranski, and that C.O. Blackmon then told Lt. Hann. According to plaintiff, Lt. Hann instructed C.O. Blackmon to provide plaintiff a sick call slip so that plaintiff could be seen by medical personnel. Plaintiff was evaluated by a nurse the following day, July 13, 2015.

According to plaintiff, upon speaking with C.O. Blackmon on July 12, 2015, and learning of plaintiff's complaints, Lt. Hann should have interviewed plaintiff immediately, created a report of the incident, and sent plaintiff for a medical evaluation.

On July 20, 2015, plaintiff submitted a grievance respecting C.O. Sudranski's alleged misconduct. Plaintiff wrote: "C.O. Sudranski deliberately hit me in the testicle area. Then, [h]e fondled my groin area in the front with his left hand. Causing great discomfort and pain. I tried to speak with the Lieutenant on [s]ite. But was immediately told to keep going, there's no stopping." (Doc. #148 ("Gashi Decl.") Ex. C at 1).

### DISCUSSION

#### I. Standard of Review

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).[2]

[2] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See Anderson v. Liberty Lobby,

Inc., 477 U.S. at 248. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010). It is the moving party's burden to establish the absence of any genuine issue of material fact. Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party fails to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 322–23. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011). The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury reasonably could find for him. Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor on the issue on which summary judgment is sought, summary judgment is improper. Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).

**\*3** In deciding a motion for summary judgment, the Court need consider only evidence that would be admissible at trial. Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998). The burden to proffer evidence admissible pursuant to the Federal Rules of Evidence applies "equally to pro se litigants." Varughese v. Mt. Sinai Med. Ctr., 2015 WL 1499618, at \*4 (S.D.N.Y. Mar. 27, 2015) (citing Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001)).[3] Accordingly, bald assertions, completely unsupported by admissible evidence, are not sufficient to overcome summary judgment. Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991).

[3] Plaintiff will be provided copies of all unpublished opinions cited in this decision. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

## II. Excessive Force Claim

Defendants argue plaintiff fails as a matter of law to establish an Eighth Amendment excessive force claim with respect to C.O. Sudranski's pat frisk of plaintiff.

The Court agrees inasmuch as plaintiff alleges an excessive force claim against Lt. Hann, but disagrees as to plaintiff's excessive force claim against C.O. Sudranski.

### A. Legal Standard

There are two components to a claim of cruel and unusual punishment in violation of the Eighth Amendment: one objective and one subjective. Wright v. Goord, 554 F.3d 255, 268 (2d Cir. 2009). The objective inquiry focuses on the harm done in light of "contemporary standards of decency." Wright v. Goord, 554 F.3d at 268 (quoting Hudson v. McMillian, 503 U.S. 1, 8 (1992)). An inmate must show "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." Id. (quoting Hudson v. McMillian, 503 U.S. at 8). "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated.... This is true whether or not significant injury is evident.' " Id. at 268–69 (quoting Hudson v. McMillian, 503 U.S. at 9).

> Although not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights, a showing of extreme injury is not required to bring an excessive force claim if the alleged conduct involved unnecessary and wanton infliction of pain.

Toliver v. N.Y.C. Dep't of Corr., 202 F. Supp. 3d 328, 334–35 (S.D.N.Y. 2016).

To establish the subjective inquiry, an inmate must show the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct." Wright v. Goord, 554 F.3d at 268. "The test of whether use of force in prison constitutes excessive force contrary to the Eighth Amendment is whether the force was used in a good-faith

effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (citing Hudson v. McMillian, 503 U.S. at 7).

> To determine whether defendants acted maliciously or wantonly, a court must examine several factors including: the extent of the injury and the mental state of the defendant, as well as "the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response."

**\*4** Id. (quoting Romano v. Howarth, 998 F.2d 101, 105 (2d Cir. 1993)).

### B. C.O. Sudranski

There are genuine issues of material fact as to whether C.O. Sudranski used excessive force while performing a pat frisk on plaintiff on July 12, 2015. With respect to the first prong of the Eighth Amendment analysis, plaintiff has presented evidence that the alleged wrongdoing was objectively harmful. Indeed, plaintiff testified at his deposition that during the frisk, C.O. Sudranski "forcibly reverse[ ] karate chopped and hit me in my groin, my testicles and then he leaned on my back with his right arm and he reached with his left hand around and fondled my groin area and shook it." (See Doc. # 148-2 ("Pl. Dep.") at 40). Plaintiff further testified he told C.O. Blackmon about the alleged incident immediately after it occurred (id. at 44), and on July 20, 2015, plaintiff filed a grievance respecting C.O. Sudranski's alleged misconduct. (See Doc. #148-3). Moreover, attached to plaintiff's opposition are records of plaintiff's complaints to medical personnel of testicular pain following the incident, one of which, dated July 13, 2015—the day after the frisk—notes tenderness in plaintiff's testicles and minor trauma. (Pl. Mem. at ECF 62). [4] Whether plaintiff's story is true is for a jury to determine.

[4]    Citations to "ECF __" refer to page numbers automatically assigned by the Court's Electronic Case Filing system.

Defendants nevertheless argue the record evidence demonstrates C.O. Sudranski's use of force was de minimis and applied for the legitimate, penological purpose of performing a routine pat frisk to ensure safety and maintain order at Green Haven. Even still, the material factual

2020 WL 3001072

dispute respecting what occurred on July 12, 2015, precludes summary judgment in C.O. Sudranski's favor. Defendants would have the Court overlook plaintiff's testimony and instead rely only on defendants' factual recitation of the incident—that the force used was de minimis and appropriate under the circumstances. But "as a general rule, a district court may not discredit a witness's deposition testimony on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury." Fincher v. Depository Tr. & Clearing Corp., 604 F.3d 712, 725 (2d Cir. 2010). Again, plaintiff's credibility is a jury question.

With respect to the subjective prong of the inquiry, a triable issue of fact exists regarding whether the alleged force was used in a good-faith effort to conduct a routine frisk, or maliciously and sadistically to cause harm. The record is devoid of evidence suggesting C.O. Sudranski needed to use any amount of force to maintain plaintiff's compliance during the frisk, or evidence suggesting plaintiff failed to follow C.O. Sudranski's orders during same. In other words, there appears to have been no need for C.O. Sudranski to employ a forceful strike or motion during the frisk, if in fact that is what he did. Moreover, defendants do not convincingly suggest that such force, if used, would have been justified under the circumstances.

 **5** Instead, defendants contend no reasonable jury could find that C.O. Sudranski's alleged use of force was malicious or sadistic because he and plaintiff had no prior relationship, and because C.O. Sudranski was unaware plaintiff took issue with the frisk when it occurred. This argument fails. First, it presupposes that an excessive force claim cannot lie absent retaliatory intent, and second, it inappropriately deflects focus of the inquiry to plaintiff's reaction to the allegedly unconstitutional conduct.

In short, genuine issues of material fact preclude summary judgment on the excessive force claim against C.O. Sudranski.

### C. Lt. Hann

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983." Wright v. Smith, 21 F.3d 496, 501 (2d. Cir. 1994).

Supervisor liability under § 1983 can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003) (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)). [5] Moreover, Section 1983 liability cannot be predicated on a theory of respondeat superior. See City of Canton v. Harris, 489 U.S. 378, 385 (1989). Indeed, "[t]he bare fact that [a defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain [a] claim." Colon v. Coughlin, 58 F.3d at 874.

[5]    After Ashcroft v. Iqbal, district courts within the Second Circuit have been divided as to whether claims alleging personal involvement under the second, fourth, and fifth of these factors remain viable. See Marom v. City of New York, 2016 WL 916424, at *15 (S.D.N.Y. Mar. 7, 2016) (collecting cases). The Second Circuit has yet to resolve this dispute. Id.

Here, plaintiff concedes Lt. Hann did not directly participate in the frisk conducted by C.O. Sudranski. In fact, according to plaintiff, he (plaintiff) attempted to discuss the incident with Lt. Hann after the incident had occurred. Accordingly, because Lt. Hann had no personal involvement in the alleged constitutional violation, she is entitled to summary judgment on the excessive force claim.

### III. Sexual Abuse Claim

Defendants next argue plaintiff, as a matter of law, cannot establish an Eighth Amendment sexual abuse claim against C.O. Sudranski.

The Court agrees.

"Instances of sexual contact by prison officials violate the constitution if they disturb 'contemporary standards of decency' and are 'objectively, sufficiently serious enough." Cole v. Suffolk Cty. Corr. Facility, 2020 WL 2113205, at *3 (E.D.N.Y. May 4, 2020) (quoting Boddie v. Schneider, 105 F.3d 857, 861 (2d Cir. 1997)). "In determining whether an Eighth Amendment violation has occurred, the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." Crawford v. Cuomo, 796 F.3d 252, 258 (2d Cir. 2015) (citing Whitley v. Albers, 475 U.S. 312, 320–21 (1986)). Courts in the Second Circuit have consistently held that "brief contact with an arrestee's ... genital area during a pat-down, without more, is insufficient" to state a constitutional claim. Scalpi v. Amorim, 2018 WL 1606002, at *18 (S.D.N.Y. Mar. 29, 2018) (collecting cases).

**\*6** Here, the undisputed record evidence demonstrates C.O. Sudranski made, at most, brief contact with plaintiff's genital area during a routine and necessary pat frisk. "Slight contact of this sort is to be expected during a frisk," Cole v. Suffolk Cty. Corr. Facility, 2020 WL 2113205, at *4, and is inherent in an officer's pat-down of an inmate's person to search for contraband. The undisputed evidence demonstrates the contact was not lengthy, and plaintiff's legs, pelvic, and groin areas were clothed during the frisk. Moreover, the frisk was conducted in the presence of several other officers, inmates, and at least one supervisor, and was incidental to legitimate penological duties. Simply, there is no evidence to suggest C.O. Sudranski frisked plaintiff in a sexually inappropriate manner, even though, as noted above, there is a material issue of fact respecting the amount of force C.O. Sudranski used during the frisk.

Thus, defendants are entitled to summary judgment on the sexual abuse claim.

IV. Failure to Intervene Claim

Defendants further argue plaintiff, as a matter of law, cannot establish an Eighth Amendment failure to intervene claim against Lt. Hann.

The Court agrees.

"[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994). "Failure to intercede results in liability where an officer observes excessive force is being used or has reason to know that it will be." Jean-Laurent v. Wilkerson, 461 F. App'x 18, 21 (2d Cir. 2012) (summary order) (citing Curley v. Village of Suffern, 268 F.3d 65, 72 (2d Cir. 2001)). "However, 'in order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring.' " Id. (citing Anderson v. Branen, 17 F.3d at 557).

Here, the record evidence, including plaintiff's testimony, demonstrates the complained-of force involved, at most, "one strike" to plaintiff's groin area. (See Pl. Dep. at 85; see also Pl. Mem. at 1 ("Sudranski struck plaintiff forcefully with a 'reverse karate chop' to his testicle and groin area.")). The evidence does not support any claim that Lt. Hann witnessed the allegedly unlawful conduct, encouraged or acquiesced in such conduct, or had a realistic opportunity to prevent the alleged use of excessive force from occurring.

For these reasons, Lt. Hann is entitled to summary judgment on this claim. [6]

> [6] Because plaintiff's failure to intervene claim against Lt. Hann fails as a matter of law, the Court need not address whether plaintiff exhausted this claim.

V. Qualified Immunity

Finally, C.O. Sudranski argues that, to the extent the record supports an Eighth Amendment excessive force claim, such claim should be dismissed on the basis of qualified immunity. [7]

> [7] Because plaintiff's claims against Lt. Hann fail as a matter of law, the Court need not address whether Lt. Hann is entitled to qualified immunity.

The Court disagrees.

Qualified immunity shields government officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

The scope of qualified immunity is broad, and it protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). "A qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Salim v. Proulx, 93 F.3d 86, 89 (2d Cir. 1996). "Where a factual issue exists on the issue of motive or intent, a defendant's motion for summary judgment on the basis of qualified immunity must fail." Johnson v. Ganim, 342 F.3d 105, 117 (2d Cir. 2003); see also Atkins v. County of Orange, 372 F. Supp. 2d 377, 403–04 (S.D.N.Y. 2005) (precluding summary judgment on defense of qualified immunity as to plaintiff's excessive force claim), aff'd sub nom. Bellotto v. County of Orange, 248 F. App'x 232 (2d Cir. 2007) (amended summary order).

**\*7** Here, there is a genuine factual dispute concerning whether C.O. Sudranski used excessive force against plaintiff during the July 12, 2015, frisk. Plaintiff's Eighth Amendment right to be free from the use of excessive force was clearly established at the time of the allegedly unlawful conduct, and it would not have been objectively reasonable for C.O. Sudranski to have believed he could lawfully violate that right by forcefully striking plaintiff in the groin during a routine pat frisk.

Accordingly, factual issues preclude summary judgment in favor of C.O. Sudranski on basis of qualified immunity.

## CONCLUSION

The motion for summary judgment is GRANTED IN PART and DENIED IN PART.

Plaintiff's Eighth Amendment excessive force claim against C.O. Sudranski shall proceed. All other claims are dismissed.

Plaintiff and defense counsel are directed to appear for a telephone status conference on July 8, 2020, at 11:00 a.m., at which time the Court will discuss the scheduling of a trial. Defense counsel shall make all necessary arrangements for plaintiff to appear by telephone. Plaintiff and defense counsel shall attend the conference by calling the following number and entering the access code when requested:

**Dial-In Number:**    **(888) 363-4749 (toll free) or (215) 446-3662**

**Access Code:**    **1703567**

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

The Clerk is instructed to terminate the motion (Doc. #145) and terminate Lt. Hann as a defendant in this action.

SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 3001072

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Toliver v. City of New York, Not Reported in F.Supp.2d (2013)

2013 WL 6476791

2013 WL 6476791
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Michel TOLIVER, Plaintiff,

v.

The CITY OF NEW YORK, Commissioner of the
Dept. of Corrections, Chief of the Dept. of Corrections,
Warden of G.R.V.C., D.O.C. Captain Pressley # 1176,
D.O.C. Captain Banks # 819, D.O.C. Officer Burton #
14371, D.O.C. Officer McArdle # 17893, Defendants.

No. 10 Civ. 5806(SHS)(JCF).
|
Dec. 10, 2013.

*REPORT AND RECOMMENDATION*

JAMES C. FRANCIS IV, United States Magistrate Judge.

**\*1** TO THE HONORABLE SIDNEY H. STEIN, U.S.D.J.:
Michel Toliver brings this action *pro se* pursuant to 42 U.S.C.
§ 1983 against Captain Pressley, Captain Banks, Correction
Officer Burton [1], and Correction Officer McArdle. [2] Mr.
Toliver alleges that the defendants violated his civil rights by
subjecting him to excessive force, failing to provide for his
medical needs, and destroying his property, all while he was
detained at George R. Vierno Center ("GRVC") on Rikers
Island in May 2010. The defendants concede that there is a
dispute of material fact pertaining to Mr. Toliver's claim of
excessive force against Officer Burton. The defendants move
for partial summary judgment pursuant to Rule 56 of the
Federal Rules of Civil Procedure on all other claims. For the
following reasons, I recommend that the motion be granted in
part and denied in part.

[1]   Mr. Toliver refers to this defendant as "Burton" in
the second amended complaint, and as "Burton,"
"Burton," "Buunton," and "Bentton" in his
opposition papers; the City defendants refer to
this defendant as "Bunton." In this report and
recommendation, he is refered to as "Burton."

[2]   The parties have not provided the first names of the
individual defendants.

*Background*

A. *Facts*

The following facts are taken from the parties' statements
pursuant to Rule 56.1 of the Local Rules of the Southern
and Eastern Districts of New York ("Local Civil Rules") and
the accompanying affidavits and exhibits. (*See* Defendants'
Statement of Undisputed Facts Pursuant to Local Civil
Rule 56.1 ("Def. 56.1 Statement"); Plaintiff's Answer to
Defendants' Undisputed Facts to Local Civil Rule 56.1 ("Pl.
56.1 Statement"); Plaintiff's Second Amended Complaint
("2d Am. Compl.")). The following facts are viewed in the
light most favorable to the plaintiff. [3]

[3]   Rule 56.1 requires a motion for summary judgment
to be accompanied by a statement of the material
facts that the movant believes undisputed, with
citations to admissible evidence. Local Civil Rule
56.1(a) & (d). The party opposing summary
judgment must submit, with his opposition, a
statement responding to each of the proposed
undisputed facts, also with citations to admissible
evidence. Local Civil Rule 56.1(b) & (d). Where
the court's independent review of the record yields
evidence contrary to a given assertion in the
moving party's Local Rule 56.1 statement, or
where a party fails to support an assertion by
citing admissible evidence, the court may reject
that assertion. *Holtz v. Rockefeller & Co.,* 258
F.3d 62, 73 (2d Cir.2001). Conversely, where
the moving party's Local Rule 56.1 statement
is not contradicted by the court's review of the
record, then the party's assertions will be "deemed
admitted as a matter of law" for the purposes of
a summary judgment motion. *See, e.g., Chitoiu
v. UNUM Provident Corp.,* No. 05 Civ. 8119,
2007 WL 1988406, at \*1 n. 1 (S.D.N.Y. July 6,
2007) (granting summary judgment against pro se
plaintiff who failed to respond to defendant's Local
Rule 56.1 statement of facts). Mr. Toliver agrees
with the defendants' Local Rule 56.1 statement
except for ¶ 27. (Pl. 56.1 Statement at 2). For all
other facts my review of the record did not reveal
anything to contradict the facts as set forth in the
defendants' Rule 56.1 Statement. Therefore, I have
taken those facts, excluding ¶ 27, as true.

On May 11, 2010, Captain Pressley, Captain Banks, Officer
Burton, and Officer McArdle approached Mr. Toliver while

he was locked in his cell at GRVC. (2d Am. Compl. at 7). [4] The captains ordered that Mr. Toliver's cell be opened and informed him that they were going to conduct a "routine search." (2d Am. Compl. at 7). The captains then ordered the officers to strip search Mr. Toliver, and after he had re-dressed, the officers began to search his cell. (2d Am. Compl. at 7, 11). During the search, Officer Burton allegedly "tore up most of [Mr. Toliver's] legal work ... and flushed it down the toilet[,] and threw the rest of [ his] files outside the cell so that sanitation could sweep it up and destroy it." (2d Am. Compl. at 11; Def. 56.1 Statement, ¶ 5). The legal papers included sworn affidavits of witnesses in Mr. Toliver's criminal case, pictures, statements, copies of letters he had sent to government agencies, transcripts, notices of claim, documents from the City of New York, documents from a commissioner's office, and answers to complaints. (Def. 56.1 Statement, ¶ 7). When Mr. Toliver complained, he was ordered to " 'shut up' ... or '[he] would be dropped to the floor[,]' handcuffed[,] and escorted outside the cell." (2d Am. Compl. at 11). Officer McArdle allegedly threatened Mr. Toliver, telling him, "I will drop your fucking Homo faggottay [sic], snitching Ass on the floor [if you] say one more word." (2d Am. Compl. at 11).

[4]     As the plaintiff's Second Amended Complaint is not fully paginated, I refer to the page numbers on the Second Amended Complaint assigned by the Case Management/Electronic Case Filing (CM/ECF) system.

After the search was completed, the captains ordered Mr. Toliver to sit on the bed in his cell, and Captain Pressley ordered Officer Burton to remove his handcuffs. (2d Am. Compl. at 12). Officer Burton then "punched and slapped [Mr. Toliver] in the face [while he] was still handcuffed," and "[n]either captain responded to the assault." (2d Am. Compl. at 12). According to Mr. Toliver, the two blows occurred in quick succession. (Def. 56.1 Statement, ¶ 12). As a result of the incident, Mr. Toliver "suffered significant bruises to [his] jaw and face", and afterward, he was denied immediate treatment for his injuries despite asking Captain Banks, Captain Pressley, and several other officers for medical attention. (2d Am. Compl. at 12; Def. 56.1 Statement, ¶ 16–17). Mr. Toliver asserts, "I am an overt homosexual and because of my sexual orientation this was done to me along with my filing complaints and grievances." (2d Am. Compl. at 12). Mr. Toliver ultimately received medical attention three days later, after he met with investigators. (Def. 56.1 Statement, ¶ 17). At that time he received antibiotic ointment and painkillers. (Def. 56.1 Statement, ¶ 22).

**B.** *Procedural History*

**\*2**  Mr. Toliver filed his 2d Am. Compl. on February 17, 2012, and in response to the defendants' motion, the Honorable Sidney H. Stein, U .S.D.J., issued an Order on January 14, 2013, dismissing the claims against the City of New York, the Commissioner of the Department of Correction, the Chief of the Department of Correction, and the Warden of GRVC.

On July 31, 2013, the remaining defendants, Captain Pressley, Captain Banks, Officer McArdle, and Officer Burton, filed the instant motion for partial summary judgment.

*Discussion*

**A.** *Standard of Review*

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed.R.Civ.P.* 56(a); *accord Doninger v. Niehoff,* 642 F.3d 334, 344 (2d Cir.2011). A dispute regarding a material fact is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986), *accord SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir.2009), and a material fact is one that " 'might affect the outcome of the suit under the governing law,' " *Roe v. City of Waterbury,* 542 F.3d 31, 35 (2d Cir.2008) (quoting *Anderson,* 477 U.S. at 248). "In deciding whether a genuine dispute exists, a court must 'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.' " *Seeman v. Local 32B–32J, Service Employees Union,* 769 F.Supp.2d 615, 620 (S.D.N.Y.2011) (quoting *Dallas Aerospace, Inc. v. CIS Air Corp.,* 352 F.3d 775, 780 (2d Cir.2003)).

The moving party bears the initial burden of identifying those portions of the record that demonstrate "the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986), following which the opposing party must come forward with specific facts showing a genuine issue for trial. The parties can support their claims with discovery materials, stipulations, affidavits, or other evidence, see *Fed.R.Civ.P.* 56(c)(1)(A); however, " ' only

Case 9:21-cv-00372-MAD-TWD    Document 61    Filed 06/22/23    Page 63 of 218
Toliver v. City of New York, Not Reported in F.Supp.2d (2013)
2013 WL 6476791

admissible evidence need be considered by the trial court in ruling on a motion for summary judgment,' " *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 582 F.3d 244, 264 (2d Cir.2009) (quoting *Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir.1997)). Thus, the parties cannot rely on " 'conclusory allegations or unsubstantiated speculation' " to support or defeat a motion for summary judgment. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 428 (2d Cir.2001)).

Where a litigant is *pro se,* his pleadings should be read liberally and interpreted " 'to raise the strongest arguments that they suggest.' " *Fulton v. Goord,* 591 F.3d 37, 43 (2d Cir.2009) (quoting *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001)). Nevertheless, proceeding pro se does not relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion, completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Geldzahler v. New York Medical College,* 746 F.Supp.2d 618, 620 n. 1 (S.D.N.Y.2010) (internal quotation marks omitted). But even where the plaintiff has received notice pursuant to Local Rule 56.2 regarding the requirements for opposing a summary judgment motion, the court may conduct " 'an assiduous review of the record' to determine if there is any evidentiary support for his assertions of fact that do not cite to evidence and to determine if there are any other material issues of fact." *Id.* (quoting *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995)).

### B. *Excessive Force and Failure to Intervene*

**\*3** It is well settled in the Second Circuit that " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). "Personal involvement," however, is not limited to direct participation in the deprivation of rights at issue. A defendant who occupies a supervisory position may be "personally involved" in a deprivation of constitutional rights in several ways, including: (1) directly participating in the infraction; (2) after learning of the violation, failing to remedy the wrong; (3) creating a policy or custom under which unconstitutional practices occurred, or allowing such a policy or custom to continue; (4) being grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) demonstrating "gross negligence" or "deliberate indifference" to the constitutional rights of an individual by having actual or constructive notice of unconstitutional practices and failing to act. *See Wright,* 21 F.3d at 501 (citing

*Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)); *McCann v. Coughlin,* 698 F.2d 112, 125 (2d Cir.1983).

The defendants argue that Captain Pressley, Captain Banks, and Officer McArdle are entitled to summary judgment on Mr. Toliver's claim of excessive force because they did not personally use force and did not have a reasonable opportunity to intercede. Mr. Toliver's position is that all the defendants were present and heard Officer McArdle threaten and then assault him. (2d Am. Compl. at 25–26). There is no dispute that Officer Burton was the only individual who allegedly struck Mr. Toliver. (Def. 56.1 Statement, ¶ 11).

Although Mr. Toliver does not claim that Captain Pressley, Captain Banks, or Officer McArdle directly participated in the alleged use of excessive force, "a correctional officer has an affirmative duty to intercede on behalf of an inmate when he witnesses a violation of that inmate's [constitutional] rights by ... [his] fellow officers." *Kee v. Hasty,* No. 01 Civ. 2123, 2004 WL 807071, at \*26 (S.D.N.Y. April 14, 2004); *O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988). However, liability attaches "only [ ] if '(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene.' " *Tavares v. City of New York,* No. 08 Civ. 3782, 2010 WL 234974, at \*4 (S.D.N.Y. Jan. 19, 2010) (quoting *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008)); *see also Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is a question of fact," unless the evidence shows that "a reasonable jury could not possibly conclude otherwise." *Anderson,* 17 F.3d at 557.

**\*4** Mr. Toliver alleges that Officer McArdle "worked along with [Officer Burton], threatening plaintiff," that Captain Banks "was alerted and was made aware of the threats," and that their failure to intervene to stop both the threats and the physical attacks violate Section 1983. (Declaration of Plaintiff's Opposition to Defendants' Motion [for] Partial Summary Judgment ("Pl.Opp.") at 3).[5] The defendants counter that they are entitled to summary judgment because they had no realistic opportunity to prevent the harm.

5      Mr. Toliver states that he is prepared to dismiss this
       claim against Captain Pressley. (Pl. Opp. at 3; Def.
       56.1 Statement ¶ 28).

Mr. Toliver has failed to demonstrate that there is sufficient
evidence to permit a jury to conclude that the failure of
Captain Banks and Officer McArdle to intercede was a
proximate cause of the beating and that there was sufficient
time for them to prevent the harm. After Mr. Toliver
complained about the destruction of his property, Officer
Burton struck Mr. Toliver in the face twice in succession.
(Def. 56.1 Statement, ¶¶ 11–12). Mr. Toliver does not contest
that the two blows were sudden and provides no evidence
showing that there was enough time after the first blow to
prevent the second. (Pl. 56.1 Statement at 2). Therefore,
Captain Banks, and Officer McArdle are entitled to summary
judgment on Mr. Toliver's excessive force and failure to
intervene claim. *See O'Neill,* 839 F.2d at 11–12 (finding no
failure to intervene claim where excessive force based on
repeated physical blows was not of "sufficient duration to
support a conclusion that an officer who stood by without
trying to assist the victim became a tacit collaborator.").

C. *Deliberate Indifference to Medical Needs*

Mr. Toliver argues that all the defendants violated his
constitutional rights by failing to heed his cries for help and
denying him immediate medical attention after he was struck
by Officer Burton. (Pl. Opp. at 6; Excerpts from Transcript of
Deposition of Michel Toliver dated June 21, 2013 ("Toliver
Dep."), attached as Exh. A to Declaration of Joshua A. Lax
dated July 31, 2013, at 111–12). The defendants respond
that Mr. Toliver cannot show that he suffered from a serious
medical condition or that they acted with a sufficiently
culpable state of mind. (Defendants' Memorandum of Law in
Support of Their Motion to Partial Summary Judgment at 6).

"To establish an unconstitutional denial of medical care, a
prisoner must prove deliberate indifference to [his] serious
medical needs." *Hathaway v. Coughlin,* 37 F.3d 63, 66
(2d Cir.1994) (alteration in original) (internal quotation
marks omitted). The test for deliberate indifference has
both objective and subjective components. *Id.* First, as
an objective matter, the alleged deprivation must be "
'sufficiently serious.' " *Id.* (quoting *Wilson v. Seiter,* 501 U.S.
294, 298 (1991)). "This standard contemplates a [showing by
the prisoner that his medical need was] a condition of urgency,
one that may produce death, degeneration, or extreme pain."
*Lucas v. McCoy,* No. 10 Civ. 9611, 2011 WL 6005164, at
*2 (S.D.N.Y. Nov. 30, 2011) (alteration in original) (internal

quotation marks omitted). When the basis for the deliberate
indifference claim is that treatment was delayed, "the relevant
concern is the 'particular risk of harm faced by a prisoner due
to the challenged deprivation of care, rather than the severity
of the prisoner's underlying medical condition.' " *Rodriguez
v. City of New York,* 802 F.Supp.2d 477, 482 (S.D.N.Y.2011)
(quoting *Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir.2003)).
The actual medical consequences attributable to the delay in
care are usually " 'highly relevant to the question of whether
the denial of treatment subjected the prisoner to a significant
risk of serious harm.' " *Id.* (quoting *Smith,* 316 F.3d at 187).

*5 Second, the prisoner must show that the charged official
acted "with a sufficiently culpable state of mind," meaning
that the "official kn[ew] of and disregard[ed] an excessive
risk to inmate health or safety." *Hathaway,* 37 F.3d at 66
(citing *Wilson,* 501 U.S. at 298, and *Farmer v. Brennan,* 511
U.S. 825, 837 (1994)). "[T]he official must both be aware
of facts from which the inference could be drawn that a
substantial risk of serious harm exists, and he must also draw
the inference." *Id.* at 66 (internal quotation marks omitted).

As to the objective element, Mr. Toliver alleges that he
suffered bruising, broken skin, a bloody nose, and a swollen
jaw. (Toliver Dep. at 111; 2d Am. Compl. at 7). He alleges
that he requested medical attention "for days and did not
get it." (Toliver Dep. at 111). When Mr. Toliver finally
received treatment three days later, the medical examiner
gave him painkillers and applied antibiotic ointment to his
skin. (Toliver Dep. at 120). Although the plaintiff does not
specifically complain of continuing pain before being treated,
it is reasonable to assume that he experienced some pain.
A medical condition is deemed "serious" if it is "one that
has been diagnosed by a physician as requiring treatment
or one that is so obvious that a lay person would easily
recognize the necessity for a doctor's attention." *Sonds v.
St. Barnabas Hospital Correctional Health Services,* 151
F.Supp.2d 303, 310 (S.D.N.Y.2001) (quoting *Hunt v. Uphoff,*
199 F.3d 1220 (10th Cir.1999)). Thus, where "unnecessary
and wanton infliction of pain" results, or where the denial of
treatment causes an inmate to suffer a life-long handicap or
permanent loss, the medical need may be considered serious.
*Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000); *Sonds,*
151 F.Supp.2d at 310. Mr. Toliver fails to proffer evidence
of a sufficiently serious injury. The minimal treatment that
he ultimately received-treatment he does not complain about-
leads to the conclusion that his injuries were not serious. *See
Dallio v. Hebert,* 678 F.Supp.2d 35, 60 (N.D.N.Y.2009) (two
black eyes, bruising in kidney area, kick marks and open

laceration on knees not serious medical condition); *Rodriguez v. Mercado,* No. 00 Civ. 8588, 2002 WL 1997885, at *8 (S.D.N.Y. Aug. 28, 2002) (bruises to head, back, and wrists sustained during excessive force incident not sufficiently serious); *Sonds,* 151 F.Supp.2d at 310 (holding that bleeding finger with ripped skin does not constitute serious medical condition). Furthermore, Mr. Toliver has not shown that any harm was caused by the delay between the time of the incident and his later treatment by medical staff. *See Rodriguez,* 802 F.Supp.2d at 482 (granting defendants' summary judgment on the plaintiff's deliberate indifference claim where "plaintiff presents no evidence that his condition worsened as a result of the three-day delay between his request and receipt of medical attention"); *Grant v. Burroughs,* No. 96 Civ. 2753, 2000 WL 1277592, at *4 (S.D.N.Y. Sept. 8.2000) (even assuming plaintiff was in pain for two months, plaintiff's pain was not so severe as to constitute serious medical condition). For these reasons, I recommend that the defendants' motion for summary judgment be granted on the plaintiff's claim for deliberate indifference to his medical needs. [6]

[6]    Because I recommend that defendants be granted summary judgment on the failure to intervene and denial of medical need claims, there is no need to address the question of qualified immunity. *See Barrett v. Orange County Human Rights Commission,* 194 F.3d 341, 344 (2d Cir.1999) (finding immunity no longer of consequence because individual defendants found not to have infringed plaintiff's rights).

### D. *Destruction of Property*

**\*6** Liberally construed, Mr. Toliver's complaint alleges that Officer Burton committed multiple constitutional violations pertaining to the destruction of his property, including (1) denial of access to the courts based on the alleged destruction of his legal documents, (2) retaliation for engaging in constitutionally protected actions, and (3) deprivation of personal property without due process.

### 1. *Denial of Access to Courts*

"It is [ ] established beyond doubt that prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821 (1977). The active interference of prison officials in the preparation or filing of legal documents may constitute denial of access. *See Lewis v. Casey,* 518 U.S. 343, 350 (1996). However, a prisoner must show an actual injury in order to sustain such a claim, *id.* at 349, and actual

injury occurs only when "the loss of [the plaintiff's] materials prejudiced his ability to pursue a legal claim." *Santiago v. New York City Department of Corrections,* No. 97 Civ. 9190, 2003 WL 1563773, at *5 (S.D.N.Y. March 6, 2003); *see also Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003). Accordingly, to survive summary judgment, the plaintiff must introduce evidence to establish that his ability to pursue some criminal or civil case was hindered by the destruction of his legal papers. *See, e.g., Thomas v. Thomas,* No. 97 Civ. 4541, 2000 WL 307391, at *3 (S.D.N.Y. March 23, 2000).

Mr. Toliver fails to describe a legal injury resulting from the destruction of his property. He merely states that "the only reason someone in defendants' position would logically destroy legal documents along with other obvious property would be to hinder ... litigation and ... the progress of my criminal matter." (Pl. Opp. at 8). Such conclusory statements are not evidence that Mr. Toliver suffered an actual injury sufficient to support a claim of denial of access to the courts.

### 2. *Retaliation*

Mr. Toliver alleges that the defendants destroyed his property in retaliation for his filing complaints and grievances against other correction officers at Rikers Island. Such actions are prohibited under the Constitution because "retaliatory actions may tend to chill individuals' exercise of constitutional rights." *ACLU v. Wicomico County,* 999 F.2d 780, 785 (4th Cir.1993).

Courts approach such retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official-even those not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). To survive summary judgment, a plaintiff alleging retaliation must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Id.* at 492; *see also Winthrow v. Donnelly,* 356 F.Supp.2d 273, 275 (W.D.N.Y.2005) (applying *Dawes* standard to summary judgment motion); *Contes v. Porr,* 345 F.Supp.2d 372, 377–78 (S.D.N.Y.2004) (same).

**\*7** Mr. Toliver has satisfied the first *Dawes* factor because a prisoner's filing of lawsuits or administrative grievances is constitutionally protected. *See Bounds,* 430 U.S. at 821

(holding that access to courts is an established constitutional right). In addition, Mr. Toliver also meets the second *Dawes* factor. Although a routine cell search may not give rise to a retaliation claim, the confiscation or destruction of property taken at the time of the search may. *Smith v. City of New York,* No. 03 Civ. 7576, 2005 WL 1026551, at *3 (S.D.N.Y. May 3, 2005) ("[R]etaliatory destruction of a prisoner's personal property has previously been found substantial enough to qualify as an adverse action."); *Soto v. Iacavino,* No. 01 Civ. 5850, 2003 WL 21281762, at *2 (S.D.N.Y. June 4, 2003) (holding that allegation that corrections officers deliberately destroyed inmate's property in retaliation for grievances stated viable claim).

To satisfy the third prong, the plaintiff must establish a casual connection between the filing of his lawsuits and the retaliatory event. "The causal connection must be sufficient to support the inference 'that the speech played a substantial part in the [ ] adverse [ ] action.' " *Diesel v. Town of Lewisboro,* 232 F.3d 92, 107 (2d Cir.2000) (quoting *Ezekwo v. New York City Health & Hospital Corp.,* 940 F.2d 775, 780–81 (2d Cir.1991)). Here, Mr. Toliver's allegations are conclusory and his pleadings contain few, if any, specific facts relating to the defendants' involvement in the destruction of his personal property. In his Second Amended Complaint, Mr. Toliver asserts cryptically that "this" was done to him because of his sexual orientation and his "filing of complaints and grievances." (2d Am. Compl. at 12). Mr. Toliver neither cites to specific complaints and grievances nor provides any evidence that might establish a causal connection between the filing of grievances and the destruction of his property. Since there is insufficient evidence supporting an inference of retaliatory motive, Mr. Toliver cannot maintain a retaliation claim for the destruction of his property.

### 3. Denial of Due Process

Whether negligent or deliberate, the destruction of an inmate's property caused by a prison officer's unauthorized conduct does not give rise to a claim under the Due Process Clause if the state provides that inmate with an adequate postdeprivation remedy. *Hudson v. Palmer,* 468 U.S. 517, 533–36 (1984). It is well established that New York provides inmates with the opportunity for a meaningful postdeprivation hearing through state law causes of action for "negligence, replevin, or conversion which could fully compensate [the plaintiff] for his alleged property loss." *Cook v. City of New York,* 607 F.Supp. 702, 704 (S.D.N.Y.1985); *see also Dove v. City of New York,* No. 99 Civ. 3020, 2000 WL 342682, at *3 (S.D.N.Y. March 30, 2000); *Smith v.*

*O'Connor,* 901 F.Supp. 644, 647 (S.D.N.Y.1995). Mr. Toliver does not claim that he was denied adequate postdeprivation procedures by which to seek compensation for the destruction of his property. "Plaintiff's failure to take advantage of the state [law] does not convert his cause of action into a constitutional due process claim." *Smith,* 901 F.Supp. at 647; see also *Morello v. James,* 810 F .2d 344, 347 (2d Cir.1987) ("[S]ection 1983[can]not be made a vehicle for transforming mere civil tort claims into constitutional injuries."). Therefore, Mr. Toliver cannot sustain a claim for violation of his due process rights.

### E. State Law Claims

**\*8** The defendants seek dismissal of pendant state law claims because they allege Mr. Toliver failed to comply with New York State statutory requirements. New York law requires that, in order for an action to be brought against the City of New York or any employee, a notice of claim must be served on the municipality within 90 days after the claim arose. N.Y. Gen Mun. Law §§ 50–e(1)(a) & 50–k(6). "Federal courts do not have jurisdiction to hear state law claims brought by plaintiffs who have failed to comply with the notice of claim requirement, nor can a federal court grant a plaintiff permission to file a late notice of claim." *Dingle v. City of New York,* 728 F.Supp.2d 332, 348–49 (S.D.N.Y.2010). "The burden is on the plaintiff to demonstrate compliance with the Notice of Claim requirement." *Horvath v. Daniel,* 423 F.Supp.2d 421, 423 (S.D.N.Y.2006).

Mr. Toliver responds that he filed several Notices of Claim with the City Comptroller's office, and he provided a copy of one such Notice with his Second Amended Complaint. Thus, there is a genuine issue of material fact pertaining to whether he successfully filed Notices of Claim. As the only federal cause of action that survives summary judgment is Mr. Toliver's claim for excessive force against Officer Burton, the defendants' motion to dismiss any state law claims arising from that claim should be denied. There is no federal supplemental jurisdiction over any other potential state claims because they would not rise from the same "case or controversy" as the remaining federal claim. 28 U.S.C. § 1367(a); *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725 (1966) (exercise of supplemental jurisdiction proper where "state and federal claims [ ] derive from a common nucleus of operative fact").

### Conclusion

2013 WL 6476791

For the foregoing reasons, I recommend that the defendants' motion for partial summary judgment be granted in part and denied in part. Specifically, I recommend that the motion be granted as to (1) Mr. Toliver's excessive force and failure to intervene claims as against Captain Pressley, Captain Banks, and Officer McArdle, (2) his deliberate indifference to medical need claim as against all defendants, and (3) his destruction of property claim as against all defendants. However, I recommend that the motion be denied as to state law claims insofar as they relate to his claim of excessive force by Officer Burton.

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Sidney H. Stein, U.S.D. J., Room 1010, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 6476791

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 549402
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Michael TOLIVER, Plaintiff,

v.

The CITY OF NEW YORK, et al., Defendants.

No. 10 Civ. 5806(SHS).
|
Feb. 11, 2014.

*ORDER*

SIDNEY H. STEIN, District Judge.

**\*1** On December 10, 2013, Magistrate Judge James C. Francis issued a Report and Recommendation (the Report and Recommendation is incorrectly dated December 10, 2012) recommending that the defendants' motion for partial summary judgment be granted as to (1) plaintiff's excessive force and failure to intervene claims as against Captain Pressley, Captain Banks, and Officer McArdle, (2) plaintiff's deliberate indifference to medical need claims as against all

defendants, and (3) plaintiff's destruction of property claim as against all defendants, and denied as to plaintiff's state law claims insofar as they relate to plaintiff's claim of excessive force by Officer Burton. To date, no objections have been received by this Court. After a *de novo* review of the Report and Recommendation dated December 10, 2013,

IT IS HEREBY ORDERED that:

1. Magistrate Judge Francis's Report & Recommendation is adopted; and

2. Defendants' motion for partial summary judgment [doc. no. 102] is granted as to (1) plaintiff's excessive force and failure to intervene claims as against Captain Pressley, Captain Banks, and Officer McArdle, (2) plaintiff's deliberate indifference to medical need claims as against all defendants, and (3) plaintiffs destruction of property claim as against all defendants, and denied as to plaintiffs state law claims insofar as they relate to plaintiffs claim of excessive force by Officer Burton.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 549402

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00372-MAD-TWD    Document 61    Filed 06/22/23    Page 69 of 218

Caravalho v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 1274575

2016 WL 1274575
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Alexander CARAVALHO, et al., Plaintiffs,

v.

The CITY OF NEW YORK, et al., Defendants.

13-cv-4174 (PKC)(MHD)

|

Signed 03/31/2016

**Attorneys and Law Firms**

Meghan Dupuis Maurus, Maurus & Heinegg, Gideon Orion Oliver, New York, NY, for Plaintiffs.

Andrew Joseph Lucas, Angharad Wilson, Joy Tolulope Anakhu, Dara Lynn Weiss, NYC Law Department, Office of the Corporation Counsel (NYC), New York, NY, for Defendants.

MEMORANDUM AND ORDER

CASTEL, United States District Judge

 *1  Nine individuals bring a variety of claims against officers and employees of the New York City Police Department ("NYPD"), as well as the City of New York ("City"), arising out of their participation in an Occupy Wall Street protest in Zuccotti Park (the "Park") on March 17, 2012. Fact discovery in this action, ably managed by Magistrate Judge Michael H. Dolinger, has concluded. Defendants now move for summary judgment on all claims.

Among the issues that arise on this motion is whether there was probable cause to arrest the nine plaintiffs for disorderly conduct. There is no serious dispute that the plaintiffs and others were "congregating," that a dispersal order was given, even if not universally heard, and that the plaintiffs willfully failed to comply. But a fundamental question presented here is whether the dispersal order was a "lawful" order.

"[T]he right of the people peaceably to assemble, and to petition the government for a redress of grievances" is expressly protected in the First Amendment. It is, however, subject to reasonable restrictions on time, place and manner. Zuccotti Park is private property that is open for certain public

uses. The Court assumes without deciding that the public, including each of the nine plaintiffs, had the right to assemble and protest in Zuccotti Park. Their presence was subject to reasonable restrictions on time, place and manner. Among the content neutral rules in place in Zuccotti Park was a prohibition on tents and tarpaulins. At a minimum, temporary structures for habitation, such as tents and tarpaulins, present sanitation issues and, because of the amount of space they occupy, their presence restricts the use of the Park by others. The incontrovertible facts of record show that the police gave a dispersal order to all present in the Park so that it could be cleaned of debris, tents and tarpaulins. Plaintiffs, as noted, did not comply and were arrested. So far as this record shows, individuals were permitted to engage in protest activities in Zuccotti Park before and after the cleaning and clearing. For this and other reasons, the Court concludes that the March 17, 2012 order to disperse from Zuccotti Park for a limited period of time was lawful.

As will be explained, defendants' motion for summary judgment is granted as to all federal claims, except plaintiff Austin Guest's excessive force claim against defendant Grantley Bovell. The Court dismisses on the merits or declines to exercise supplemental jurisdiction over all remaining state law claims, except for Guest's state assault and battery claim against Bovell and the City.

BACKGROUND

The following facts are taken from materials submitted in connection with the present motion and are either undisputed or construed "in the light most favorable to the [plaintiffs]." Costello v. City of Burlington, 632 F.3d 41, 45 (2d Cir. 2011).

Plaintiffs in this action are Alexander Caravalho, Eric Carter, Sergio Castillo, Daniel Greenspan, Austin Guest, Thomas Hintze, Joseph Sharkey, Easton Smith, and Jennifer Waller. Defendants are Chief of Department Joseph Esposito, Captain Nichole Papamichael, Deputy Inspector Edward Winski, Lieutenant Frank Viviano, Officer Grantley Bovell, Officer Jabded Ahmed, Officer Alexis Rodriguez, Officer Cheung Li, Officer Michael Galgano, and Officer Fnu Abdel-Rahim, who are all employed by the NYPD, and unidentified NYPD Officers John and Jane Doe #1-15, as well as the City of New York. In the Declaration of Gideon Orion Oliver in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Oliver Decl."), plaintiffs withdrew their claims against Captain Papamichael.

2016 WL 1274575

**\*2** Plaintiffs assert federal claims under section 1983 for false arrest, excessive force, excessive detention, denial of a fair trial, denial of First Amendment protections, denial of the equal protection of the laws, and denial of due process of law. 42 U.S.C. § 1983. Invoking the Court's supplemental jurisdiction, plaintiffs also assert state constitutional claims for false arrest, violations of due process, and violations of equal protection as well as state common law claims for false imprisonment, assault and battery, intentional and negligent infliction of emotional distress ("IIED" and "NIED"), and negligent hiring, screening, retention, supervision, and training against the City.

On March 17, 2012, all nine plaintiffs were present in Zuccotti Park in connection with an Occupy Wall Street ("OWS") protest celebrating the six month anniversary of the Occupy Wall Street movement. (Plaintiffs' Rule 56.1 Statement ("P's 56.1") ¶¶ 152, 206, 261-68, 342, 391-95, 447, 487, 522-29, 560-61).[1] There were hundreds of other OWS protestors congregating in and around the Park on that same day. (P's 56.1 ¶¶ 37-38, 53, 206, 212, 263). Members of the NYPD as well as members of MSA, a private security company hired by the owner of Zuccotti Park, were also present. (P's 56.1 ¶¶ 36, 51).

[1]  Where applicable, the Court's citations to Plaintiffs' Rule 56.1 Statement are citations to plaintiffs' "response." Citations to the summary judgment record in this Memorandum and Order are intended to be illustrative, but not exhaustive.

Zuccotti Park is a privately-owned public space (a "POPS") created through a special permit issued by the City in 1968. (P's 56.1 ¶¶ 2-3; Declaration of Joy Anakhu ("Anakhu Decl.") Ex. DD, Affidavit of Edith Hsu-Chen, ¶ 5). It encompasses about a block of open space between Broadway, Cedar Street, Church Street, and Liberty Street in lower Manhattan. (Anakhu Decl. Ex. DD, ¶ 7). It is owned and operated by Brookfield Office Properties ("Brookfield"). (P's 56.1 ¶ 1). Under the terms of the special permit, the Park is available for public use every day of the year. (P's 56.1 ¶ 6; Anakhu Decl. Ex. DD, ¶ 10). Brookfield also promulgates and enforces its own rules of conduct regarding permissible behavior in the Park, which, according to the sworn affidavit of Edith Hsu-Chen, the Director of the Manhattan Office of the New York City Department of Planning, do not need City approval prior to promulgation. (P's 56.1 ¶¶ 24, 27-29; Anakhu Decl. Ex. DD, ¶ 11-12).[2]

[2]  Defendants submitted Edith Hsu-Chen's sworn affidavit describing the status of Zuccotti, which Ms. Hsu-Chen swore was based on her personal knowledge, records maintained by the City, and conversations with employees, officers, and agents of the City. (Anakhu Decl. Ex. DD, ¶ 1). Plaintiffs object to Ms. Hsu-Chen's affidavit as "non-evidentiary opinion testimony." (P's 56.1 ¶1).

Defendants produced a document entitled the "Rules of Conduct for Zuccotti Park" (the "Park Rules"), which they assert were the rules governing behavior in Zuccotti Park at the time of the incident. (Anakhu Decl. Ex. HH). Those rules prohibit, among other things, erecting tents or other structures; lying down on the ground in ways that unreasonably interfere with the use of the Park; placing tarps or other coverings on the property; and, any other activity prohibited by law or statute. (Anakhu Decl. Ex. HH). Plaintiffs deny that there were rules against camping, erecting tents and other structures, laying down on the ground and laying down on benches, sitting areas, or walkways, but produce no evidence supporting their conclusory denial. (P's 56.1 ¶ 23). It is undisputed, however, that representatives of Brookfield, usually private security personnel hired by Brookfield, enforced rules of conduct inside the Park. (P's 56.1 ¶¶ 27-31).

**\*3** On the day in question, two high ranking NYPD officials, Chief of Department Esposito and Deputy Inspector Winski, were present in the Park and observed protestors engaging in behavior that they believed to be in violation of the Park Rules. (P's 56.1 ¶¶ 51-52; Anakhu Decl. Ex. U, 82; Ex. V, 54-55). Specifically, they observed protestors setting up tents and tarps, laying down, climbing on fences, and climbing on shrubs and plants. (P's 56.1 ¶¶ 51-52; Anakhu Decl. Ex. U, 82; Ex. V, 54-55). Esposito did not recall the exact number of Park Rule violations he saw that day, but generally recalled there being a "half dozen or so" tarps and many fewer tents than tarps. (Anakhu Decl. Ex. V, 54). He also recalled observing that the recently repaired Park property, particularly the newly replaced shrubbery, was "being destroyed again." (Anakhu Decl. Ex. V, 56). Winski similarly recalled "banners being hung from [Park] trees," "tents being erected," and "[p]eople [ ] standing in the flower beds again." (Anakhu Decl. Ex. U, 82). In addition, both officers believed that Brookfield wanted police assistance in protecting the Park, although neither Winski nor Esposito could recall being approached directly by a representative of Brookfield. (P's 56.1 ¶¶ 71-72; Anakhu Decl. Ex. U, 98-99; Ex. V, 55, 57-58).

Caravalho v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 1274575

After conferring with Winski, Esposito decided to temporarily clear the Park of people to allow Brookfield to remedy the ongoing violations and clean the Park. (P's 56.1 ¶¶ 74-76; Anakhu Decl. Ex. U, 81-82). Specifically, in recalling his discussion with Winski about the decision to clear people from the Park, Esposito said:

> "[t]he violations, the park rules, the rules of the park were definitely being violated and [Winski] felt that was the best course of action, to clear the park for a period of time so we could have Brookfield come in and clean it, take down the tents, move any of the debris. There were a few rules now that had come in with regarding what you can and can't do in the Park. We wanted to enforce those rules and I felt that was the proper course of action."

(Anakhu Decl. Ex. V, 57-58).

After Esposito made the decision to temporarily clear the Park of people, Winski and other police officers, including Lieutenant Frank Viviano, used bullhorns to give dispersal orders to the assembled crowd of protestors. (P's 56.1 ¶¶ 85-88, 937-38). Those orders informed protestors that they had to leave the Park because they were violating Zuccotti Park Rules. (P's 56.1 ¶¶ 89, 938). Certain plaintiffs deny hearing or understanding the dispersal orders, (P's 56.1 ¶¶ 230, 353, 406, 455), but Caravalho and Greenspan testified in their depositions that they both heard dispersal orders, (P's 56.1 ¶¶ 161, 490). After giving several dispersal orders, the police gave protestors an opportunity to leave, (P's 56.1 ¶ 91), but each of the nine plaintiffs remained inside the Park, (P's 56.1 ¶¶ 169, 232-33, 284-88, 355-58, 421-23, 459-66, 492, 534-36, 563-65). Each plaintiff, except Castillo, then locked arms with other protestors around them, (P's 56.1 ¶¶ 170, 233, 288, 358, 423, 466, 496, 536), forming human walls of between 140 to 340 total protestors, (P's 56.1 ¶¶ 172-74).

Police officers proceeded to arrest the locked-arm protestors, including plaintiffs, using varying degrees of force. (P's 56.1 ¶¶ 185, 246, 291-92, 360-64, 428, 475-77, 504-06, 540-41, 564-66). Officers took these arrestees to transport buses, drove them to police precincts, and eventually moved them to Central Booking where the officers filled out arrest processing paperwork. (P's 56.1 ¶¶ 190-91, 250, 256-57, 321, 324, 331, 386-88, 442, 444, 479, 485, 513, 520, 546, 550). Each of the nine plaintiffs was held in custody for between 24 and 30 hours before being released without charges. (P's 56.1 ¶¶ 1498-99). Plaintiffs' "Declination of Prosecution" forms explain that the district attorney decided not to file charges against each plaintiff because each one's

arresting officers were unable "to personally attest to" their criminal conduct. (P's 56.1 ¶ 1498; Oliver Decl. Ex. U). [3] According to Officer Galgano's deposition testimony, some arresting officers became separated from their arrestees while the arrestees were being moved into transport buses; as a result, other officers were designated as arresting officers and completed processing paperwork for their newly acquired arrestees on the basis of information provided to them by other officials. (P's 56.1 ¶¶ 626, 642-46).

[3]     Defendant Galgano was listed as the arresting officer for plaintiff Sharkey. (Oliver Decl. Ex. P, 27). Defendant Rodriguez was listed as the arresting officer for plaintiffs Smith and Castillo. (Oliver Decl. Ex. P, 15, 31). Defendant Ahmed was listed as arresting officer for plaintiffs Caravalho, Carter, and Guest. (Oliver Decl. Ex. P, 3, 7, 19). And, defendant Li was listed as arresting officer for plaintiffs Greenspan, Hintze, and Waller. (Oliver Decl. Ex. P, 11, 23, 35).

**\*4** Additional facts relevant to each specific claim will be addressed, as necessary, during the analysis of those claims.

## DISCUSSION

### I. Legal Standard.

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. A fact is material if it "might affect the outcome of the suit under the governing law ...." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he is entitled to relief as a matter of law. Vt. Teddy Bear Co., Inc. v. 1–800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).

When the moving party has met this initial burden and has asserted facts demonstrating that the non-moving party's claim cannot be sustained, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250. In raising a triable issue of fact, the non-movant carries only a "limited burden of production," but nevertheless "must demonstrate more than some metaphysical doubt as to the material facts, and come forward with specific facts showing that there is a genuine

Case 9:21-cv-00372-MAD-TWD    Document 61    Filed 06/22/23    Page 72 of 218

Caravalho v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 1274575

issue for trial." Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (internal quotation marks omitted).

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (internal quotations and citations omitted). In reviewing a motion for summary judgment, the Court must scrutinize the record, and grant or deny summary judgment as the record warrants. Rule 56(c). In the absence of any disputed material fact, summary judgment is appropriate.

II. Section 1983 Claims.

To establish a claim under section 1983, a plaintiff must prove that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." Snider v. Dylag, 188 F.3d 51, 53 (2d Cir. 1999). In this case, plaintiffs' claim they were deprived of rights protected by the First, Fourth, Sixth, and Fourteenth Amendments to the Constitution. Specifically, they claim that they were: (a) falsely arrested, (b) subjected to excessive force, (c) subjected to excessive detention, (d) deprived of their rights to a fair trial, (e) deprived of their rights under the First Amendment, (f) deprived of the equal protection of the laws, and (g) deprived of due process of law. Plaintiffs also claim that the City is liable for the alleged constitutional violations they suffered. See Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 696 (1978). Each claim will be addressed separately.

A. False Arrest.

**\*5** Defendants move for summary judgment on plaintiffs' false arrest claims on the basis that there was probable cause to arrest each plaintiff. Probable cause to arrest "is a complete defense to an action for false arrest." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) (quoting Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994) (internal quotation marks omitted)). "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." Id. at 852. There is probable cause to arrest

"when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Id. It is not necessary for probable cause to have existed "with respect to each individual charge" so long as "probable cause existed to arrest for any crime." Marcavage v. City of New York, 689 F.3d 98, 109 (2d Cir. 2012). A court "must examine the totality of the circumstances of a given arrest" and judge those circumstances "from the perspective of a reasonable police officer in light of his training and experience." United States v. Delossantos, 536 F.3d 155, 159 (2d Cir. 2008).

Defendants assert that the arresting officers had probable cause to believe that plaintiffs committed trespass in violation of N.Y. Penal Law section 140.05, disorderly conduct in violation of N.Y. Penal Law section 240.20(6), and obstruction of governmental administration in violation of N.Y. Penal Law section 195.05. [4] Defendants bear the burden of establishing probable cause for an arrest as an affirmative defense. As will be discussed, evidence that has not been disputed by plaintiffs, including in some instances their own admissions, establishes that those officers who physically arrested plaintiffs inside Zuccotti Park had probable cause to believe that each plaintiff violated the statutory prohibition on disorderly conduct. It is not necessary for the Court to consider whether there was also probable cause to arrest plaintiffs for trespass and obstruction of governmental administration. See Marcavage, 689 F.3d at 109.

[4]     New York classifies trespass and disorderly conduct as "violations," but not crimes. N.Y. Penal Law §§ 140.05, 240.20.

To show that there was probable cause to arrest for disorderly conduct, four elements must be established: "(1) defendant congregated with other persons in a public place; (2) was given a lawful order of the police to disperse; (3) refused to comply with that order; and (4) acted "with intent to cause public inconvenience, annoyance or alarm" or with recklessness to the "risk thereof." United States v. Nelson, 10 cr 414 (PKC), 2011 WL 1327332, at *3 (S.D.N.Y. Mar. 31, 2011) aff'd, 500 Fed. App'x 90 (2d Cir. 2012); cf. Provost v. City of Newburgh, 262 F.3d 146, 157 (2d Cir. 2001). [5] Defendants establish all four elements.

[5]     Under N.Y. Penal Law section 240.20(6), "[a] person is guilty of disorderly conduct when, with

Case 9:21-cv-00372-MAD-TWD    Document 61    Filed 06/22/23    Page 73 of 218

Caravalho v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 1274575

intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof ... [h]e congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse."

The first element is satisfied because each plaintiff was present in the Park immediately prior to his or her arrest together with at least three or more persons. People v. Carcel, 3 N.Y.2d 327, 333 (1957) (holding that "[t]he term 'congregates with others', as used in the statute, requires at the very least three persons assembling at a given time and place."). Each plaintiff admits that he or she was voluntarily present in Zuccotti Park on March 17, 2012. (P's 56.1 ¶¶ 152, 206, 261-68, 342, 391-95, 447, 487, 522-29, 560-61). And, there is testimony from plaintiffs, defendants, and non-party witnesses establishing that there was a large crowd of other people present in and around the Park, in physical proximity to plaintiffs. (P's 56.1 ¶¶ 37-38, 53, 206, 212, 263). For example, Deputy Inspector Winski testified that "maybe 500 to 1,000" people were present in the Park, (Anakhu Decl. Ex. U, 89), and Joseph Sharkey stated that there were "likely upwards of 1,000 people in the vicinity of Zuccotti Park," (Anakhu Decl. Ex. T, 51). Plaintiffs have not come forward with evidence to raise a material dispute as to the first element.

*6  Regarding the second element, defendants have come forward with evidence tending to establish that they gave dispersal orders to the protestors in the Park. Winski and other police officers used bullhorns to give numerous dispersal orders to the crowd of protestors gathered in Zuccotti Park. (P's 56.1 ¶¶ 85-88, 937-38). Those orders informed protestors that they were required to leave because they were violating Zuccotti Park Rules. (P's 56.1 ¶ 89, 938). In response, plaintiffs present evidence that some plaintiffs did not hear or did not understand defendants' dispersal orders. (P's 56.1 ¶¶ 230, 353, 406, 455). For example, Easton Smith testified at his deposition that he "heard some announcement being made by the police officer and [was] not sure if it was an order per se." (Anakhu Decl. Ex. N, 76). That evidence, however, does not create a material dispute regarding whether defendants *gave* a dispersal order.

Because probable cause is analyzed "from the perspective of a reasonable police officer in light of his training and experience," Delossantos, 536 F.3d at 159, evidence showing that defendants gave dispersal orders in a manner calculated to be heard is sufficient to establish that an order was given, whether or not it was, in fact, heard or understood. Here,

defendants testified that they gave numerous dispersal orders with bullhorns that were at full volume. (Anakhu Decl. Ex. U, 101; Ex. X, 150). And, that they observed "the vast majority of people," "hundreds" of people, leaving the Park in response to their orders. (Anakhu Decl. Ex. U, 102). Moreover, two plaintiffs, Caravalho and Greenspan, specifically admitted to hearing the police dispersal orders. (P's 56.1 ¶¶ 161, 490). That undisputed testimony is sufficient, for the purposes of determining probable cause, to establish the fact that defendants gave dispersal orders.

The record also establishes that defendants' dispersal orders were "lawful." An order to disperse is lawful under section 240.20(6), "unless the order was 'purely arbitrary' and 'not calculated in any way to promote the public order.'" Crenshaw v. City of Mount Vernon, 372 Fed. App'x 202, 206 (2d Cir. 2010) (quoting People v. Galpern, 259 N.Y. 279, 284-85 (1932)). Defendants have come forward with evidence showing that defendants Esposito and Winski made the decision to temporarily clear the Park of people in order to enforce the Park Rules and allow Brookfield to clean the Park. A dispersal order reasonably calculated to enforce lawful Park Rules is itself "lawful" within the meaning of section 240.20(6).

Prior to making the decision to temporarily clear the Park, Esposito and Winski personally observed protestors engaging in behavior they believed to be in violation of the Park Rules. (P's 56.1 ¶¶ 51-52; Anakhu Decl. Ex. U, 82; Ex. V, 54-55, 57-58). In particular, they observed protestors setting up tents and tarps, laying down, climbing on fences, and climbing on shrubs and plants. (P's 56.1 ¶¶ 51-52; Anakhu Decl. Ex. U, 82; Ex. V, 54-55). While Esposito and Winski did not recall the exact number of Park Rule violations they saw, Esposito recalled there being a "half dozen or so" tarps and many fewer tents than tarps, (Anakhu Decl. Ex. V, 54), and Winski recalled "banners being hung from [Park] trees," "tents being erected," and "[p]eople [ ] standing in the flower beds again," (Anakhu Decl. Ex. U, 82). Esposito also recalled observing that protestors were destroying Park property, specifically shrubbery that Brookfield had recently replaced. (Anakhu Decl. Ex. V, 56).

In the course of pretrial discovery, defendants produced a notice containing the Park Rules as promulgated by Brookfield at the time in question. (Anakhu Decl. ¶ 35, Ex. HH). Those Rules expressly prohibited "camping and/ or erecting tents or other structures," "lying down on the ground or on benches, sitting areas, or walkways in ways

2016 WL 1274575

that unreasonably interfere with their use," "placing tarps ... or other coverings on the property," and, "any other activity prohibited by law or statute." (Anakhu Decl. Ex. HH). While plaintiffs deny that the rules in effect at the time actually prohibited camping, erecting tents and other structures, and laying down on the ground, they present no evidence supporting their conclusory denial. (P's 56.1 ¶ 23). Nor do they present evidence challenging the veracity of defendants' account of the applicable Park Rules. Simply denying that the Park Rules prohibited certain conduct does not create a genuine issue of material fact regarding the existence or content of those rules.

**\*7** Plaintiffs have not produced evidence materially disputing the content of the Park Rules or Winski's and Esposito's testimony describing what they saw and why they gave dispersal orders. Instead, plaintiffs challenge the lawfulness of defendant's dispersal order on First Amendment and Due Process grounds. Specifically, they contend that the Park Rules were improper time, place, and manner restrictions, that the Park Rules did not provide adequate notice of the prohibited conduct, and that defendants' decision to clear the Park of people in order to enforce the Park Rules unlawfully restricted their speech. Because defendants gave dispersal orders as a means of enforcing the Park Rules, plaintiffs could successfully challenge a finding of probable cause if the Park Rules, or defendants' act enforcing those Rules, violated another constitutional provision.

Nevertheless, plaintiffs have failed to establish any viable First Amendment or Due Process claim attacking the police dispersal orders. In short, the Park Rules are constitutional content neutral time, place and manner regulations; the Park Rules are clear on their face and they deprived no plaintiff of any liberty interest protected by the Due Process Clause; and, defendants' decision to enforce the Park Rules by clearing the Park of people was viewpoint neutral and did not overly burden plaintiffs' speech. For those reasons, there is no colorable First Amendment or Due Process challenge to finding that defendants' gave "lawful" dispersal orders.

In sum, the undisputed facts are sufficient to warrant a reasonable belief that defendants gave a dispersal order to clear Zuccotti Park of people and that the order was "lawful." See Marcavage, 689 F.3d at 104 (quoting Bery v. City of New York, 97 F.3d 689, 697 (2d Cir. 1996)) ("Government 'certainly has a significant interest in keeping its public spaces safe and free of congestion.'"); see also Rivera v. City of New York, 40 A.D.3d 334, 338 (1st Dep't 2007) (finding

that dispersal order given to individuals handing out fliers on crowded boardwalk was lawful).

The third element is satisfied because a reasonable officer would believe that plaintiffs failed to comply with defendants' lawful dispersal orders. Defendants have presented evidence that, after Winski announced the dispersal orders, the police gave protestors an opportunity to leave the Park. (P's 56.1 ¶ 91). As a result, many protestors left the Park and were not arrested. (P's 56.1 ¶¶ 93, 273, 370). Each of the nine plaintiffs, however, by their own admission, remained inside the Park. (P's 56.1 ¶¶ 169-71, 232-33, 284-88, 355-58, 421-23, 459-66, 492, 534-36, 563-65). Plaintiffs present no evidence disputing the fact that defendants gave protestors an opportunity to leave the park in compliance with the dispersal order or that plaintiffs remained in the Park until they were arrested.

As to the fourth and final element, the undisputed facts support the conclusion that it was reasonable for the arresting officers to believe that each plaintiff acted recklessly in creating a risk of causing public inconvenience, annoyance, or alarm. This element contains two requirements: a public conduct requirement and an intent requirement. See Provost, 262 F.3d at 157-58. Regarding the intent requirement, "the statute does not require proof of the accomplished fact of public inconvenience, annoyance or alarm; but proof only from which the [r]isk of it, recklessly created, might be inferred." People v. Todaro, 26 N.Y.2d 325, 328 (1970) (internal quotation marks omitted). And, "because the practical restraints on police in the field are greater with respect to ascertaining intent ..., the latitude accorded to officers considering the probable cause issue in the context of mens rea crimes must be correspondingly great." Zalaski v. City of Hartford, 723 F.3d 382, 393 (2d Cir. 2013) (quoting Cox v. Hainey, 391 F.3d 25, 34 (1st Cir. 2004)) (internal quotations marks omitted).

**\*8** Plaintiffs' admissions about their own behavior in Zuccotti Park demonstrate that a reasonable arresting officer could have inferred plaintiffs' reckless disregard for public order. For example, every plaintiff but Castillo admits that he or she locked arms with other protestors when the police entered the Park to effectuate the dispersal order. (P's 56.1 ¶¶ 170, 233, 288, 358, 423, 466, 496, 536). While Castillo did not testify that he locked arms, he stated that he was seated on his knees inside the Park just prior to being arrested. (P's 56.1 ¶¶ 564-65). According to Caravalho's deposition testimony, there were between 140 and 340 locked-arm protestors in total. (P's 56.1 ¶¶ 172-74). And, according

2016 WL 1274575

Hintze's and Waller's testimony, some of those protestors had been engaging in "Plus Brigades" prior to their arrests, which involved practice in "melting to the ground, making a wall, and locking arms." (P's 56.1 ¶¶ 346-49, 460, 464). Moreover, plaintiffs Guest, Hintze, Smith, and Carter admitted that they did not voluntarily move their bodies when ordered to move by the police, which impeded the arresting officers' ability to carry out the dispersal orders. (P's 56.1 ¶¶ 293, 297, 365, 367, 429, 434, 543, 545). This undisputed testimony shows that each plaintiff remained in the Park after dispersal orders were given and participated in, or associated with others participating in, activities reasonably interpreted by an arresting officer as recklessly creating a public inconvenience and exhibiting a reckless disregard for public safety. See People v. Nunez, 36 Misc.3d 172, 183-84 (N.Y. City Crim. Ct. 2012) ("[T]he intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof is evidenced by the alleged acts of locking arms with others and that the defendant tightened his arms to prevent the NYPD from himself and other persons thereby preventing the NYPD from enforcing it's order to disperse from the location.") (internal quotation marks omitted); see also Nelson, 2011 WL 1327332, at *4; Todaro, 26 N.Y.2d at 329.

Regarding the "public conduct" requirement, the Court must assess whether plaintiffs' actions carried "public ramifications." People v. Munafo, 50 N.Y.2d 326, 331 (1980) (describing the aim of the disorderly conduct statute as being "situations that carr[y] beyond the concern of individual disputants to a point w[h]ere they had become a potential or immediate public problem"). In doing so, "courts are constrained to assess the nature and number of those attracted, taking into account the surrounding circumstances, including, of course, the time and the place of the episode [ ] under scrutiny." Id. Plaintiffs conduct in remaining in groups waiting to be arrested in the middle of Zuccotti Park after other Occupy Wall Street protestors had dispersed was conduct "beyond the concern of individual disputants." Id.

Finally, while each plaintiff ultimately was released without charges, the district attorney's decision to forgo prosecution does not, in and of itself, undermine the arresting officers' conclusions that there was probable cause to arrest each of the plaintiffs. The appropriate inquiry in a probable cause analysis "is limited to whether the facts known by the arresting officer at the time of arrest objectively provided probable cause to arrest." Gonzalez v. City of Schenectady, 728 F.3d 149, 155 (2d Cir. 2013). There is evidence in the record establishing that, at some point in time between

when certain protestors were arrested and when they were processed, some arresting officers were separated from their arrestees. (P's 56.1 ¶ 626). This led to other officers, such as defendant Michael Galgano, filling out arresting paperwork for protestors whom they did not physically arrest on the basis of information provided to them by other officials. (P's 56.1 ¶¶ 642-46). Based on the evidence produced here, it is reasonable to conclude that this "mix-up" affected each of the plaintiffs: the arresting officers listed on their paperwork were not actually the officers who physically arrested them in Zuccotti Park. (P's 56.1 ¶¶ 628, 708, 711, 773-75, 854). As a result, the district attorney declined to prosecute plaintiffs because their arresting officers were unable "to personally attest to" their criminal conduct. (P's 56.1 ¶ 1498; Oliver Decl. Ex. U). Nevertheless, because this error in arrest processing took place after plaintiffs were initially arrested, it does not create a material dispute of fact regarding the basis for probable cause to arrest. Moreover, the fact that a charging instrument is based entirely upon hearsay—second hand information—does not render it constitutionally deficient. See United States v. Costello, 221 F.2d 668, 679 (2d Cir. 1955) (Hand, J.) aff'd, 350 U.S. 359 (1956) (sustaining a grand jury indictment that was based only on hearsay evidence).

An alternative grounds for dismissing the false arrest claims is that, in response to defendants' motion, plaintiffs have come forward with no evidence of the named defendants' "personal involvement" in their arrests in Zuccotti Park, except arguably as to Esposito, Winski, and Viviano. See Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995). The record establishes that none of the named defendants physically seized any of the plaintiffs. (P's 56.1 ¶¶ 628, 708, 711, 773-75, 854). Instead, plaintiffs claim that defendants John and Jane Does #1-15 made the initial arrests inside the Park. After a full and fair opportunity to conduct discovery, plaintiffs have been unable to identify John and Jane Does #1-15. For that reason, plaintiffs' false arrest claims against defendants Bovell, Ahmed, Rodriguez, Li, Galgano, and Abdel-Rahim are dismissed on this alternative ground.

*9 Defendants' motion for summary judgment is granted as to plaintiffs' false arrest claims.


B. Excessive Force.
Defendants move for summary judgment on plaintiffs' excessive force claims for several reasons including that the force used against plaintiffs was reasonable as a matter of law and that plaintiffs failed to establish the "personal involvement" of any named defendant.

2016 WL 1274575

A claim that excessive force was used during an arrest is analyzed under Fourth Amendment principles. Graham v. Connor, 490 U.S. 386, 394 (1989). To prevail, a plaintiff must show that a defendant's use of force was objectively unreasonable "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397. "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," and "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' [ ], violates the Fourth Amendment." Id. (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)) (internal citation omitted). In evaluating whether the amount of force used against a plaintiff was reasonable, the Court should consider: "[i] the severity of the crime at issue, [ii] whether the suspect poses an immediate threat to the safety of the officers or others, and [iii] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." Pelayo v. Port Auth., 893 F. Supp. 2d 632, 642 (S.D.N.Y. 2012) (quoting Graham, 490 U.S. at 386) (alterations in original). While courts in this Circuit regularly hold that a plaintiff must have sustained some injury to maintain a claim of excessive force, see, e.g., Acosta v. City of New York, 11 cv 856 (KBF), 2012 WL 1506954, at *10 (S.D.N.Y. Apr. 26, 2012), that injury, need not be severe, see Robison v. Via, 821 F.2d 913, 924 (2d Cir. 1987) (denying summary dismissal of excessive force claim where plaintiff "testified that she suffered bruises lasting a 'couple weeks'").

Courts in this Circuit have separately addressed excessive force claims arising from an officer's use of handcuffs. See, e.g., Usavage v. Port Auth. of New York & New Jersey, 932 F. Supp. 2d 575, 592 (S.D.N.Y. 2013); Pelayo, 893 F. Supp. 2d at 642. "Although handcuffs must be reasonably tight to be effective, [ ], overly tight handcuffing can constitute excessive force." Lynch ex rel. Lynch v. City of Mount Vernon, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008) (internal citation omitted). "[I]n evaluating the reasonableness of handcuffing, a Court is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the [plaintiffs'] pleas that the handcuffs were too tight; and 3) the degree of *injury to the wrists.*" Id. (quoting Esmont v. City of New York, 371 F. Supp. 2d 202, 215 (E.D.N.Y. 2005)) (emphasis in original). Generally, "handcuffing does not suffice for an excessive force claim unless it causes some injury beyond temporary discomfort or bruising." Omor v. City of New York, 13 cv 2439 (RA), 2015 WL 857587, at *7 (S.D.N.Y. Feb. 27, 2015);

see also Higginbotham v. City of New York, 105 F. Supp. 3d 369, 377 (S.D.N.Y. 2015) (collecting cases); Lynch, 567 F. Supp. at 468-69 (collecting cases).

**\*10** "Given the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 123 (2d Cir. 2004) (Sotomayor, J.). "The plaintiff's testimony about the injuries and subsequent treatment alone is sufficient to support an excessive force claim on a motion for summary judgment." Pelayo, 893 F. Supp. 2d at 642 (citing Mickle v. Morin, 297 F.3d 114, 121–22 (2d Cir. 2002)).

### 1. Carter, Castillo, Greenspan, Sharkey, Smith, and Waller.

Plaintiffs Carter, Castillo, Greenspan, Sharkey, Smith, and Waller testify that police officers used varying degrees of physical force against them during their arrests. The Court need not reach the question of whether each of those instances of force was reasonable because none of these plaintiffs have put forth evidence establishing the "personal involvement" of any named defendant. This shortcoming is fatal to their federal excessive force claims against the individual defendants.

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Colon, 58 F.3d at 873 (quoting Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)). There are several ways to establish the "personal involvement" of a defendant. A plaintiff could show that a defendant directly participated in the infraction. Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986). She could show that a defendant failed to intervene on her behalf where there was a realistic opportunity to prevent the harm from occurring. Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994). And, she could show that a supervisory defendant, through "his or her supervisory responsibilities," violated the terms of the constitutional provision at issue. Ashcroft v. Iqbal, 556 U.S. 662, 675-77 (2009); see also Colon 58 F.3d at 873 (describing the various ways a supervisor could be personally involved in a constitutional deprivation carried out by a subordinate).[6] None of these six plaintiffs present facts showing that any of the named defendants directly participated in, or were in a position to effectively intercede in, the alleged uses of force. They also do not adduce evidence showing that the

Case 9:21-cv-00372-MAD-TWD    Document 61    Filed 06/22/23    Page 77 of 218

Caravalho v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 1274575

supervisory defendants, Esposito, Winski, and Viviano, failed to properly supervise any subordinate officer responsible for, or put in place or continued any policy leading to, the alleged uses of force.

6        For the purposes of this motion, the Court need not weigh in on the extent to which the Colon factors survive Iqbal, 556 U.S. at 675-77. See Marom v. City of New York, 15 cv 2017 (PKC), 2016 WL 916424, at *15 (S.D.N.Y. Mar. 7, 2016) (describing the impact of Iqbal on the "Colon test" for supervisory liability).

Unlike the plaintiffs in Shankle v. Andreone, 06 cv 487 (NG) (LB), 2009 WL 3111761, at *5 (E.D.N.Y. Sept. 25, 2009), or De Michele v. City of New York, 09 cv 9334 (PGG), 2012 WL 4354763, at *16-17 (S.D.N.Y. Sept. 24, 2012), these plaintiffs do not present any evidence, circumstantial or otherwise, of any named defendants' "personal involvement" in the uses of force, or even that any of the named defendants witnessed plaintiffs being arrested inside the Park. See Rasmussen v. City of New York, 766 F. Supp. 2d 399, 411-12 (E.D.N.Y. 2011) (holding that it was an "insurmountable problem" that plaintiff, despite discovery, failed to identify most of the officers who allegedly violated her rights). Rather, the evidence shows that each of the named defendants only became aware of certain plaintiffs' existence after they were arrested, which is after the force had been used. Specifically, the undisputed record shows that Officer Galgano did not encounter Sharkey until he was placed on one of the transport buses, (P's 56.1 ¶ 628); that Officer Rodriguez did not encounter Smith or Castillo until they were at the Midtown South Precinct, (P's 56.1 ¶¶ 708, 711); that Officer Ahmed did not encounter Carter while he was in Zuccotti Park, (P's 56.1 ¶ 775); and, that Officer Li did not encounter Waller and Greenspan until they were on a transport bus, (P's 56.1 ¶ 854). [7] Nor have these plaintiffs come forward with evidence sufficient to raise a material dispute of fact as to the defendants "personal involvement" in the use of force associated with their handcuffing.

7        Plaintiff Waller claims that defendant Sergeant Abdel-Rahim threatened to use a taser on her if she did not stop singing in her cell. (P's 56.1 ¶ 1421). There is no evidence that Abdel-Rahim ever used force or was present during any other police officers use of force against any plaintiff.

*11 Plaintiffs allege that John and Jane Does #1-15 were "personally involved" in the uses of force against them. But,

after a full and fair opportunity to conduct discovery, plaintiffs have been unable to identify John and Jane Does #1-15. Fact discovery began on December 17, 2013. (Dkt. 16). It was originally scheduled to end on June 17, 2014, (Dkt. 16), but was extended four times, (Dkt. 49, 70, 75, 140). Fact discovery ultimately ended a year and a half later on May 15, 2015. (Dkt. 140). Because these plaintiffs cannot identify any named defendant "personally involved" in their excessive force claims, their claims fail as a matter of law. Defendants' motion for summary judgment against Carter's, Castillo's, Greenspan's, Sharkey's, Smith's, and Waller's excessive force claims is granted.

    2. Caravalho, Hintze, and Guest.
In contrast, plaintiffs Caravalho, Hintze, and Guest present evidence of the "personal involvement" of certain named defendants in their excessive force claims. The Court will address each of those plaintiffs' specific claims in turn.

According to Caravalho, he was kicked by an officer in the ribs during his arrest and his handcuffs were painful when they were put on and got tighter whenever he moved his hands. (P's 56.1 ¶¶ 180, 187, 189). Critically, Caravalho presents no evidence identifying any named defendant as being "personally involved" in the alleged kick. He does, however, identify one named defendant during his testimony regarding his tight handcuffs—Officer Li. Specifically, Caravalho testified that he complained to Li about his handcuffs being tight and that Li loosened them for him; he characterized Officer Li as "the kind one." (P's 56.1 ¶ 195; Anakhu Decl. Ex. S, 108). Caravalho does not claim that Officer Li was responsible for putting handcuffs on him or that Officer Li failed to respond to any other complaint from him about his handcuffs. On the basis of Caravalho's own testimony, Officer Li could not have been "personally involved" in any constitutional deprivation associated with excessive force or handcuffing. Because there is no evidence in the record linking any other named defendant to Caravalho's excessive force claims, defendants' motion for summary judgment is granted as to Caravalho's excessive force claim.

Plaintiff Hintze testified that officers gave him "pressure point treatments" on his shoulders and neck—namely, "[t]hey jammed their fingers into [his] back and the area where [his] neck meets [his] shoulders"—to get him to release his locked arms. (P's 56.1 ¶ 360; Anakhu Decl. Ex. J, 29). Then, they flipped him over on to his chest, with "one of the officers [coming] down with his knee on [Hintze's] cheek,"

Case 9:21-cv-00372-MAD-TWD    Document 61    Filed 06/22/23    Page 78 of 218

Caravalho v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 1274575

and handcuffed him. (P's 56.1 ¶¶ 362, 364; Anakhu Decl. Ex. J, 28-29). Finally, officers carried him out of the Park by his hands and legs, dropping him a few times while carrying him. (P's 56.1 ¶¶ 367, 372). Like the previously discussed seven plaintiffs, Hintze does not present evidence, direct or circumstantial, of any named defendants' "personal involvement" in those actions. Therefore, he cannot sustain an excessive force claim based on those actions at this stage.

Hintze does, however, present evidence that, while waiting on a transport bus, he too asked Officer Li to remove his flex cuffs because they were too tight. (P's 56.1 ¶ 378). Officer Li complied with this request and replaced Hintze's flex cuffs with metal handcuffs. (P's 56.1 ¶ 379). Although Hintze testified that his metal handcuffs were also too tight, there is no evidence that he asked Officer Li to loosen the replacement handcuffs. (P's 56.1 ¶ 380). Hintze also testified that his only injury from being handcuffed was some numbness for a period of "some weeks and maybe a couple of months." (P's 56.1 ¶ 382). Because Hintze fails to show that Li "ignored [his] pleas that the handcuffs were too tight," Lynch, 567 F. Supp. 2d at 468, and that he suffered some injury "beyond temporary discomfort or bruising," Omor, 2015 WL 857587, at *7, no reasonable fact finder could conclude that the handcuffing with which Li may have been "personally involved" was unreasonable. On the above basis, defendants' motion for summary judgment is granted on all of Hintze's excessive force claims.

**\*12** According to plaintiff Guest, police officers threw him face down on the ground, handcuffed him, and carried him outside of Zuccotti Park. (P's 56.1 ¶¶ 290-97). Guest stated that he "let [his] body go limp." (Anakhu Decl. Ex. K, 30). About a half hour later, officers carried Guest again, this time on to a transport bus, because Guest continued to refuse to move his body. (P's 56.1 ¶¶ 302-07; Anakhu Decl. Ex. K, 36). During that second round of carrying, the officers allegedly dragged Guest up the bus stairs causing him to hit his shin and knee on the steps, threw him into the driver partition head first, and dragged him down the row of seats with his head banging on the seats. (P's 56.1 ¶¶ 308-10; Anakhu Decl. Ex. K, 36-37). Then, shortly after placing Guest in one seat, officers asked him to move to a different seat in the back of the bus. (P's 56.1 ¶ 312). For a third time Guest refused, saying "something to the effect of '[n]o, you just threw me here, I'm not going to get up and go somewhere else.'" (P's 56.1 ¶¶ 312-314). Two officers then picked him up and carried him up the stairs to the back of the bus causing his head to hit each stair. (P's 56.1 ¶¶ 314-16). Guest also testified that his flex

cuffs were tight and that, at some point on the bus, he asked for everyone's flex cuffs to be loosened. (P's 56.1 ¶¶ 319-20).

Guest suffered only *de minimis* injuries as a result of the force used. With regard to his tight flex cuffs, Guest experienced numbness in his hands while the cuffs were on, tingling in his fingers for several hours after the cuffs were taken off, and less severe tingling in his hand for about a month. (P's 56.1 ¶¶ 319, 337-38). Otherwise, Guest claims to have suffered only a "sore and [ ] bruised" shin. (P's 56.1 ¶ 326; Anakhu Decl. Ex. R, 128). He could not recall if his knee hurt as a result of the incident on the bus and stated his head felt "okay" when he was at the Midtown South Precinct. (P's 56.1 ¶¶ 327, 325; Anakhu Decl. Ex. R, 128). Guest did not ask for medical assistance while in custody, has not sought medical treatment for any injuries related to that incident thereafter, and has no limitation as a result of any physical injury suffered on March 17, 2012. (P's 56.1 ¶¶ 330, 335-36, 339).

While Guest does not identify any of the named defendants as being responsible for those actions, Officer Grantley Bovell separately testified that he was involved in escorting Guest through the transport bus, although he denied using the force alleged. (P's 56.1 ¶¶ 1331-33). Because there is some evidence of Bovell's "personal involvement," the Court must proceed to deciding whether it can resolve Guest's excessive force claim on the record presented.

Given Guest's testimony that officers dragged him up the bus stairs, threw him into the driver partition head first, dragged him down the row of seats with his head banging on the seats, and dragged up him up another set of stairs causing his head to hit each stair, (P's 56.1 ¶¶ 308-10, 314-16; Anakhu Decl. Ex. K, 36-37), a reasonable juror could conclude that the force used was unreasonable even though Guest suffered minimal injuries and admitted to going "limp" when approached by the police, (Anakhu Decl. Ex. K, 30, 36-37). Whether Officer Bovell is responsible for using unreasonable force against Austin Guest is a question for a jury to decide.

In sum, Caravalho's, Carter's, Castillo's, Greenspan's, Sharkey's, Smith's, Waller's, and the balance of Hintze's excessive force claims are dismissed because each plaintiff failed to establish the "personal involvement" of any named defendant. Hintze's remaining handcuff claim is also dismissed, but on grounds that the force used was reasonable as a matter of law. Guest's excessive force claim against Officer Bovell, however, survives to trial.

Case 9:21-cv-00372-MAD-TWD   Document 61   Filed 06/22/23   Page 79 of 218
Caravalho v. City of New York, Not Reported in Fed. Supp. (2016)
2016 WL 1274575

## C. Excessive Detention.

Defendants move for summary judgment on plaintiffs' excessive detention claims on the basis that, under the facts presented, there was no constitutional deprivation as a matter of law. The Fourth Amendment also "governs the procedures applied during some period following an arrest." Bryant v. City of New York, 404 F.3d 128, 136 (2d Cir. 2005). Its reasonableness test is, again, one of "objective reasonableness," meaning that the subjective motivations of individual officers have no bearing on whether a seizure was reasonable under the Fourth Amendment. Id. "In the context of pretrial detention, the Supreme Court has held that, when there has been a warrantless arrest, the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention." Id.; see Gerstein v. Pugh, 420 U.S. 103, 113-14 (1975). The Supreme Court subsequently clarified what it meant by "prompt" judicial determination of probable cause and held that "a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement." Cty. of Riverside v. McLaughlin, 500 U.S. 44, 56 (1991). In sum, "[w]hat is constitutionally required is that, except in extraordinary circumstances, the arrestee be given a hearing into probable cause for the arrest within 48 hours." Bryant, 404 F.3d at 138; see also McLaughlin, 500 U.S. at 56 ("Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake.").

 **\*13** It is undisputed that each plaintiff was held in police custody for between 24 and 30 hours before being released without an arraignment. (P's 56.1 ¶¶ 1498-99). This length of detention is presumptively reasonable. See Bryant, 404 F.3d at 138. Although an arrestee can rebut that presumption "if the arrested individual can prove that his or her probable cause determination was delayed unreasonably," plaintiffs adduce no evidence supporting such a contention. McLaughlin, 500 U.S. at 56.

Instead, plaintiffs make two untenable arguments. First, plaintiffs argue that a reasonable jury could decide that their detentions were unlawful based on the fact that defendants denied them release with a summons or a Desk Appearance Ticket ("DAT"). Even assuming that plaintiffs were "eligible" for release on a summons or DAT, plaintiffs fail to produce evidence showing that defendants' decision denying them release on a summons or DAT was unreasonable—i.e. the

result of ill will. See McLaughlin, 500 U.S. at 56. The fact that plaintiffs were not given summonses does not, itself, create a genuine issue of material fact regarding the reasonableness of plaintiffs' detention. If plaintiffs could sustain their excessive detention claims simply by showing that defendants could have, but did not, release them with a summons, then every summons-eligible arrest for which a summons was not given would amount to an unreasonable detention. There is no law supporting that assertion.

Second, plaintiffs argue that their detentions were unreasonably prolonged by defendants' acts of "falsifying" police reports. This argument is based on evidence of an error during arrest processing whereby certain defendants were assigned to be arresting officers on arrests they did not personally make. (P's 56.1 ¶ 626). That "mix-up" produced arrest reports based on hearsay, (P's 56.1 ¶¶ 642-46, 833-41, 856-62), but the district attorney expressly refused to charge plaintiffs based on those reports because the arresting officers assigned to each plaintiff could not personally attest to his or her criminal conduct, (P's 56.1 ¶ 1498; Oliver Decl. Ex. U). Plaintiffs insinuate that this evidence shows defendants had "ill will" toward them, but they fail to present facts that create an inference that defendants purposefully "falsified" the reports or otherwise had any malice towards plaintiffs. Moreover, plaintiffs fail to present any evidence establishing a causal connection between those arrest reports and the length of plaintiffs' detentions. These arrest reports do not raise a genuine issue of material fact regarding the reasonableness of plaintiffs' detention.

Because plaintiffs were detained for less than 48 hours and because plaintiffs fail to set forth any evidence showing that their releases were unreasonably delayed, defendants' motion for summary judgment is granted and plaintiffs' excessive detention claims are dismissed.

## D. Right to a Fair Trial.

In their memorandum in opposition to the motion, plaintiffs employ language indicative of a fair trial claim. (Plaintiffs' Memorandum of Law in Opposition, 23-24). Specifically, they assert that defendants fabricated evidence against them causing them to suffer a deprivation of liberty. This allegation is based on evidence that plaintiffs' arrest reports were created by officers who did not have personal knowledge of the circumstances of their arrests. (Id.; P's 56.1 ¶¶ 626, 642-46, 833-41, 856-62). While the Court strains to read the First Amended Complaint as including a fair trial claim, it will "oblige[ ]" plaintiffs and infer the existence of such a claim.

Case 9:21-cv-00372-MAD-TWD    Document 61    Filed 06/22/23    Page 80 of 218

Caravalho v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 1274575

Shamir v. City of New York, 804 F.3d 553, 556 (2d Cir. 2015). Moreover, because defendants address the possible existence of a fair trial claim in their reply memorandum of law and move for summary judgment on those claims on the basis that plaintiffs fail to establish the necessary elements, the Court finds it appropriate to adjudicate the arguably unpled claim. (Defendants' Reply Memorandum of Law in Support, 17-18).

**\*14** "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial." Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997); see also Morse v. Fusto, 804 F.3d 538, 548 (2d Cir. 2015). A plaintiff need not have proceeded to a full trial on the merits in order to have an actionable section 1983 claim based on the denial of a fair trial. See Ricciuti, 124 F.3d at 127 (criminal charges dismissed pre-trial); Canario v. City of New York, 05 cv 9343 (LBS), 2006 WL 2015651, at \*1 (S.D.N.Y. July 12, 2006) (plaintiffs original criminal charges were dismissed pre-trial). However, the Court is aware of no legal precedent establishing the existence of a fair trial claim where a plaintiff has never been charged with a violation or crime. Considering the rationale for a fair trial cause of action is that "false evidence works an unacceptable corruption of the truth-seeking function of the trial process," Ricciuti, 124 F.3d at 130 (quoting United States v. Agurs, 427 U.S. 97, 104 (1976)) (internal quotation marks omitted), the imposition of some form of criminal charges would seem to be a prerequisite for a fair trial claim. See Blair v. City of New York, 03 cv 1485(SLT) (CLP), 2009 WL 959547, at \*11 (E.D.N.Y. Mar. 31, 2009) ("Falsified or fabricated evidence alone does not amount to a constitutional violation, however. The constitutional violation occurs when such evidence is admitted at trial and impairs the truth-seeking function of the court proceedings.").

Plaintiffs rely on Henry v. City of New York to support the proposition that they suffered a violation of their rights to a fair trial even though they were never charged with any crime or violation. 02 cv 4824 (JSM), 2003 WL 22077469, at \*4 (S.D.N.Y. Sept. 8, 2003). In Henry, a court in this district held that "while there is no constitutional right to be free from having evidence fabricated against an individual, the offense rises to a constitutional violation if one is deprived of his liberty because of the fabrication." Id. Critically, the plaintiff in Henry was actually tried and acquitted and thus the "deprivation of liberty" he suffered was not so obviously captured by another constitutional tort, which plaintiffs' "deprivation" is here. If and to the extent plaintiffs

assert that their arrests were made without probable cause because the post-arrest paperwork was not completed by the actual arresting officer those claims are subsumed in their failed false arrest claim. If they contend that the completion of post-arrest paperwork by a person other than the actual arresting officer led to an excessive detention, those claims are subsumed in their failed excessive detention claims.

Because no plaintiff has been charged with any violation or crime, (P's 56.1 ¶ 1498; Oliver Decl. Ex. U), and because all allegedly unconstitutional conduct at issue is already subsumed in plaintiffs' other section 1983 claims, the Court grants defendants' motion for summary judgment and dismisses plaintiffs' fair trial claims.

### E. First Amendment.
Plaintiffs claim they suffered multiple violations of their First Amendment rights. First, they assert that defendants unlawfully arrested them in retaliation for exercising their right to free speech. Second, they assert that the process through which defendants promulgated and enforced the Park Rules violated their First Amendment rights. Defendants move for summary judgment on both claims.

#### 1. Retaliation.
"To plead a First Amendment retaliation claim a plaintiff must show: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." Dorsett v. Cty. of Nassau, 732 F.3d 157, 160 (2d Cir. 2013). The existence of probable cause, however, will defeat a First Amendment claim "premised on the allegation that defendants prosecuted a plaintiff out of a retaliatory motive." Fabrikant v. French, 691 F.3d 193, 215 (2d Cir. 2012); see also Mozzochi v. Borden, 959 F.2d 1174, 1180 (2d Cir. 1992) ("An individual does not have a right under the First Amendment to be free from a criminal prosecution supported by probable cause, [even if it is] in reality an unsuccessful attempt to deter or silence criticism of the government."). As already explained, the undisputed evidence in this case shows that there was probable cause to arrest each plaintiff for a disorderly conduct violation pursuant to N.Y. Penal Law section 240.20(6). As a result, defendants' motion for summary judgment on the basis of that affirmative defense is granted and plaintiffs' First Amendment retaliation claims are dismissed.

Case 9:21-cv-00372-MAD-TWD    Document 61    Filed 06/22/23    Page 81 of 218
Caravalho v. City of New York, Not Reported in Fed. Supp. (2016)
2016 WL 1274575

2. Promulgation and Enforcement of Zuccotti Park Rules.

**\*15** In parsing plaintiffs' claims regarding how the promulgation and enforcement of the rules governing Zuccotti Park violated plaintiffs' First Amendment rights, the Court understands plaintiffs to be making three separate arguments. First, Brookfield promulgated the Park Rules in violation of applicable zoning regulations. Second, the Park Rules themselves are unconstitutional time, place, and manner restrictions and defendants violated plaintiffs' First Amendment rights by enforcing those rule. And, third, even if the Rules are lawful, defendants' method of enforcing the Rules was itself unconstitutional.

Only two of those arguments support a First Amendment claim. The first argument addresses an issue not suitable for adjudication in this matter. Brookfield is not a party to this case. Whether Brookfield violated the applicable zoning regulations when promulgating the Rules for Zuccotti Park has no bearing on whether defendants violated plaintiffs' rights under the Constitution. Plaintiffs offer no theory explaining, and cite no law supporting, such a proposition.

The second and third arguments do state possible First Amendment claims. Namely, that defendants' dispersal orders were premised on enforcing rules that unlawfully restricted plaintiffs' speech and that defendants' act of temporarily clearing the Park of people itself unlawfully restricted plaintiffs' speech. Defendants move for summary judgment on both claims, arguing that the undisputed evidence establishes that the Park Rules are lawful and that the defendants acted lawfully by clearing people from the Park. Assuming *arguendo* that the First Amendment applies, the Court concludes that neither the Rules defendants were enforcing nor defendants' enforcement action violated the First Amendment.

As an initial matter, whether the First Amendment applies in Zuccotti Park remains an open question. Other courts in this Circuit have assumed, but have not held, that it does apply. See Bogart v. City of New York, 13 cv 1017 (NRB), 2015 WL 5036963, at \*9 n.8 (S.D.N.Y. Aug. 26, 2015). While this Court is inclined to conclude that First Amendment protections apply in Zuccotti Park because of the hybrid nature of the property, it is unnecessary to definitively decide the issue. Because the Park Rules are lawful even if the First Amendment applied at full strength, the Court need only assume that the full spectrum of First Amendment protections apply in order to resolve defendants' pending motion.

"[T]he government may regulate the time, place, and manner of the expressive activity, so long as such restrictions are content neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternatives for communication." Paulsen v. Gotbaum, 982 F.2d 825, 828 (2d Cir. 1992) (quoting Burson v. Freeman, 504 U.S. 191, 197 (1992)). Any regulation of expressive activity "is content neutral when it is justified without reference to the content of the regulated speech." Marcavage, 689 F.3d at 104. A facially neutral regulation "does not become content based simply because it may disproportionately affect speech on certain topics." McCullen v. Coakley, 134 S. Ct. 2518, 2531 (2014). And, a time, place, and manner regulation is narrowly tailored if it does not "burden substantially more speech than is necessary to further the government's legitimate interests." McCullen, 134 S. Ct. at 2535 (quoting Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989)).

The Park Rules prohibit camping and/or erecting tents or other structures; lying down on the ground or on benches, sitting areas, or walkways in ways that unreasonably interfere with their use; placing tarps, sleeping bags, or other coverings on the property; storing or placing personal property on the ground, benches, sitting areas, or walkways in ways that unreasonably interfere with their use; using bicycles, skateboards, or roller blades; removing objects from trash bins; and, any other activity prohibited by law or statute. (Anakhu Decl. Ex. HH).

**\*16** Plaintiffs deny that the rules for Zuccotti Park included the prohibition on camping, the erection of tents and other structures, laying down on the ground and laying down on benches, sitting areas or walkways. (P's 56.1 ¶ 23). They also adduced testimony showing that there may have been other Park Rules, i.e. rules against food trays or drumming, (P's 56.1 ¶¶ 1267-82, 1302-10), or that the rules may have changed over time, (P's 56.1 ¶ 1293). [8] Plaintiffs' evidence, however, does not create a genuine issue of material fact regarding the constitutionality of the Park Rules.

[8]  Plaintiffs denial that the Park Rules included prohibitions on tents, tarps, camping, and laying down is peculiar given that their basis for inferring that other rules did exist, i.e. the rules against drumming and food trays, was a "rules of engagement" document that affirmatively included a prohibition on tents, tarps, sleeping and laying down. (Oliver Decl. Ex. PP).

Case 9:21-cv-00372-MAD-TWD    Document 61    Filed 06/22/23    Page 82 of 218

Caravalho v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 1274575

First, plaintiffs make only a conclusory assertion that the Park Rules did not include the prohibition on tents, camping, etc. (P's 56.1 ¶ 23). They produce no evidence substantively challenging the existence or content of the Park Rules as presented by defendants. (Anakhu Decl. Ex. HH). At the summary judgment stage, simply denying that the Park Rules prohibited certain conduct is not enough. Second, there is no evidence that defendants' dispersal orders were issued in order to enforce any rules other than the Park Rules. (Anakhu Decl. Ex. HH). For example, Esposito and Winski specifically cited protestors putting up tents and tarps, climbing on fences, and destroying plants and shrubs as the rule violations that led to the dispersal order. (P's 56.1 ¶¶ 51-52; Anakhu Decl. Ex. U, 82; Ex. V, 54-55). Plaintiffs' assertion that there may have been other rules of conduct is of no moment because plaintiffs only have standing to challenge the constitutionality of regulations that motivated the dispersal orders. See Sec'y of State of Md. v. Joseph H. Munson Co., 467 U.S. 947, 955 (1984) (recognizing that plaintiff challenging statute on First Amendment grounds must have suffered sufficient injury as a result of the statute).

The Park Rules that motivated defendants' March 17, 2012 dispersal orders are constitutional. (P's 56.1 ¶¶ 51-52; Anakhu Decl. Ex. U, 82; Ex. V, 54-55). First, they are self-evidently content neutral. They in no way proscribe conduct on the basis of its intended message. Second, they are narrowly tailored to serve a significant "government" interest. Those rules work to "alleviat[e] congestion and improv[e] circulation, promot[e] the aesthetics of the park[ ], and ensur[e] that the park[ ] [is] available to the public for a wide range of activities," which are "indisputably significant" interests. Lederman v. New York City Dep't of Parks & Recreation, 731 F.3d 199, 202 (2d Cir. 2013); see Clark v. Community for Creative NonViolence, 468 U.S. 288, 297 (1984) (upholding a regulation banning camping in certain public parks on the basis that "the Government has a legitimate interest in ensuring that the National Parks are adequately protected"). And, they do not impose substantial burdens on speech. The only speech that is conceivably burdened is expressive conduct that takes the form of laying on the ground, pitching tents, and other not obviously expressive activities. Third, the regulations leave open ample alternatives for expressive conduct within the Park. For example, Park goers were free to give speeches, dance, hold signs, or pass out leaflets. Because the regulations that motivated defendants' dispersal orders were lawful, plaintiffs' claim that defendants violated their First Amendment rights simply by relying on the Park Rules fails as a matter of law.

*17 Plaintiffs' second claim—that defendants' decision to clear the Park was itself an unlawful restriction on speech—fails as well. Within this claim, plaintiffs make three separate but related arguments. First, plaintiffs assert that defendants gave the dispersal orders because defendants wanted to censor Occupy Wall Street's contrarian political message. In other words, plaintiffs claim that defendants' dispersal order amounted to viewpoint discrimination. See Amidon v. Student Ass'n of State Univ. of New York at Albany, 508 F.3d 94, 105-06 (2d Cir. 2007) (holding that a state university student association's use of advisory referenda amounted to viewpoint discrimination). Plaintiffs fail to sustain a First Amendment claim for viewpoint discrimination because they produce no evidence that defendants' dispersal orders were based on any animus towards, or even consideration of, OWS's political message. Instead, the record establishes that defendants acted with the intention of only temporarily closing the Park in order to stop protestors from violating Park Rules and to allow Brookfield to clean up the Park. (Anakhu Decl. Ex. U, 81-82). Nothing about defendants' dispersal orders forbade plaintiffs and other Occupy Wall Street protestors from returning to Zuccotti Park on March 18, 2012 to resume their protest.

Second, plaintiffs argue that police are only permitted to interfere with a protest if confronted with imminent "clear and present danger." See Brandenburg v. Ohio, 395 U.S. 444, 447 (1969). On that basis, plaintiffs contend that defendants violated the First Amendment because they interfered with the Occupy Wall Street protest only to enforce the Park Rules. Plaintiffs rely on the Second Circuit's decision in Jones v. Parmley, 465 F.3d 46, 60 (2d Cir. 2006) (Sotomayor, J.), to support their claim.

In Parmley, the defendants could not have had probable cause to believe that certain of the arrestees had engaged in disorderly conduct because "an important predicate of their defense" was lacking—"an order to disperse:"

[W]hile defendants repeatedly invoke the need to disperse the crowd as their *coup de grâce*—even claiming that "dispersal [is] the essence of plaintiffs' First Amendment claims"—they completely ignore an important predicate of their defense: the order to disperse. Here, defendants concede that they issued no dispersal order and instead stood in a "skirmish line," waited thirty-five seconds, and then charged into the crowd, arresting protesters indiscriminately. They further concede that most demonstrators (including many, if not all, of the plaintiffs)

Case 9:21-cv-00372-MAD-TWD    Document 61    Filed 06/22/23    Page 83 of 218

Caravalho v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 1274575

had not ventured out onto the Interstate and that they could not identify any of the demonstrators who had. As we noted earlier, plaintiffs had an undeniable right to continue their peaceable protest activities, even when some in the demonstration might have transgressed the law... Plaintiffs still enjoyed First Amendment protection, and absent imminent harm, the troopers could not simply disperse them without giving fair warning.

*Parmley*, 465 F.3d at 60 (footnote and citation omitted). Perhaps of equal importance is the fact that there would not have been a lawful reason to issue a dispersal order under the facts of *Parmley*. Whereas here, the police, in fact, issued dispersal orders temporarily clearing protestors from the Park in order to enforce constitutional time, place, and manner regulations—the Park Rules—and to assist Brookfield in cleaning Zuccotti Park. As a result, to the extent defendants' dispersal orders required protestors who did not violate the Park Rules to discontinue their speech, defendants' actions were lawful. See *Parmley*, 465 F.3d at 60.

Plaintiffs' third argument is that clearing Zuccotti Park was not itself a "narrowly tailored" means of enforcing the Park Rules. In other words, the police burdened too much speech by forcing every protestor out of Zuccotti Park in order to remedy the rule violations taking place inside the Park. To the extent this is a distinct First Amendment claim, the law affords defendants some latitude in selecting the appropriate means of enforcing the content neutral Park Rules. *Ward*, 491 U.S. at 800 ("So long as the means chosen are not substantially broader than necessary to achieve the government's interest, [ ] the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.").

**\*18**  Defendants present evidence that a number of Rule violations were going on in Zuccotti Park amidst a crowd of hundreds of protestors. (P's 56.1 ¶¶ 37-38, 51-53, 206, 212, 263; Anakhu Decl. Ex. U, 82; Ex. V, 54-55). Plaintiffs set forth no evidence materially disputing the size of the protest or the existence of several Rules violations. Giving a dispersal order only to the specific protestors who were responsible for violating the Park Rules while allowing the remaining crowds to occupy other parts of the Park would have required interviewing untold numbers of persons and, perhaps, conducting forensic examinations, for example, to determine the rightful owners of the offending tents and tarps. There is no evidence in this record that those who were dispersed from the Park could not have continued their political speech on March 17 in other nearby and convenient places, or returned to Zuccotti Park the next day. The Court concludes that defendants' decision to temporarily clear the Park was reasonable and not "substantially broader than necessary" to serve the interests of protecting the Park.

In sum, all plaintiffs' First Amendment claims fail as a matter of law and defendants' motion for summary judgment is granted.

**F. Equal Protection.**

Plaintiffs make two cognizable Equal Protection claims. First, defendants selectively enforced the Park Rules against plaintiffs because defendants disagreed with Occupy Wall Street's message. And, second, defendants failed to release plaintiffs on a summons or DAT because of animus towards Occupy Wall Street. Defendants move for summary judgment on both claims on the basis that, on the record presented, plaintiffs fail to establish that they were selectively treated.

"There are several ways for a plaintiff to plead intentional discrimination that violates the Equal Protection Clause." Brown v. City of Oneonta, New York, 221 F.3d 329, 337 (2d Cir. 2000). A plaintiff could: (1) "point to a law or policy that expressly classifies persons on [an improper basis];" (2) "identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner;" or, (3) "allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus." Id. It appears from plaintiffs' submissions that they are proceeding with an Equal Protection claim based on a selective enforcement theory.

"[A] violation of equal protection for selective enforcement would arise if: (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."

LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester, 40 F.3d 587, 590 (2d Cir. 1994)(quoting LeClair v. Saunders, 627 F.2d 606, 609-10 (2d Cir. 1980)). The Second Circuit has interpreted "similarly situated" to mean "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000).

Case 9:21-cv-00372-MAD-TWD   Document 61   Filed 06/22/23   Page 84 of 218

Caravalho v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 1274575

Defendants are entitled to summary judgment on both of plaintiffs' Equal Protection claims because there is no evidence in the record to support a conclusion that plaintiffs, "as compared with others similarly situated, [were] selectively treated." LaTrieste, 40 F.3d at 590. Regarding the selective enforcement of the Park Rules, plaintiffs present testimony that, on some occasions, Brookfield put up barricades around certain segments of the Park in order to perform maintenance without closing the whole Park. (P's 56.1 ¶¶ 1296-97). The fact that Brookfield may have segmented the Park for cleaning under normal conditions, without similarly large crowds, but that defendants cleared the Park on March 17, 2012, does not, without more, create a genuine dispute of material fact regarding whether plaintiffs were selectively treated. Plaintiffs fail to show that the police have acted differently towards similarly situated individuals.

 *19  Likewise, plaintiffs fail to produce any evidence showing that defendants' decision not to release plaintiffs with a summons or DAT was unlawful discrimination. Plaintiffs adduce testimony showing that different individuals have the discretion to choose to release arrestees with a summons or DAT depending on the circumstances. Specifically, that desk sergeants determine who will receive a summons or DAT in normal arrest situations, (P's 56.1 ¶ 1042), whereas police supervisors or representatives from the Legal Bureau make the same decision in large scale or "mass" arrest situations, (P's 56.1 ¶¶ 1008-09, 1169). And, they adduce evidence showing that the NYPD Commissioner may have "made policy decisions regarding whether summonses could be issued in connection with Occupy Wall Street arrests" and that there were written criteria regarding what qualifies a person for release with a summons or DAT. (P's 56.1 ¶¶ 1005-06, 1170).

The fact that defendants treated individuals arrested on his or her own differently than individuals arrested in large groups is not evidence of selective treatment because such individuals are not similarly situated. See Graham v. Long Island R.R., 230 F.3d at 40. And, the fact that defendants may have articulated specific orders regarding how to police the OWS protest is not evidence that the defendants policed other large events, whether concerts, sporting events, or other types of religious or political gatherings, differently on the basis of protected characteristics. Critically, plaintiffs present no facts showing that the policy denying OWS arrestees release with summonses treated OWS protestors any differently than other

individuals seized during arrests of a large number of people at a single time and place.

Because plaintiffs have failed to produce any fact showing that they were selectively treated, defendants' motion for summary judgment is granted.

  G. Due Process.

Plaintiffs also raise two claims they classify as due process violations. First, they assert that the Park Rules did not provide adequate notice of the proscribed conduct. And second, they argue that defendants' decision not to release them with a summons or DAT violated their right to due process of law. Defendants move for summary judgment on both theories on the basis that each fails to state a cognizable due process violation.

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." Mathews v. Eldridge, 424 U.S. 319, 332 (1976). Consequently, "[t]o award damages under 42 U.S.C. § 1983 for an alleged violation of procedural due process, a court must find that, as the result of conduct performed under color of state law, the plaintiff was deprived of life, liberty, or property without due process of law." Bedoya v. Coughlin, 91 F.3d 349, 351 (2d Cir. 1996).

Plaintiffs argue that the Park Rules did not provide adequate notice of the regulated conduct and that, as a result, defendants violated plaintiffs' due process rights by enforcing them through dispersal orders. In doing so, plaintiffs rely on the Supreme Court's decision in Kolender v. Lawson, which held that "the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." 461 U.S. 352, 357 (1983). That case is inapposite. First, it is not clear that the Due Process clause is applicable here because the Park Rules were promulgated by Brookfield, a private entity, and they created no criminal liability and deprived no one of a protected property interest. Second, even assuming that the Due Process clause applies, the Park Rules submitted by defendants are clear, direct, and easily understood. (Anakhu Decl. Ex. HH). No reasonable jury could conclude that the Park Rules were vague or otherwise confusing. In addition, at least two defendants, Captain Papamichael and Esposito,

Case 9:21-cv-00372-MAD-TWD    Document 61    Filed 06/22/23    Page 85 of 218

Caravalho v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 1274575

recalled that certain rules of conduct were posted in Zuccotti Park, although neither defendant testified to the content of those posted rules. (P's 56.1 ¶¶ 999, 1156).

**\*20**  Plaintiffs also have failed to establish that they were deprived of any liberty interest protected by the Due Process Clause of the Fourteenth Amendment as a consequence of the Park Rules. The Park Rules were not enforced by any defendant against any plaintiff. Nor was any plaintiff accused of owning or possessing a prohibited tent or tarp. The violations of the Park Rules were the reason why certain defendants authorized the issuance of dispersal orders. The reasons for plaintiffs' arrests were the failure to comply with lawful dispersal orders. Moreover, to the extent plaintiffs claim that they were deprived of a liberty interest protected by the First Amendment, the Court has already held that the Park Rules were lawful time, place, and manner restrictions.

Plaintiffs' second theory, that defendants violated their due process rights when defendants did not release them immediately with a summons or DAT, also fails. Even assuming *arguendo* that plaintiffs' suffered a deprivation of liberty because of that decision, plaintiffs cite no rule of law holding that "due process of law" requires the police to release certain arrestees with a summons or DAT simply because they are "eligible." In addition, to the extent this claim is simply a reformulation of plaintiffs' excessive detention or false arrest claims, the Court has already held that plaintiffs failed to establish those constitutional deprivations as a matter of law.

In sum, plaintiffs' have failed to establish any cognizable due process claim and, accordingly, defendants' motion for summary judgment is granted.

### H. Monell Claims.

Finally, defendants move for summary judgment on plaintiffs' claim that the City of New York is liable for the deprivations of their constitutional rights. A municipality may not be held liable on section 1983 claims solely "by application of the doctrine of *respondeat superior*." Pembaur v. City of Cincinnati, 475 U.S. 469, 478 (1986). Instead, in order to establish municipal liability, a plaintiff must show that: (1) "a particular municipal action *itself* violates federal law, or directs an employee to do so," Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397, 404 (1997) (emphasis in original), (2) an "authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right," Id. at 405, (3) unconstitutional "practices [are] so persistent and widespread as to practically have the force

of law," Connick v. Thompson, 563 U.S. 51, 61 (2011), or (4) a municipality's failure to train its employees about their legal duty to avoid violating a citizen's rights amounts to "deliberate indifference," id. In any case, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Bryan Cty., 520 U.S. at 404.

The Court has dismissed all plaintiffs' section 1983 claims except for Austin Guest's excessive force claim. Because there can be no municipal liability where there are no underlying constitutional deprivations, City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986), that fact would normally be dispositive of every other plaintiffs' Monell claims, see, e.g., Cancel v. NYPD Commissioner Raymond Kelly, 13 cv 6007 (JMF), 2016 WL 590230, at \*7 (S.D.N.Y Feb. 11, 2016) (dismissing Monell claims where no underlying constitutional violations existed). However, the Court did not conclude that every plaintiff's excessive force claims failed to state a constitutional deprivation as a matter of law. The Court instead held that many of those claims should be dismissed because plaintiffs' failed to establish the "personal involvement" of any named defendant.[9] For that reason, any one of those plaintiffs could still have a viable Monell claim if he or she can show that a municipal action proximately caused an unreasonable use of force against him or her, regardless of whether a named defendant was "personally involved." Nevertheless, the Court does not need to determine whether any of those plaintiffs actually suffered an unreasonable use of force because plaintiffs have failed to adduce evidence supporting any plausible theory of municipal liability. Guest's Monell claim based on his surviving excessive force claim fails for the same reason.

[9]  The Court did hold that part of Hintze's claims were not Fourth Amendment violations as a matter of law.

**\*21**  Plaintiffs identify three possible bases for municipal liability. First, "[d]efendants had a policy and practice of unreasonably restricting First Amendment activities perceived to be associated with OWS in Zuccotti Park." (Plaintiffs' Memorandum in Opposition, 56). Second, "to the extent [d]efendants Esposito and/or Winski were final policymakers with respect to the decision to clear Zuccotti Park based on purported rules violations, the City faces liability based on their statuses as such." (Id. at 57). And, third, "to the extent that a jury might find that a failure to

Case 9:21-cv-00372-MAD-TWD   Document 61   Filed 06/22/23   Page 86 of 218
Caravalho v. City of New York, Not Reported in Fed. Supp. (2016)
2016 WL 1274575

train resulted in any [p]laintiff's injuries, the City may be called to account for, and face liability, based on that failure to train." (Id.)

Only plaintiffs' third theory could bear some causal link to an excessive force claim. However, there is no support in the record for a "failure to train" Monell claim. For example, there is no evidence of the City's deliberate indifference toward its officers' treatment of OWS protestors or of a pattern or practice of untrained officers using excessive force against them. See Cash v. Cty. of Erie, 654 F.3d 324, 334 (2d Cir. 2011); Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir. 1992). In fact, the only possibly relevant evidence plaintiffs do adduce are statements from Esposito that there have been "some issues from time to time" with the processing of large scale arrests and with "detaining of prisoners for extended periods of time." (P's 56.1 ¶¶ 1139, 1141; Oliver Decl. Ex. LL, 81-82). Even still, plaintiffs fail to establish how any of those "issues" proximately caused any defendant's use of force against any plaintiff. Regarding Guest's claims specifically, there is no evidence establishing any causal relationship between a City policy or custom and the force allegedly used by Bovell against Guest and no evidence showing a pattern or practice of similar uses of force.

Consequently, each plaintiff's Monell claims, including Austin Guest's, fail as a matter of law. Defendants' motion for summary judgment is granted on each plaintiff's Monell claims.

### III. State Constitutional and Common Law Claims.

A district court's exercise of supplemental jurisdiction is governed by 28 U.S.C. section 1367(a), which provides in pertinent part, that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Subsection (c) provides that a district court "may" decline to exercise supplemental jurisdiction over a claim if the court has dismissed all claims over which it had original jurisdiction. 28 U.S.C. § 1367(c)(3).

The Second Circuit has held that:

> in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine —judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.

Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305 (2d Cir. 2003) (quoting Carnegie–Mellon University v. Cohill, 484 U.S. 343, 349-50 (1988)). Here, the Court has dismissed all federal claims except for Austin Guest's excessive force claim. Because each of the other eight plaintiffs, aside from Guest, have only New York State constitution and New York common law claims remaining, judicial economy, fairness, convenience and comity will be served best by declining to exercise supplemental jurisdiction over each of those plaintiffs' remaining state law claims and, accordingly, all those claims are dismissed.

### A. Austin Guest's Common Law and New York Constitutional Claims.

**\*22** Regarding Guest's remaining claims, the Court will exercise supplemental jurisdiction over those claims that "form part of the same case or controversy" as his excessive force claim against Officer Bovell. 28 U.S.C. § 1367(a). Claims form part of the same case or controversy when they "derive from a common nucleus of operative fact." United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966). "[I]n other words, they must be such that the plaintiff 'would ordinarily be expected to try them all in one judicial proceeding.'" Montefiore Med. Ctr. v. Teamsters Local 272, 642 F.3d 321, 332 (2d Cir. 2011) (quoting Gibbs, 383 U.S. at 725).

### 1. Assault and Battery.

The Court exercises supplemental jurisdiction over Guest's common law assault and battery claim against Officer Bovell because it arises from the same allegedly unreasonable use of force against Guest. Because the essential elements of a section 1983 claim for excessive force and a claim for assault and battery under New York law are "substantially identical," Posr v. Doherty, 944 F.2d 91, 95 (2d Cir. 1991),

Case 9:21-cv-00372-MAD-TWD    Document 61    Filed 06/22/23    Page 87 of 218

Caravalho v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 1274575

the Court denies defendants' motion for summary judgment on Guest's common law assault and battery claim for the same reasons that the Court denied summary judgment on Guest's federal excessive force claim. Id. Both claims against Officer Bovell will proceed to trial. In addition, the City will remain a defendant on Guest's surviving claim for assault and battery because, unlike under federal law, the City can be found liable on the doctrine of *respondeat superior* for the common law torts of its employees. Jones v. State, 33 N.Y.2d 275, 280 (1973).

2. Negligent Hiring, Screening, Retention, Supervision, and Training.

The Court also exercises supplemental jurisdiction over Guest's common law negligent hiring, screening, retention, supervision, and training claim against the City because liability on that claim could arise out of Officer Bovell's allegedly unreasonable use of force against Guest. However, defendants are entitled to summary judgment dismissing this claim because it is duplicative of the City's pending *respondeat superior* liability on Bovell's common law assault and battery claim.

"[W]here an employee is acting within the scope of his or her employment, thereby rendering the employer liable for any damages caused by the employee's negligence under a theory of respondeat superior, no claim may proceed against the employer for negligent hiring or retention." Karoon v. New York City Transit Auth., 241 A.D.2d 323, 324 (1st Dep't 1997). "This is because if the employee was not negligent, there is no basis for imposing liability on the employer, and if the employee was negligent, the employer must pay the judgment regardless of the reasonableness of the hiring or retention or the adequacy of the training." Id. The evidence presented here shows that Officer Bovell was acting within the scope of his employment as a police officer when he used force against Guest. If Bovell is liable for assault and battery than the City is automatically liable under *respondeat superior*. Guest's negligent hiring, screening, retention, supervision, and training claim is therefore duplicative and is dismissed.

3. IIED and NIED.

The Court exercises supplemental jurisdiction over Guest's intentional infliction of emotional distress and negligent infliction of emotional distress claims against Officer Bovell as they relate to his allegedly unreasonable use of force against Guest. The elements of an IIED claim under New York law are: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." Bender v. City of New York, 78 F.3d 787, 790 (2d Cir. 1996). A plaintiff may recover for the related tort of NIED under New York law in two different ways: "(1) the 'bystander' theory; or (2) the 'direct duty theory.'" Mortise v. United States, 102 F.3d 693, 696 (2d Cir. 1996). Only the "direct duty theory" is applicable to Guest. See Id. Under that theory, Guest "has a cause of action for negligent infliction of emotional distress if [he] suffer[ed] an emotional injury from [Bovell's] breach of a duty which unreasonably endangered [Guest's] own physical safety." Id.

**\*23** Defendants move for summary judgment on these two claims on the basis that Bovell's conduct was not extreme or outrageous, that Guest has produced no medical evidence of severe emotional distress, and that Guest's claims are encompassed entirely within his state law claim for assault and battery. Defendants are entitled to summary judgment dismissing Guest's IIED and NIED claims against Bovell because they are duplicative of his assault and battery and excessive force claims.

The New York Court of Appeals stated in dictum in Fischer v. Maloney, 43 N.Y.2d 553, 557-58 (1978), that: "it may be questioned whether the doctrine of liability for intentional infliction of extreme emotional distress should be applicable where the conduct complained of falls well within the ambit of other traditional tort liability, [such as] malicious prosecution and abuse of process." The Second Circuit in Bender v. City of New York, 78 F.3d at 791, recognized, but did not definitively resolve the issue. It stated that it was "uncertain whether the state courts would entertain an emotional distress claim" where the elements substantially overlap with traditional torts already alleged in a case, such as battery and false arrest. Bender, 78 F.3d at 792. Meanwhile, state courts and federal district courts in this Circuit "have consistently held that the tort of intentional infliction of emotional distress may not be used as a substitute for an available traditional tort theory." Brewton v. City of New York, 550 F. Supp. 2d 355, 370 (E.D.N.Y. 2008); see e.g., Leonard v. Reinhardt, 20 A.D.3d 510, 510, (2005); Bender, 78 F.3d at 791 (collecting New York state appellate court cases). Courts in this Circuit have held the same for claims of NIED. See, e.g., Poulos v. City of New York, 14 cv 3023 (LTS) (HBP), 2015 WL 5707496, at \*10 (S.D.N.Y. Sept. 29, 2015); Crews v. Cty. of Nassau, 996 F. Supp. 2d 186, 214 (E.D.N.Y.

Case 9:21-cv-00372-MAD-TWD   Document 61   Filed 06/22/23   Page 88 of 218

Caravalho v. City of New York, Not Reported in Fed. Supp. (2016)
2016 WL 1274575

2014); Druschke v. Banana Republic, Inc., 359 F. Supp. 2d 308, 315 (S.D.N.Y. 2005).

Here, the Court only exercises supplemental jurisdiction over Guest's IIED and NIED claims against Officer Bovell. Thus, the only conduct at issue is Bovell's allegedly unreasonable use of force. There are no allegations that Bovell engaged in any other potentially tortious conduct against Guest, for example verbal conduct, which is not subsumed by Guest's assault and battery or excessive force claims. The Court grants defendants' motion for summary judgment on Guest's IIED and NIED claims against Bovell on the basis that the conduct at issue—Bovell's allegedly unreasonable use of force—and any resulting emotional damage is entirely subsumed by Guest's common law assault and battery claim and his federal excessive force claim. Guest's IIED and NIED claims against Bovell are dismissed as duplicative.

4. Common Law False Imprisonment and State Constitutional Claims.

Guest also brings claims for common law false imprisonment and for false arrest, due process violations, and equal protection violations under the New York Constitution. Those claims do not substantially overlap with Guest's surviving federal excessive force claim against Officer Bovell. As a result, judicial economy, fairness, convenience and comity will be served best by declining to exercise supplemental jurisdiction over Guest's remaining state law claims and, accordingly, those four claims are dismissed.

CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED in part and DENIED in part. All section 1983 claims against all defendants brought by Alexander Caravalho, Eric Carter, Sergio Castillo, Daniel Greenspan, Thomas Hintze, Joseph Sharkey, Easton Smith, and Jennifer Waller are dismissed with prejudice, and each of those eight plaintiffs' remaining state law claims are dismissed without prejudice. All section 1983 claims against all defendants brought by Austin Guest are dismissed with prejudice, except for his excessive force claim against Officer Grantley Bovell. Guest's common law intentional infliction of emotional distress and negligent infliction of emotional distress claims against Grantley Bovell are dismissed with prejudice, as is Guest's common law negligent, hiring, screening, retention, supervision, and training claim against the City of New York regarding employee Grantley Bovell. Guest's common law assault and battery claim against Grantley Bovell, and the City of New York in *respondeat superior*, survives defendant's motion for summary judgment. All Guest's other state law claims are dismissed without prejudice

**\*24** SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 1274575

---

End of Document                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00372-MAD-TWD    Document 61    Filed 06/22/23    Page 89 of 218

Henry v. City of New York, Not Reported in Fed. Supp. (2003)

2003 WL 22077469

KeyCite Yellow Flag - Negative Treatment

Distinguished by   Caravalho v. City of New York,   S.D.N.Y.,   March 31, 2016

2003 WL 22077469
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Philburn HENRY, Plaintiff,

v.

THE CITY OF NEW YORK, P.O. Oran Eberhart,
individually and in his official capacity, P.O. William
Roettger, individually and in his official capacity, and
P.O.s "Jon Doe" # 1–10 (the name John Doe being
fictitious, as the true names are presently unknown),
individually and in their official capacities, Defendants.

No. 02 Civ. 4824(JSM)
|
Sept. 8, 2003.

**Synopsis**

Citizen brought action against city of New York and individual police officers under § 1983 for false arrest, malicious prosecution, and malicious abuse of process. Defendants moved for summary judgment. The District Court, Martin, J., held that: (1) citizen failed to establish a claim against the City of New York under § 1983; (2) police officers had probable cause to arrest citizen, thus false arrest claim failed; (3) genuine issue of material fact existed as to when police officers saw bound victim, precluding summary judgment on claim of excessive force; (4) genuine issue of material fact existed as to whether police officers planted evidence on citizen, precluding summary judgment on malicious prosecution and malicious abuse of process claims; and (5) genuine issue of material fact existed as to whether citizen's deprivation of liberty was caused by the fabrication of evidence, precluding summary judgment on denial of fair trial claim.

Motion granted in part and denied in part.

West Headnotes (5)

**[1]    Civil Rights**      Criminal law enforcement;
prisons

Citizen who did not establish an identifiable municipal policy, practice, or custom responsible for the alleged constitutional violation's during his arrest failed to establish a claim against the City of New York under § 1983. 42 U.S.C.A. § 1983.

**[2]    Civil Rights**      Arrest and detention

Police officers had probable cause to arrest citizen, thus citizen's claim of false arrest under § 1983 against officers failed; police were called to scene because of a possible struggle at address, once police arrived at scene they were directed to back apartment by an upstairs home-dweller, providing further evidence of criminal activity, and officers saw an individual with his hands bound and a pillowcase on his head. 42 U.S.C.A. § 1983.

**[3]    Civil Rights**      Criminal law enforcement;
prisons

**Summary Judgment**      Law enforcement
activities

Genuine issue of material fact existed as to when police officers saw the bound victim and whether officers used reasonable force in arresting citizen, precluding summary judgment on citizen's claim of excessive force against officers under § 1983 related to his arrest. 42 U.S.C.A. § 1983.

7 Cases that cite this headnote

**[4]    Civil Rights**      Criminal law enforcement;
prisons

**Summary Judgment**      Law enforcement
activities

Genuine issue of material fact existed as to whether police officers planted evidence on citizen and falsely pursued prosecution, precluding summary judgment on citizen's malicious prosecution and malicious abuse of process claims under § 1983 related to his arrest. 42 U.S.C.A. § 1983.

Case 9:21-cv-00372-MAD-TWD    Document 61    Filed 06/22/23    Page 90 of 218

Henry v. City of New York, Not Reported in Fed. Supp. (2003)
2003 WL 22077469

[5]    **Civil Rights** 🔑 Criminal law enforcement; prisons

**Summary Judgment** 🔑 Law enforcement activities

Genuine issue of material fact existed as to whether citizen's deprivation of liberty was caused by the fabrication of evidence, precluding summary judgment on citizen's claim that he was denied a fair trial under § 1983 after his arrest. 42 U.S.C.A. § 1983.

17 Cases that cite this headnote

OPINION and ORDER

MARTIN, J.

**\*1** Plaintiff brings this action against the City of New York, and individual police officers asserting various civil rights claims under 42 U.S.C. § 1983.

The complaint alleges that on December 19, 1999, at approximately 9:00 p.m., Plaintiff, Philburn Henry, along with his friends Benjamin Brown and Anwar Cargill stopped at 3326 Gunther Avenue to visit a friend. Deposition of Philburn Henry ("Henry Dep."), Jon Norinsberg Decl. Ex. A at 91–92. Henry alleges that he was injured at the scene when, upon exiting the premises, he was grabbed by Officer Eberhart and slammed down onto the concrete, knocking out a front tooth and chipping another. Henry Dep. at 41–42. Plaintiff also alleges that the officers planted false evidence on him and then charged him with stealing that property.

Police arrived at Gunther Avenue in response to a 911 call in which the caller said there was a "possible struggle" at the location. Sprint Record, Decl. of Jon Norinsberg Ex. D. Henry claims that he left the apartment after hearing the officers knock on the door. Henry Dep. at 112.

Plaintiff now brings this action alleging false arrest, malicious prosecution, malicious abuse of process, and denial of his constitutional right to a fair trial in violation of his First, Fourth, Fifth, Eighth and Fourteenth Amendment rights and in violation of 42 U.S.C. § 1983. Currently before the Court is Defendants' motion for summary judgment. The motion

with respect to the City of New York is granted in its entirety. Defendants Eberhart and Roettger's motion is granted in part and denied in part.

DISCUSSION

I. City of New York

[1]    In order to establish a claim against the City of New York under 42 U.S.C. § 1983, Plaintiff must establish that an identifiable municipal policy, practice or custom is responsible for the constitutional violation. *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). Plaintiff has failed to establish a policy, practice or custom and, in fact, has only alleged a single incident and thus does not meet the requirements necessary to maintain any of his claim against the City. *City. City of Oklahoma v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985). Therefore, Plaintiff's claims against the City are dismissed.

II. False Arrest

[2]    Plaintiff's claims are also against the officers who arrested him. Plaintiff claims that the officers had no probable cause for his arrest. A police officer who makes an arrest without a warrant is not liable for false arrest if the officer had reasonable cause to believe that the plaintiff committed an offense. *Illinois v. Gates,* 462 U.S. 213, 241–46, 103 S.Ct. 2317, 2333–36, 76 L.Ed.2d 527 (1983). Probable cause is determined based on the totality of the circumstances. *Gates,* 462 U.S. at 230–32, 103 S.Ct. 2328–29. In this case, given the circumstances surrounding the response to the 911 call, police had probable cause to arrest Plaintiff. Police were called to the scene because of a possible struggle at the address. Plaintiff has not disputed police testimony that once they arrived at the scene, the officers were directed to the back apartment by an upstairs home-dweller, thus providing further evidence of possible criminal activity. (Testimony of Officer Eberhart, Paul Villanueva Decl. Ex. C at 9.) The totality of these circumstances provided probable cause for the officers' investigation and arrest.

**\*2** The officers testified, and Plaintiff does not dispute, that the officers saw David Tomlinson with hands bound and a pillowcase on his head. Henry Dep. at 152. Whether this occurred before or after Plaintiff was thrown to the ground is a disputed fact. Even assuming the officers saw Tomlinson after Plaintiff was on the ground, the arriving officers' actions were

Case 9:21-cv-00372-MAD-TWD   Document 61   Filed 06/22/23   Page 91 of 218

Henry v. City of New York, Not Reported in Fed. Supp. (2003)

2003 WL 22077469

justified. The officers have a right to detain citizens, pending an investigation of possible criminal activity. *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). In this case, they had cause to arrest Plaintiff once they saw and spoke to Tomlinson.

### III. Excessive Force

[3] Plaintiff also alleges, however, that the officers used excessive force in making the arrest. A claim for use of excessive force under § 1983 may be established if the force used was excessive or unreasonable in light of the circumstances. *Graham v. Connor,* 490 U.S. 386, 395–96, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). According to Plaintiff's version of events, he was in an apartment and upon learning that the police were outside, he voluntarily exited 3326 Gunther Avenue with two other men. When leaving, he was thrown to the ground by police officers and handcuffed with his arms behind his back. Plaintiff states that only after he had been thrown to the ground did Mr. Tomlinson, with a pillowcase on his head, come into the officer's view.

A determination of whether the force exerted is reasonable is made in light of the totality of the circumstances, regardless of the defendant's underlying intent or motive. *Ricketts v. City of Hartford,* 74 F.3d 1397, 1411 (2d Cir.1996). To determine whether the actions are reasonable, the fact finder must pay careful attention to the facts of the case, including:

> the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspects are] actively resisting arrest or attempting to evade arrest by flight.

*Graham,* 490 U.S. at 396, 109 S.Ct. at 1872.

The officers have not testified that Plaintiff was evading arrest or that they believed he was carrying a weapon. The law is clear, however, that the court must "consider the perspective of the officer at the time of the arrest, taking into account the fact that the officer may have been required to make a split-second decision." *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 573 (2d Cir.1996) (citing *Graham,* 490 U.S. at 397, 109 S.Ct. at 1872).

Although this Court believes that the trier of fact will not find the force used in this case was excessive, when there is a factual dispute about the circumstances surrounding the arrest and the degree of force used, the Second Circuit requires a jury determination on the reasonableness of that force. *See Kerman v. City of New York,* 261 F.3d 229, 239–40 (2d Cir.2001)("Summary judgment on qualified immunity grounds is not appropriate when there are fats in dispute that are material to a determination of reasonableness."); *Breen v. Garrison,* 169 F.3d 152, 153 (2d Cir.1999); *Calamia v. City of New York,* 879 F.2d 1025, 1036 (2d Cir.1989). *See also Welch v. City of New York,* 1997 WL 436382, at *6 (S.D.N.Y. Aug.4, 1997).

*3 Because there is a dispute in this action about when the bound victim was seen by police and there is no assertion that Henry was armed or trying to resist arrest, there remains a factual question whether the force used was reasonable. *See Breen,* 169 F.3d at 153; *Miller v. Lovett,* 879 F.2d 1066, 1069–70 (2d Cir.1989).

Defendants argue that the officers' actions are protected by qualified immunity. While it is important to resolve the immunity issue as early in the litigation as possible, *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001), it is premature to determine immunity when Plaintiff alleges he was thrown to the ground when voluntarily exiting an apartment, had no weapons and was not attempting to flee.

> "Where the circumstances are in dispute, and contrasting accounts present factual issues as to the degree of force actually employed and its reasonableness, a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity."

*Curry v. City of Syracuse,* 316 F.3d 324, 334 (2d Cir.2003)(quoting *Mickle v. Morin,* 297 F.3d 114, 122 (2d Cir.2002)). Therefore, Defendants' motion for summary judgment with respect to the excessive force claim is denied.

### IV. Malicious Prosecution and Malicious Abuse of Process

[4] In order to establish a malicious prosecution claim, plaintiff must establish that the defendant initiated prosecution without probable cause, that the proceeding terminated in plaintiff's favor and that the defendants acted with actual malice. *Fernandez v. DeLeno,* 71 F.Supp.2d 224, 228 (S.D.N.Y.1999). In this case, Defendants Eberhart and Roettger's motion must be denied because there is a triable

Case 9:21-cv-00372-MAD-TWD   Document 61   Filed 06/22/23   Page 92 of 218

Henry v. City of New York, Not Reported in Fed. Supp. (2003)

2003 WL 22077469

issue as to the basis for the prosecution. While the appearance and testimony of Tomlinson may have provided reasonable grounds for making the arrest, there is a factual dispute as to whether Defendants planted evidence on Plaintiff and falsely pursued the prosecution, demonstrating malice.

Plaintiff has provided more than simply an allegation that evidence was planted on him. Officer Roettger testified in his deposition that he found a watch, a bracelet and a ring in Plaintiff's pocket. Deposition of William Roettger, Villanueva Decl. Ex. D at 52–53. At trial, Plaintiff offered into evidence a pre-arrest picture of himself wearing the jewelry that was allegedly removed from his pocket during the search. Villanueva Decl. Ex. M. Defendants' argument that they had probable cause for the arrest is unavailing with respect to the malicious prosecution claim. "No arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee." *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 130 (2d Cir.1997). "Where a party is responsible for providing false information or manufactured evidence that influences a decision whether to prosecute, he may be held liable for malicious prosecution." *Chimurenga v. City of New York,* 45 F.Supp.2d 337, 343 (2d Cir.1999)(citing *Babi–Ali v. City of New York,* 979 F.Supp. 268, 276 (S.D.N.Y.1997).

 *4 Defendants argue that Plaintiff is collaterally estopped from arguing that evidence was falsely planted on him. Under New York law, plaintiff is collaterally estopped from relitigating the issue when 1) the issue was necessarily decided in a prior action and is decisive to the present action; and 2) there was a full and fair opportunity to contest the decision that is being asserted as controlling. *S.T. Grand, Inc. v. City of New York,* 38 A.D.2d 467, 32 N.Y.2d 300, 300 (1 st Dept.1972). *See Wallace v. Roche,* 921 F.Supp. 946, 951 (E.D.N.Y.1996); *Anderson v. City of New York,* 611 F.Supp. 481, 486 (S.D.N.Y.1985). The opinion resulting from the Mapp/Huntley/Wade hearing held during the state proceedings addresses only whether the officer's had probable cause for the search and did not represent a litigation about whether the evidence was planted. *East Coast Novelty Co., Inc. v. City of N.Y.,* 781 F.Supp. 999, 1005 (S.D.N.Y.1992) (discussing narrow limits of issue preclusion in § 1983 actions).

Plaintiff also claims malicious abuse of process. Malicious prosecution and malicious abuse of process are similar and both are actionable under § 1983. *Cook v. Sheldon,* 41 F.3d 73, 80 (2d Cir.1994). To establish an abuse of process claim, Plaintiff must show the following elements:

> (1) regularly issued process compelling the performance or forbearance of some prescribed act, (2) the person activating the process must have been motivated to do harm without economic or social excuse or justification, and (3) the person activating the process must be seeking some collateral advantage or corresponding detriment to the plaintiff which is outside the legitimate ends of process.

*Bernard v. United States,* 25 F.3d 98, 104 (2d Cir.1994). The factual dispute regarding the planting of evidence precludes granting summary judgment on the malicious abuse of process claim.

V. Denied Fair Trial

 [5] Defendants' motion with respect to the denial of a fair trial must also be denied.

> When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983.

*Ricciuti,* 124 F.3d at 130. Defendants argue no such cause of action is available because Plaintiff was acquitted at trial. However, while there is no constitutional right to be free from having evidence fabricated against an individual, the offense rises to a constitutional violation if one is deprived of his liberty because of the fabrication. *See Zahrey v. Coffey,* 221 F.3d 342, 348 (2d Cir.2000). In this case, it is a question of fact whether Plaintiff's deprivation of liberty (his

2003 WL 22077469

incarceration between his arrest and his release) was caused by the fabrication of evidence. *Zahrey,* 221 F.3d at 348.

If Plaintiff's deprivation of liberty was a result of the planted evidence, this was a clearly defined constitutional right at the time of Plaintiff's arrest, and qualified immunity is not available to the officers. *See Zahrey,* 221 F.3d at 355.

CONCLUSION

**\*5** For the reasons stated above, summary judgment is granted in its entirety with respect to the City of New York.

Summary judgment is granted with respect to the claim of false arrest against the remaining Defendants. Factual disputes preclude summary judgment on the remaining claims.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2003 WL 22077469

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5405468
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Tyrone LASTER, Plaintiff,

v.

Detective Robert MANCINI, et al., Defendant.

No. 07 Civ. 8265(DAB).
|
Sept. 25, 2013.

*ORDER*

DEBORAH A. BATTS, District Judge.

**\*1** ADOPTION OF REPORT AND RECOMMENDATION.
This matter is before the Court upon the Report and Recommendation of United States Magistrate Judge Michael H. Dolinger ("Report"), which was filed on September 28, 2012. The Report recommends that Defendants' Motion for Summary Judgment be GRANTED in part and DENIED in part. (Report at 2.) For the reasons set forth below, the Court ADOPTS the Report in its entirety.

I. BACKGROUND
The background and Magistrate Judge's findings in this case are set out in great detail in the Report. Parties' familiarity with the Report is assumed, and this Order recounts the facts only to the extent necessary for the resolution of Objections thereto.

On August 17, 2007, *pro se* Plaintiff Tyrone Laster ("Plaintiff") filed the instant 42 U.S.C. § 1983 action against the New York Police Department ("NYPD") and three individual officers-Detective Robert J. Mancini, Officer Douglass Vincent, and Lieutenant James Gribbon (collectively "Defendants"). Plaintiff alleges that, during the course of his September 26, 2006 arrest, Defendants violated his constitutional rights, namely those stemming from the Fourth and Eighth Amendments. Judge Dolinger, affording *pro se* Plaintiff's Complaint a liberal reading, construed the pleading to include state-law claims that paralleled the federal claims. Defendants oppose the claims, arguing principally that the individual officers are entitled to qualified immunity,

and that state-law claims should be dismissed for failure to comply with the notice of claim requirement as set out in Section 50–i of New York's General Municipal Law.

Plaintiff did not submit a response to Defendants' Motion for Summary Judgment. (Report at 2.) Defendants' Motion papers, however, included Plaintiff's deposition testimony (Report at 8), and Plaintiff's version of the facts differs substantially from those set out in the Defendant' deposition testimonies. (*Id.* at 8, 49–52.)

While Magistrate Judge Dolinger recommended the dismissal of most of Plaintiff's claims, he concluded that two of the claims-denial of medical care and excessive force-should not be dismissed on summary judgment. Nor could he conclude, due to the necessary factual findings that remain, that Defendants should prevail on the qualified immunity defense to the claims. (Report at 72–73.)

Judge Dolinger found that Plaintiff's claim against Officer Vincent for denial of medical care may not be dismissed on summary judgment because it is in dispute whether Officer Vincent was aware that Plaintiff was seriously injured and, if he was aware, whether (1) he was responsible for the denial of medical care, (2) the denial led to a serious medical condition, and (3) Officer Vincent had the requisite state of mind. (Report at 51, 54).

Judge Dolinger also recommended that the Court not dispose of Plaintiff's excessive force claim because Plaintiff's "medical records are consistent with his" deposition testimony, and there is a lack of evidence to demonstrate that the inconsistencies that may exist are anything more than minor and immaterial. (Report at 61.) He further noted that Defendants failed to address the allegation that Plaintiff was hit in the head and that his hand was twisted and broken, leaving open yet another genuine issue of fact related to the question of excessive force. (Report at 72.)

**\*2** To determine whether individual Defendants were covered by-qualified immunity, Judge Dolinger recommended that the case proceed on the remaining claims to establish whether they acted intentionally or recklessly. (Report at 72–73.)

II. DISCUSSION

A. Standards of Review

2013 WL 5405468

1. Legal Standard for Summary Judgment

A party is entitled to summary judgment when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.,* 219 F.3d 104, 107 (2d Cir.2000). The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The substantive law governing the case will determine which facts are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When determining whether summary judgment is appropriate, the Court must resolve all ambiguities, and draw all reasonable inferences, against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). If the moving party meets its burden, there is a shift to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). With respect to the issues on which summary judgment is sought, if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper. *See Chambers v. TRM Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994). When a *pro se* litigant is involved, although the same standards for summary judgment apply, the *pro se* litigant "should be given special latitude in responding to a summary judgment motion." *Gonzalez v. Long,* 889 F.Supp. 639 (E.D.N.Y.1995); *see also Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988) ("special solicitude should be afforded *pro se* litigants generally, when confronted with motions for summary judgment."); *Delgado v. Koehler,* 1993 U.S. Dist. LEXIS 8405,1993 WL 227715 (S.D.N.Y. June 19, 1993) ("it would be premature to accept all of the facts contained in defendant's Rule 3(g) statement simply because of plaintiff's initial failure to file a response ... *pro se* plaintiffs should be afforded 'special latitude on summary judgment motions ....'") (internal citation omitted).

2. Standard of Review for a Report and Recommendation

"Within fourteen days after being served with a copy [of a report and recommendation], a party may serve and file specific written objections to the proposed findings and recommendations." Fed.R.Civ.P. 72(b)(2); *accord* 28 U.S.C. § 636(b)(1)(C). The Court will review *de novo* a magistrate judge's recommendation on a dispositive motion when a litigant has made a timely objection, Fed.R.Civ.P. 72(b) advisory committee's note, as well as "those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). However, "to the extent that the party makes only conclusory or general arguments, or simply reiterates the original arguments, the Court will review the Report strictly for clear error." *DiPilato v. 7–Eleven, Inc.,* 662 F.Supp.2d 333, 339 (S.D.N.Y.2009) (internal citation omitted); *Ortiz v. Barkley,* 558 F.Supp.2d 444, 451 (S.D.N.Y.2008) ("Reviewing courts should review a report and recommendation for clear error where objections are merely perfunctory responses, argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original petition."). A decision is "clearly-erroneous" when, "upon review of the entire record[,]" the Court is "left with the definite and firm conviction that a mistake has been committed." *United States v. Snow,* 462 F.3d 55, 72 (2d Cir.2006). After conducting the appropriate levels of review, the Court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. 28 U.S.C. § 636(b)(1).

**\*3** Defendants's Objection states that all state-law claims must be dismissed due to Plaintiff's failure to file a notice of claim pursuant to Section 50–i of the New York General Municipal Law. (Defs.' Obj. at 2–3.) This is the same argument Defendants raised when they sought summary judgment against Plaintiff. There, the "defendants argue[d] that to the extent that any of plaintiff's allegations could be construed as state-law claims, they must be dismissed because plaintiff failed to ... fil[e] a notice of claim." (Report at 75.)

Defendants' Objection will be reviewed under clear error, as it is "merely a perfunctory response[ ] argued in an attempt to engage the district court in a rehashing of the same argument" considered by the Magistrate Judge. *Vega v. Artuz,* 2002 U.S. Dist. LEXIS 18270,2002 WL 31174466 (S.D.N.Y. Sept. 30, 2002) ("Objections of this sort are frivolous, general and conclusory and would reduce the magistrate's work to something akin to a 'meaningless dress rehearsal.' ") (internal citation omitted); *Singh v. N.Y. State Dep't of Taxation and Finance,* 865 F.Supp.2d 344, 348 (W.D.N.Y.2011) (concluding that despite the "full benefit of the requirements for consideration of matters raised in *pro*

*se* submissions," the Court will not review *de novo* the same exact arguments made before a magistrate.).

### B. Defendants' Objection to the Report

#### 1. State–Law Claims

Defendants filed a timely Objection to Magistrate Judge Dolinger's Report. Defendants object to the recommendation that would deny Defendants' request to dismiss all state claims. In their Objection, Defendants "note that Plaintiff does not appear to allege any state-law claims in the complaint." (Defs.' Obj. at 2.) Defendants do not contend error in the Magistrate's liberal construal of the Complaint, i.e. reading the pleading to assert federal claims and parallel state claims, nor do they take issue with the principle that pleadings submitted by a *pro se* litigant must be interpreted "to raise the strongest arguments that they *suggest.*" (Report at 74) (citing *Triestman v. Fed. Bur. of Prisons,* 470 F.3d 471, 472 (2d Cir.2006) (internal citation omitted) (emphasis in original)). Instead, Defendants contend that all state-law claims must be dismissed due to Plaintiff's failure to file a notice of claim pursuant to Section 50–i of the New York General Municipal Law. (Defs.' Obj. at 2–3.)

"Under New York law, notice of claim is a statutory-precondition to filing suit against the City or its employees." *Harris v. Bowden,* 2006 U.S. Dist. LEXIS 12450,2006 WL 738110 (S.D.N.Y. Mar. 23, 2006); *accord* N.Y. Gen. Mun. Law § 50–i. Sections 50–e and 50–i require that in tort actions, a plaintiff suing a municipality, a municipal entity, or a municipal employee acting in the scope of his employment must file a notice of claim within ninety days of the incident, and that the action be filed no later than a year and ninety days from that date. N.Y. Gen. Mun. Law §§ 50–e, 50–i. Failure to comply with the strict timetables warrants dismissal of the state tort actions. N.Y. Gen. Mun. Law § 50–i.

**\*4** The required filing of the Notice is not just an obstacle to thwart persons from suing municipalities; it is in place to put entities on notice when they must indemnify their employees. In New York, a municipality is obligated to indemnify its officers in an action when they were "acting within the scope of [their] public employment and in the discharge of [their] duties and [were] not in violation of any rule or regulation of [their] agency at the time the alleged act or omission occurred." N.Y. Gen. Mun. Law § 50–k. However, the duty to indemnify ... shall not arise where the injury or damage resulted from intentional wrongdoing or recklessness on the part of the employee." *Id.* Therefore, Section 50–e's notice of

claim requirement and 50–i's limitations period are applicable to claims brought against individual defendants only if the government is obligated to indemnify them. *Bertuglia v. City of N.Y.,* 839 F.Supp.2d 703, 736 (S.D.N.Y.2012) (citing *Int'l Shared Servs. Inc., v. Cnty. Nassau,* 222 A.D.2d 407, 634 N.Y.S.2d 722, 724); *Brenner v. Heavener,* 492 F.Supp.2d 399, 405 (citing N.Y. Gen. Mun. Law § 50–k(3) ("The notice prerequisite does not apply to claims asserted against municipal employees in their individual capacities that allege injuries resulting from intentional wrongdoing or recklessness-misconduct for which the City had no obligation to indemnify.").

Here, based on the Plaintiff's version of the facts and submitted medical evidence, a factfinder may reasonably conclude that Plaintiff's injuries resulted from intentional wrongdoing or recklessness. Because "[t]he obligation to indemnify turns upon the resolution of the fact-sensitive question of whether the individual defendants[']" committed tortious acts of intentional wrongdoing or recklessness, at this time it cannot be determined whether the failure to file a notice of claim is fatal to Plaintiff's suit. *Bertuglia,* 839 F.Supp.2d at 736. Assuming arguendo that the officers are not entitled to indemnification by the city, Plaintiff's omission does not bar him from proceeding against the officers in their individual capacities. N.Y. Gen. Mun. § 50–e(1)(b) ("If an action or special proceeding is commenced against [a municipal officer], but not against the public corporation, service of the notice of claim upon the public corporation shall be required *only if* the corporation has a statutory obligation to indemnify ....") (emphasis added).

Conversely, if the factfinder determines that Plaintiff's alleged injuries did not arise from the officers' intentional wrongdoing or recklessness, the City of New York will have a statutory obligation to indemnify the officers. In such a case, Plaintiff will have been required to have submitted a notice of claim and, given that he has not done so, the state tort claims will be dismissed. *Allen v. New York City Dep't of Corr.,* 2010 U.S. Dist. LEXIS 39109 at *53,2010 WL 1644943 (S.D.N.Y. Mar. 17, 2010) (citing *Silberstein v. County of Westchester,* 92 A.D.2d 867, 459 N.Y.S.2d 838, 839 (2d Dep't 1983)) ("The failure to comply with ... conditions [set out in N.Y. Gen. Mun. Law §§ 50e and 50k] is grounds for dismissal of the action."); *See* N.Y. Gen. Mun. Law §§ 50e, 50k; *Int'l Shared Servs. Inc., v. Cntv. Nassau,* 222 A.D.2d 407, 634 N.Y.S.2d 722 (N.Y.App. Div. 2nd Dep't 1995).

**\*5** As Magistrate Judge Dolinger concluded, the record contains factual uncertainties, which fail to establish whether the officers are entitled to indemnification. "Because the Court finds that defendants have failed to establish that no genuine issue of material fact exists as to whether the state claim defendants are statutorily entitled to indemnification, defendants' motion for summary judgment on the ground that plaintiff failed to file a notice of claim must be DENIED." *D'Angelo v. City of New York,* 929 F.Supp. 129, 136 (S.D.N.Y.1996) (emphasis added).

C. Portions of the Report to Which Neither Party Opposes
"The district court may adopt those portions of a report and recommendation to which no timely objections have been made, provided no clear error is apparent from the face of the record." *DiPilato v. 7–Eleven, Inc.,* 662 F.Supp.2d 333, 339 (S.D.N.Y.2009) (citing *Lewis v. Zon,* 573 F.Supp.2d 804, 811 (S.D.N.Y.2008)); Fed.R.Civ.P. 72 advisory committee's note (b). Defendants do not object to Magistrate Judge Dolinger's recommendations so this Court will review them only for clear error. (Defs.' Obj. at 2.) Having found no clear error, the Court adopts the Report's recommendations.

III. CONCLUSION
Having conducted the appropriate level of review, the Court APPROVES, ADOPTS, AND RATIFIES the Judge Dolinger's September 28, 2012 Report in its entirety.

The Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part. Plaintiff's claims (1) against the NYPD; (2) for false-arrest and unlawful-entry; (3) for denial of medical care only as to Detective Mancini and Lieutenant Gribben; and (4) for excessive-force only as to Officer Vincent are DISMISSED. Defendant Officers' qualified immunity defenses are DENIED. All other claims, including parallel state tort claims, shall REMAIN.

SO ORDERED.

TYRONE LASTER, Plaintiff,

-against-

DET. ROBERT J. MANCINI, 43 PCT., P.O. DOUGLAS VINCENT, 43 PCT. # 31914, LT. GRIBBEN, 43 PCT. # 596407, NEW YORK POLICE DEPARTMENT,

Defendants.

*REPORT & RECOMMENDATION*

MICHAEL H. DOLINGER, United States Magistrate Judge.

TO THE HONORABLE DEBORAH A. BATTS, U.S.D.J.:
*Pro se* plaintiff Tyrone Laster commenced this lawsuit on August 17, 2007, in the Eastern District of New York, alleging that his constitutional rights had been violated during his arrest on September 26, 2006 by officers of the New York City Police Department ("NYPD"). The case subsequently was transferred to this district, as all defendants and a substantial part of the events giving rise to the claims occurred in Bronx County. *See* Transfer Order, *Laster v. Mancini,* No. 07–cv–3581 (E.D.N.Y. Aug. 29, 2007). Plaintiff names as defendants three individual officers Detective Robert J. Mancini, Officer Douglas Vincent and Lieutenant James Gribben—and the NYPD, and asserts claims under 42 U.S.C § 1983 for false arrest, illegal entry, excessive force and failure to provide prompt medical assistance.

**\*6** Defendants have moved for summary judgment, arguing principally that (1) plaintiff's claims for false arrest or unlawful detention are precluded by his conviction following the arrest; (2) plaintiff fails to state a claim for denial or delay of medical treatment; (3) plaintiff's excessive-force claim fails because his testimony is irreconcilable and he cannot establish that any of the defendant officers were involved in a violation of his constitutional rights; (4) the individual defendants are entitled to qualified immunity; (5) the NYPD is not an entity that may be sued; and (6) any remaining state-law claims should be dismissed for failure to comply with the notice-of-claim requirement of section 50–i of New York's General Municipal Law. (*See generally* Defs.' Mem. of Law in Supp. of Mot. for Sum. J. ("Defs.' Mem. of Law")). Plaintiff has submitted no response to the motion.

For the reasons that follow, we recommend that defendants' motion be granted in part and denied in part.

*BACKGROUND*

Plaintiff's allegations stem from his arrest on September 26, 2006 based on the complaint of his stepsister-Ms. Jeanette Santos—to officers at the NYPD's 43 rd Precinct, She told the officers that plaintiff was in her apartment in possession of a gun and that she wanted him removed. (*See* Defs.' Rule 56.1 Stmt. ¶¶ 9–16; Decl. of Bradford C. Patrick in Supp. of Mot.

for Summ. J. ("Patrick Decl.") Ex. D (Decl. of P.O. Vincent in Supp. of Mot. for Summ. J. ("Vincent Decl.")) ¶¶ 10–17; Patrick Decl. Ex. Q ("Santos Decl.") ¶ 2). A team of officers entered the apartment and arrested plaintiff, recovering a semi-automatic handgun from his pants pocket. (Patrick Decl. ¶ 52). Plaintiff was subsequently indicted and convicted under 18 U.S.C. § 922(g)(1) as a felon-in-possession, that is, for having possessed a loaded semi-automatic handgun in interstate commerce after having been convicted of: (i) attempted rape in 1998, (ii) attempted assault in 1995, and (iii) attempted robbery in 1982. (Patrick Decl. ¶¶ 92, 94).

A. *Facts and Prior Testimony* [1]

[1]     We rely here on testimony from plaintiff's criminal trial as well as declarations offered by the officers and Ms. Santos. Plaintiff's version of events, as reflected in his deposition testimony—which defendants proffered as part of their motion—differs substantially, and we present his side below, although we note that he did not oppose defendants' summary-judgment motion and thus offers no current opposition to their factual assertions.

Plaintiff arrived at Ms. Santos's apartment the night before his arrest, on September 25, 2006, at approximately nine p.m. (*See* Patrick Decl. Ex. Q (Santos Oct. 23, 2007 Trial Testimony Tr.) at 57). Ms. Santos testified at plaintiff's criminal trial that she had not permitted plaintiff to stay with her that night, but that he had come back the following morning. (*Id.*). She testified that in order to get him to leave, she told plaintiff that her ex-boyfriend was still living with her, an assertion that she admitted was not true. (*Id.* at 69).

According to Ms. Santos, plaintiff returned to her apartment at approximately 7:00 a.m. on September 26. She testified that he "didn't look like himself", and that he had a gun in his hand. (*Id.* at 57–59). Ms. Santos then left the house with her twelve-year-old son, locking the door behind her, and went to the 43 rd Precinct. (*Id.* at 59–60). Officer Vincent, who was on duty on the morning of September 26, was summoned to the precinct to meet with Ms. Santos. (Vincent Decl. ¶¶ 7–9; *see also* Patrick Decl. Ex. L (Vincent Trial Tr. 75)). He and defendant Lieutenant Gribben were both present when Ms. Santos made her complaint. (*See* Patrick Decl. Ex. E (Decl. of Lt. James Gribben in Supp. of Mot. for Summ. J. ("Gribben Decl.")) ¶¶ 6, 8). After hearing Ms. Santos's account, the officers decided to contact the Emergency Services Unit ("ESU") of the NYPD to undertake the operation to remove plaintiff from the apartment. (Vincent

Decl. ¶¶ 21–22; Gribben Decl. ¶ 9; Vincent Trial Tr. 76). Ms. Santos gave the officers permission to enter her apartment and also gave them the key. (Santos Trial Tr. 60; Vincent Decl. ¶¶ 18–19). She indicated her consent to the entry by signing her name in Officer Vincent's memo book. (Vincent Decl. ¶ 19). Vincent testified that he had informed Ms. Santos that the police might need to use force to enter the apartment and that he believed that she understood. (Vincent Tr. 101–02).

**\*7** Lieutenant Gribben proceeded to Ms. Santos's apartment building—1471 Watson Avenue—and instructed officers to form a perimeter around the outside. (Gribben Decl. ¶ 11). Officer Vincent and his partner went into the building and surveyed the area outside Ms. Santos's apartment—apartment 6D. (Vincent Decl. ¶ 23). Ms. Santos did not accompany the officers inside, but instead remained a block away. (Santos Trial Tr. 67).

The ESU team then arrived, consisting of seven officers, including defendant Detective Robert Mancini, and the team proceeded to the hallway outside Ms, Santos's apartment. (Vincent Decl. ¶ 24–26; Bradford Decl. Ex. F (Mancini Decl.) ¶¶ 5, 11, 13). At this point Officer Vincent left the apartment building, and Lieutenant Gribben stayed in the interior hallway outside apartment 6D while the ESU officers went inside. (Vincent Decl. ¶ 28; Gribben Decl. ¶ 17).

The ESU officers entered apartment 6D and spread out to various locations within the apartment. (Mancini Decl. ¶¶ 16–17; *see also* Patrick Decl. Ex. M (Mancini Trial Tr.) 120). A radio transmission then alerted the officers that an individual was on the fire escape of the apartment. Two ESU officers went to the window where the fire escape was located and brought plaintiff back through the window. (Mancini Decl. ¶¶ 20–22; Mancini Trial Tr, 121). The two officers placed plaintiff face-down on the floor, and Detective Mancini and another officer then handcuffed him. (Mancini Decl. ¶¶ 22–23). Detective Mancini then frisked plaintiff and asked him if he had a weapon, to which, Mancini attests, plaintiff replied that he had a gun in his pants pocket. (*Id.* ¶¶ 37–39). Detective Mancini searched plaintiff's right rear pants pocket and found a .25 caliber semi-automatic handgun. (*Id.* ¶ 40; Mancini Trial Tr. 122).

When the ESU officers indicated that all was secure, Lieutenant Gribben went inside the apartment and saw plaintiff already in handcuffs. (Gribben Decl. ¶¶ 17–20). Officer Vincent, after hearing the radio transmission that plaintiff was going out the window (Vincent Decl. ¶¶ 28–

2013 WL 5405468

32), returned to the sixth floor and saw plaintiff being led out of apartment 6D in handcuffs; he did not see or participate in the apprehension of plaintiff. (*Id.* ¶¶ 34–37). Vincent then asked plaintiff "Are you sick? Are you injured", to which plaintiff responded "no". (*Id.* ¶¶ 40–41). Vincent then transported plaintiff to the 43 rd Precinct, where he confirmed that plaintiff was wanted in connection with an armed robbery in Mississippi that had occurred on September 23, 2006. (*Id.* ¶¶ 45, 50).

Officer Vincent asserts that plaintiff never requested medical attention from him, that he was never informed that plaintiff needed or had requested such attention, and that he was not aware that plaintiff had been injured. (*Id.* ¶ ¶ 54–56). He further asserts that he did not observe or participate in the use of any force upon plaintiff. (*Id.* ¶ 57).

**\*8** Detective Mancini states that he had to pull plaintiff's left arm out from underneath his body before placing the handcuff on his wrist. (Mancini Decl. ¶ 31). He asserts that he did not strike plaintiff's head (*id.* ¶ 30), and that plaintiff did not complain, and he had no reason to believe, that he was squeezing plaintiff's hands too tightly or twisting them unnaturally while handcuffing him. (*Id.* ¶ 34). He also asserts that plaintiff did not request medical treatment from him and that he was never aware that plaintiff needed, or had asked for, such treatment. (*Id.* ¶¶ 47–48). He testified that the arresting officers had used the "minimal force necessary to take a person into custody" when arresting plaintiff. (Mancini Tr. 133).

### B. *Plaintiff's Testimony*

Plaintiff's version of the facts, which is included in defendants' motion papers in the form of his deposition transcript, differs substantially from that of the officers and Ms. Santos. He testified in his deposition that Ms. Santos had permitted him to stay overnight in her apartment on the night of September 25, 2006. (*See* Patrick Decl. Ex. G (Pl.'s Feb. 24, 2009 Dep. Tr.) ("Dep.Tr.") at 27). He asserted that he had slept on the couch and had not brought a gun to her apartment. (*Id.* at 27). He recounted that Ms. Santos had left the apartment to take her son to school and that he was asleep on the couch when the police entered the apartment around 7:00 a.m. on September 26. (*Id.* at 28–29). He testified that officers "kicked the door in with machine guns ... pointed at me." (*Id.* at 32–33). He stated that he then went toward the window, contending that he never went out onto the fire escape but rather stayed inside the apartment. (*Id.* at 33–34). He did not remember how

many officers had entered the apartment, just that there were multiple officers and at least one machine gun. (*Id.* at 35–36).

Plaintiff summarized the incident in his deposition as follows:

> They entered the apartment. They slammed me on the floor and attempted to handcuff me and as they were handcuffing me, my hand was broken. All they kept shouting was ["]where's the gun, where's the gun. ["] I said "what gun?" That's when my hand was broken like as they're saying you know where it's at and broke my hand in order to make me say where the gun was.

(*Id.* at 42).

Plaintiff further asserts that he did not resist being handcuffed and that his hands were at his sides. (*Id.* at 43). He alleges in essence that the officers broke his hand because he did not tell them where any gun was (*id.* at 45), and that when he told the officers that they had broken his hand, an officer replied "so what, you're going to jail". (*Id.* at 48–49). He also states that he was hit on the head at least twice. (*Id.* at 46–47). He denied in his deposition that the officers had found a gun on him. (*Id.* at 48).

Plaintiff asserts that he did request medical attention, testifying that he told the officers that he wanted to go to the hospital (*id.* at 49, 53), but that it was not until he was in the City correctional facility that medical staff there arranged for him to go to Bellevue Hospital's emergency room on September 28, 2006. (*Id.* at 49–50, 58). He described his hand as bruised with a large bump, and so swollen that it looked like "a boxing glove." (*Id.* at 59).

**\*9** With respect to the individually named defendants, plaintiff testified that it was Mancini who handcuffed him and broke his hand, and that it was Vincent who knew that his hand was broken and did nothing to intervene or obtain medical treatment for him. *Id.* at 37–39, 67). He bases his accusations against the specific officers on the paperwork that he received in discovery. (*Id.* at 37–41). He asserts that Gribben was the supervising officer who was present and did nothing to intervene. (*Id.* at 68).

C. *Medical Treatment*

Plaintiff recounted that at Bellevue Hospital his hand was x-rayed and he was given pain medication and a splint, but that he was forced to surrender the splint at the correctional center. (*Id.* at 61–62). He was advised that he would need surgery in the form of a screw and two plates. (*Id.* at 62). He was also given Bacitracin for a wound on the back of his head. (*Id.* at 63).

The medical evidence in the record confirms that plaintiff was treated in the emergency room at Bellevue Hospital on September 28, 2006. (Patrick Decl. Ex. T ("Hosp.Records") at NYC 547). His hand was x-rayed that day, showing "a fracture of the base of the fifth metacarpal, with slight radial displacement of the distal fragment", and "associated soft tissue swelling overlying the fracture site". (*Id.* at NYC 551–52). The records also show that while initially the doctors thought that he needed surgery, upon further review they decided that such an operation was not necessary. (*Id.* at NYC 548).

Plaintiff asserted at his deposition that as a result of this incident, he still—three years later—had trouble using his injured hand, that it is his dominant hand, and that he wakes up in the middle of the night with pain in his hands. (Dep. Tr. 66). He also stated that he had developed anxiety problems about police officers and prisons. (*Id.* at 65).

D. *The Resulting Prosecution*

On November 16, 2006,[2] a grand jury in the Southern District of New York indicted Laster for possession of a firearm in interstate commerce after having been previously convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). (Patrick Decl. Ex. U (Indictment); *see also* Defs.' R.56.1 Stmt. ¶ 91). A superceding indictment was returned on January 25, 2007 to include 18 U.S.C. § 924(e)(1), which mandates the minimum custodial sentence allowed for persons convicted of § 922(g)(1). (Patrick Decl. Ex. V (Superceding Indictment); *see also* Defs.' R.56.1 Stmt. ¶ 92).

[2]    Plaintiff was indicted on a charge of armed robbery in the state of Mississippi on September 23, 2006. (Patrick Decl. Ex. H (Miss.Indictment).

The court held a suppression hearing on June 6, 2007 to determine whether the gun or plaintiff's post-arrest admission to possessing the gun should be suppressed. (*See* Patrick

Decl, Ex. O ("Supp.Tr.") 3). Officer Vincent testified that Ms. Santos had described plaintiff as being menacing and "brandish[ing] a firearm", and that he appeared to be under the influence of drugs. (*Id.* at 5–6, 33). He stated that she also had told him that Laster was wanted for a crime in Mississippi and that he had a long criminal history. (*Id.* at 6). Ms. Santos told him that she was frightened and wanted Laster removed from her apartment. (*Id.* at 8–9). She described the gun to the officers and consented to a search of her apartment. (*Id.* at 9). Specifically, Vincent had her acknowledge in a signed writing that she consented to a forcible search. (*Id.* at 9–10).

**\*10**  Mancini also testified at the suppression hearing. He described going with the rest of the ESU team into the apartment and hearing a radio transmission that there was an individual on the fire escape. (Patrick Decl. Ex. P ("Mancini Supp. Tr.") 36). He testified that plaintiff was placed on the floor and handcuffed, and then frisked. According to Mancini, he then asked Laster if he had a weapon, and plaintiff replied that it was in his rear pocket. (*Id.* at 37). Mancini testified that the ESU officers had guns, including submachine guns, and that the officers still had their weapons drawn when plaintiff was handcuffed and searched. (*Id.* at 44–46), The gun that was recovered by Mancini was given to Vincent. (Vincent Supp. Tr. 19–20).

In an opinion dated June 26, 2007, the District Court denied the suppression motion in its entirety. The Court found that the officers' testimony was believable (Patrick Decl. Ex. R ("Supp.Op.") at 2–3) and that exigent circumstances had justified the police in not knocking and announcing their presence before entering the apartment. (*Id.* at 3). It further found that Laster's own testimony supported the officers' assertions that he had tried to flee through the window when they entered. (*Id.* at 3–4). The Court thus held that the entry and the protective search of plaintiff were justified. (*Id.* at 4).

A jury trial commenced before the Hon. John F. Keenan on October 23, 2007 and resulted in a verdict finding plaintiff guilty of violating 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(e)(1). (*See* Defs.' R.56.1 Stmt. ¶ 94). On May 29, 2008, he was sentenced to seventeen years in prison, to be followed by five years of supervised release. (Patrick Decl. Ex. W). Laster appealed to the Second Circuit, which affirmed his conviction by order dated February 3, 2009. (Patrick Decl. Ex. X; Defs.' R.56.1 Stmt. ¶ 95).

On April 16, 2009 plaintiff pled guilty to the armed robbery charge in Mississippi. (Defs.' R.56.1 Stmt. ¶ 96).

Laster v. Mancini, Not Reported in F.Supp.2d (2013)

2013 WL 5405468

D. *The Current Suit*

Plaintiff filed suit here on August 17, 2007, while his criminal case was pending in this District. Defendants' motion for summary judgment was filed after completion of discovery.

*ANALYSIS*

We turn now to an analysis of defendants' current motion. Defendants move for summary judgment principally on the grounds that (1) plaintiff is precluded from asserting his claims for false arrest or illegal entry; (2) he fails to state a claim for denial or delay of medical treatment; (3) his excessive-force claim fails because his testimony is irreconcilable and because he cannot establish that any of the defendant officers were personally involved in a violation of his constitutional rights; (4) the individual defendants are entitled to qualified immunity; (5) the NYPD is not an entity that may be sued; and (6) any remaining state-law claims should be dismissed for failure to comply with the notice-of-claim requirement of section 50–i of New York's General Municipal Law. We analyze the arguments roughly in the order in which they are asserted. We begin by discussing the standard applicable on a motion for summary judgment.

I. *Standard of Review*

**\*11** The court may enter summary judgment only if it concludes that there is no genuine dispute as to the material facts and that, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Feingold v. New York,* 366 F.3d 138, 148 (2d Cir.2004). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law [while] [a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Shade ex rel. VelezShade v. Hous. Auth. of New Haven,* 251 F.3d 307, 314 (2d Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). It is axiomatic that the responsibility of the court in deciding a summary-judgment motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986); *see, e.g., Anderson,* 477

U.S. at 255; *Howley v. Town of Stratford,* 217 F.3d 141, 150–51 (2d Cir.2000).

The party moving for summary judgment bears the initial burden of informing the court of the basis for his motion and identifying those portions of the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations ... admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact. Fed.R.Civ.P. 56(c)(1); *see, e.g., Celotex,* 477 U.S. at 323; *Koch v. Town of Brattleboro,* 287 F.3d 162, 165 (2d Cir.2002). If the non-moving party has the burden of proof on a specific issue, the movant may satisfy his initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim. *See, e.g., Celotex,* 477 U.S. at 322–23, 325; *PepsiCo, Inc. v. Coca–Cola Co.,* 315 F.3d 101, 105 (2d Cir.2002) (*per curiam* ); *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). If the movant fails to meet his initial burden, however, the motion will fail even if the opponent does not submit any evidentiary materials to establish a genuine factual issue for trial. *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 160, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Giannullo v. City of N.Y.,* 322 F.3d 139, 140–41 (2d Cir.2003).

If the moving party carries his initial burden, the onus of demonstrating a genuine issue of material fact on any such challenged element of his claim then falls upon the opposing party. *See, e.g., Beard v. Banks,* 548 U.S. 521, 529, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006); *Celotex,* 477 U.S. at 323–24; *Santos v. Murdock,* 243 F.3d 681, 683 (2d Cir.2001) (*per curiam* ). In doing so, the opposing party may not rest "upon the mere allegations or denials of his pleading," *Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti,* 374 F.3d 56, 59–60 (2d Cir.2004) (citation omitted), nor may he rely on merely conclusory factual allegations. *See, e.g., Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000). He must also "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Woodman v. WWOR–TV, Inc.,* 411 F.3d 69, 75 (2d Cir.2005). Rather, he must present specific evidence in support of his contention that there is a genuine dispute as to the material facts. *See, e.g., Celotex,* 477 U.S. at 324; *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 526 (2d Cir.1994).

**\*12**  In order to show a "genuine dispute" of material fact, the opposing party must demonstrate that there is sufficient evidence for a reasonable jury to find in his favor. *Anderson,* 477 U.S. at 248; *Matsushita,* 475 U.S. at 587; *Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.,* 473 F.3d 450, 455–56 (2d Cir.2007) (citing *Anderson,* 477 U.S. at 249). Only if "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact" will summary judgment be denied. *Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 9–10 (2d Cir.1983)

II. *The False–Arrest/Unlawful–Entry Claim*
In plaintiff's complaint, he alleges that he was arrested after "officers broke down the apartment door without an arrest or search warrant." (*See* Compl., Ex. C, at 4 ¶ IV). Because we read the complaints of *pro se* litigants liberally and derive from them the most reasonable claims and arguments that they may be read to imply, *see, e.g., Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474–76 (2d Cir.2006) (*per curiam* ), we construe this allegation to be a claim for false arrest or, in the alternative, unlawful entry.

Defendants argue that plaintiff's false-arrest claim is barred by his subsequent criminal conviction, and that plaintiff already litigated the lawfulness of the entry into the apartment in his criminal case and thus may not relitigate it here. (Defs.' Mem. of Law 3–7).

For the reasons that follow, we conclude that plaintiff's false-arrest claim is not barred by *Heck v. Humphrey,* 512 U.S. 477, 486–87, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), but that it is meritless based on both his prior conviction and the evidence of record. We also find that although plaintiff is not precluded from raising the issue of the lawfulness of the entry into the apartment, this claim is meritless as well.

A. *False–Arrest Claim*

1. *Legal Standards*

A section 1983 claim for false arrest "is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). [3] Under New York law, for a plaintiff to prevail on a false-arrest claim, he must demonstrate that (1) the defendant intentionally confined him, (2) the plaintiff was aware of being confined, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not justified or otherwise privileged. *See, e.g., Escalera v. Lunn,* 361 F.3d 737, 743 (2d Cir.2004) (quoting *Weyant,* 101

F.3d at 852); *Savino v. City of New York,* 331 F.3d 63, 75 (2d Cir.2003) (quoting *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994)).

3       To the extent that plaintiff's complaint might be construed as encompassing a false-imprisonment claim it should be noted that the Second Circuit analyzes false-arrest and false-imprisonment claims identically. *See, e.g., Jenkins v. City of New York,* 478 F.3d 76, 88 n. 10 (2d Cir.2007) (citing 59 N.Y.Jur.2d False Imprisonment § 1) ("False arrest is simply false imprisonment accomplished by means of an unlawful arrest."). This analysis is thus equally applicable to any such false-imprisonment claim.

An arrest is justified or privileged if, *inter alia,* it is based on probable cause, which exists when an officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Jocks v. Tavernier,* 316 F.3d 128, 135 (2d Cir.2003) (quoting *Weyant,* 101 F.3d at 852); *accord Dunaway v. New York,* 442 U.S. 200, 208 n. 9, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (quoting *Brinegar v. United States,* 338 U.S. 160, 175–176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). An arrest supported by probable cause cannot be the basis of a section 1983 claim for false arrest. *See Boyd v. City of New York,* 336 F.3d 72, 75–76 (2d Cir.2003); *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995).

**\*13**  Probable cause exists where the objective facts known by the arresting officer at the time of arrest suggest that a person has committed some crime, even if not the crime invoked by the officer at the time of arrest. *See Devenpeck v. Alford,* 543 U.S. 146, 153, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004); *Jaegly v. Couch,* 439 U.S. 149, 153–54 (2d Cir.2006). The focus with regard to probable cause is not on certitude by the arresting officer, but on the likelihood of some criminal activity. *See Illinois v. Gates,* 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("The process does not deal with hard certainties, but with probabilities."). Establishing probable cause requires a fact-based determination that considers the totality of the circumstances. *See id.* at 233; *see also United States v. Martin,* 426 F.3d 68, 74–76 (2d Cir.2005). A law-enforcement official's basis for probable cause can be information about the commission of a crime received from another person, normally the putative victim or an eyewitness. *Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir.2000) (citing *Miloslavsky v. AES Eng'g Soc'y,* 808

F.Supp. 351, 355 (S.D.N.Y.1992), *aff'd*, 993 F.2d 1534 (2d Cir.1993)). Moreover, once an officer has probable cause to arrest a suspect, the officer need not investigate the suspect's claims of innocence prior to making the arrest. *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 128 (2d Cir.1997) (citing *Baker v. McCollan,* 443 U.S. 137, 145–46, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Krause v. Bennett,* 887 F.2d 362, 372 (2d Cir.1989)); *see also Curley v. Village of* Suffern, 268 F.3d 65, 70 (2d Cir.2001) (citing *Krause,* 887 F.2d at 371–72). The existence of probable cause may be determined as a matter of law absent dispute about either the pertinent events or the knowledge of the arresting officers. *Weyant,* 101 F.3d at 852.

Of particular significance here, a conviction upon the charges that arose from the arrest is deemed to be sufficient evidence that probable cause existed at the time of the arrest. Thus, a claim for false arrest may be entirely barred as a matter of law if the plaintiff was subsequently convicted of the crime for which he was arrested. *See, e.g., McLaurin v. New Rochelle Police Officers,* 439 Fed. App'x 38, 39 (2d Cir.2011) (upholding grant of summary judgment in favor of defendants with respect to section 1983 false-arrest claims where "[plaintiff's] conviction established probable cause for the arrest as a matter of law" (citing *Cameron v. Fogarty,* 806 F.2d 380, 388–89 (2d Cir.1989)); *Hayes v. Cnty. of Sullivan,* 2012 WL 1129373, at *16 (S.D.N.Y., Mar.30, 2012) (citing cases, and finding that because plaintiff had pled guilty to the criminal charges that arose from his arrest, he was "barred as a matter of law from bringing a claim for false arrest under § 1983"); *Green v. Gonzalez,* 2010 WL 5094324, at *2 (S.D.N.Y. Nov.22, 2010) ("A conviction of the plaintiff following arrest is viewed as establishing the existence of probable cause." (internal quotation marks and citation omitted)).

**\*14** A plaintiff may recover damages on a claim for false arrest that resulted in a conviction, but to do so he must generally prove that his conviction has been invalidated, *Heck,* 512 U.S. at 486–87, and therefore a claim for false arrest relating to a conviction that has not been invalidated is usually not cognizable under section 1983. *Id.* at 487. The analysis is "whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence." *Id.* If it would, the claim must be dismissed. If, however, it would not necessarily demonstrate that the conviction is invalid, the claim may be pursued. *Id.* With respect to this latter category, the *Heck* Court noted that such a situation might arise due to doctrines such as "independent source" and "inevitable discovery", which could mean that

the underlying conviction would not be invalidated by a successful false-arrest claim. *Id.* at 487 n. 7. Put differently, "in a case where the *only* evidence for conviction was obtained pursuant to an arrest, recovery in a civil case based on false arrest would necessarily impugn any conviction resulting from use of that evidence." *Covington v. City of N.Y.,* 171 F.3d 117, 123 (2d Cir.1999) (emphasis in original).

### 2. *Analysis*

#### a. *Heck v. Humphrey Bar*

Defendants do not dispute the fact that the arresting officers had neither an arrest warrant for plaintiff nor a search warrant for the apartment. (*See generally* Defs.' Rule 56.1 Stmt.). Rather, they argue that because plaintiff has offered no proof that his conviction on the charge stemming from his arrest has been invalidated, he is barred from pursuing a false-arrest claim. (Defs .' Mem. of Law 3).

As noted, sometimes a conviction resulting from an arrest may be perfectly valid even though the arrest itself was invalid. *See Covington,* 171 F.3d at 123 (citing *Washington v. Summerville,* 127 F.3d 552, 556 (7th Cir.1997)). It is in cases "where the *only* evidence for conviction was obtained pursuant to [the] arrest," *id.* (emphasis in original), or where a lawful arrest is an element of the crime, *see Heck,* 512 U.S. at 486 n. 6, that a claim for false-arrest may not be pursued while the conviction stands.

Although we do not have the entire criminal trial transcript in this case, the record that we do have reflects that evidence obtained pursuant to plaintiff's arrest—the recovered gun and plaintiff's statement about the gun—was not the only evidence available to support a conviction for unlawful possession. Indeed, Ms. Santos testified at trial that plaintiff was in possession of a gun and was brandishing it in her presence. (*See* Santos Oct, 23, 2007 Trial Testimony Tr. 57–59; Supp. Tr. 5–6, 9). A successful false-arrest claim by plaintiff on the basis that the officers lacked probable cause would imply that the gun recovered from him upon his arrest, and his statement about the gun, should have been suppressed. Suppression of both the gun and plaintiff's statement, however, would not eliminate all of the evidence supporting his conviction of unlawful gun possession, and Ms. Santos' testimony would have been sufficient, as a legal matter, to support his conviction. Thus, such a result would not "necessarily imply the invalidity of his conviction." *Heck,* 512 U.S. at 487; *but see Thompson v. N.Y. City Transit Police,* 2012 WL 2792931, at *2 (E.D.N.Y. July 9, 2012) ("Suppressing the

2013 WL 5405468

gun seized at the time of [plaintiff's] arrest would eliminate the only evidence supporting his conviction for unlawful gun possession; therefore, *Heck* bars his false arrest claim."). Accordingly, plaintiff's false-arrest claim is not barred as a matter of law by his conviction.

### b. *Probable Cause*

**\*15** Even though plaintiff's claim is cognizable, we nonetheless find it to be meritless, because the officers plainly had probable cause to arrest him.

Probable cause is established when, taking all the circumstances into account, we can determine that the objective facts known to the arresting officer at the time of the arrest indicated that it was likely that some criminal activity had occurred. Probable cause "is a complete defense to an action for false [-]arrest," *Weyant,* 101 F.3d at 852 (quoting *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994)). The record here conclusively demonstrates that probable cause existed.

First, as discussed, the fact that plaintiff was subsequently convicted of unlawful gun possession is itself sufficient evidence that probable cause existed at the time of his arrest. *See, e.g., McLaurin,* 439 Fed. App'x at 39 (upholding grant of summary judgment in favor of defendants with respect to section 1983 false-arrest claims where "[plaintiff's] conviction established probable cause for the arrest as a matter of law" (citing *Cameron,* 806 F.2d at 388–89)); *cf. Hayes,* 2012 WL 1129373, at *16 ("When a Section 1983 plaintiff ... pleads guilty to the underlying or a lesser charge, th[is] fact [ ] *alone* provide[s] sufficient evidence that probable cause existed at the time of the arrest and preclude[s] a false arrest claim under Section 1983.") (modifications and emphasis in original); *Green,* 2010 WL 5094324, at *2 ("A conviction of the plaintiff following arrest is viewed as establishing the existence of probable cause." (internal quotation marks and citation omitted)). Since the officers arrested plaintiff because of the complaint by Ms. Santos that he had a gun, and since plaintiff was subsequently convicted on the charge of unlawful possession of a firearm, we find that his conviction is sufficient proof that the officers had probable cause to arrest him.

Second, the circumstances surrounding plaintiff's arrest give rise to an independent finding that the officers had probable cause to arrest him. In this case, Officer Vincent was assigned the role of the arresting officer. (Vincent Decl. ¶ 48). Prior to plaintiff's arrest, Vincent and Gribben met with Ms. Santos at

the 43 rd Precinct (*see U.S. v. Laster* Trial Tr. Vincent Direct, Ex. L, at 75:6–13; Gribben Decl. ¶¶ 6, 8), and she informed them that Laster was in her apartment and that his presence made her fear for her safety. (*Id.* at 75:14–23). In Vincent's words, Ms. Santos "basically said that [plaintiff] appeared to be under the influence of some drug, that his behavior became progressively more bizarre through the morning, and that he began brandishing, manipulating a firearm." (*U.S. v. Laster* Mot. to Suppress Tr. Vincent Cross, Ex. O, at 33:11–14). Because of the "description that Ms. Santos was able to give regarding the events and her description of the firearm," Vincent found her "extremely credible ." (Trial Tr. Vincent Direct, Ex. L, at 76:13–19). Additionally, Ms. Santos informed Vincent that plaintiff might have been "wanted for a crime in Mississippi and ... that he had a long criminal history." (Mot. to Suppress Tr. Vincent Cross, Ex. 0, at 6:17–22). Although plaintiff claims that he did not have a gun in Ms. Santos's apartment (Dep. Tr. 28), that he did not tell her that he was **wanted** for a crime in Mississippi (*id.* at 30), and that Ms. Santos expressed no desire for him to leave (*id.* at 32), he does not dispute that Ms. Santos actually made contrary statements to the police.

**\*16** Based on Ms. Santos' statements, it was objectively reasonable for the officers to conclude that it was likely that some criminal activity had occurred. We need not determine whether the officers concluded that plaintiff was committing the federal offense of being a felon in possession of a firearm, or that he had simply menaced Ms. Santos, or that he had committed some other crime. Rather, we need only to determine that, based on the totality of the circumstances, the officers could have objectively concluded that plaintiff had likely committed *some* crime, and that, consequently, there was probable cause to arrest him. The complaint by Ms. Santos to the officers provided them with ample information to establish probable cause. *See, e.g., Sewell v. City of N.Y.,* 2011 WL 1748733, at *3 (E.D.N.Y. May 9, 2011) (complaint by neighbor to police that plaintiff had pointed a handgun at him was sufficient to establish probable cause for arrest).

Because plaintiff's subsequent conviction warrants a finding of sufficient probable cause, and because the undisputed facts in the record support a finding of probable cause, we conclude that plaintiff's false-arrest claim fails as a matter of law, and we therefore recommend that it be dismissed.

### C. *The Illegal–Entry Claim*

Plaintiff alleges that he was arrested after "officers broke down the apartment door without an arrest or search

2013 WL 5405468

warrant." (*See* Compl. ¶ IV). Defendants assert that the issue of illegal entry was already litigated and decided in the federal criminal proceeding that resulted from plaintiff's arrest. (*See* Defs.' Mem. of Law 5).

We conclude that plaintiff's claim is not barred by collateral estoppel, but we find it to be meritless.

The preclusive effect of a federal judgment is determined by federal law. *See Barnes v. Pozzi,* 2012 WL 3155073, at *6 (S.D.N.Y. Aug.3, 2012) (citing *Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 286 (2d Cir.2002)). The doctrine of collateral estoppel "bars a party from relitigating in a subsequent proceeding an issue of fact or law that was clearly raised in a prior action where the party to be precluded ... had a full and fair opportunity to litigate the issue, and a decision on that issue was necessary to support a valid and final judgment on the merits." *Giantasio v. D'Agostino,* at *3 (S.D.N.Y. May 22, 2012) (quoting *Envtl. Def. v. U.S. Envtl. Prot. Agency,* 369 F.3d 193, 202 (2d Cir.2004)). The party against whom the bar is asserted has the burden of demonstrating that there was an absence of a full and fair opportunity to litigate the issue. *See Rahman v. Acevedo,* 2011 WL 6028212, at *5 (S.D.N.Y. Dec.5, 2011). The doctrine has been consistently applied to bar relitigation of Fourth Amendment claims in Section 1983 actions. *See, e.g., Hayes,* 2012 WL 1129373, at *15 (citing cases). [4]

[4]     *Hayes* applies the doctrine to a state-court judgment, but the analysis would be the same for plaintiff's federal conviction here. *See Postlewaite v. McGraw–Hill, Inc.,* 333 F.3d 42, 47–48 (2d Cir.2003).

In this case, Laster clearly raised the issue of unlawful entry in his defense to the firearm prosecution. (*See generally* Supp. Order). Specifically, he made a motion to suppress the gun on the basis that the search and seizure was unlawful, as well as a motion to suppress the statement about the gun that he allegedly made to the officers. (See, e.g., Vincent Supp. Tr. at 3).

 *17  He also had a full and fair opportunity to litigate the issue. The court held a suppression hearing at which it heard testimony from Officer Vincent and Detective Mancini, and defense counsel was given the opportunity to cross-examine them. The court then issued a written opinion denying both motions. It found that the entry into the apartment was lawful, as Ms. Santos had given her consent and exigent

circumstances did not require the officers to knock, and that the question put to plaintiff regarding the whereabouts of the gun was proper under the "public safety" exception to the *Miranda* warning requirements. (Supp. Op. at 3–5). Laster appealed his conviction but did not choose to appeal the ruling regarding the lawfulness of the officers' entry, (*See* Ex. X (USCA Mandate (2d Cir. Feb. 27, 2009))). He therefore had a full and fair opportunity to litigate the issue of the lawfulness of the entry. *See, e.g., Hayes,* 2012 WL 1129373, at *14–16 (plaintiff afforded full and fair opportunity to litigate issue of probable cause where state trial court held a suppression hearing at which officers were cross-examined, the trial court issued a written decision denying the motion to suppress, and plaintiff pled guilty); *cf. Reyes v. City of N.Y.,* 2012 WL 37544, at *4 (E.D.N.Y. Jan.9, 2012) (plaintiff afforded a full and fair opportunity to litigate issue in state court where a hearing was held and the judge issued a written memorandum and order finding that the officers had probable cause to arrest plaintiff); *Mitchell v. Hartnett,* 262 F.Supp.2d 153, 155 (S.D.N.Y.2003) (plaintiff precluded from re-litigating issue of lawfulness of his arrest in § 1983 action where the issue had been the subject of a suppression hearing before the trial court).

As for the last element of collateral estoppel, the trial court decided the issue of the lawfulness of the entry (*see* Supp. Op. at 5), but we cannot say that that decision was necessary to support the final judgment of conviction. As we have noted, even if the gun and taster's statements were suppressed, it was possible for the State to have obtained a conviction for unlawful gun possession based on the testimony of Ms. Santos. Since the suppression decision by the trial court was not a final judgment and since it cannot be said to have been "essential" to the judgment, *Wilson v. Steinhoff,* 718 F,2d 550, 552 (2d Cir.1983) (rejecting collateral-estoppel effect on civil challenge to denial of suppression since plaintiff pled guilty); *see also Johnson v. Watkins,* 101 F.3d 792, 795–96 (2d Cir.1996); *Crespo v. New York City Police Comm'r,* 930 F.Supp. 109, 115 (S.D.N.Y.1996), we find that plaintiff is not precluded here from raising again the issue of unlawful entry.

We nonetheless find plaintiff's claim of unlawful entry to be meritless. Simply stated, the entry of the officers into the apartment was reasonable based on the consent of Ms. Santos.

A warrantless search is *per se* unreasonable under the Fourth Amendment unless it falls within certain exceptions. One such exception is where the search is undertaken pursuant to the consent of an authorized party. *See United States v. Lewis,* 386 F.3d 475, 481 (2d Cir.2004); *see also Georgia v.*

2013 WL 5405408

*Randolph,* 547 U.S. 103, 109, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006) (discussing consent exception); *United States v. Matlock,* 415 U.S. 164, 169–72, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (same); *United States v. Pabon,* 603 F.Supp.2d 406, 412 (N.D.N.Y.2009) ("So long as the police do not coerce consent, a search conducted on the basis of consent is not an unreasonable search." (quoting *United States v. Garcia,* 56 F.3d 418, 422 (2d Cir.1995)). Where consent is given, neither a warrant nor probable cause is required to justify the search. Rather, the prosecution need only prove by a preponderance of the evidence that consent was voluntarily given. *Lewis,* 386 F.3d at 481. There is no dispute as to the fact that Ms. Santos consented to a police search of her apartment with the goal of removing plaintiff from the premises. She in fact asked the officers to remove him and provided her consent to entry in writing at the time of her complaint (see Ex. D, Ex. 1 (Vincent Memo Book)), and she later affirmed that consent by affidavit in Laster's criminal case. (*See* Ex. Q). We therefore find that Ms. Santos voluntarily consented to the search, and that therefore the officers' subsequent entry and search of her apartment did not violate plaintiff's Fourth Amendment rights. *See, e.g., Lewis,* 386 F.3d at 481 (warrantless search of defendant's bedroom not unreasonable where his mother had given consent to the search); *United States v. Soto–Teran,* 44 F.Supp.2d 185, 193–94 (E.D.N.Y.1996) (where resident of apartment gave consent to search, subsequent seizure of contents of defendant's briefcase did not violate her Fourth Amendment rights).

**\*18** Furthermore, a warrantless entry may also be justified where "exigent circumstances demand that law enforcement agents act without delay." *United States v. Stokes,* 2012 WL 752078, at \*4 (S.D.N.Y. Mar.7, 2012) (quoting *United States v. MacDonald,* 916 F.2d 766, 769 (2d Cir.1990)); *see also United States v. Mendoza,* 406 Fed. App'x 513, 514–15 (2d Cir.2011). The test for determining the existence of exigent circumstances is an objective one based upon an examination of the totality of the circumstances. Factors to be considered include

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises

being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry.

*Stokes,* at \*4 (quoting *MacDonald,* 916 F.2d at 769–70). The "essential question" is "whether law enforcement agents were confronted by an 'urgent need' to render aid or take action", as in situations involving a threat of bodily harm. *Id.* (citations omitted).

In this case, the police were informed by Ms. Santos that plaintiff was in her apartment in possession of a firearm, that he had a criminal history, and that he appeared to be "not himself". This account weighs strongly in favor of a finding of exigent circumstances. The officers clearly had reason to believe that plaintiff had a criminal history, was armed, was inside Ms. Santos's apartment, and was acting bizarrely. Such circumstances are sufficient to warrant a finding that there was an "urgent need" to take action, and thus a finding that exigent circumstances justified the warrantless entry in this case. *Cf. Pierce v. Ottoway,* 2009 WL 749862, at \*8 (W.D.N.Y. Mar.18, 2009) (even assuming officers had forced their way into plaintiff's home without his consent, exigent circumstances justified their entry since they had received reports that he was a convicted felon and was discharging firearms on his property).

In sum, we find that plaintiff's false-arrest claim is not barred as a matter of law, but that it is meritless, as the officers had probable cause to arrest him. We further find that plaintiff's unlawful-entry claim is not barred because the suppression decision was not "essential" to the final judgment of conviction, but this claim is also meritless. We therefore recommend that defendants' motion for summary judgment on these claims be granted and that they be dismissed.

## II. *The Denial–of–Medical–Treatment Claim*

Plaintiff claims that he suffered injuries as a result of the arrest and that he was denied medical treatment. (Compl. ¶ IV, V; *see also, e.g.,* Dep. Tr. 49, 53). Defendants argue first that plaintiff fails to plead a claim for delay or denial of medical treatment because he fails to allege any facts putting defendants on notice of a claim involving deliberate indifference to his medical needs, and second, that the claim fails as a matter of law because the alleged injury was not sufficiently serious. (*See* Defs.' Mem. of Law 7–10).

2013 WL 5405468

**\*19** We understand defendants' first argument to be essentially that, under Rules 8(a) and 12(b)(6), plaintiff fails to state a claim, and their second argument to be that, regardless of whether plaintiff's complaint passes pleading muster, any deprivation was not "sufficiently serious" to rise to the level of a constitutional violation. Because we find defendants' first argument to substantially similar to the second, we address both by analyzing plaintiff's allegations and the evidence in the record in light of the standards for finding an Eighth Amendment violation.

A. *Eighth Amendment Criteria*
The Eighth Amendment "imposes a duty upon prison officials to ensure that inmates receive adequate medical care." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (citing *Farmer v. Brennan,* 511 U.S. 825, 832, 844, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). [5] To establish a constitutional claim based on the quality of medical care provided by a defendant, a plaintiff who is in custody must demonstrate "deliberate indifference to [his] serious medical needs." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)) (alteration in original).

[5]  While at the time of the incident in question, Laster was a pre-trial detainee and not a convicted prisoner, the standards governing deliberate indifference to the medical needs of persons in custody are the same. *See Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) ("Claims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment.").

This two-part test embodies both an objective and a subjective component. First, as an objective matter, "the alleged deprivation of adequate medical care must be 'sufficiently serious.' " *Salahuddin,* 467 F.3d at 279 (quoting *Wilson v. Setter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). "Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* (quoting *Wilson,* 501 U.S. at 298) (internal quotation marks omitted). This objective inquiry itself may be split into two parts. First, the court asks "whether the prisoner was actually deprived of adequate medical care." If so, the court next considers

"whether the inadequacy in medical care is sufficiently serious." *Id.* at 279–80. "This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Id.* (quoting *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003)) (internal quotation marks and brackets omitted). "[I]n most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Smith,* 316 F.3d at 187.

The second, subjective component of an Eighth Amendment claim requires us to ask whether the failure to render proper care resulted from "a sufficiently culpable state of mind." *Id.* (citing *Wilson,* 501 U.S. at 300). This state of mind must reflect "deliberate indifference to inmate health, ... a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Id.* (citing *Farmer,* 511 U.S. at 839–40). Disagreement with a course of treatment chosen by a medical provider does not suffice to demonstrate such indifference. *See, e.g., Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998); *Sonds v. St. Barnabas Hosp. Corr. Health Serv.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). Indeed, even negligence tantamount to medical malpractice does not amount to an Eighth Amendment violation, *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703. To be held in violation of the Eighth Amendment, the charged official must "act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 836–37).

B. *Evaluation of the Claim*
**\*20** Plaintiff states that a bone in his hand just below his pinky finger was broken during his arrest. (Compl.¶ IV(A)). He asserts that he requested medical attention from the arresting officers, specifically Officer Vincent, testifying that he told the officer that his hand was broken and that he wanted to go to the hospital. (Dep. Tr. at 49, 50, 53). He states that Officer Vincent refused to take him to the hospital and did nothing to get him medical attention. (*Id.* at 67). It was not until he was in the City correctional facility that medical staff there arranged for him to go to Bellevue Hospital's emergency room on September 28, 2006. (*Id.* at

2013 WL 5405468

49–50, 58). He described his hand as bruised with a large bump, and so swollen that it looked like "a boxing glove." (*Id.* at 59). He recounts that he saw a hand specialist at Bellevue Hospital, where his hand was x-rayed five times, and he was told that "a metal plate with the support of two screws had to be inserted" in his hand "in order to hold the bones together for healing purposes." (*Id.*). He received pain medication and a "substitute splint for the metal plates." (*Id.*). He states that the surgery was never done "because federal marshal[ ]s took [him] to the" Manhattan Correctional Complex. (*Id.*). In his deposition testimony, he further states that now he has "problems using [his] right hand" and "wake[s] up in the middle of the night with pains in [his] hand[ ]." (*Id.* at 66.).

Defendants argue that such a deprivation does not constitute a sufficiently serious injury, and that plaintiff has not alleged any facts giving rise to an inference of deliberate indifference on the part of any of the defendants. We disagree in part with this analysis.

In substance, plaintiff presses two complaints about his medical treatment. First, he asserts that he asked for medical help at the time of his arrest because of the pain in his broken hand, and that the officers, notably Officer Vincent, refused to allow it, choosing instead to take him to the precinct and then to Central Booking for processing. As a result, he asserts, his treatment, including pain relief, was delayed, apparently for two days. Second, he seems to take issue with the fact that his treating doctors ultimately decided that surgery was unnecessary. We first address plaintiff's delay-in-treatment claim.

With respect to the first part of the deliberate-indifference inquiry, we cannot say as a matter of law that a broken hand, with attendant pain, does not constitute a sufficiently serious injury for Eighth Amendment purposes. *See, e.g., Benning v. Ehrits,* 2009 WL 2982973, at *4 (N.D.N.Y. Sept.14, 2009) (citing *Bryan v. Endell,* 141 F.3d 1290, 1293 (8th Cir.1998) (finding a broken hand a serious medical condition)); *Mendez v. Acting Sheriff, Nassau Ctny. Corr. Ctr.,* 2010 WL 2629781, at *2 (E.D.N.Y. June 28, 2010) (citing same). The objective inquiry, however, focuses not just on the level of injury but on the denial or delay of care, and the medical consequences that flow from the alleged denial of care are "highly relevant". *Smith,* 316 F.3d at 187. Plaintiff reports that he was not taken to Bellevue Hospital until two days after his arrest, where he received x-rays and pain medication, that he was taken for follow-up visits, and that he saw a hand specialist. (Compl.¶ IV(A); Dep. Tr. 50, 58–59, 60–61). He goes on to allege that

he now has trouble using his right hand and still suffers from residual pain. (Dep. Tr. 66).

**\*21** While it is undisputed that a two-day delay occurred between plaintiff breaking his hand and first receiving treatment, nothing in the record suggests that this delay caused whatever long-term damage about which plaintiff complains. Nevertheless, there remain the questions of whether the two-day delay in care for a broken hand, during which he assertedly suffered significant pain, was sufficiently serious to satisfy the objective inquiry, and, if so, whether any of the named defendants may be held responsible for that delay.

There is no dispute that plaintiff sustained a broken hand, and drawing all inferences in the light most favorable to the non-moving party, we assume the truth of plaintiff's allegations that he suffered and continues to suffer substantial pain as a result of that injury. Severe pain can itself constitute a serious medical need for Eighth Amendment purposes. *McMillon v. Davidson,* 2012 WL 2711011, at *2 (W.D.N.Y. July 9, 2012) (citing cases); *accord Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003) ("[W]e have long held that the Eighth Amendment forbids not only deprivations of medical care that produce physical torture and lingering death but also less serious denials which cause or perpetuate pain."); *Chance,* 143 F.3d at 702 (listing factors to be considered in determining whether a serious medical need exists, including "the existence of chronic and substantial pain") (citations omitted).

Moreover, "an intentional delay in necessary medical care, amounting in effect to a form of punishment, is actionable." *Arnold v. Westchester Cty.,* 2012 WL 336129, at *13 (S.D.N.Y. Feb.3, 2012) (citing *Thomas v. Tisch,* 2009 WL 701009, at *8 (E.D.N.Y., Mar.11, 2009)). Courts have declined to dismiss deliberate-indifference claims as a matter of law where plaintiffs have alleged a delay in medical treatment causing substantial pain, even when the injuries alleged were not life-threatening and the delay was relatively brief. *See, e.g., Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) (reversing lower court's summary judgment order on the ground that plaintiff's allegations demonstrated the possibility that defendants had intentionally delayed medical care for five hours while knowing that plaintiff was in "extreme pain"); *Thomas,* 2009 WL 701009, at *7 (declining to conclude as a matter of law that a delay of treatment and medication for twenty hours cannot plausibly rise to the level of deliberate indifference); *Lasher v. City of Schenectady,* 2004 WL 1732006, at *5 (N.D.N.Y. Aug.3,

2004) ("Delays in treating painful medical conditions that are not life threatening can support Eighth Amendment claims."); *Davidson v. Harris,* 960 F.Supp. 644, 648 (W.D.N.Y.1997) ("under certain circumstances a five—or six-hour delay in medical care can constitute deliberate indifference, [but that such] a conclusion is highly fact-sensitive."); *Todaro v. Ward,* 431 F.Supp. 1129, 1132 (S.D.N.Y.1997) ("there are those cases which have held unconstitutional denied or unreasonably delayed access to a physician for diagnosis and treatment of physical conditions which, although not life-threatening or likely to result in permanent disability, cause discomfort").

**\*22**  In contrast, a number of courts, when confronted with delays of one day or less, have found no Eighth Amendment violation, emphasizing the brevity of the delay because it undercut the assertion that defendants were deliberately indifferent, that is, that the circumstances suggested a failure to meet at least the subjective standard for Eighth Amendment liability. *See, e.g., Tatum v. City of New York,* 2009 WL 124881, at \*6 (S.D.N.Y. Jan.20, 2009) (concluding, on summary judgment, that a delay of ten to twenty minutes cannot constitute deliberate indifference as a matter of law); *Revenell v. Vall Per Steeg,* 2007 WL 765716, at \*4 (S.D.N.Y. Mar.14, 2007) (holding at summary judgment stage that fifteen to twenty minute delay in treatment of fractured finger could not amount to deliberate indifference); *Rodriguez v. Mercado,* 2002 WL 1997885, at \*9 (S.D.N.Y. Aug.28, 2002) (because plaintiff did not allege that he experienced extreme pain that more rapid treatment would have alleviated, and because he was seen within eight or nine hours of the incident by a nurse who prescribed him pain medication, this was not sufficient to state an Eighth Amendment claim); *Palacio v. Ocasio,* 2006 WL 2372250, at \*11 (S.D.N.Y. Aug.11, 2006) (finding at summary judgment level that where delay in treatment was at most a little more than two hours and nothing in the record suggested that plaintiff suffered from a life-threatening or fast-degenerating condition or that prison officials deliberately delayed his treatment as a form of punishment, delay did not rise to level of deliberate indifference). *See also Thomas,* 2009 WL 701009, at \*8 (citing cases).

To similar effect, some courts in this district have held that delays in treatment relating to a broken hand or finger do not constitute deliberate indifference to medical needs, as long as the plaintiff was given a preliminary examination and at least some treatment the day of the injury or the day following. *See, e.g., Jones v. Mack,* 2012 WL 386269, at \*6 (S.D.N.Y. Feb.3, 2012) (eight-day delay before setting broken hand not sufficiently serious where plaintiff was seen by a doctor and given pain medication the day following the injury); *Henderson v. Doe,* 1999 WL 378333, at \*3 (S.D.N.Y. Sept.28, 1999); (failure to see specialist for broken finger not sufficiently serious where plaintiff was examined the day of the injury and given an x-ray, splint, and pain medication); *Ruiz v. Homeringhouse,* 2003 WL 21382896, at \*4 (W.D.N.Y. Feb.13, 2003) (no violation where plaintiff was taken to the emergency room the day he broke his hand and given a splint and pain medication); *Rodriguez v. Ames,* 224 F.Supp.2d 555, 563 (W.D.N.Y.2002) (15–day delay in receiving x-ray for fractured hand not sufficiently serious where plaintiff was seen by a nurse on the day of the injury).

In this case, plaintiff was not seen by medical personnel nor was he given pain medication for his broken hand, until two days after the injury, during which time he allegedly suffered severe pain. This delay in care, coupled with plaintiff's alleged pain, are sufficient to permit a trier of fact to determine that plaintiff's injury was serious enough to satisfy the objective inquiry. *See, e.g., Archer,* 733 F.2d at 16; *Thomas,* 2009 WL 701009, at \*7.

**\*23**  Assuming that there was a deprivation of medical care for plaintiff's hand injury that was sufficiently serious under the deliberate-indifference standard, plaintiff must also satisfy the second prong of the inquiry. To do so, he must show both that "the official [was] ... aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and that he ... [drew] that inference." *Bennett v. Vaccaro,* 2011 WL 1900185, at \*9 (S.D.N.Y. Apr.11, 2011) (quoting *Farmer,* 511 U.S. at 837). In this case, defendants have proffered evidence that they were not aware that plaintiff needed medical attention or that he had requested such attention. Officer Vincent states that he asked plaintiff if he was sick or injured and that plaintiff responded that he was not. (*See* Vincent Decl. ¶¶ 40–41). The officer further affirms that on the date of the incident plaintiff did not request medical attention from him, he was never informed that plaintiff had required or requested medical attention, and he was never informed that plaintiff had been injured. (*Id.* ¶¶ 54–56). Lieutenant Gribben also attests that plaintiff "did not appear to be injured" and that "[n]o individual informed [Gribben] that plaintiff had been injured during his arrest." (Gribben Decl. ¶¶ 28–29). Mancini similarly submitted a declaration stating that plaintiff did not request medical treatment from him and that he was never aware that plaintiff had requested or was in need of any medical treatment. (Mancini Decl. ¶¶ 47–48).

Though plaintiff has submitted no further evidence refuting defendants' version of the facts, defendants have incorporated plaintiff's deposition testimony as part of the record in their motion for summary judgment. Therefore, we can use this testimony to determine whether a factual dispute exists concerning defendants' awareness that plaintiff was injured and required immediate medical care at the time of his arrest. See *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001) ("[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement."); *Wali v. One Source Co.,* 678 F.Supp.2d 170, 178 (S.D.N.Y.2009) ("[W]here a pro se plaintiff fails to submit a proper [opposing statement] ... the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions.") (citations omitted).

In plaintiff's deposition testimony, he states that at the time of the incident he said "my hand is broken, you broke my hands", and asserts that he requested medical attention. (Dep. Tr. 49, 51). Plaintiff states that Officer Vincent "knew that [plaintiff's] hand was broken and he knew who broke [plaintiff's] hand and he did nothing to intervene or ... get [plaintiff] medical attention." (*Id.* at 67). He states that he asked for medical attention "on the way down in the elevator" immediately following his arrest, (*id.* at 50), and that Vincent "was aware [he] was in pain and did nothing about it." (*Id.* at 67). Moreover, he describes his hand as so bruised and swollen at that point that any accompanying officers should have been aware that his plea for help was justified. (*Id.* at 59).

 **\*24** Even assuming that Officer Vincent was aware that plaintiff was seriously injured and did nothing, it is not clear whether the officer was personally responsible for denying plaintiff immediate medical care. However, the record before us leaves the question open, and indeed Vincent's own testimony to the effect that he asked Laster whether he needed medical attention raises at least a permissible inference that he had the ability to arrange for such care if he decided that it was warranted. In the end, this is a question for the factfinder. See, e.g., *Weyant,* 101 F.3d at 857 (finding summary judgment inappropriate where a reasonable jury could have inferred that defendant police officer was aware of plaintiff's serious medical condition and disregarded it, despite the fact that defendant had no supervisory capacity and was not personally responsible for providing plaintiff with medical care).

Plaintiff also complains about the failure to provide surgery for his injury. According to plaintiff, when he was taken to the City Corrections Department, he told an unidentified lieutenant of his injury, and at that point medical staff looked at his hand. (*Id.* at 49–50, 58). He was then taken to Bellevue Hospital on September 28, 2006. (*Id.* at 50, 58–59). At Bellevue he was told that a bone was broken in his hand below the wrist and above the pinky finger. (*Id.* at 60). He reiterates that the doctors initially thought that he would require surgery, but that when he went back, "they said it looked like it had healed or was starting to heal." (*Id.* at 60–61). He further testified that he was taken to Bellevue three or four times, that he was given Motrin or Tylenol 3, and that he was given a splint but it was taken away from him in custody. (*Id.* at 60–61).

Plaintiff's apparent complaint that he was denied surgery fails, if for no other reason, because he did not sue the doctors who were apparently responsible for the decision not to operate. In any event, "[a] difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference." *Sonds,* 151 F. Supp,2d at 311 (citations omitted). "[T]he fact that an inmate might prefer an alternative treatment, or feels that he did not get the level of medical attention he preferred", does not give rise to a constitutional violation. *Id.* (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1995)).

It is undisputed that plaintiff was given medical treatment, including x-rays and follow-up visits, and that plaintiff did not receive surgery as a result of the medical findings of his treating doctors. As noted, to demonstrate deliberate indifference reguires a showing of a mental state equivalent to recklessness; disagreement with a course of treatment does not suffice, see, e.g., *Sonds,* 151 F.Supp.2d at 312, and even negligence rising to the level of medical malpractice does not amount to an Eighth Amendment violation. *Estelle,* 429 U.S. at 105–06. The doctors made the ultimate determination to forego surgery because, according to plaintiff, "they said it looked like it had healed or was starting to heal." (Dep. Tr. 60–61). That was a medical decision, which plaintiff cannot challenge in a section 1983 lawsuit based solely on his unhappiness with the doctors' assessment.

 **\*25** In sum, we find that defendants have failed their initial burden to show the absence of a factual dispute regarding plaintiff's deliberate-indifference claim as to defendant Vincent. Viewed in the light most favorable to the non-

moving party, plaintiff, through his deposition testimony, has plausibly alleged that he informed Vincent about his broken hand and that Vincent was deliberately indifferent to his need for immediate medical care. The fact, undisputed by both parties, that plaintiff's hand was broken during the incident offers more credibility to plaintiff's contention that he told the officers that he was hurt and that they were aware of his request for medical attention. Whether Vincent was responsible for the delay in medical care, whether the delay contributed in any way to a serious medical condition, and whether Vincent possessed the requisite subjective state of mind to constitute deliberate indifference, are factual disputes reserved for the jury. As to defendant Vincent, we recommend that summary judgment on plaintiff's medical-care claim be denied.

However, plaintiff cannot sustain his burden of demonstrating that defendants Gribben or Mancini acted with deliberate indifference to a serious medical need. Plaintiff has not alleged in any part of the record that Gribben was aware of his broken hand and his need for immediate medical care. Moreover, plaintiff never specifically states that he asked Mancini for medical attention or that Mancini was aware that he was hurt. We therefore recommend that plaintiff's claim for delay or denial of medical care be dismissed as to defendants Gribben and Mancini for lack of proof on an essential element of the claim.

### III. *The Excessive–Force Claim*

Plaintiff also articulates a claim for the use of excessive force during his arrest. He alleges in his complaint that during his arrest, the officers "used deadly force ... by wrenching [his] hands with a vengeful twist while [his] hands were cuffed behind [his] back" and that this resulted in his hand being broken. (Compl.¶ IV). He further alleges that he was "shoved to the ground and punched in [the] face while [the] supervisor looked on." (*Id.*).

Defendants argue that plaintiff's claim must be dismissed because his deposition testimony is inconsistent with the allegations in his complaint. As a second argument, they assert that his claim must fail because he cannot establish the personal involvement of any of the defendants in a constitutional violation. (*See* Defs.' Mem. of Law 11–24). For the reasons that follow, we find that the inconsistencies between plaintiff's allegations and his testimony are not sufficient to reject his testimony on summary judgment, and that plaintiff has put forward sufficient evidence of personal involvement by defendants Mancini and Gribben.

### A. *Legal Standard*

A claim for the use of excessive force during an arrest arises under the Fourth Amendment and is analyzed under a standard of objective reasonableness. *See Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *see also Step henson v. Doe,* 332 F.3d 68, 77 (2d Cir.2003) ("It is well established that 'use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness.' " (quoting *Saucier v. Katz,* 533 U.S. 194, 201–02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001))). In applying this test, the trier of fact must look to whether, in light of the circumstances confronting the officer, the amount and nature of the force used was "objectively reasonable". *Graham,* 490 U.S. at 397; *Mickle v. Morin,* 297 F.3d 114, 120 (2d Cir.2002). As emphasized by the Supreme Court, "[d]etermining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham,* 490 U.S. at 396 (citations omitted); *accord, e.g., Lennon v. Miller,* 66 F.3d 416, 425 (2d Cir.1995). The analysis requires "consideration of the specific facts in each case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of others and whether he is actively resisting arrest." *Sullivan v. Gagnier,* 225 F.3d 161, 165 (2d Cir.2000). "If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe." *Robison v. Via,* 821 F.2d 913, 924 (2d Cir.1987); *see also Maxwell v. City of N.Y.,* 380 F.2d 106, 108–10 (2d Cir.2004).

### B. *Analysis*

**\*26** Defendants do not specifically address the reasonableness of the force used in this case. Rather, they argue that the court may rule on plaintiff's credibility and that it "should disregard plaintiff's contradictory sworn statements" as being insufficient to raise a genuine issue of material fact sufficient to withstand summary judgment. (*See* Defs.' Mem. of Law 11–13).

Defendants rely on *Jeffreys v. City of N.Y.,* 426 F.3d 549 (2d Cir.2005), for the proposition that a court may "make assessments about whether a reasonable jury could credit a plaintiff's testimony" (Defs.' Mem. of Law 13 (quoting *Jeffreys* )), and that summary judgment may be proper where a plaintiff's testimony is "unsubstantiated by other direct

evidence ... [and is] 'so replete with inconsistencies and improbabilities' that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the plaintiff's complaint." (Defs.' Mem. of Law 13 (quoting *Jeffreys* )). The panel in *Jeffreys* upheld a district court decision granting summary judgment where the district court had found "nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony, and ... even after drawing all inferences in the light most favorable to the plaintiff, determined that 'no reasonable person would undertake the suspension of disbelief necessary to credit the allegations made in [the] complaint.' " *Jeffreys,* 426 F.3d at 555 (citation omitted). However, the court also noted that even if much of a plaintiff's testimony is contradictory and incomplete, and a court must make some assessment of the plaintiff's account of the facts, "the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor." *Id.* at 554.

*Jeffreys* does not support defendants' argument. In *Jeffreys,* the Second Circuit affirmed the grant of summary judgment against a plaintiff who had alleged that, while unlawfully present in a school building, he had been severely beaten and thrown out of a third-floor window by a group of police officers. *Id.* at 551. A deciding factor for the Court in finding that the plaintiff's testimony was so inconsistent that no reasonable jury could credit his version of the facts was that on three separate occasions, within hours or days after the incident, Jeffreys had admitted (to medical personnel, to a sergeant and to prison screening personnel) that he had in fact jumped or run out of a window, and that he had injured himself and made no mention of being attacked by police. *Id.* at 552. In addition, the panel noted that during Jeffreys' prosecution, he never suggested that he had been assaulted by the police. *id.* Moreover, the Court pointed out that the contemporaneous medical records were inconsistent with his claim that he had been beaten about the head by police. *Id.* at 552–53.

**\*27** In this case, none of the salient factors cited in *Jeffreys* are present. Rather, defendants point to several minor inconsistencies between plaintiff's testimony and his prior pleading. First, they quote his complaint, in which he alleges that his hands were twisted while he was being handcuffed and that he was then shoved to the ground and punched in the face. (Defs.' Mem. at 11–12). Next, they recount plaintiff's deposition testimony that his hand was twisted prior to being handcuffed, that he was shoved to the ground before the

handcuffing, and that he was hit in the back of the head while on the ground. (*Id.* at 12). As a third version, they point to plaintiff's medical records, recounting that he told a treating physician that his hand had been stepped on. (*Id.*).

We decline to view these inconsistencies as irreconcilable to the point of deeming plaintiff to be incredible as a matter of law, as defendants urge. While plaintiff's testimonial account of the facts differs slightly from his complaint, we can surmise that plaintiff's arrest happened rather quickly, and in such a situation it may be difficult for him to know or remember in what order he was hit, shoved and handcuffed, and whether he was punched in the face or another part of his head. With respect to plaintiff's statement that his hand was stepped on, although this is clearly inconsistent with twisting, it is not so out of the boundary of possible events as to lead us to conclude that plaintiff's testimony must be discounted. Moreover, there is no dispute that plaintiff's hand was broken during the incident and required medical treatment.

As noted in *Jeffreys,* it is defendants' burden to show that there is no evidence upon which a reasonable juror could find in plaintiff's favor. Fed.R.Civ.P. 56(c)(1). Unlike in *Jeffreys* on still another basis, Laster's medical records are consistent with his version of what occurred during his arrest, and there is no evidence that he made materially inconsistent statements to others regarding the incident. Whether or not his hand was broken in the manner asserted by plaintiff in his complaint or in his deposition is a matter for the jury. We therefore find defendants' argument that plaintiff's testimony should be discredited as a matter of law to be unavailing.

### C. *Personal Involvement of Defendants*
Defendants next argue that plaintiff's excessive-force claim fails because he is unable to establish the personal involvement of any of the individual defendants. (*See* Defs.' Mem. of Law 14).

### 1. *Legal Standard*
The personal involvement of a defendant in an alleged constitutional deprivation "is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted), "A police officer is personally involved in the use of excessive force if he either: (1) directly participates in an assault; or (2) was present during the assault, yet failed to intercede on behalf of the victim even though he had a reasonable opportunity to do so." *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003), *aff'd sub nom. Jeffreys*

Case 9:21-cv-00372-MAD-TWD  Document 61  Filed 06/22/23  Page 113 of 218
Laster v. Mancini, Not Reported in F.Supp.2d (2013)
2013 WL 5405468

*v. City of N.Y.*, 426 F.3d 549 (2d Cir.2005) (citing, *inter alia, Ricciuti v. N.Y. City Transit Auth.*, 124 F.3d 123, 129 (2d Cir.1997)). However, "a plaintiff need not establish who, among a group of officers, directly participated in the attack and who failed to intervene." *Id.*

2. *Analysis*

i. *Officer Vincent*

**\*28** Plaintiff asserts that Officer Vincent did nothing to intervene. However, it is undisputed that he took no part in the seizure of plaintiff. No evidence places Vincent in the room at the time of plaintiff's arrest, and in Vincent's own sworn testimony he affirmatively states that he was not there. (*See* Vincent Decl. ¶¶ 36–37). In plaintiff's deposition, he did not contradict that representation, and he focused instead on the fact that Vincent subsequently did nothing to intervene with respect to medical treatment. It is therefore unclear exactly what, if anything, plaintiff is alleging with respect to Vincent's involvement in the use of excessive force. Plaintiff seems to allege that Vincent was in the apartment at the time that plaintiff was arrested (Dep. Tr. 39), but he admits that he bases this assertion on the general fact that Vincent was "one of the ones that helped——take me into custody", and that he does not actually recall Vincent being in the apartment. (*Id.*).

We therefore find that plaintiff has not raised a genuine dispute as to Vincent's presence, and consequently summary judgment should be granted as to Vincent on the excessive-force claim.

ii. *Detective Mancini*

With respect to Detective Mancini, summary judgment is not appropriate. Mancini admits that he participated in the handcuffing of plaintiff (*see* Mancini Decl. ¶¶ 31–35), negating any suggestion by defendants that he was not personally involved in any alleged use of excessive force.

Defendants attempt to circumvent Mancini's involvement by stating that he was not one of the ESU officers who put plaintiff on the ground **(Defs.'** Mem. of Law 19), and that that particular action would have happened so fast that Mancini would have been unable to intervene. (*Id.*). Defendants also argue that while plaintiff alleges that he was hit in the back of the head at least twice, he does not know or describe who hit him, and because Mancini denies striking plaintiff, Laster cannot raise a genuine issue of fact as to whether Mancini was personally involved. (*Id.* at 20). They similarly argue that

even assuming plaintiff was hit in the head and that such force was unreasonable, he cannot establish that Mancini saw the act and had an opportunity to intervene. (*Id.* at 21).

Lastly, defendants assert that plaintiff cannot identify who twisted his hand while he was being handcuffed and that his allegation that it was Mancini is conclusory and unsupported. (*Id* . at 22). They focus on the fact that plaintiff at his deposition was unable to provide a description of the detective. (*Id.*). Thus, they contend, the fact that there were two people handcuffing plaintiff and that he was face-down during the encounter, unable to see, means that there is "insufficient evidence for a rational trier of fact to conclude, even assuming that the twisting of plaintiff's right hand during the course of handcuffing constituted [ ] excessive force, that Detective Mancini was the individual who allegedly twisted plaintiff's right hand." (*Id.* at 23). As with their other arguments, defendants couple this contention with the assertion that Mancini would also have been unable to intervene, even if he had observed excessive force being used, because the action was of such short duration. (*Id.* at 24).

**\*29** We find defendants' line of reasoning to be unpersuasive. The fact that Mancini was physically involved in handcuffing plaintiff, (Mancini Decl. ¶¶ 31–35) gives rise to a plausible inference that he was the one who twisted and broke plaintiff's hand.[6] Plaintiff "need not establish who, among a group of officers, directly participated in the attack and who failed to intervene", *Jeffreys*, 275 F.Supp.2d at 474, to survive summary judgment. With respect to plaintiff's specific allegations regarding being shoved to the ground and hit in the head, we similarly decline to find that there is no genuine issue of fact regarding Mancini's personal involvement. Accordingly, we recommend that summary judgment be denied with respect to Mancini on plaintiff's excessive-force claim.

6    Plaintiff also identified Mancini as the officer who asked him where the gun was, an identification confirmed by Mancini himself. (*See* Mancini Decl. ¶ 38).

iii. *Lieutenant Gribben*

Gribben states that he was not present during plaintiff's arrest. In his declaration he states that an ESU officer requested that he remain in the hallway, and that from his position there, he was unable to see inside the apartment and did not observe plaintiff's arrest. (Gribben Decl. ¶¶ 17–19).

Plaintiff in his deposition asserted that Gribben was present in the apartment, and that he knew this because Gribben was the only one wearing a white shirt and displaying "lieutenant bars". (Dep. Tr. 40). Plaintiff was unable to say what Gribben looked like, but stated that, based on the paperwork provided in discovery and his recollection of the lieutenant bars, Gribben was present. (*Id.* at 41).

"The law is clear that a police officer has an affirmative duty to intervene and prevent the unlawful use of force by other officers in his presence." *Skorupski v. Suffolk Cnty.,* 652 F, Supp. 690, 694 (E.D.N.Y.1987). The court in *Skorupski* denied summary judgment where all defendants admitted to being present, although plaintiff could not specify who actually hit him. *Id.* While Gribben denies that he was present, plaintiff's deposition testimony offers sufficient evidence to create a genuine dispute as to the material fact of Gribben's presence at the time of plaintiff's arrest. We therefore find a grant of summary judgment to be inappropriate with respect to Gribben.

#### iv. *Conclusion as to Personal Involvement*

In sum, defendants have not shown an absence of dispute as to whether defendants Mancini and Gribben were personally involved in any excessive use of force against plaintiff. They have, however, demonstrated that there is no genuine dispute that Vincent was not present during plaintiff's arrest. We therefore recommend that summary judgment be granted on plaintiff's excessive-force claim with respect to Vincent, and denied with respect to Mancini and Gribben.

### II. *Qualified Immunity*

Defendants next argue that they are protected by the doctrine of qualified immunity.

#### A. *Legal Standard*

The doctrine of qualified immunity serves to protect public officials from liability in section 1983 actions insofar as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Purnell v. Lord,* 952 F.2d 679, 683–84 (2d Cir.1992). The doctrine applies an objective standard to actions of government officials arising from performance of their discretionary functions. *Harlow,* 457 U.S. at 818.

**\*30** Individual defendants are " 'shielded from liability for civil damages' " under 42 U.S.C. § 1983 if " 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Harlow,* 457 U.S. at 818); *accord Gilles v. Repicky,* 511 F.3d 239, 243 (2d Cir.2007). "A right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful,' " *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir., 2003) (quoting *Young v. Cnty. of Fulton,* 160 F.3d 899, 903 (2d Cir.1998)).

A public official is entitled to qualified immunity if "Ml) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act.' " *Jenkins v. City of N.Y.,* 478 F.3d 76, 87 (2d Cir.2007) (quoting *Cerrone v. Brown,* 246 F.3d 194, 199 (2d Cir.2001)) (internal quotation marks omitted); *see Field Day, LLC v. Cnty. of Suffolk,* 463 F.3d 167, 191 (2d Cir.2006); *Curry v. City of Syracuse,* 316 F.3d 324, 334 (2d Cir.2003). Since qualified immunity is an affirmative defense, defendants "bear the burden of showing that the challenged act was objectively reasonable in light of the law existing at that time." *Varrone v. Bilotti,* 123 F.3d 75, 78 (2d Cir.1997). Where there are triable disputes as to the circumstances that could dictate whether a defendant could reasonably believe that his conduct was lawful, summary judgment based on an immunity defense must be denied. *See, e.g., Curry,* 316 F.3d at 334; *Kent v. Katz,* 312 F.3d 568, 576–77 (2d Cir.2002).

We also note here that the traditional qualified-immunity analysis mandated by the Supreme Court's decision in *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), required that courts engage in a two-step sequence in making determinations on qualified-immunity claims. First, a court was required to decide whether the facts alleged by plaintiff were sufficient to make out a violation of a constitutional right. Second, if the plaintiff satisfied that test, the court was to determine whether the right at issue was "clearly established" at the time of the alleged misconduct. *See Pearson v. Callahan,* 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (discussing *Saucier* ). However, more recently the Supreme Court has stated that the *Saucier* test "should not be regarded as an inflexible requirement." *Id.* at

2013 WL 5405468

227. Rather, courts have discretion in determining which of the two questions should be decided first. *Id.* at 236.

### B. *Analysis*

Defendants assert that because their actions were objectively reasonable, they are entitled to qualified immunity. They argue that plaintiff cannot demonstrate that they actually violated his clearly established constitutional rights.

**\*31** Plaintiff's remaining claims are for excessive force and denial of medical care. The excessive-force claim is analyzed under the Fourth Amendment's reasonableness standard. It is "axiomatic that ... [the] right under the Fourth Amendment to be free from excessive force [ ] is clearly established." *Hodge v. Village of Southampton,* 838 F.Supp.2d 67, 85 (E.D.N.Y., 2012) (citing *Maxwell v. City of N.Y.,* 380 F.3d 106, 108 (2d Cir.2004)). Furthermore, it was clearly established as of the date of the alleged violations. *See, e.g., Fetway v. City of N.Y.,* 2005 WL 2137805, at \*10 (E.D.N.Y. Sept.2, 2005) (pre-dating Laster's arrest) ("There can be no doubt that the right to be free from excessive use of force was clearly established at the time of the incident." (citing *Graham,* 490 U.S. at 395)). Similarly, the right to be free from deliberate indifference to serious medical needs was well settled at the time of plaintiff's arrest. *See, e.g ., Carrasquillo v. City of N.Y.,* 324 F.Supp.2d 428, 440–41 (S.D.N.Y.2004) (pre-dating Laster's arrest) ("The Eighth Amendment right to receive adequate medical treatment is both clearly established and well-settled, so deliberate indifference ... [is] never objectively reasonable." (citing *Estelle,* 429 U.S. at 104–05)).

With respect to whether defendants' conduct violated plaintiff's clearly established right to be free from excessive force, they argue that whatever force the officers may have used was reasonable under the circumstances. The ESU officers were told that plaintiff was armed, and therefore, they assert, it was reasonable for them to believe that plaintiff posed a risk to their safety and the safety of others. (*See* Defs.' Mem. of Law 28). Moreover, they contend, plaintiff moved towards the fire-escape when they entered the apartment, creating a potential flight situation where "anticipated resistance could become violent or even deadly." (*Id.*). Thus, it was "objectively reasonable for officers to take plaintiff to the ground to prevent plaintiff from escaping and to eliminate the possibility that plaintiff would open fire upon the officers." (*Id.*).

While it may have been reasonable for defendants to use some amount of force during plaintiff's arrest, defendants do not

address plaintiff's allegations that he was hit in the head and that his hand was twisted so hard that it was broken. (Dep. Tr. 42, 46–47). There appear to be genuine disputes as to the amount of force used and thus the reasonableness of that force, and accordingly we cannot find, as a matter of law, that defendants had reason to believe that they were not violating faster's clearly established constitutional right to be free from excessive force. That is a question for a finder of fact, and is not properly determined on a summary judgment motion. We therefore recommend that defendants' qualified-immunity defense on the excessive-force claim be rejected.

As for the denial-of-medical-care claim, defendants do not specifically discuss the immunity defense. Rather, they cite only facts relating to the use of force during the arrest, and argue that qualified immunity is warranted because the officers' actions were "objectively reasonable." (Defs.' Mem. of Law 28). In view of their failure even to attempt to justify qualified immunity on the medical claim, it must be rejected at this stage.

### III. *The New York City Police Department*

**\*32** Defendants next target the inclusion of the NYPD as a defendant. They argue that because the NYPD "is not a suable entity," any claims lodged against it should be dismissed. (*See* Defs.' Mem. of Law 29 (citing *Koulkina v. City of N.Y.,* 559 F.Supp.2d 300, 315 (S.D.N.Y.2008))). Section 396 of the New York City Charter provides that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency". New York City Charter § 396 ch. 16. This law has been read to cover suits against the City of New York, *see, e.g., East Coast Novelty Co. v. City of N.Y.,* 781 F.Supp. 999, 1010 (S.D.N.Y.1992), and therefore if a plaintiff means to sue for the wrongdoings of a City agency, he should name the City of New York as the defendant. Although plaintiff failed to name the City as a defendant, *pro se* pleadings "must be construed liberally and interpreted 'to raise the strongest arguments they *suggest,'* " *Triestman,* 470 F.3d at 474 (quoting and adding emphasis to *Pabon v. Wright,* 459 F.3d 241, 248 (2d Cir.2006)). We believe that in naming the NYPD in his complaint, plaintiff meant to bring suit against whichever institution might be responsible for the conduct of the individual police personnel he named. Therefore, we read his complaint as "suggesting" a claim against the City of New York.

However, even assuming that plaintiff intended to name the City as a defendant, his claim fails. In support of the dismissal

of any claims against the City, defendants argue that plaintiff has failed to plead any theory of liability as to the City. (*See* Defs.' Mem. of Law 29 (citing Fed.R.Civ.P. 8(a))). While the City may be held liable under *Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), in appropriate circumstances, plaintiff has not asserted facts to support such a claim. His allegations target specific officers, and he makes no assertion that the actions of the officers were the result of a policy or procedure instituted by the City, which is a predicate for municipal liability under section 1983. *Id.* We therefore recommend that defendants' motion for summary judgment as to the NYPD be granted.

IV. *State–Law Claims*

Lastly, defendants argue that to the extent that any of plaintiff's allegations could be construed as state-law claims, they must be dismissed because plaintiff failed to comply with the New York General Municipal Law by filing a notice of claim.

Construing plaintiff's complaint liberally, we can interpret his pleading as asserting, along with his federal claims, parallel state-law claims. In order to assert a claim against a city or an officer or agent of the city, a plaintiff must comply with section 50–i of the New York General Municipal Law, which states that

> No action ... shall be prosecuted or maintained against a city ... for personal injury, wrongful death or damage to real or personal property alleged to have been sustained by reason of negligence or wrongful act of such city ... or any officer, agent or employee thereof ... unless a notice of claim shall have been made and served upon the city.

**\*33** Although section 50–i refers only to claims asserted against a municipality or its agencies, the New York courts have held that any tort claim pressed against a City official who would be entitled to indemnification by the City must be the subject of an administrative claim under the General Municipal Law. *See e.g., Int'l Shared Servs., Inc. v. County of Nassau,* 222 A.D.,2d 407, 408, 634 N.Y.S.2d 722, 724 (2d Dep't 1995); *see also Petway v. City of N.Y.,* 2012 WL

2254246, at \*8 (E.D.N.Y. June 14, 2012) (dismissing state-law claims for failure to comply with New York's General Municipal Law procedural requirements),

The provision governing indemnification by the City of New York is section 50–k of the General Municipal Law, It requires indemnification of a municipal employee if his liability arose from conduct "within the scope of his public employment and in the discharge of his duties," provided that the employee was "not in violation of any rule or regulation of his agency at the time the alleged damages were sustained" and that the injury did not arise "from intentional wrongdoing or recklessness on the part of the employee." N.Y. General Municipal Law § 5Q-k(3).

Plaintiff admitted in his deposition that he had not filed a notice of claim. (Dep. Tr. 7). However, this is not necessarily fatal to his assumed state-law claims, as it is unclear whether the conduct cited by plaintiff as the basis for his claim constituted "intentional wrongdoing or recklessness". If a jury were to find that defendants Mancini and Gribben acted intentionally while using excessive force in arresting plaintiff, that verdict would necessarily encompass a finding that they had engaged in intentional wrongdoing. *See, e.g., Brenner v. Heavener,* 492 F.Supp.2d 399, 405 (S.D.N.Y.2007) (holding that claims alleging ordinary acts of negligence would fall into the category of claims for which the City has an obligation to indemnify, but not those asserting more extreme intentional misconduct, such as use of excessive force); *accord Jean–Laurent v. Hennessy,* 2008 WL 3049875, at \*11 (E.D.N.Y. Aug.1, 2008) (denying summary judgment where "a rational fact-finder could find that defendants intentionally hit plaintiff's head ... and that this constituted an objectively unreasonable use of force that resulted in compensable injury."). Similarly, if it were shown that Officer Vincent deliberately withheld medical care that he knew was needed and did so without a colorable basis, he might be found not to be entitled to indemnification. Therefore, a decision by a factfinder regarding the merits of plaintiff's section 1983 excessive-force and medical-care claims is necessary before it can be determined whether plaintiff's assumed state-law claims should be dismissed for failure to comply with procedural requirements.

*CONCLUSION*

In sum, we recommend that defendants' motion for summary judgment be granted in part and denied In part. We

recommend (I) that plaintiff's claim for false-arrest/unlawful-entry be dismissed; (2) that plaintiff's claim for denial of medical care be dismissed only as to defendants Mancini and Gribben; (3) that plaintiff's excessive-force claim be dismissed only as to Officer Vincent; (4) that the NYPD be dismissed as a defendant; (5) that defendant officers' qualified immunity defense be denied; and (6) that any state-law claims remain in the case.

**\*34**  Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation, Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Deborah A. Batts, Room 2510, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York, 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn,* 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(d).

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5405468

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 1230778

2019 WL 1230778
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Carlos ABREU, Plaintiff,
v.
Eric FARLEY, et al., Defendants.

6:11-CV-06251 EAW
|
Signed 03/15/2019

**Attorneys and Law Firms**

Richard A. McGuirk, Nixon Peabody LLP, Andrew Peter Zappia, LeClairRyan, Rochester, NY, for Plaintiff.

Hillel David Deutsch, NYS Attorney General's Office Department of Law, Rochester, NY, for Defendants.

**DECISION AND ORDER**

ELIZABETH A. WOLFORD, United States District Judge

**INTRODUCTION**

**\*1** Plaintiff Carlos Abreu ("Plaintiff"), currently incarcerated at the Marcy Correctional Facility,[1] filed this action pursuant to 42 U.S.C. § 1983, alleging constitutional violations arising out of his incarceration at the Five Points Correctional Facility ("Five Points"). (Dkt. 1). After this Court's initial screening of Plaintiff's first complaint, the Court granted Plaintiff leave to proceed *in forma pauperis* ("IFP"). (Dkt. 3). Soon thereafter, Plaintiff was appointed *pro bono* counsel to assist in the prosecution of this action. (*See* Dkt. 9). Plaintiff has since filed voluminous pleadings, alleging numerous grounds for which he believes he is entitled to relief against an array of individuals.

[1]  Plaintiff's address has been ascertained from the most recent filing containing his location in this action (Dkt. 117 (notice of interlocutory appeal) ), and Plaintiff's address as provided in a different action, *see* Abreu v. Brown, Case No. 6:14-cv-06599, Dkt. 60 (W.D.N.Y. Mar. 12, 2018).

Presently before the Court is Defendants' motion to revoke Plaintiff's IFP status and for partial summary judgment.

(Dkt. 61). For the reasons set forth below, the Court holds Defendants' motion to revoke Plaintiff's IFP status in abeyance pending the Second Circuit's decision in *Shepherd v. Annucci*, No. 17-2261 (2d Cir. July 21, 2017), grants in part and denies in part Defendants' motion for partial summary judgment, and stays this action until the Court resolves Defendants' motion for IFP revocation.

**BACKGROUND**

Plaintiff arrived at Five Points on or about March 25, 2010 (Dkt. 46 at ¶ 93), and alleges that he has been subject to countless constitutional infractions, and other allegedly wrongful conduct, which purportedly continued into 2012. Despite *pro bono* counsel's efforts to refine Plaintiff's allegations, the operative complaint remains voluminous and is composed of 531 paragraphs. Plaintiff's counsel also requests that the Court consider two supplemental *pro se* filings submitted by Plaintiff as part of a related case that has since been consolidated into this action. (Dkt. 93 at 25-26; *see* Dkt. 40; Dkt. 93-5; Dkt. 93-6; Dkt. 93-7; Dkt. 93-8; Dkt. 93-9; Dkt. 93-10).

The following facts are taken from Defendants' and Plaintiff's Rule 56 statements of undisputed facts. (*See* Dkt. 59-1; Dkt. 93-1). Between 2010 and January of 2012, Plaintiff was examined "well over 100 times" by medical staff at Five Points. (Dkt. 59-1 at ¶ 1; Dkt. 93-1 at ¶ 1). Although Plaintiff disputes that he was prescribed appropriate medical treatment for back and neck pain on a number of occasions (Dkt. 93-1 at ¶ 2; *cf.* Dkt. 59-1 at ¶ 2), he does not dispute that he was prescribed "an albuterol inhaler for asthma and Lipitor for elevated lipids" (Dkt. 93-1 at ¶ 2). It is also undisputed that Plaintiff received medication, bloodwork, physical examinations, and x-rays between March 25, 2010, and January 23, 2012 (*see* Dkt. 59-1 at ¶ 6; Dkt. 93-1 at ¶ 6), and that he refused to take medications and to undergo physical examinations on several occasions while at Five Points (*see* Dkt. 59-1 at ¶ 8; Dkt. 93-1 at ¶ 8).

**\*2** The parties dispute whether Plaintiff was of general good health while housed at Five Points (Dkt. 59-1 at ¶ 4; Dkt. 93-1 at ¶ 4), and whether many of Plaintiff's alleged injuries and ailments were ever properly diagnosed or observed by Five Points medical staff (Dkt. 59-1 at ¶ 5; Dkt. 93-1 at ¶ 5). Plaintiff also disputes Defendants' assertion that he was "not in imminent danger of serious physical harm at any point during the relevant period" underlying this action (Dkt.

2019 WL 1230778

59-1 at ¶ 3), and argues that he "endured repeated assaults, living under a constant and imminent danger [of] being subjected to ongoing threats of further physical assaults" while housed at Five Points (Dkt. 93-1 at ¶ 3). The parties do not dispute that only doctors, physicians assistants, and nurse practitioners may provide prescription medication to inmates at Five Points, that corrections officers and counselors may not do so, and that general nurses may provide limited medical treatment only in emergency circumstances. (*See* Dkt. 59-1 at ¶ 9; Dkt. 93-1 at ¶ 9).

The New York State Department of Corrections and Community Supervision ("DOCCS") maintains a policy that corrections staff seek a court order if an inmate loses 15% of his or her baseline weight, or even prior to that point if the inmate "appears in imminent need of hydration or nutrition." (Dkt. 59-1 at ¶ 10; Dkt. 93-1 at ¶ 10). In addition, it is undisputed that Plaintiff's baseline weight remained above 200 pounds between March 2010 and January 2012 (Dkt. 59-1 at ¶ 11; Dkt. 93-1 at ¶ 11), and at no point did it drop by 30 pounds, or 15% of Plaintiff's baseline weight (Dkt. 59-1 at ¶ 12; Dkt. 93-1 at ¶ 12).

At times, Plaintiff complained that he suffered from rectal bleeding, but on at least one occasion, Dr. Daniel Weinstock ("Dr. Weinstock") took Plaintiff's stool samples and discovered no blood after running hemoccult tests on April 18 and April 26, 2011. (Dkt. 59-1 at ¶ 16; Dkt. 93-1 at ¶ 16). Although Plaintiff disputes Defendants' assertion that he "frequently harassed medical staff" (Dkt. 59-1 at ¶ 17; Dkt. 93-1 at ¶ 17), it is undisputed that Five Points staff submitted written misbehavior reports regarding Plaintiff's conduct on several occasions (Dkt. 59-1 at ¶ 18; Dkt. 93-1 at ¶ 18; *but see* Dkt. 93-1 at ¶ 18 (also arguing that "false misbehavior reports were written in retaliation against [Plaintiff]") ).

While Plaintiff claims that Defendants' decision not to provide him with an interpreter during his Tier II and Tier III violation hearings violated his right to due process (Dkt. 93-1 at ¶ 19), he does not dispute that he was found guilty of Tier II and Tier III violations 17 times during the relevant period underlying this action (Dkt. 59-1 at ¶ 19; Dkt. 93-1 at ¶ 19). Relatedly, Plaintiff's fluency in the English language is a point of contention between the parties. (Dkt. 59-1 at ¶ 23; Dkt. 93-1 at ¶ 23). For example, Defendants contend that Plaintiff could meaningfully converse with corrections staff in English (Dkt. 59-1 at ¶ 23), but Plaintiff states that his understanding of the English language is limited and notes that Spanish is his native language (Dkt. 93-1 at ¶ 23). Despite

his disciplinary violations, Plaintiff received a "time cut" for each violation, save one, during the period extending from February 23, 2010, to July 5, 2013. (Dkt. 59-1 at ¶ 20; Dkt. 93-1 at ¶ 20). Plaintiff was not required to serve any time in the Special Housing Unit ("SHU") and did not lose any good time credits as a result of these violations. (Dkt. 59-1 at ¶ 20; Dkt. 93-1 at ¶ 20). Plaintiff did spend two months' time in the SHU for an incident occurring in May 27, 2010, but he did not serve this time until December 2013 because he had accumulated SHU time from other incidents predating 2010. (Dkt. 59-1 at ¶ 22; Dkt. 93-1 at ¶ 22).

DOCCS Directive 4421 sets forth DOCCS' policy regarding inmate mailings. (Dkt. 59-1 at ¶ 25; Dkt. 93-1 at ¶ 25). Directive 4421 permits inmates to mail five first-class legal letters free of charge per week and allows inmates an advance of up to $20 for additional legal mail. (Dkt. 59-1 at ¶ 25; Dkt. 93-1 at ¶ 25). Inmates also receive free postage for documents that "must be sent pursuant to a Court Order, statute of limitations or legal deadline, if, by rule, such correspondence must be sent prior to receipt of the next week's free postage allowance." (Dkt. 59-1 at ¶ 26; Dkt. 93-1 at ¶ 26). Plaintiff almost always exhausted his weekly allotment of five free legal letters and used up his $20 advance immediately upon arriving at Five Points. (Dkt. 59-1 at ¶ 27; Dkt. 93-1 at ¶ 27). However, Plaintiff disputes that he was afforded free postage when a deadline so entitled him —although "on several occasions, a court order or other deadline entitled him to free postage"—and states that certain correspondence he addressed to courts, government officials, and legal organizations was refused postage. (Dkt. 93-1 at ¶ 27).

## PROCEDURAL HISTORY

**\*3** On May 10, 2011, Plaintiff commenced this action by filing a voluminous 340-page complaint, alleging various injuries arising from the actions of over 130 defendants. (*See* Dkt. 1). Plaintiff also filed a motion for leave to proceed *in forma pauperis* (Dkt. 3) and a motion for appointment of counsel (Dkt. 4). By Order, dated May 25, 2011, Plaintiff was granted *in forma pauperis* status, and was directed to amend his complaint in compliance with Rule 8 of the Federal Rules of Civil Procedure. (Dkt. 5); *see* Fed. R. Civ. P. 8(a) (2) (providing that a pleading must contain "a short and plain statement of the claim"). On August 11, 2011, Plaintiff's motion for appointment of counsel was granted and *pro bono* counsel was assigned. (Dkt. 9). On April 1, 2013,

2019 WL 1230778

Plaintiff filed a 101-page amended complaint (Dkt. 35), and on September 19, 2013, a related case—also instituted by Plaintiff—was merged with this matter (Dkt. 40). The *pro se* complaint and supplemental filings submitted in the related case constituted a Supplemental Complaint in the instant action. (*Id.* at 12; *see* Dkt. 41).

On February 21, 2014, Plaintiff filed a 103-page second amended complaint (the "SAC"), which, alongside the *pro se* Supplemental Complaint, remains the operative pleading in this matter. (Dkt. 46). This action was reassigned to the undersigned on January 5, 2015. (Dkt. 48).

On April 6, 2015, Defendants filed a motion for partial summary judgment in lieu of an answer. (Dkt. 59). Defendants also request that the Court revoke Plaintiff's IFP status. (*See* Dkt. 59-2 at 5-6). After several appearances and extensions of time, Plaintiff filed responsive papers on July 15, 2016, opposing Defendants' motion. (Dkt. 93). Defendants filed reply papers in further support of their motion on September 21, 2016. (Dkt. 105).

## DISCUSSION

### I. Defendants' Motion to Revoke Plaintiff's IFP Status is Held in Abeyance

A party commencing a civil action in this Court ordinarily must pay a $350.00 filing fee, as well as a $50.00 administrative fee.[2] *See* 28 U.S.C. § 1914. Of course, the Court may grant a party leave to proceed IFP if it determines that the party is unable to pay the filing fee. *See id.* § 1915. Nonetheless, not all litigants may be granted leave to proceed IFP. As set forth in 28 U.S.C. § 1915(g), the "three strikes" provision prevents prisoners from proceeding IFP if they have brought three or more lawsuits that have been dismissed as frivolous or for failure to state a claim:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon

> which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).

[2] Effective May 1, 2013, the Judicial Conference of the United States added an administrative fee of $50.00 to the cost of filing a civil lawsuit in district court. *See* September 2012 Report of the Proceedings of the Judicial Conference of the United States, *available at* <http://www.uscourts.gov/about-federal-courts/reports-proceedings-judicial-conference-us>.

Thus, under that statute, a prisoner with three strikes may proceed IFP only if he can show that he is "under imminent danger of serious physical injury." *Id.* "An imminent danger is not one that has dissipated by the time a complaint is filed; rather it must be one existing at the time the complaint is filed." *Chavis v. Chappius*, 618 F.3d 162, 169 (2d Cir. 2010) (internal quotation marks and citation omitted).[3]

[3] Whether the "imminent danger" must exist at the time the initial complaint was filed or whether it can arise at the time the complaint is amended has not been expressly resolved by the Second Circuit. One district court has noted that "at least some cases have indicated that even when amended complaints are filed, the imminent danger must have existed at the time the initial complaint is filed." *Antrobus v. Dapcevic*, No. 17-CV-5840 (KMK), 2018 WL 3242272, at *4 (S.D.N.Y. July 3, 2018) (citing *Harris v. City of New York*, 607 F.3d 18, 24 (2d Cir. 2010) (considering the allegations in both the initial and amended complaints, but concluding that the facts alleged did not "support a finding that [the plaintiff] was in imminent danger at the time he filed his initial complaint") ); *accord Jackson v. McPartland*, No. 06-CV-6524 CJS, 2008 WL 619364, at *1 (W.D.N.Y. Mar. 4, 2008) ("[E]ven construing the *pro se* Plaintiff's Complaint and Amended Complaint liberally, as the Court is required to do, it is clear that Plaintiff has not alleged that he was in imminent danger at the time he filed this lawsuit."). Nonetheless, the Second Circuit has not definitively ruled on this issue, and there is authority outside this Circuit that supports

Case 9:21-cv-00372-MAD-TWD   Document 61   Filed 06/22/23   Page 121 of 218

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

placing the point of reference at the time the amended complaint is filed. *See Jonassen v. United States*, 671 F. App'x 668, 668 (9th Cir. 2016) ("The district court revoked Jonassen's in forma pauperis status without considering Jonassen's proposed Third Amended Complaint ('TAC'), which made plausible allegations that Jonassen was 'under imminent danger of serious physical injury' at the time he lodged the TAC."); *Burke v. St. Louis City Jails*, 603 F. App'x 525, 525-26 (8th Cir. 2015) ("[T]he District Court should have considered whether Burke met the imminent-danger exception when he filed his amended complaint, not when he filed his original complaint." (citing *Martin v. Shelton*, 319 F.3d 1048, 1051 (8th Cir. 2003) ) ).

**\*4** The Second Circuit has instructed that, when determining whether a prisoner has shown an imminent danger, a court should "not make an overly detailed inquiry into whether the allegations qualify for the exception, because § 1915(g) concerns only a threshold procedural question." *Id.* (internal quotation marks omitted). That instruction suggests that a court should consider only the allegations in the complaint when considering whether the imminent danger applies, although the Second Circuit has not specifically limited the imminent danger review to the four corners of the complaint. *See id.*; *see also Abreu v. Lira*, No. 9:12-CV-1385 (NAM/ DEP), 2014 WL 4966911, at \*2 (N.D.N.Y. Sept. 30, 2014), *adopting report and recommendation*, 9:12-CV-1385 (NAM/ DEP) (N.D.N.Y. Apr. 11, 2014).

But several courts in this Circuit—including some cases involving Plaintiff—have revoked the IFP status of a three-strikes litigant when the defendant challenges the court's preliminary finding that the litigant is entitled to the imminent danger exception, using evidence outside the four corners of the complaint to refute that preliminary finding. *See Abreu v. Brown*, 317 F. Supp. 3d 702, 705 (W.D.N.Y. 2018) ("The Court agrees with those courts that it may look beyond the complaint when considering a defendant's challenge to the preliminary finding that a three-strikes litigant is entitled to the imminent danger exception."); *Tafari v. Baker*, No. 6:16-cv-06427(MAT), 2017 WL 1406274, at \*2 (W.D.N.Y. Apr. 20, 2017) (collecting cases stating the same); *Bernier v. Koenigsmann*, No. 15-CV-209A, 2017 WL 603217, at \*4 (W.D.N.Y. Feb. 15, 2017) ("Although courts assessing imminent danger should not make an overly detailed inquiry, they are allowed to look at information outside the four corners of a complaint."); *Green v. Venettozzi*, No. 14-CV-1215 (BKS/CFH), 2016 WL 6902545, at \*3 (N.D.N.Y.

Oct. 31, 2016) ("To refute a preliminary finding with facts that satisfy the imminent danger exception, the Court may look outside the four corners of the complaint."), *report and recommendation adopted*, 2016 WL 6902180 (N.D.N.Y. Nov. 23, 2016); *Abreu v. Lira*, 2014 WL 4966911, at \*2 ("In reviewing the issues surrounding plaintiff's claim that at the time he filed the complaint, he was facing imminent danger of serious physical injury, the Court agrees ... that it is appropriate for the Court to review evidence outside the allegations of the complaint upon defendants' challenge to plaintiff's IFP status."); *Jackson v. Jin*, No. 12-CV-6445-FPG, 2014 WL 1323211, at \*1 (W.D.N.Y. Mar. 31, 2014) ("In determining whether the imminent danger exception applies, the Court may consider more recent medical evidence."). Some circuit courts have reached the same result. *See Stine v. U.S. Fed. Bureau of Prisons*, 465 F. App'x 790, 794 n.4 (10th Cir. 2012) ("[A]fter a district court provisionally grants IFP on the basis of a showing of imminent danger, the defendants are permitted to mount a facial challenge, based on full development of the facts, to the district court's provisional determination on the face of the complaint that the prisoner satisfies the imminent danger element." (quotation and alteration omitted) ); *Taylor v. Watkins*, 623 F.3d 483, 485 (7th Cir. 2010) ("[W]hen a defendant contests a plaintiff's claims of imminent danger, a court must act to resolve the conflict. A contrary conclusion would mean that a three-strikes plaintiff could proceed IFP whenever his allegations of imminent danger were facially plausible, even if the defendant had incontrovertible proof that rebutted those allegations."); *Gibbs v. Roman*, 116 F.3d 83, 86 (3d Cir. 1997) ("If the defendant, after service, challenges the allegations of imminent danger ..., the district court must then determine whether the plaintiff's allegation of imminent danger is credible ... in order for the plaintiff to proceed on the merits [IFP]."), *overruled on other grounds by Abdul-Akbar v. McKelvie*, 239 F.3d 307 (3d Cir. 2001).

**\*5** Although this Court recently agreed with this line of cases, *see Abreu v. Brown*, 317 F. Supp. 3d at 705, an appeal pending before the Second Circuit from a decision revoking IFP status after it was initially granted will likely clarify the law of this Circuit regarding this issue, *see Shepherd v. Annucci*, No. 17-2261 (2d Cir. July 21, 2017). A review of the briefs submitted on appeal in *Shepherd* reveals that the parties dispute, among other things, the weight afforded to any evidence contradicting a plaintiff's claim of imminent danger, the distribution of the burden of proof, and the quantum of evidence required to grant a motion to revoke IFP status. *See Shepherd*, No. 17-2261, Dkt. 90; Dkt. 98. Indeed, the

Case 9:21-cv-00372-MAD-TWD   Document 61   Filed 06/22/23   Page 122 of 218
Abreu v. Farley, Not Reported in Fed. Supp. (2019)
2019 WL 1230778

Second Circuit has recently deferred any decision regarding Plaintiff's motion for leave to proceed *in forma pauperis* and for appointment of counsel on the appeal from this Court's decision in *Abreu v. Brown*, and that appeal is now held in abeyance pending the Second Circuit's decision in *Shepherd*. *See Abreu v. Brown*, No. 18-2722, Dkt. 30 (2d Cir. Sept. 14, 2018). Therefore, the Second Circuit appears poised to clarify the law in this Circuit as it relates to motions to revoke IFP status. Because the *Shepherd* decision is likely to establish principles that this Court will be bound to apply in ruling upon Defendants' motion for IFP revocation, the Court is disinclined to presume the Second Circuit's position before *Shepherd* is decided. Accordingly, in the interests of judicial economy, the Court holds Defendants' motion to revoke Plaintiff's IFP status in abeyance pending the Second Circuit's decision in *Shepherd*.

## II. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) ).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact...." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) ). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) ). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358. Indeed, "the mere existence

of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

A party may file a motion for summary judgment "at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). A party may move for summary judgment in lieu of an answer. *See, e.g., Anderson v. Rochester-Genesee Reg'l Transp. Auth.*, 337 F.3d 201, 202 (2d Cir. 2003); *Riehl v. Martin*, No. 9:13-CV-439 (GLS/TWD), 2014 WL 1289601, at *1-2 (N.D.N.Y. Mar. 31, 2014); *Beckford v. N.Y. State Office of Mental Health*, No. 06-CV-00561(SR), 2010 WL 1816689, at *1 (W.D.N.Y. May 3, 2010); *Crenshaw v. Syed*, 686 F. Supp. 2d 234, 236 (W.D.N.Y. 2010); *Wegman v. Grimmke*, No. 03-CV-234S, 2004 WL 2202642, at *2 (W.D.N.Y. Sept. 30, 2004). Although summary judgment is generally not appropriate until after some discovery has occurred in a case, *Nelson v. Deming*, 140 F. Supp. 3d 248, 257-58 (W.D.N.Y. 2015), a motion for summary judgment in lieu of an answer is appropriate where the facts are undisputed and no amount of discovery would change the outcome, *Parra v. Wright*, No. 11-CV-6270 CJS, 2013 WL 6669235, at *7 (W.D.N.Y. Dec. 18, 2013). The standard for granting summary judgment is the same whether the motion is made in lieu of an answer or after discovery has occurred—the moving party must demonstrate that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law. *See Anderson*, 337 F.3d at 206.[4]

4    The Court notes that in various places throughout his opposition papers, Plaintiff argues that summary judgment is inappropriate because no discovery has taken place. (*See, e.g.*, Dkt. 93 at 23, 34-35, 54). However, the lack of discovery, in and of itself, cannot justify denial of a properly supported motion for summary judgment. Moreover, although Fed. R. Civ. P. 56(d) permits a party to oppose a motion for summary judgment on the grounds that it needs discovery, any such opposition must demonstrate "by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." *Whelehan v. Bank of Am. Pension Plan for Legacy Companies-Fleet-Traditional Ben.*, 5 F. Supp. 3d 410, 420 (W.D.N.Y. 2014) (quoting Fed. R. Civ. P. 56(d) ). "The affidavit must explain: '[ (1) ] the nature of the uncompleted discovery; [ (2) ]

Case 9:21-cv-00372-MAD-TWD    Document 61    Filed 06/22/23    Page 123 of 218

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

how the facts sought are reasonably expected to create a genuine issue of material fact; [ (3) ] what efforts the affiant has made to obtain those facts; and [ (4) ] why those efforts were unsuccessful.' " *Cont'l Cas. Co. v. Marshall Granger & Co., LLP*, 921 F. Supp. 2d 111, 127 (S.D.N.Y. 2013) (quoting *Hoffmann v. Airquip Heating & Air Conditioning*, 480 F. App'x 110, 112 (2d Cir. 2012) ). "The failure to file a Rule 56(d) affidavit sufficiently explaining the need for additional discovery 'is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.' " *hunts v. Rochester City Sch. Dist.*, 515 F. App'x 11, 13-14 (2d Cir. 2013) (quoting *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137 (2d Cir. 1994) ); *see Cross v. State Farm Ins. Co.*, 926 F. Supp. 2d 436, 446 (N.D.N.Y. 2013) (stating that if "a proper affidavit or declaration" is not submitted in support of a Rule 56(d) motion, the "application fails on this basis alone"); *see also Whelehan*, 5 F. Supp. 3d at 421 ("Merely referencing the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56(d) affidavit.").

Plaintiff has failed to submit an affidavit or declaration satisfying the requirements of Rule 56(d). Although the Court recognizes the early stage of this litigation, Plaintiff's conclusory requests for additional discovery in his opposition papers are insufficient to oppose Defendants' motion for summary judgment on that basis.

### III. Plaintiff's Due Process Claims Are Dismissed

**\*6** Plaintiff argues that he was deprived of a liberty interest without due process of law when he was not afforded an interpreter during several disciplinary hearings at which he was found guilty of the alleged wrongdoing. (*See* Dkt. 93 at 47-51). "The failure to provide interpretive services or assistive devices during disciplinary hearings has been found to be a denial [of] due process." *Young v. Polizzi*, No. 9:16-CV-0660 (FJS/CFH), 2018 WL 3949967, at \*8 (N.D.N.Y. July 11, 2018) (citing *Clarkson v. Coughlin*, 898 F. Supp. 1019, 1049 (S.D.N.Y. 1995) ), *report and recommendation adopted*, 2018 WL 3949942 (N.D.N.Y. Aug. 16, 2018). However, "[a]s a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property." *Ocasio v. Deluke*, No. 08-CV-51 GLS/DRH, 2010 WL 6001595, at \*16 (N.D.N.Y. Sept. 3, 2010) (citing *Perry v.*

*McDonald*, 280 F.3d 159, 173 (2d Cir. 2001) ), *report and recommendation adopted*, 2011 WL 864898 (N.D.N.Y. Mar. 8, 2011), *aff'd*, 468 F. App'x 89 (2d Cir. 2012).

"The Supreme Court held in *Sandin v. Conner*, 515 U.S. 472, 115 S. Ct. 2293, 132 L.Ed.2d 418 (1995), that to state a claim for a violation of due process, a prisoner first must identify a liberty interest protected by the Due Process Clause of which he was deprived." *Jenkins v. Haubert*, 179 F.3d 19, 28 (2d Cir. 1999). To prevail on a claim for a violation of procedural due process, a prisoner "must establish both that the confinement or restraint creates an 'atypical and significant hardship' under *Sandin*, and that the state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir. 1996). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (quoting *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir. 1998) ).

While the parties dispute whether Plaintiff required an interpreter at the disciplinary hearings (*see* Dkt. 59-1 at ¶ 23; Dkt. 93-1 at ¶ 23),[5] Plaintiff has failed to raise a triable issue of fact as to whether he was deprived of a protected liberty interest. Indeed, Plaintiff concedes that he was not confined to the SHU for any of the disciplinary violations he was found guilty of committing, save just one. (*See* Dkt. 59-1 at ¶ 20; Dkt. 93-1 at ¶ 20); *see generally Young v. Hoffman*, 970 F.2d 1154, 1156 (2d Cir. 1992) (finding that the plaintiff had "suffered no interference with a liberty interest and has no valid claim for relief" for procedural due process where he "was never penalized on the charges of committing unhygienic acts"); *Strasser v. New York*, No. 9:10-CV-141 (FJS/DEP), 2012 WL 253391, at \*3 (N.D.N.Y. Jan. 26, 2012) (dismissing a procedural due process claim where the plaintiff failed to allege whether he served any disciplinary confinement before his violation was administratively reversed).

---

5    The Court notes that, under New York law, "[a]n interpreter is only required when the inmate speaks no English." *Zhang v. Murphy*, 1 A.D.3d 784, 785 (3d Dep't 2003); *see* 7 N.Y.C.R.R. § 253.2 ("A non-English speaking inmate who cannot read

Case 9:21-cv-00372-MAD-TWD   Document 61   Filed 06/22/23   Page 124 of 218

Abreu v. Farley, Not Reported in Fed. Supp. (2019)
2019 WL 1230778

and understand English must be given a translated notice of the charges and statements of evidence relied upon and reasons for actions taken, and provided with a translator who shall be present at the hearing."); *Maldonado v. Racette*, 175 A.D.2d 963, 963 (3d Dep't 1991) ("[T]he regulations only require the presence of an interpreter when the inmate does not speak any English."); *see also Rodriguez v. Murphy*, 19 A.D.3d 913, 913 (3d Dep't 2005) (rejecting the "petitioner's contention that he should have been provided with the assistance of a Spanish interpreter" where "the record reveals that [the] petitioner 'was sufficiently fluent in English to understand and knowledgably participate in the disciplinary hearing' " (quoting *Santiago v. Goord*, 253 A.D.2d 970, 970 (3d Dep't 1998) ) ).

**\*7** Plaintiff did serve time in the SHU during December of 2013 for an incident occurring in May 27, 2010, but it was for a period of just two months. (*See* Dkt. 59-1 at ¶ 22; Dkt. 93-1 at ¶ 22). The Second Circuit has stated that "restrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection, and thus require proof of conditions more onerous than usual." *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009). Generally, the plaintiff must demonstrate that the conditions of confinement under such relatively brief periods "were more severe than the normal SHU conditions ... or a more fully developed record show[s] that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer*, 364 F.3d at 65.

In response to Defendants' properly supported summary judgment motion with respect to this incident (*see* Dkt. 59-6), Plaintiff has failed to set forth proof suggesting that his confinement in the SHU, beginning in December 2013 and lasting for just two months, was any more severe than normal, *Gaines v. City of New York*, No. 14 Civ. 6403 (ER), 2016 WL 951580, at \*3 (S.D.N.Y. Mar. 9, 2016) (granting the defendants' motion to dismiss where the plaintiff failed to allege "any facts regarding the conditions of his confinement to suggest that it imposed 'atypical and significant hardship' "); *Vogelfang v. Copra*, 889 F. Supp. 2d 489, 511 (S.D.N.Y. 2012) (stating that "[a]bsent additional particularized allegations regarding the harshness of the confinement—which plaintiff does not adduce—[sixty days of keeplock confinement], under the case law, is insufficient to rise to the level of a due process violation"); *Sales v. Barizone*, No. 03 Civ. 6691RJH, 2004 WL 2781752, at \*7 (S.D.N.Y. Dec. 2, 2004) ("Sales' other due process claim

arising out of two months' confinement in the SHU, however, cannot survive the *Sandin* test absent further allegations."); *Williams v. Goord*, 111 F. Supp. 2d 280, 289 (S.D.N.Y. 2000) (finding that 75 days of solitary confinement under normal conditions did not implicate a due process liberty interest). As a result, Plaintiff has failed to establish that he was deprived of a protected liberty interest. Therefore, the Court grants summary judgment dismissing Plaintiff's due process claims. [6]

[6]

To the extent Plaintiff seeks to raise an independent due process claim concerning the denial of his federal Freedom of Information Act ("FOIA") or New York State Freedom of Information Law ("FOIL") requests (Dkt. 46 at ¶¶ 389, 405-06), the Court construes Plaintiff's allegations as arising solely under FOIL because FOIA "applies only to federal agencies." *Chisholm v. United of Omaha Life Ins. Co.*, 514 F. Supp. 2d 318, 321 (D. Conn. 2007) ("Although [the plaintiff] does not say so, this Court construes her constitutional claims as having been brought under 42 U.S.C. § 1983, and her FOIA claims as arising under the Connecticut Freedom and Information Act, since the federal Freedom of Information Act, applies only to federal agencies." (citations omitted) (citing *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 484 (2d Cir. 1999) ) ). Furthermore, it is well-settled that the denial of a FOIL request "does not implicate Fifth or Fourteenth Amendment due process rights, where [the] plaintiff did not pursue state law remedies." *Murray v. Coleman*, 737 F. Supp. 2d 121, 126 (W.D.N.Y. 2010), *on reconsideration* (Dec. 14, 2010); *see Reed v. Medford Fire Dep't, Inc.*, 806 F. Supp. 2d 594, 607 (E.D.N.Y. 2011) ("[I]t is well-settled in New York that section 1983 is not a proper vehicle for bringing a FOIL claim." (quotation omitted) ); *see also Old St. George's LLC v. Bianco*, 389 F. App'x 33, 35 (2d Cir. 2010) ("[W]ith respect to appellants' claims relating to the alleged interference by officials of the Town of Yorktown with appellants' ability to access the Town's public records, we agree with the district court that the complaint alleges, at best, only a violation of New York's Freedom of Information Law, and not a federal constitutional claim."). Accordingly, insofar as Plaintiff alleges

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

Case 9:21-cv-00372-MAD-TWD    Document 61    Filed 06/22/23    Page 125 of 218

a § 1983 cause of action arising out of his FOIL disputes, such a claim is untenable and is dismissed.

## IV. Plaintiff's Eighth Amendment Claims

### A. General Principles

**\*8** "The Eighth Amendment, which applies to the states under the Due Process Clause of the Fourteenth Amendment, guarantees freedom from cruel and unusual punishment." *Jones v. Westchester Cty. Dep't of Corr. Med. Dep't*, 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008). "A prison deprivation violates the Eighth Amendment only when there is an 'unnecessary and wanton infliction of pain.' " *Barclay v. New York*, 477 F. Supp. 2d 546, 553 (N.D.N.Y. 2007) (quoting *Wilson v. Setter*, 501 U.S. 294, 297 (1991) ). "In order to prove that a prison condition amounted to cruel and unusual punishment, a plaintiff must satisfy both an objective and a subjective standard." *Stokes v. Goord*, No. 9:03-CV-1402 (LEK/DRH), 2007 WL 995624, at \*4 (N.D.N.Y. Mar. 30, 2007) (citing *Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996) ). "First, the prisoner must allege that the defendant acted with a subjectively 'sufficiently culpable state of mind.' Second, he must allege that the conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions." *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015) (citations omitted).

### 1. Subjective Element

"The subjective component of the claim requires a showing that the defendant 'had the necessary level of culpability, shown by actions characterized by "wantonness" ' " in light of the particular circumstances surrounding the challenged conduct." *Sims v. Artuz*, 230 F.3d 14, 21 (2d Cir. 2000) (quoting *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999) ); *see Swift v. Tweddell*, 582 F. Supp. 2d 437, 444 (W.D.N.Y. 2008) ("To establish deliberate indifference, then, plaintiff must prove that the defendants had a culpable state of mind and intended wantonly to inflict pain."). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citation omitted).

### 2. Objective Element

The objective requirement "does not mandate comfortable prisons." *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981); "[o]nly 'deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation,' " *Salahuddin*, 467 F.3d at 279 (quoting *Wilson*, 501 U.S. at 298). "States must not deprive prisoners of their 'basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety.' " *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Helling v. McKinney*, 509 U.S. 25, 32 (1993) ). In other words, the objective component requires that a prisoner "prove that the conditions of his confinement violate contemporary standards of decency." *Id.*

### B. Allegations of Contaminated Food

"[T]he Eighth Amendment prohibition against cruel and unusual punishment does require that prisoners be served 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.' " *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (quoting *Ramos v. Lamm*, 639 F.2d 559, 571 (10th Cir. 1980) ). "In food tampering claims a plaintiff must allege that he suffered an actual injury, 'the mere allegation of food tampering alone [ ] is insufficient to establish a claim under the Eighth Amendment.' " *Calvin v. Schmitt*, No. 15 CV-6584 (NSR), 2017 WL 4280683, at \*5 (S.D.N.Y. July 7, 2017) (alteration in original) (quoting *Harris v. Ashlaw*, No. 9:07-CV-0358(LEK/DEP), 2007 WL 4324106, at \*5 (N.D.N.Y. Dec. 5, 2007) ).

Here, Plaintiff's alleged food contamination is too speculative to survive summary judgment. Plaintiff alleges that the food loaves [7] he received "were wet[,]" as if C.O. Countryman had spit in his food. (Dkt. 93-5 at ¶ 41; *see also id.* at ¶ 107 (alleging that C.O. Countryman "was spitting on my loa[ves]") ). He also alleges that some of the food items he received had been opened and mixed around or were broken into pieces. (*See id.* at ¶ 107). "[A] plaintiff's allegation that 'Defendants spit in his food and 'violat[ed] [his] bread by making holes in it,' without more, has been found insufficient to state an Eighth Amendment violation." *Bee v. Krupp*, No. 08 Civ.10141 (SHS)(KNF), 2009 WL 2981910, at \*3 (S.D.N.Y. Sept. 15, 2009) (quoting *Chavis v. Kienert*, No. 9:03-CV-0039(FJSRFT), 2005 WL 2452150, at \*21 (N.D.N.Y. Sept. 30, 2005) ). Plaintiff's allegations

Case 9:21-cv-00372-MAD-TWD   Document 61   Filed 06/22/23   Page 126 of 218
Abreu v. Farley, Not Reported in Fed. Supp. (2019)
2019 WL 1230778

that C.O. Countryman either spit on his loaves or otherwise tampered with his food are conclusory and unsubstantiated. Without more, such bare-bone allegations are insufficient to sustain an Eighth Amendment conditions-of-confinement cause of action. *See Sital v. Burgio*, 592 F. Supp. 2d 355, 359 (W.D.N.Y. 2009) ("the allegations in the Amended Complaint that Defendant Karamonos 'spit' in [p]laintiff's food and poked his finger in [p]laintiff's food are conclusory and unsubstantiated.... Plaintiff provides no factual support for the contention and, therefore, the claim in subject to dismissal" (quoting *Zimmerman v. Seyfert*, No. 9:03-CV-1389(TJM), 2007 WL 2080517, at *29 (N.D.N.Y. July 19, 2007) ) ); *Bee*, 2009 WL 2981910, at *3 (concluding that the plaintiff's allegations that " 'visible globs of spit' were present in his food" did not give rise to an Eighth Amendment violation).

7    A "food loaf" generally "contains a variety of ingredients, including carrots and potatoes." *Alexander v. Whitney*, No. 9:04-CV-1298 (LEK/GJD), 2008 WL 904897, at *6 n.8 (N.D.N.Y. Mar. 31, 2008).

**\*9** Plaintiff also makes the general assertion that his food was "regularly and frequently contaminated and or spoiled." (Dkt. 93-5 at ¶ 190). He further alleges that he became nauseous and was forced to vomit after eating the food loaves. (*Id.*). Plaintiff also allegedly experienced stomach pains and anal bleeding, which were "*possibly due to bacterias* [sic] and parasites due to the spoiled foods" and the "dirty hands" of the correctional officers and their practice of "spitting" into his food. (*Id.* (emphasis added) ). Plaintiff's allegations are self-serving and completely unsupported. *See Martinez v. Lape*, No. 9:09-CV-0665 (TJM/RFT), 2011 WL 4527943, at *9 (N.D.N.Y. Mar. 28, 2011) ("Other than the unsupported broad assertion that he contracted H. pylori from the food or water at Coxsackie, Plaintiff fails to allege how the expired food and juice posed an immediate risk to his health, inflicted pain and suffering, or otherwise amounted to an extreme deprivation."), *report and recommendation adopted*, 2011 WL 4528980 (N.D.N.Y. Sept. 28, 2011). Conclusory claims of spoiled food are insufficient to survive a dispositive motion. *See Black v. Fischer*, No. 9:08-CV-0232, 2010 WL 2985081, at *8 (N.D.N.Y. July 1, 2010) (stating that the "plaintiff's food complaints consist entirely of broad and conclusory allegations which, while at first blush troublesome, are devoid of the specifics necessary to prove such a claim"); *Dorsey v. Fisher*, No. 9:09-CV-1011 (GLS)(DEP), 2010 WL 2008966, at *7 (N.D.N.Y. May 19, 2010) (dismissing an Eighth Amendment claim based on

contaminated food where the plaintiff alleged, in "conclusory fashion," a conspiracy to "poison[ ] his food with infected DNA").

Furthermore, the injuries that allegedly resulted from Plaintiff's ingestion of the food loaves are not borne out by the medical evidence. *See Stokes*, 2007 WL 995624, at *4 ("[A]lthough Stokes makes general allegations regarding the health effects he suffered because of the alleged contaminated and inadequate food, there is nothing in his medical records to indicate that he suffered any adverse health effects from the food served to him by defendants."). While a Court must view the evidence in the light most favorable to the non-movant on a motion for summary judgment, "[v]ague assertions supported only by self-serving statements," even if found "in the nonmoving party's affidavit[,] are insufficient to defeat a properly supported summary judgment motion." *Moe v. United States*, 668 F. Supp. 2d 497, 502 (W.D.N.Y. 2009); *see also Brown v. Eagen*, No. 9:08-CV-0009 (TJM/DRH), 2009 WL 815724, at *10 (N.D.N.Y. Mar. 26, 2009) (rejecting the plaintiff's "allegations that his food was contaminated" by blood, feces, semen, and chemicals as so "conclusory and fantastic as to rise to the level of factually frivolous"). Indeed, outside his general allegations that the correctional officers had "dirty hands" and were "spitting" in his food, Plaintiff provides no credible basis to support the assertion that he was actually exposed to harmful "bacteria[ ]" or "parasites." *See generally Stokes*, 2007 WL 995624, at *4 ("[A]lthough Stokes contends that defendants delivered him the food, he fails to allege that he saw any of them actually contaminate or tamper with his food.").

Therefore, Plaintiff's Eighth Amendment claim for cruel and unusual punishment, based upon the alleged contamination of his food, is dismissed because he has failed to raise an issue of material fact sufficient to satisfy the objective element of this cause of action.

### C. Deliberate Medical Indifference

For purposes of opposing Defendants' motion, Plaintiff "focuses on his most serious untreated medical conditions." (Dkt. 93 at 30). These conditions include the injuries he allegedly sustained during an "assault that occurred on March 30, 2010, the chronic back and neck pain that was at issue in the March 30, 2010 assault, for which he requires at least pain medication and a back brace, and the acute incident of a potential heart attack he suffered on April 2, 2010." (*Id.*).

"The Eighth Amendment [also] forbids 'deliberate indifference to serious medical needs of prisoners....' " *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) ). This category of Eighth Amendment violation also requires the satisfaction of objective and subjective elements. In the context of a deliberate indifference claim, the objective component requires that "the alleged deprivation of adequate medical care ... be 'sufficiently serious,' " *Salahuddin*, 467 F.3d at 279 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) ), while the subjective component requires that "the charged officials ... be subjectively reckless in their denial of medical care," *Spavone*, 719 F.3d at 138.

**\*10** The "sufficiently serious" element is analyzed more broadly where the alleged claim amounts to "a failure to provide any treatment for an inmate's medical condition" than "where the inadequacy is in the medical treatment given." *Salahuddin*, 467 F.3d at 280. In the former scenario, the focus is on whether "the inmate's *medical condition* is sufficiently serious," whereas the latter situation emphasizes the treatment itself. *Id.* (emphasis added); *see Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) ("When the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.").

"It appears that no courts have specifically addressed neck pain in the context of a deliberate indifference claim." *Medina v. Barrett*, No. 14-CV-6377-FPG, 2018 WL 1383232, at \*6 (W.D.N.Y. Mar. 19, 2018). However, "courts have held that '[s]evere back pain, especially if lasting an extended period of time, can amount to a "serious medical need" under the Eighth Amendment.' " *Guarneri v. Hazzard*, No. 9:06-CV-0985, 2008 WL 552872, at \*6 (N.D.N.Y. Feb. 27, 2008) (quoting *Nelson v. Rodas*, No. 01-CV-7887 (RCC/AJP), 2002 WL 31075804, at \* 14 (S.D.N.Y. Sept. 17, 2002) ); *see Mosley v. Woodty*, No. 9:11-CV-1490, 2013 WL 5347272, at \*4 (N.D.N.Y. Sept. 23, 2013) ("Courts have found chronic, debilitating back pain to be a serious injury for Eighth Amendment purposes.").

Plaintiff appears to quarrel with the medical treatment he received at Five Points and challenges the propriety of the Five Points medical staffs' decision to interrupt treatment previously prescribed by other correctional facilities. Specifically, Plaintiff disputes Dr. Weinstock's

decision to remove his back brace on March 30, 2010, even though Plaintiff informed Dr. Weinstock that it had been prescribed by physicians at another correctional facility, who had also recommended physical therapy and pain medication to treat his chronic back pain. (Dkt. 93 at 30; *see* Dkt. 46 at ¶¶ 101, 103-04). However, Plaintiff's contentions merely challenge Dr. Weinstock's medical judgment, and Plaintiff submits no medical evidence demonstrating that a back brace should have been continued as a form of treatment. *See Evan v. Manos*, 336 F. Supp. 2d 255, 263 (W.D.N.Y. 2004) (stating that the plaintiff's opinion that the defendant "should have prescribed a back brace is also inadequate to give rise to any issue of fact about whether his constitutional rights were violated," and noting that "[t]here is no medical evidence that a back brace was medically called for or that it would have relieved plaintiff's alleged pain"). "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998). "Disagreement over treatment relates to an issue of medical judgment and at worst, amounts to medical malpractice, not a constitutional violation." *Tavares v. N.Y.C. Belleview Hosp.*, No. 13 CV 3148 (PKC)(MHD), 2015 WL 7736544, at \*5 (S.D.N.Y. Nov. 30, 2015) (citing *Estelle*, 429 U.S. at 106).

Indeed, Dr. Weinstock indicates that his decision to remove the back brace and to discontinue some of Plaintiff's pain medications was based upon his medical examination of Plaintiff and objective medical evidence, such as x-rays. (Dkt. 59-9 at ¶¶ 24-28); *see Lewis v. Alves*, No. 01-CV-0640A(SR), 2004 WL 941532, at \*6 (W.D.N.Y. Mar. 22, 2004) (stating that the defendant's decision to deny drug treatment while the plaintiff completed "an alcohol and drug treatment program was based upon objective medical criteria and the exercise of [the defendant's] medical judgment," and thus, could not support a medical indifference claim); *see also Munlyn v. Pietrie*, No. 13-CV-6170FPG, 2014 WL 3695488, at \*6 (W.D.N.Y. July 24, 2014) (stating that the plaintiff's allegations only reflect his "disagreement with [the medical staff's] evaluation and assessment of his medical circumstances" where he claims that they "did not believe he had any pain, or disputed the severity of the pain," and then they "refused [the p]laintiff's requests to see the doctor," removed his neck brace and walking cane, disapproved physical therapy, and told him "to stop lying"). Furthermore, Dr. Weinstock affirms that Plaintiff was often seen multiple times a week by the Five Points medical staff (Dkt. 59-9 at ¶ 7), an averment that is borne out by the medical records submitted by Defendants (*see* Dkt. 59-10).

Case 9:21-cv-00372-MAD-TWD    Document 61    Filed 06/22/23    Page 128 of 218

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

**\*11** Plaintiff also argues that Defendants consistently ignored his chronic back and neck pains. (Dkt. 93 at 31 & n.8). However, "a delay in medical treatment does not necessarily give rise to an Eighth Amendment violation." *Pagan v. Corr. Med Servs.*, No. 11 Civ. 1357 (ER), 2013 WL 5425587, at *12 (S.D.N.Y. Sept. 27, 2013). Where delays in medical treatment have implicated Eighth Amendment concerns, "they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness." *Ferguson v. Cai*, No. 11 Civ. 6181 (PAE), 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012).

As such, Plaintiff's allegations must be viewed in context; it appears that Plaintiff frequently sought and received some form of medical attention, and it is undisputed that he was examined by medical personnel "well over 100 times" while housed at Five Points. (Dkt. 59-1 at ¶ 1; Dkt. 93-1 at ¶ 1). Simply because Plaintiff was not examined each and every day he complained of some form of chronic pain does not demonstrate that Defendants were deliberately indifferent to a serious medical need. At least under the circumstances presented here, where the medical records reveal that Plaintiff was examined and/or prescribed medications multiple times a month and sometimes several times a week, Plaintiff's assertion that Defendants ignored his complaints of pain fails to establish a viable constitutional cause of action. (*See* Dkt. 59-10). Indeed, many of Plaintiff's medical evaluations were only separated by a matter of days. *See Youngblood v. Glasser*, No. 9:10-CV-1430 (NAM/DEP), 2012 WL 4051846, at *8 (N.D.N.Y. Aug. 22, 2012) ("Plaintiff maintains that his constitutional rights were violated as a result of a five-day delay in arranging for a physician to examine his hemorrhoids. Proof of such complaints and the modest delay at issue is not sufficient to establish an Eighth Amendment claim."), *report and recommendation adopted*, 2012 WL 4051890 (N.D.N.Y. Sept. 13, 2012); *Williams v. Raimo*, No. 9:10-CV-245 (MAD/GHL), 2011 WL 6026111, at *5 (N.D.N.Y. Dec. 2, 2011) (noting that any delay in treating "a prisoner's injuries from the weekend to the next business day does not constitute deliberate indifference where the prisoner 'submitted no medical evidence showing any negative effect of the delay' " (quoting *Croft v. Hampton*, 286 F. App'x 955, 959 (8th Cir. 2008) ) ); *Alster v. Goord*, 745 F. Supp. 2d 317, 335 (S.D.N.Y. 2010) (dismissing the plaintiff's medical indifference cause of action where he claimed that the defendants "waited two days after he complained of abdominal pain to take him to the hospital"); *Evan v.*, 336 F. Supp. 2d at 261 (finding that a "nine-day delay between

being placed on the callout list and plaintiff's initial visit" was not actionable where the plaintiff "has not identified anything that [the defendant] could or should have done had he examined plaintiff sooner, nor has he shown that he was harmed by any delay in treatment"); *see also Colon v. Plescia*, No. CIVA9:07-CV-0727(DNH/DE), 2009 WL 2882944, at *7 (N.D.N.Y. July 27, 2009) ("Where a plaintiff's claim is based on a delay in medical treatment, the plaintiff must show that substantial harm resulted from the delay itself."), *report and recommendation adopted*, 2009 WL 2914160 (N.D.N.Y. Sept. 4, 2009). [8]

[8]  Insofar as Plaintiff asserts a medical indifference claim based upon the many allegedly unwarranted denials of his sick-call slips (*see, e.g.*, Dkt. 46 at ¶¶ 190, 193, 196, 200-01, 203-04, 206, 216-17, 223, 226, 245, 252, 265, 267, 285), it too is unsupported by the evidence, *see Kee v. Hasty*, No. 01 Civ.2123 (KMW)(DF), 2004 WL 807071, at *29 (S.D.N.Y. Apr. 14, 2004) (rejecting the plaintiff's "overly conclusory" allegations that the defendants failed to treat him where he failed "to specify the dates on which [he] was denied proper treatment, the nature of his needs on those dates, and the nature of the treatment that was purportedly denied"); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 309 (S.D.N.Y. 2001) ("[A] generalized claim that an inmate was denied access to medical treatment will not suffice."); *Vento v. Lord*, No. 96 Civ. 6169 (SS), 1997 WL 431140, at *4 (S.D.N.Y. July 31, 1997) (dismissing the deliberate medical indifference claim where the plaintiff complained that "the medical staff will not see me fit ... for medical attention," but failed to provide sufficient allegations regarding the denial of his sick call requests or the nature of those requests). Indeed, "[t]he issue in this case is not whether [the plaintiff] was seen every time that he requested sick call, but whether the defendants were deliberately indifferent to his serious medical needs concerning his back pain." *Butler v. Weissman*, No. CIV.9:00-CV-1240 (LEK/GLS), 2002 WL 31309347, at *5 (N.D.N.Y. June 20, 2002). In light of the extensive medical record, which demonstrates that Plaintiff was frequently seen in the infirmary multiple times a month, and sometimes several times a week, any claim of medical indifference based upon the wrongful denial of his sick-call slips is

Case 9:21-cv-00372-MAD-TWD    Document 61    Filed 06/22/23    Page 129 of 218
Abreu v. Farley, Not Reported in Fed. Supp. (2019)
2019 WL 1230778

unsustainable. *See Davidson v. Desai*, 817 F. Supp. 2d 166, 190-91 (W.D.N.Y. 2011) (concluding that the plaintiff failed to point to "a request seeking sick call for a serious medical need sufficient to support a jury verdict on the claim" where the plaintiff's medical record establishes that he "was seen in sick call multiple time[s] each month"); *see generally Arnow v. Aeroflot Russian Airlines*, 980 F. Supp. 2d 477, 482 (S.D.N.Y. 2013) ("[S]elf-serving, conclusory affidavits, standing alone, are insufficient to create a triable issue of fact and to defeat a motion for summary judgment." (citing *BellSouth Telecomms., Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) ) ).

**\*12** Notably, despite Plaintiff's claim of medical indifference, it is undisputed that he failed to cooperate with medical staff or refused to take his prescribed medications on several occasions. (Dkt. 59-1 at ¶ 8; Dkt. 93-1 at ¶ 8); *see generally Buffaloe v. Fein*, No. 12 Civ. 9469 (GBD) (AJP), 2014 WL 1224446, at \*2 (S.D.N.Y. Mar. 20, 2014) (noting that the plaintiff's "medical records indicate that he often refused treatment" and that a "plaintiff's refusal of medical treatment 'has been found to effectively rebut[ ] ... claims of deliberate indifference to serious medical needs' " (alteration in original) (quoting *Rivera v. Goord*, 253 F. Supp. 2d 735, 756 (S.D.N.Y. 2003) ) ). Whether or not Plaintiff ultimately agreed with the medical staff's evaluations and the medication and treatments prescribed during his numerous examinations, Plaintiff's "personal dissatisfaction" with the treatment received does not give rise to a constitutional violation. *See Wright v. Conway*, 584 F. Supp. 2d 604, 607 (W.D.N.Y. 2008) ("Wright's complaints demonstrate no more than his personal dissatisfaction with the level of care that he received, and these claims must therefore be dismissed.").

Plaintiff also references a "potential heart attack" that he allegedly suffered on or about April 2, 2010. (*See* Dkt. 93 at 32-33). Plaintiff alleges that Dr. Weinstock and nurse Annette Holm ("Nurse Holm") ignored his complaints of chest pain, which he could feel spreading over his left shoulder. (*See* Dkt. 46 at ¶¶ 124-26). Plaintiff further alleges that he had difficulty breathing and speaking at that time as well. (*Id.* at ¶ 125). The medical staff allegedly ignored these symptoms even though they suggested that Plaintiff was suffering from a "potential heart attack." (*Id.* at ¶ 126).

Plaintiff fails to provide any evidence—medical or otherwise—to explain the difference between a "potential" heart attack and an actual heart attack, or to associate his

alleged symptoms with any other cardiovascular health-related issues. Furthermore, a review of the medical records reveals that Plaintiff was examined several times on April 2, 2010, and in the following days. (*See* Dkt 59-10 at 131-33). For example, on April 2, 2010, Plaintiff complained of chest pain and discomfort in his left shoulder, but the medical staff noted that he was "talking easily," without any shortness of breath, and that his blood pressure had been taken. (*Id.* at 133). Dr. Weinstock was notified of the assessment, and the medical staff ordered Plaintiff to be evaluated again in an hour. (*Id.*). After one hour had passed, Plaintiff was observed "talking easily" without shortness of breath. (*Id.*). Plaintiff was instructed to request an escort back to the infirmary if he experienced an increase in pain, shortness of breath, or dizziness, but was otherwise told to return for a follow-up in the morning. (*Id.*).

The next morning, Plaintiff complained of a cough, chronic pain in his right arm, neck, back, both wrists, legs, face, and head, but apparently did not indicate whether he felt pain in his chest or shoulder. (*Id.*). Plaintiff was then provided with some ritussin and ibuprofen. (*Id.*). Later that morning, Plaintiff returned to the infirmary, where he again complained of pain in his back, wrist, head, face, and right arm, but displayed no signs of redness or swelling. (*Id.* at 132). Plaintiff did not appear to exhibit any shortness of breath, and he was "talking easily." (*Id.*). Plaintiff also indicated that he "doesn't feel too much compression to [his] chest." (*Id.*). On April 7, 2010, Plaintiff again complained of some "difficulty breathing," but was examined and prescribed treatment. (*Id.* at 131). The medical notes dated April 10, 2010, reveal that Plaintiff was "talking easily" without any shortness of breath, and no subjective complaints of chest or shoulder pain were recorded. (*Id.*).

In sum, the above-referenced medical progress notes wholly undermine Plaintiff's contention that he suffered a sufficiently serious cardiovascular event that was ignored by the Five Points medical staff. Even if Plaintiff suffered a "potential heart attack," the medical records demonstrate that he was provided with consistent care and treatment at the time his symptoms arose and in the days that followed—Plaintiff points to no medical evidence demonstrating that the medical staff were "subjectively reckless" in their examination of Plaintiff's condition. *Spavone*, 719 F.3d at 138.

**\*13** Plaintiff has strategically chosen to focus his opposition papers on a few of the most allegedly egregious instances of deliberate indifference to a serious medical need asserted

Case 9:21-cv-00372-MAD-TWD   Document 61   Filed 06/22/23   Page 130 of 218

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

by Plaintiff in this action. Although the Court has reviewed the balance of Plaintiff's alleged medical indifference claims against the medical records submitted by Defendants, "in deciding a motion for summary judgment, a District Court is not required to 'scour the record on its own in a search for evidence' where the non-moving party fails to adequately present it." *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 44 F. Supp. 3d 409, 426 (S.D.N.Y. 2014) (quoting *CILP Assocs. LP v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 125 (2d Cir. 2013) ). Here, Defendants have established that Plaintiff was medically examined on "numerous occasions" while incarcerated at Five Points, and sometimes multiple times a week. (Dkt. 59-4 at ¶¶ 4-6; *see* Dkt. 59-7 at ¶ 9; Dkt. 59-9 at ¶ 4, 7, 18). Despite Plaintiff's frequent complaints of medical ailments, these complaints were not substantiated by objective medical examination. (*See* Dkt. 59-4 at ¶ 9; Dkt. 59-7 at ¶¶ 10-12; Dkt. 59-9 at ¶¶ 9, 24-28, 34, 68-69). Furthermore, Plaintiff was often prescribed medications to relieve him of the subjective pain or discomfort he complained of, and he would usually receive medications at least once a day while housed in the SHU. (*See* Dkt. 59-4 at ¶¶ 6-7, 20; Dkt. 59-7 at ¶ 8; Dkt. 59-9 at ¶¶ 5, 18, 23-24, 28, 30). These averments are borne out by the medical records submitted by Defendants. (*See* Dkt. 59-10). In response, Plaintiff has submitted no medical evidence to substantiate his claims of deliberate indifference —instead, he relies on only his conclusory claims. In light of the robust medical records documenting Plaintiff's treatment, Plaintiff's self-serving averments are insufficient to raise a triable issue of fact as to whether he suffered constitutionally inadequate medical care during his confinement at Five Points. *See Scott v. Koenigsmann*, No. 9:12-CV-1551, 2016 WL 1057051, at *12 (N.D.N.Y. Mar. 14, 2016) (finding the record did not establish that the defendant "acted with deliberate indifference or deliberately ignored [the p]laintiff's complaints of pain" where the plaintiff "received a plethora of prescription medication for chronic low back pain and was routinely treated at Sick Call, by nurse practitioners and consulted with medical providers").

Accordingly, summary judgment is granted in favor of Defendants dismissing Plaintiff's Eighth Amendment claim for deliberate medical indifference. [9]

[9] To the extent Plaintiff raises a related claim for the deprivation of constitutionally protected medical confidentiality (Dkt. 46 at ¶¶ 221, 258-59, 292), the Court notes that "[c]ourts within this Circuit have accorded constitutional privacy protection to

a handful of medical conditions only, including HIV, transsexualism and sickle cell anemia," *Myers v. Dolac*, No. 09-CV-6642P, 2013 WL 5175588, at *7 (W.D.N.Y. Sept. 12, 2013). Constitutional protection will only extend to a medical condition that "is both serious in nature and the type that is 'excruciatingly private and intimate in nature' such as those 'likely to provoke ... an intense desire to preserve one's medical confidentiality.' " *Id.* (quoting *Matson v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 631 F.3d 57, 64 (2d Cir. 2011) ). As such, this constitutional right is limited in scope and exists only under "narrow parameters." *Matson*, 631 F.3d at 65 (quoting *Powell v. Schriver*, 175 F.3d 107, 112 (2d Cir. 1999) ). In determining whether constitutional protection extends to a particular medical condition, "courts must determine whether the disease is 'contagious ... or attributed in any way to socially repugnant conduct and whether it could be said that society as a whole views [the disease] as directly associated with any disease which might conceivably be characterized as loathsome.' " *Myers*, 2013 WL 5175588, at *7 (quoting *Matson*, 631 F.3d at 66).

The instant matter "is not a case in which plaintiff has an unusual medical problem which, if disclosed unnecessarily to other inmates, would likely expose plaintiff to discrimination, intolerance, or potential violence." *Rodriguez v. Ames*, 287 F. Supp. 2d 213, 220 (W.D.N.Y. 2003) (rejecting the plaintiff's claim where he had been "diagnosed with proctitis, a nontoxic inflammation of the mucose tissue of the rectum, and internal hemorrhoids"); *see Webb v. Goldstein*, 117 F. Supp. 2d 289, 298 (E.D.N.Y. 2000) (finding no right to privacy attendant to medical records containing information about the plaintiff's treatment for genital conditions); *see also Myers*, 2013 WL 5175588, at *7 ("[C]ourts have declined to recognize constitutional protection for many other medical conditions, including fibromyalgia, arthritis and sleep apnea."); *Ebert v. Hargreaves*, No. 4:11CV3139, 2012 WL 642470, at *3 (D. Neb. Feb. 28, 2012) (assuming that prisoners enjoy a limited right to privacy in medical information, the plaintiff failed to establish a violation of that right where he alleged that the defendant spoke about the plaintiff's "back pain in front of other inmates"); *see generally Kendall v. Kittles*, No. CO CIV. 628 (GEL),

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

Case 9:21-cv-00372-MAD-TWD   Document 61   Filed 06/22/23   Page 131 of 218

2004 WL 1752818, at *6 (S.D.N.Y. Aug. 4, 2004) ("Hemorrhoids, albeit uncomfortable, are a minor health issue, far removed from the category of medical conditions that have been deemed 'sufficiently serious' by other courts."). Accordingly, Plaintiff has failed to raise a triable issue of fact as to whether he was deprived his limited right to privacy in medical information.

### D. Eighth Amendment Excessive Use of Force

**\*14** In order for an Eighth Amendment excessive force claim to survive a motion for summary judgment, the evidence, viewed in the light most favorable to the non-moving party, must go "beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives," and instead "support a reliable inference of wantonness in the infliction of pain...." *Whitley v. Alters*, 475 U.S. 312, 322 (1986). " '[S]ome degree of injury is ordinarily required to state a claim' of excessive use of force in violation of the Eighth Amendment." *Taylor v. N.Y. Dep't of Corr.*, No. 10 CIV. 3819 (JPO), 2012 WL 2469856, at *4 (S.D.N.Y. June 27, 2012) (quoting *United States v. Walsh*, 194 F.3d 37, 50 (2d Cir. 1999) ). Accordingly, "a *de minimis* use of force will rarely suffice to state a constitutional claim." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993). Indeed, "[t]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992) ).

However, "an inmate 'need not prove "significant injury" to make out an excessive force claim.' " *Banks v. County of Westchester*, 168 F. Supp. 3d 682, 688 (S.D.N.Y. 2016) (quoting *Griffin v. Crippen*, 193 F.3d 89, 92 (2d Cir. 1999) ). "[T]he core judicial inquiry is that set out in *Whitley*: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7.

Factors to consider in determining whether prison officials unnecessarily and wantonly inflicted pain include: (1) the extent of the injury suffered; (2) the need for the application of force; (3) the relationship between the need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response. *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (citing *Hudson*, 503 U.S. at 7). [10]

[10] Although Plaintiff submits responsive papers opposing summary judgment on almost every one of his alleged assaults (*see* Dkt. 93 at 36-45), Defendants indicate that they have only moved to dismiss the allegations pertaining to the March 30, 2010, and September 27, 2011, incidents (*see* Dkt. 105-2 at 8; *see also* Dkt. 59-2 at 79 ("[T]he Supplement should be dismissed in its entirety with the exception of the alleged incident of January 17, 2012.") ) ). Despite Defendants' clarification, the Court will also address the alleged use of force events pertaining to nurse Kimberly Cheasman ("Nurse Cheasman") because Defendants' motion papers allude to at least one of these events and request that all claims alleged against her be dismissed. (*See* Dkt. 59-2 at 63-65). Accordingly, the Court does not address the assaults allegedly taking place on May 10, 2010, February 21, 2011, March 21, 2011, December 5, 2011, and January 17, 2012, and thus Plaintiff's § 1983 claims for excessive use of force and his common law claims arising from these incidents may proceed.

### 1. Alleged Use of Excessive Force on March 30, 2010

Plaintiff alleges that on March 30, 2010, C.O. Countryman and correctional officer Jacob Smith used excessive force to remove Plaintiff's back brace and to restrain Plaintiff after he protested the manner in which the correctional officers attempted to remove the brace. (Dkt. 46 at ¶¶ 104-06). Both correctional officers allegedly "dragged Plaintiff out of the sick-call room, and violently slammed Plaintiff to the floor face down." (*Id.* at ¶ 107). C.O. Countryman then "tightened the handcuffs on Plaintiff's wrists, twisting both hands and wrists maliciously," and then "twisted Plaintiff's legs, causing extreme pain and suffering to Plaintiff's body, legs and back." (*Id.* at ¶¶ 108-09). C.O. Countryman then "shoved and pushed Plaintiff into a wall," and then he, correctional officer Richard Cioffa, and other unidentified correctional officers "took Plaintiff's back brace violently from his body...." (*Id.* at ¶ 110).

**\*15** A review of the medical evidence reveals that the medical staff did not observe any injuries subsequent to the alleged assault. Although Plaintiff complained of pain in his arm, face, and wrist, no visible injuries, edema, or redness were observed ten minutes after the use of force occurred. (*See* Dkt. 59-10 at 134-35). Plaintiff made similar complaints

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

the following day, but no swelling or any deformity was noted; nonetheless, the medical staff prescribed Motrin to relieve any discomfort, (*Id.* at 134).

However, the Court does not require corroborating medical evidence demonstrating the presence of an injury to conclude that an excessive force claim survives summary judgment. *See Ninortey v. Shova*, No. 05 CIV. 542 (SHS), 2008 WL 4067107, at *12 (S.D.N.Y. Sept. 2, 2008) (noting that courts in the Southern District of New York "have not required that injuries caused by the alleged use of excessive force be corroborated by medical records"); *Beckles v. Bennett*, No. 05 CIV. 2000 (JSR), 2008 WL 821827, at *16 (S.D.N.Y. Mar. 26, 2008) (denying summary judgment even though "the nurse noted no sign of physical injury after the incident," where "the medical records provided by [the p]laintiff show that he complained repeatedly and consistently about pain to the back and kidney, beginning immediately after the incident and continuing for months"). "Where 'a prisoner's allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically,' summary judgment is improper 'even where the plaintiff's evidence of injury [is] slight and the proof of excessive force [is] weak.' " *Clarke v. Anderson*, No. 10-CV-319S, 2012 WL 3292879, at *5 (W.D.N.Y. Aug. 10, 2012) (quoting *Wright v. Goord*, 554 F.3d 255, 269 (2d Cir. 2009) ). "[T]he absence of visible injuries does not mean ... that [the p]laintiff was not harmed," and thus, "the records, standing alone, are not sufficient to permit the Court to conclude as a matter of law that [the p]laintiff was not subjected to the excessive use of force or that he suffered only *de minimis* injuries." *Ninortey*, 2008 WL 4067107, at *12; *see also United States v. Walsh*, 194 F.3d 37, 50 (2d Cir. 1999) (finding that the prisoner's pain resulting from the force used demonstrates a sufficient injury); *Campbell v. City of New York*, No. 06 CV 5743 (HB), 2010 WL 2720589, at *8 (S.D.N.Y. June 30, 2010) ("That there is at best limited medical evidence in the record to corroborate [the plaintiff's] story is insufficient to dismiss his excessive force claim as a matter of law.").

Furthermore, a "plaintiff's injuries are but one factor to consider in the excessive force analysis." *Cole v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 9:14-CV-0539 (BKS/DEP), 2016 WL 5394752, at *12 (N.D.N.Y. Aug. 25, 2016), *report and recommendation adopted*, 2016 WL 5374125 (N.D.N.Y. Sept. 26, 2016); *see also Dellamore v. Stenros*, 886 F. Supp. 349, 352 (S.D.N.Y. 1995) (rejecting the argument that the excessive force claim should be dismissed because

the plaintiff's "medical records do not show any injuries from the use of an alleged chokehold," and explaining that "if a chokehold was used, the fact that it did not cause any physical injuries goes to the amount of damages, if any, to which [the plaintiff] may be entitled, rather than the legal sufficiency of his allegation"). Indeed, Defendants do not appear to dispute the fact that some force was used to restrain Plaintiff on March 30, 2010, nor do they argue that the amount of force used was appropriate to maintain order and discipline. Instead, Defendants simply contend that any injury sustained was *de minimis* in the absence of substantiating medical proof. (*See* Dkt. 59-2 at 50-51). That Plaintiff's primary source of proof may be his own testimony does not mean there are no material issues of fact as to the circumstances underlying the force used and whether such force was maliciously and sadistically applied. *See Griffin*, 193 F.3d at 91 (reversing the dismissal of an excessive force claim, even though the plaintiff's evidence was "extremely thin" and "the only evidence he intended to offer in support of his claims was his own testimony and that the only injuries he suffered were a bruised shin and swelling"); *see also Jordan v. Fischer*, 773 F. Supp. 2d 255, 272 (N.D.N.Y. 2011) (denying a motion for summary judgment where the "plaintiff's excessive force claim will turn on issues of credibility").

**\*16** Therefore, Defendants' motion for summary judgment is denied insofar as it seeks dismissal of Plaintiff's Eighth Amendment excessive force claim arising out of the incident taking place on March 30, 2010.

## 2. Alleged Use of Excessive Force on November 21, 2010

Plaintiff alleges that on November 21, 2010, Nurse Cheasman was informed that Plaintiff had filed grievances and complaints against her. (Dkt. 46 at ¶ 212). After being so advised, Nurse Cheasman approached Plaintiff's cell, "opened the window panel of the solid door," and proceeded to "physically assault[ ] Plaintiff with a bucket, injuring Plaintiff's fingers and hands." (*Id.*).

Plaintiff's medical records indicate that he complained of hand pain for several medical visits subsequent to the alleged assault; however, no injuries were ever discerned and Plaintiff was always found to have full use of his hands. (*See* Dkt. 59-10 at 107-08, 110). On November 22, 2010, Plaintiff specifically informed medical staff that he had been assaulted by the "log nurse" with a "medical bucket." (*Id.* at 110). However, the progress notes also reveal

Case 9:21-cv-00372-MAD-TWD    Document 61    Filed 06/22/23    Page 133 of 218

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

that Plaintiff "refused to unwrap hands and show this nurse any injuries." (*Id.*). Defendants argue that Plaintiff's assertion that Nurse Cheasman assaulted him is "far too vague to make out a claim to which any Defendant can respond." (Dkt. 59-2 at 64).

The fact that Plaintiff's medical records suggest that he suffered no visible injury to his fingers, and that he had no difficulty moving his fingers, does not wholly contradict Plaintiff's sworn allegations that he was assaulted by Nurse Cheasman in a manner that was unrelated to the maintenance of prison discipline and order. Indeed, Plaintiff's medical records indicate that he continued to complain of hand pain for several subsequent medical visits, and that he specifically stated that a nurse had struck him with a bucket. Although Nurse Cheasman has affirmed that she never acted "wantonly or willfully against Plaintiff" and never sought to harm him (*see* Dkt. 59-4 at ¶¶ 24-25), Defendants' reliance upon Plaintiff's medical records fails to establish their entitlement to judgment as a matter of law, *see Abascal v. Fleckenstein*, No. 06-CV-349S, 2012 WL 638977, at *6 (W.D.N.Y. Feb. 27, 2012) (denying summary judgment where the plaintiff alleged that the correctional officer committed a brief, yet unprovoked assault, "unrelated to any effort to maintain or restore discipline," despite having only resulted in a minor injury); *see also Cole*, 2016 WL 5394752, at * 11 (acknowledging that "a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation," but recognizing that "when prison officials use force to cause harm maliciously and sadistically, contemporary standards of decency always are violated ... whether or not significant injury is evident" (quoting *Wright*, 554 F.3d at 268-69) ); *see generally Breen v. Garrison*, 169 F.3d 152, 153 (2d Cir. 1999) ("Where the parties' versions of facts differed markedly, '[t]he issue of excessive force was ... for the jury, whose unique task it was to determine the amount of excessive force used, the seriousness of the injuries, and the objective reasonableness of the officer's conduct.' ").

 **\*17**  Therefore, Defendants' motion for summary judgment is denied insofar as it seeks dismissal of Plaintiff's Eighth Amendment excessive force claim arising out of the incident taking place on November 21, 2010.

### 3. Alleged Use of Excessive Force on December 18, 2010

Plaintiff alleges that on December 18, 2010, Nurse Cheasman assaulted him by "slamming the hatch of Plaintiff's cell door on Plaintiff's left arm when Plaintiff was attempting to retrieve a cup that contained [his] medications." (Dkt. 46 at ¶ 247). However, a review of Plaintiff's medical records over the days that followed this alleged incident reveals that he did not complain of any pain in his left arm and was only treated for a sore throat. (Dkt. 59-10 at 100). The Court recognizes that there is authority supporting the proposition that "where undisputed medical records '*directly and irrefutably* contradict a plaintiff's descriptions of his injuries' attributed to an alleged use of excessive force, 'no reasonable jury could credit plaintiff's account of the happening.' " *Henry v. Brown*, No. 14-CV-2828 (LDH)(LB), 2016 WL 3079798, at *2 (E.D.N.Y. May 27, 2016) (quoting *Davis v. Klein*, No. 11-CV-4868 ENV, 2013 WL 5780475, at * 1 (E.D.N.Y. Oct. 25, 2013) ); *see also Felder v. Diebel*, No. 10-CV-343 JTC, 2012 WL 6690239, at *5 (W.D.N.Y. Dec. 21, 2012) (finding that the plaintiff's "medical records ... indicate no signs of injuries consistent with his allegations and no medical treatment," and concluding that "the amount of force used in this case was *de minimis*").

Nonetheless, the instant matter presents the unique scenario where a medical staff member is charged with the use of excessive force. Under these circumstances, the person alleged to have committed the unconstitutional act is potentially also responsible for recording and maintaining the very progress notes relied upon by Defendants in arguing that any amount of force used must have been *de minimis*. The Court cannot decipher the identity of the medical personnel who recorded the progress notes relevant to the December 18, 2010, incident simply by reading the signature transcribed therein. Put another way, Defendants have failed to provide a persuasive reason to dissociate Nurse Cheasman, a member of the medical staff, from the rest of the medical personnel charged with recording and maintaining the medical progress notes at issue. [11] As a result, Defendants have not carried their burden of demonstrating the absence of a triable issue of fact regarding the excessive force claims asserted against Nurse Cheasman.

11    This observation differs from general claims that medical personnel falsified medical records to minimize any injuries or illnesses. Such speculation is insufficient to defeat a motion for summary judgment. *See, e.g., Slater v. Lacapriccia*, No. 13-CV-1079S, 2018 WL 437931, at *6 n.8 (W.D.N.Y. Jan. 16, 2018) ("Slater contends that [the d]efendants and other medical providers falsified his medical records by not accurately

Case 9:21-cv-00372-MAD-TWD    Document 61    Filed 06/22/23    Page 134 of 218

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

recording his complaints and minimizing his conditions. But Slater has presented no evidence to support this allegation, which is essentially a denial of [the d]efendants' evidence." (citation omitted) ). Here, because Nurse Cheasman is alleged to have herself committed an act of excessive force against Plaintiff—and because the Court is required to view Plaintiff's sworn allegations in the light most favorable to him—the Court is not prepared to give dispositive weight to the very medical progress notes that Nurse Cheasman is arguably tasked with maintaining. In other words, Defendants cannot simply point to the absence of any medical evidence where those same medical records are kept and maintained by the person charged with the use of unconstitutional force. This is, by itself, insufficient to carry Defendants' burden on a motion for summary judgment.

**\*18** Therefore, Defendants' motion for summary judgment is denied insofar as it seeks dismissal of Plaintiff's Eighth Amendment excessive force claim arising out of the incident taking place on December 18, 2010.

### 4. Alleged Use of Excessive Force on September 27, 2011

Plaintiff alleges that on September 27, 2011, C.O. Countryman violently assaulted him in the presence of Nurse Holm, Dr. Weinstock, and correctional sergeant Remy Babineaux ("Sgt. Babineaux"). (Dkt. 93-5 at ¶ 34). Plaintiff has submitted use of force reports that were completed after the alleged incident took place. (*See, e.g.*, Dkt. 93-6 at 7). Furthermore, the medical records indicate that force was used to restrain Plaintiff, and that he sustained minor injuries. (Dkt. 59-10 at 44). Clearly some degree of force was used on this occasion, and thus, questions of fact exist as to "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7; *see Henry v. City of New York*, No. 02 Civ. 4824, at \*6, 2003 WL 22077469 (S.D.N.Y. Sept. 8, 2003) ("[W]here there is a factual dispute about the circumstances surrounding ... the degree of force used, the Second Circuit requires a jury determination of the reasonableness of that force."). Therefore, Defendants' motion for summary judgment is denied to the extent it seeks to dismiss any excessive force claim arising from the events taking place on September 27, 2011.

### E. Other Eighth Amendment Claims

To the extent Plaintiff's allegations also raise several other claims falling within the broader category of "cruel and unusual punishment," those claims are dismissed—with one exception, related to lighting as discussed below. For example, Plaintiff alleges that he was only provided with one clean bed sheet instead of two clean bed sheets for two weeks. (Dkt. 46 at ¶¶ 339-40). However, "such a temporary and minimal deprivation is *de minimis* at best, and as such does not rise to constitutional proportions." *Ahlers v. Nowicki*, No. 9:12-CV-0539 (DNH/RFT), 2014 WL 1056935, at \*5 (N.D.N.Y. Mar. 18, 2014) (where the plaintiff claimed "he was forced to sleep on dirty sheets for approximately four nights"). In addition, Plaintiff alleges that he was not afforded adequate access to certain reading materials and the general library cart while he was housed in the SHU (Dkt. 46 at ¶ 202), but this assertion fails to state an Eighth Amendment claim, *see Lunney v. Brureton*, No. 04 Civ. 2438 LAK GWG, 2005 WL 121720, at \*9 (S.D.N.Y. Jan. 21, 2005) (rejecting the plaintiff's claim that "the general library court was not 'properly stocked' as it was 'void of magazines, newspapers and periodicals' ... because magazines, newspapers and periodicals are not considered one of life's 'basic necessities' within the meaning of the Eighth Amendment" (collecting cases) ), *report and recommendation adopted*, 2005 WL 433285 (S.D.N.Y. Feb. 23, 2005).

Although Plaintiff sets forth general and conclusory allegations that he was deprived of recreational privileges (Dkt. 46 at ¶¶ 443, 459), he only once specifically alleges that correctional officer Eric Farley ("C.O. Farley") actually "denied [him] his daily access to the recreation yard for three days" (*id.* at ¶ 297). "Because exercise is one of the basic human needs protected by the Eighth Amendment, a plaintiff may prevail on an Eighth Amendment claim for deprivation of exercise by alleging that defendants were deliberately indifferent to a sufficiently serious deprivation of exercise." *Dillon v. City of New York*, No. 12 Civ. 6746 (LAP), 2013 WL 3776252, at \*3 (S.D.N.Y. July 18, 2013). "However, not every deprivation of exercise amounts to a constitutional violation. Rather, a plaintiff must show that he was denied all meaningful exercise for a substantial period of time." *Williams v. Goord*, 142 F. Supp. 2d 416, 425 (S.D.N.Y. 2001). Assuming C.O. Farley denied Plaintiff recreational access for three days, such a minor deprivation of these privileges does not state a viable Eighth Amendment cause of action. *See Davidson v. Coughlin*, 968 F. Supp. 121, 131 (S.D.N.Y. 1997) (finding that the denial of "all outdoor exercise" for "fourteen days in a row" does not "implicate

2019 WL 1230778

Eighth Amendment concerns"); *Chappie v. Coughlin*, 92 CIV. 8629 (TPG), 1996 WL 507323, at *2 (S.D.N.Y. Sept. 5, 1996) (finding that the deprivation of recreational privileges for three days does not violate the Eighth Amendment); *see also Calderon v. Wheeler*, No. 9:06-CV-0963 (GTS/DEP), 2009 WL 2252241, at *14 (N.D.N.Y. July 28, 2009) ("Deprivations of exercise for limited periods have been found in several instances not to support a constitutional claim under the Eighth Amendment."); *Ford v. Phillips*, No. 05 CIV. 6646 (NRB), 2007 WL 946703, at *9 (S.D.N.Y. Mar. 27, 2007) ("[A]s a matter of law, minor and temporary deprivations of property, showers and recreation do not violate the Eighth Amendment."); *Hattley v. Goord*, No. 02 Civ. 2339(WHP) (RLE), 2003 WL 1700435, at *8 (S.D.N.Y. Mar. 27, 2003) (noting that one hour of recreation per day and 23 hours of confinement "are the normal conditions of an SHU").

 **\*19** Plaintiff also makes various allegations regarding the lighting conditions at Five Points. In particular, Plaintiff alleges that he was subject to 24-hour illumination of his prison cell on several occasions. (*See, e.g.*, Dkt. 46 at ¶¶ 208, 273, 281). "Requiring inmates to live in constant illumination can[,] ... under certain circumstances, rise to the level of an Eighth Amendment violation." *Jones v. Rock*, No. 9:12-CV-0447 (NAM/TWD), 2013 WL 4804500, at *10 (N.D.N.Y. Sept. 6, 2013); *see Holmes v. Fischer*, No. 09-CV-00829S(F), 2016 WL 552962, at *17 (W.D.N.Y. Feb. 10, 2016) (same). "Indeed, the Second Circuit has recognized that sleep deprivation due to constant illumination can be [a] sufficiently serious condition[] that jeopardizes a prisoner's health." *Collins v. Fischer*, No. 15-CV-103 (KMK), 2018 WL 1626528, at *6 (S.D.N.Y. Mar. 30, 2018) (citing *Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013) ("[S]leep is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment.") ). "Nevertheless, 'to succeed on a claim of illegal illumination, [a] plaintiff must produce evidence that the constant illumination had harmful effects on his health beyond mere discomfort.' " *Holmes*, 2016 WL 552962, at *17 (quoting *Vasquez v. Frank*, No. 05-C-528-C, 2007 WL 3254702, at *5 (W.D. Wis. Nov. 2, 2007), *aff'd*, 290 F. App'x 927 (7th Cir. 2008) ).

Plaintiff alleges that the constant illumination of his prison cell caused him to suffer eye problems, headaches, sleeplessness, and depression. (*See, e.g.*, Dkt. 46 at ¶¶ 181, 191, 208, 256, 281). In particular, he alleges three specific occasions where his prison cell was illuminated for extended durations. Plaintiff asserts that C.O. Farley ordered the "light to remain on in [his] cell" for an unspecified period of time

on October 1, 2010, and that correctional lieutenant Charles Coventry ("Lieutenant Coventry") kept his cell light on "for approximately 24 hours" on November 11, 2010. (*See id.* at ¶¶ 191, 208). Notably, Plaintiff further alleges that on January 14, 2011, C.O. Farley "altered his cell light so that it remained on 24 hours a day" (*id.* at ¶ 273), causing Plaintiff to be "unable to sleep for close to two weeks because his cell light was on day and night" (*id.* at ¶ 274).

"The decisions evaluating Eighth Amendment claims based on continuous lighting in the prison setting are very 'fact-driven,' generally turning on the degree of illumination, the duration of the inmate's exposure, the extent of harm it causes, and the penological justification for the lighting." *Quick v. Graham*, No. 9:12-CV-1717 (DNH/ATB), 2016 WL 873853, at *5 (N.D.N.Y. Jan. 8, 2016) (quoting *Booker v. Maly*, No. 9:12-CV-246 (NAM/ATB), 2014 WL 1289579, at * 18-19 (N.D.N.Y. Mar. 31, 2014), *aff'd*, 590 F. App'x 82 (2d Cir. 2015) ), *report and recommendation adopted*, 2016 WL 879310 (N.D.N.Y. Mar. 7, 2016), *vacated* (Mar. 7, 2016), *and report and recommendation adopted*, 2016 WL 1261107 (N.D.N.Y. Mar. 30, 2016). Defendants have not submitted any evidence disputing the fact that Plaintiff was subjected to periods of 24-hour prison cell illumination. Instead, Defendants argue that Plaintiff has failed to set forth any injury caused by these lighting conditions that rises to the level of an Eighth Amendment violation. (*See* Dkt. 59-2 at 33-34). In several cases where summary judgment was deemed appropriate, the court relied upon the low wattage of the light bulbs illuminating the inmate's prison cell. *See, e.g., Booker*, 2014 WL 1289579, at *18 & n.27 (noting that "a 3-watt LED bulb is much less bright than the 9 or 13-watt illumination that was found acceptable" in other cases); *McGee v. Gold*, No. 1:04-CV-335, 2010 WL 5300805, at *5 (D. Vt. Aug. 3, 2010) ("The record indicates that Vermont prisons are using compact fluorescent lighting between 5 and 8 watts, fluorescent bulbs between 7 and 8 watts, and 10-watt incandescent bulbs. These intensities are in a range that courts have generally found permissible under the Constitution." (collecting cases) ) (footnote omitted), *report and recommendation adopted sub nom. McGee v. Pallito*, No. 1:04-CV-00335, 2010 WL 5389996 (D. Vt. Dec. 20, 2010), *vacated on other grounds and remanded sub nom. Kimber v. Tallon*, 556 F. App'x 27 (2d Cir. 2014) (finding class counsel's representation deficient). By contrast, Defendants have not provided any indication of the intensity of the cell lights installed at Five Points.

Case 9:21-cv-00372-MAD-TWD    Document 61    Filed 06/22/23    Page 136 of 218

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

**\*20** The Court recognizes that Plaintiff's medical records disclose very little to suggest that his cell lights caused any alleged ailments. Nevertheless, Plaintiff appears to have complained of blurry or impaired vision on several occasions (*see, e.g.*, Dkt. 59-10 at 2-3, 48, 59, 108, 112), and he associated these symptoms with his cell lights at least twice, indicating that the "lights hurt[ ] his eyes," and that the "lights ... annoy me" (*id.* at 50, 99). In fact, Plaintiff lodged the former complaint on January 16, 2011, just two days after C.O. Farley allegedly "altered his cell light so that it remained on 24 hours a day." (Dkt. 46 at ¶ 273; Dkt. 59-10 at 50). Although other causes could have resulted in or at least contributed to Plaintiff's alleged sleeplessness and eye problems, Defendants have failed to submit evidence supporting such a conclusion on their motion. *Cf. McGee,* 2010 WL 5300805, at *7 ("The affidavit of Dr. Burroughs-Biron establishes that there are a number of potential causes for the symptoms being alleged."). Furthermore, in the absence of evidence demonstrating the intensity of the lighting or the need for such illumination to sustain a secure prison environment, the fact that Plaintiff's medical records do not conclusively establish that his injuries were caused by the prison cell lights is not determinative. *Cf. Huertas v. Sec'y Penn. Dep't of Corr.*, 533 F. App'x 64, 68 & n.7 (3d Cir. 2013) (noting that the plaintiff failed to provide "competent medical evidence" demonstrating that his injuries were caused "because of the lighting" conditions, but relying on the defendants' explanation "that the constant illumination is required for security purposes" and the lack of evidence that "the lights were kept on for any impermissible purpose" in affirming summary judgment); *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 368 (N.D.N.Y. 2010) (distinguishing case law where the defendants "failed to cite any legitimate penological justification for their conduct" and relying on record submissions regarding safety and security concerns to grant summary judgment on the plaintiff's "retaliatory lighting" claim).

Therefore, because Plaintiff alleges that he suffered periods of 24-hour illumination of his prison cell, which resulted in headaches, eye problems, depression, and the inability "to sleep for close to two weeks" (Dkt. 46 at ¶ 274; *see id.* at ¶¶ 181, 191, 208, 256, 273, 281), in the absence of admissible evidence refuting these sworn statements, Defendants have failed to establish their entitlement to judgment as a matter of law, *see Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996) (denying summary judgment, despite the defendants' supporting evidence to the contrary, where the plaintiff "alleged that large florescent lights directly in front of and

behind his cell shone into his cell 24 hours a day, so that his cell was 'constantly illuminated, and [he] had no way of telling night or day,' and that this condition caused him 'grave sleeping problems' and other mental and psychological problems"), *opinion amended on denial of reh'g*, 135 F.3d 1318 (9th Cir. 1998); *cf. Murray v. Edwards Cty. Sheriffs Dep't*, 248 F. App'x 993, 998 (10th Cir. 2007) (distinguishing *Keenan* because the plaintiff's "own testimony indicated that the lights *only sometimes* disturbed his sleep and that he suffered headaches as a result of his loss of sleep *only every now and then*") (emphases added). Accordingly, Plaintiff's Eighth Amendment conditions-of-confinement claim for the unlawful illumination of his prison cell may proceed against C.O. Farley and Lieutenant Coventry.

Plaintiff further asserts that various correctional officials allegedly entered his prison cell and unlawfully searched his materials on several occasions. (Dkt. 46 at ¶¶ 130, 183-84, 218, 273, 436). However, Plaintiff does not appear to allege that any of these searches occurred with greater frequency than twice in a single month. *See Lashley v. Wakefield*, 367 F. Supp. 2d 461, 471 (W.D.N.Y. 2005) ("The number of searches during the five or six month time period is not excessive, in light of the policy at Five Points that cells are searched once or twice a month."); *Little v. Mun. Corp.*, 51 F. Supp. 3d 473, 498 (S.D.N.Y. 2014) ("[T]he three searches specifically alleged, as well as the general allegation that Plaintiffs were subject to 'intense discriminatory search[e]s, ['] are insufficient to satisfy the objective element of an Eighth Amendment claim."). Plaintiff's conclusory assertions that the searches took place "without cause" and "to harass" Plaintiff are insufficient to raise a triable issue of fact, and thus, Defendants are granted summary judgment on this claim as well. *Polk v. Olles*, No. 12-CV-01106S(F), 2015 WL 10381751, at *8 (W.D.N.Y. Dec. 29, 2015) ("Plaintiff offers only conclusory assertions in support of his position that the cell search was other than a routine random search, which statements are insufficient to avoid summary judgment."), *report and recommendation adopted*, 2016 WL 777313 (W.D.N.Y. Feb. 29, 2016).

## V. Plaintiff's Common Law Causes of Action

**\*21** Plaintiff has also asserted common law causes of action for assault, battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and false imprisonment. (Dkt. 46 at 99-101). Defendants have not set forth specific arguments addressing these claims. While assault and battery claims are treated similarly to a Fourth Amendment excessive force claim, *see Kavazanjian v. Rice*,

Case 9:21-cv-00372-MAD-TWD   Document 61   Filed 06/22/23   Page 137 of 218

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

No. 03-CV-1923 (FB) (SMG), 2008 WL 5340988, at *7 (E.D.N.Y. Dec. 22, 2008) ("[I]n effect, 'the test for whether a plaintiff can maintain [a state-law assault-and-battery] cause of action against law enforcement officials is ... the exact same test as the one used to analyze a Fourth Amendment excessive force claim.' " (quoting *Hogan v. Franco*, 896 F. Supp. 1313, 1315 n.2 (N.D.N.Y. 1995) ) ), an Eighth Amendment excessive force claim is not so analytically aligned with its common law counterparts, *see Davidson v. Brzezniak*, No. 95-CV-00204-RJA, 2011 WL 3236209, at *13 (W.D.N.Y. July 28, 2011) ("Although there is some overlap between the standards for assessing a prison official's liability for assault and battery under the common law and liability under the Eighth Amendment for use of excessive force, the standards are not identical."); *Dufort v. Burgos*, No. 04-CV-4940 (FB) (LB), 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (same). As Judge Friendly explained several decades ago:

> Certainly the constitutional protection [of the cruel and unusual punishment clause] is nowhere nearly so extensive as that afforded by the common law tort action for battery, which makes actionable any intentional and unpermitted contact with the plaintiff's person or anything attached to it and practically identified with it; still less is it as extensive as that afforded by the common law tort action for assault[.]

*Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973) (citation omitted), *rejected on other grounds by Graham v. Connor*, 490 U.S. 386 (1989); *see also Hernandez v. Lattimore*, 612 F.2d 61, 67 (2d Cir. 1979) ("Just as malpractice does not become a constitutional violation merely because the victim is a prisoner, so, too, not every assault and battery gives rise to a cause of action under the Eighth Amendment because the victim happens to be a prisoner." (citation omitted) ).

Since Defendants have set forth no specific arguments addressing any of these distinct causes of action, Defendants have failed to carry their burden of demonstrating their entitlement to judgment as a matter of law, and thus, Plaintiff's common law claims may proceed. *See, e.g., Guzman v. Sposato*, No. 13-CV-6829 (JMA) (AYS), 2018 WL 1597395, at *5 (E.D.N.Y. Mar. 31, 2018) (stating that while the defendants "have ... moved for summary judgment based

on qualified immunity," they have "not offered any specific argument as to why they are entitled to qualified immunity as to the excessive force claims," and concluding that the plaintiff's excessive force claims survive summary judgment); *Shao v. City Univ. of N.Y.*, No. 12-CV-1566 (RJS), 2014 WL 5038389, at *6 (S.D.N.Y. Sept. 30, 2014) (stating that while the defendants "purport to seek summary judgment with respect to all of [the p]laintiff's claims, [the d]efendants do not specifically address [the p]laintiff's hostile work environment claim in either their opening brief or reply brief," and finding that the defendants have failed to demonstrate that they are entitled to judgment as a matter of law on that claim); *Frederick v. Sheahan*, No. 6:10-CV-6527 (MAT), 2014 WL 3748587, at *9 (W.D.N.Y. July 29, 2014) ("At this juncture, the Court declines to grant summary judgment in Sgt. Holton's favor as to this claim, since he did not specifically address or move to dismiss the failure to supervise claim."); *see also Sprott v. Franco*, No. 94 Civ. 3818 (PKL), 1997 WL 79813, at *1 n.1 (S.D.N.Y. Feb. 25, 1997) (noting that the defendants "do not specifically argue for summary judgment with respect to plaintiff's § 1981 claim in their notice of motion or in their supporting memorandum of law," and stating that "[t]he Court will not consider this issue without the benefit of briefing from the parties"); *see generally Adeghe v. Janssen Pharm., Inc.*, No. 16 CIV. 2235 (LGS), 2017 WL 4839063, at *2 (S.D.N.Y. Oct. 24, 2017) (noting that the defendant "made no particularized arguments" as to certain claims in its initial motion for summary judgment and finding that the defendant's "new arguments to support summary judgment on the claims it had neglected to specifically address in its initial briefing ... need not be considered" on its motion for reconsideration).

## VI. First Amendment Retaliation Claims

**\*22**  Because of the "near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated, [courts in this Circuit] examine prisoners' claims of retaliation with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *see Khudan v. Lee*, No. 12-CV-8147 (RJS), 2016 WL 4735364, at *6 (S.D.N.Y. Sept. 8, 2016) ("Courts generally review claims of 'retaliation by prisoners "with skepticism" because of the ease with which a retaliation claim may be fabricated.' " (quoting *Bolton v. City of New York*, No. 13-CV-5749 RJS, 2015 WL 1822008, at *2 (S.D.N.Y. Apr. 20, 2015) ) ), *app. dismissed*, No. 16-3534, 2016 WL 10100723 (2d Cir. Dec. 8, 2016). Accordingly, retaliation claims must "be 'supported by specific and detailed factual allegations,' not stated 'in wholly

Case 9:21-cv-00372-MAD-TWD   Document 61   Filed 06/22/23   Page 138 of 218

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

conclusory terms.' " *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds by Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002) ).

To the extent Plaintiff alleges that certain defendants falsified his medical records or omitted certain information from them (*see, e.g.*, Dkt. 46 at ¶¶ 150, 156, 224, 233, 306-07, 313, 329), those allegations, standing alone, do not provide a basis to support a § 1983 cause of action, *see Micolo v. Fuller*, No. 6:15-CV-06374(MAT), 2016 WL 6404146, at *3 (W.D.N.Y. Oct. 28, 2016) (noting that "the only omission attributed to Jones is a failure to record all of [the p]laintiff's alleged injuries in the treatment note" and stating that "this alleged omission does not amount to a constitutional violation"); *Williams v. Bentivegna*, No. 14-CV-6105-CJS, 2015 WL 162994, at *7 (W.D.N.Y. Jan. 13, 2015) ("Williams' complaints that prescribed medication was not provided to him, or that the doctors wrote false information in his medical record, might amount to malpractice, but not a constitutional violation."); *see also Crenshaw v. Hartman*, 681 F. Supp. 2d 412, 415 (W.D.N.Y. 2010) ("The law is clear that 'the issuance of false misbehavior reports against an inmate by corrections officers is insufficient on its own to establish a denial of due process.' " (quoting *Sital v. Burgio*, 592 F. Supp. 2d 355, 357 (W.D.N.Y. 2009) ) ). Nonetheless, "[a] prisoner may be able to state a constitutional claim by alleging facts indicating that false charges were brought against him in retaliation for the prisoner's exercise of a constitutionally protected right, such as the filing of grievances." *Crenshaw*, 681 F. Supp. 2d at 415.

To prevail on a First Amendment retaliation claim, a prisoner must demonstrate that: "(1) he engaged in protected speech or activity; (2) the defendant took adverse action against him; and (3) there was a causal connection between the protected speech or activity and the adverse action." *Simmons v. Adamy*, 987 F. Supp. 2d 302, 306 (W.D.N.Y. 2013) (citing *Espinal v. Goord*, 558 F.3d 119, 227 (2d Cir. 2009) ).

Plaintiff alleges that several correctional officers filed false misbehavior reports against him in retaliation for his filing of grievances against them, and that certain medical personnel denied him appropriate care and medications in retaliation for the grievances he filed against them as well. (*See, e.g.*, Dkt. 46 at ¶¶ 215, 220, 272, 279, 328, 418, 420, 422, 424, 428, 430, 432, 434, 436, 438, 440, 442, 445, 450, 453, 456). "Because the filing of prison grievances is a protected activity, Plaintiff meets the first prong of the test." *Nelson v. McGrain*, No. 6:12-CV-6292 (MAT), 2015 WL 7571911,

at *1 (W.D.N.Y. Nov. 24, 2015) (citation omitted). "The Second Circuit has defined 'adverse action' in the prison context as 'retaliatory conduct "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " " *Adams v. Rock*, No. 9:12-CV-1400 (GLS/ATB), 2015 WL 1312738, at *10 (N.D.N.Y. Mar. 24, 2015) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) ). "[C]ourts have found that 'denial of medical evaluation, treatment, and adequate pain medication' can suffice to establish adverse action under a First Amendment retaliation analysis." *Castro v. Heath*, No. 9:12-CV-01250 (MAD), 2013 WL 5354241, at *10 (N.D.N.Y. Sept. 23, 2013) (quoting *Burton v. Lynch*, 664 F. Supp. 2d 349, 366 (S.D.N.Y. 2009) ); *see Williams v. Fisher*, No. 02 CIV. 4558(LMM), 2003 WL 22170610, at *11 (S.D.N.Y. Sept. 18, 2003) (finding the second element satisfied where the plaintiff alleged that medical staff revoked a "necessary medical rehabilitative treatment" as a result of the filing of a grievance). In addition, "[i]t is well settled that filing ... a false misbehavior report is an adverse action." *James v. Mosko*, No. 13-CV-5-LJV-MJR, 2016 WL 8671478, at *6 (W.D.N.Y. July 22, 2016) (citation omitted), *report and recommendation adopted*, 2017 WL 397474 (W.D.N.Y. Jan. 30, 2017); *Reed v. Doe No. 1*, No. 9:11-CV-0250 (TJM/DEP), 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) ("The filing of a false misbehavior report can qualify as an adverse action for purposes of a First Amendment retaliation." (citing *Gill*, 389 F.3d at 384) ), *report and recommendation adopted*, 2012 WL 4486085 (N.D.N.Y. Sept. 27, 2012); *Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010) ("Filing a false misbehavior report against Mateo ... would deter a similarly situated person of ordinary firmness from exercising his First Amendment rights."). Thus, Plaintiff has also sufficiently alleged an "adverse action," satisfying the second element of a First Amendment retaliation claim.

**\*23** However, Plaintiff has failed to raise a triable question of fact as to whether there is a causal connection between the filing of his grievances and the alleged adverse actions at issue.

> In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, a number of factors may be considered, including: (1) the temporal proximity between the protected activity and the alleged

2019 WL 1230778

retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation.

*Bunting v. Conway*, No. 04-CV-0731A (HKS), 2010 WL 5332280, at \*7 (W.D.N.Y. Nov. 1, 2010) (citing *Colon*, 58 F.3d at 872), *report and recommendation adopted*, 2010 WL 5313308 (W.D.N.Y. Dec. 20, 2010).

Given that many of the alleged adverse actions seem to have occurred within weeks or even days of Plaintiff's grievances, it appears that Plaintiff relies on the temporal proximity between the filing of his grievances and the alleged retaliatory acts to establish the necessary causal connection—although Plaintiff's opposition papers do not discuss this element in any great detail. (*See* Dkt. 93 at 51-54). However, while "the temporal proximity of the filing of the grievance" and an "adverse action" is "circumstantial evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment." *Williams*, 111 F. Supp. 2d at 290; *see Ayers v. Stewart*, 101 F.3d 687, 1996 WL 346049 (Table), at \*1 (2d Cir. 1996) (stating that the plaintiff's "reliance on circumstantial evidence of retaliation—namely, the proximity of the disciplinary action to his complaint where no misbehavior reports were previously filed against him—does not suffice to defeat summary judgment"); *see also Colon*, 58 F.3d at 873 ("If ... circumstantial evidence represented the sum total of Colon's proof, we might be inclined to affirm the grant of summary judgment based on the weakness of Colon's case."); *see generally Flaherty*, 713 F.2d at 13 (acknowledging the ease in which a plaintiff may manufacture a claim for retaliation, and stating that summary judgment is appropriate if the claim appears insubstantial). Furthermore, the sheer volume of grievances filed by Plaintiff diminishes the weight attributed to the temporal proximity of any of his retaliatory allegations. (*See* Dkt. 46 at ¶ 408 (alleging that Plaintiff filed about 155 grievances "from March 25, 2010 through June 5, 2011") ); *Andino v. Fischer*, 698 F. Supp. 2d 362, 385 (S.D.N.Y. 2010) ("While there is some proximity between the complaints and the alleged adverse actions, this results from the large number of complaints in a short period of time.").

In addition, Plaintiff accumulated a lengthy disciplinary record while incarcerated. It is undisputed that "[b]ecause Plaintiff had accumulated so much SHU time from incidents occurring prior to 2010, he did not serve" an SHU penalty imposed for an incident occurring in May 27, 2010, until over three years later in December 2013. (*See* Dkt. 59-1 at ¶ 22; Dkt. 93-1 at ¶ 22). The fact that Plaintiff was ultimately found guilty of at least some of the charged conduct asserted in many if not all of the misbehavior reports filed against him (*see* Dkt. 93 at 53; Dkt. 93-5 at ¶ 61; *see also* Dkt. 59-1 at ¶ 19; Dkt. 93-1 at ¶ 19)—and that those findings were subsequently affirmed (*see* Dkt. 93 at 53; Dkt. 93-5 at ¶ 72)—"certainly suggests that there was a valid basis for the issuance of the report, and [P]laintiff's conclusory assertion that it was retaliatory in nature fails to state a plausible claim," *Crenshaw v. Hartman*, 681 F. Supp. 2d 412, 416 (W.D.N.Y. 2010); *see White v. Bergenstock*, No. 9:08-CV-717, 2009 WL 4544390, at \*7 (N.D.N.Y. Nov. 25, 2009) (stating that since "the charges in the misbehavior report have never been overturned[,] ... there is no sufficient allegation that the misbehavior report was false in any material respect"); *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 478 (N.D.N.Y. 2009) (noting that the plaintiff "has alleged that he was ultimately convicted of the disciplinary charge leveled" against him and that "the conviction was affirmed on appeal, plausibly suggesting that what caused him to receive the referenced misbehavior report was his own misconduct." Furthermore, a large number of Plaintiff's allegations pertaining to the retaliatory conduct purportedly advanced against him are alleged "upon information and belief." (*See, e.g.*, Dkt. 46 at ¶¶ 220, 241, 248, 272, 281, 328, 415, 418, 420, 422, 424, 428, 430, 432, 434, 438, 440, 442, 445, 450, 453, 456). "[C]onclusory allegations 'upon information and belief,' as [P]laintiff advances here, cannot defeat summary judgment." *Little v. Massari*, 526 F. Supp. 2d 371, 376-77 (E.D.N.Y. 2007); *see Estate of Gustafson ex rel. Reginella v. Target Corp.*, 819 F.3d 673, 677 n.4 (2d Cir. 2016) ("The verified answer is stated only '[u]pon information and belief,' rather than on the basis of personal knowledge, and therefore may not be considered in opposition to summary judgment." (alternation in original) (citation omitted) ); *Dellacava v. Painters Pension Fund of Westchester & Putnam Ctys.*, 851 F.2d 22, 26 (2d Cir. 1988) (stating that an explanation based " 'upon information and belief' ... could not have been considered in the summary judgment motion"); *cf. Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004) ("[A] verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, *and not merely on information and belief* has the effect of an affidavit and may be relied on to oppose summary judgment." (emphasis added) ).

**Abreu v. Farley, Not Reported in Fed. Supp. (2019)**

2019 WL 1230778

**\*24** The Court is cognizant of the Second Circuit's instruction to view claims of First Amendment retaliation in this context with care and skepticism given their potential for abuse. *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). Certainly, the number of grievances and sick-call requests filed by Plaintiff provide suitable fodder for the manufacture of numerous claims of retaliation. *See generally Davidson v. Bartholome*, 460 F. Supp. 2d 436, 444 (S.D.N.Y. 2006) (noting that the "possibility of abuse" of a retaliation claim is "ever present," but was "especially apparent in the instant case" where the plaintiff had "filed approximately 150 previous lawsuits"). Indeed, in light of Plaintiff's failure to raise a triable issue of fact pertaining to his claim for deliberate medical indifference, as previously discussed, Plaintiff cannot sustain a viable claim for the retaliatory denial of constitutionally adequate medical treatment. *See Bilal v. White*, 494 F. App'x 143, 147 (2d Cir. 2012) ("As for the delay in Bilal's receipt of prescription pain medication, we conclude, for substantially the same reasons that we reject Bilal's Eighth Amendment claim, that the record presented fails to bring Bilal's retaliation claim within 'the ambit of constitutional protection.' " (quoting *Dawes*, 239 F.3d at 493) ); *Vail v. Lashway*, No. 9:12-CV-1245 (GTS/RFT), 2014 WL 4626490, at \*19 (N.D.N.Y. Sept. 15, 2014) (dismissing a retaliation claim where "there is no evidence that [the p]laintiff was ever deprived of adequate medical care," and stating that the court's "conclusion in this regard is, on its own, likely sufficient to grant summary judgment against [the p]laintiff's medical retaliation claims"); *Cole v. Levitt*, No. 07-CV-00767(M), 2009 WL 4571828, at \*10 (W.D.N.Y. Dec. 4, 2009) ("Having concluded that Dr. Levitt was not deliberately indifferent to plaintiff's medical needs, I likewise conclude that there is no evidentiary basis to conclude that her conduct was retaliatory."); *see generally Adams*, 2015 WL 1312738, at \*10 (stating that "[e]ven where a complaint or affidavit contains specific assertions, the allegations may still be deemed conclusory if [they are] ... largely unsubstantiated by any other direct evidence" (quotation omitted) ).

Therefore, for the foregoing reasons, Plaintiff's First Amendment retaliation claim is dismissed.[12]

---

[12] To the extent Plaintiff also alleges that certain correctional officers and medical personnel made hostile remarks or threats against him on various occasions (*see, e.g.*, Dkt. 46 at ¶¶ 145, 164, 212, 215, 225, 248, 286, 288, 348), these allegations

fail to give rise to a viable claim for retaliation, *see Roseboro v. Gillespie*, 791 F. Supp. 353, 373 (S.D.N.Y. 2011) (finding that the plaintiff's retaliation "claim fails because an inmate 'has no right to redress simply because [an officer] made a hostile or derogatory comment about him.' " (quoting *Davidson v. Bartholome*, 460 F. Supp. 2d 436, 446 (S.D.N.Y. 2006) (dismissing retaliation cause of action where the defendant "became hostile and began cursing" at the plaintiff and told the plaintiff "that he was going to issue him a 'false' misbehavior ticket") ) ); *see also Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) ("The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly dismissed").

## VII. Plaintiff's Right to Access to the Courts

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003). The right of access to the courts "requires state prisons 'to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.' " *Bellezza v. Holland*, No. 09 CIV. 8434, 2011 WL 2848141, at \*4 (S.D.N.Y. July 12, 2011) (quoting *Bounds v. Smith*, 430 U.S. 817, 825 (1977) ). "To state a claim for denial of access to the courts—in this case due to interference with legal mail—a plaintiff must allege that the defendant 'took or was responsible for actions that hindered [a plaintiff's] efforts to pursue a legal claim.' " *Davis*, 320 F.3d at 351 (quoting *Monsky v. Moraghan*, 127 F.3d 243, 247 (2d Cir. 1997) ). "[P]risoners who bring a claim for the violation of a derivative right of access to the courts must demonstrate 'actual injury' in order to have standing." *Collins v. Goord*, 581 F. Supp. 2d 563, 573 (S.D.N.Y. 2008). "In other words[,] 'the plaintiff must show that a non-frivolous legal claim had been frustrated or was being impeded due to the actions of prison officials.' " *Cancel v. Goord*, No. 00 CIV 2042 LMM, 2001 WL 303713, at \*4 (S.D.N.Y. Mar. 29, 2001) (quoting *Warburton v. Underwood*, 2 F. Supp. 2d 306, 312 (W.D.N.Y. 1998) ).

**\*25** Nowhere in Plaintiff's submissions does he provide factual proof that a non-frivolous legal claim was frustrated due to the alleged interference with his legal mail. Instead, Plaintiff only alleges, in conclusory form, that "[a]s a result of the failure of [certain of his] legal documents to reach the

Case 9:21-cv-00372-MAD-TWD   Document 61   Filed 06/22/23   Page 141 of 218

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

court, Plaintiff's rights were violated in the associated court proceedings." (Dkt. 46 at ¶ 352). Plaintiff fails to elaborate upon this general allegation in any respect. Accordingly, because Plaintiff has failed to raise a triable issue of fact as to whether he suffered an "actual injury" from any alleged interference with his legal mail, Plaintiff's claim is dismissed. [13]

[13]    To the extent Plaintiff also alleges that he was denied access to the courts due to constitutionally inadequate access to law library resources (*see, e.g.*, Dkt. 46 at ¶¶ 211, 354, 363, 368, 404, 407), this too fails to raise a triable issue of fact because Plaintiff has failed to establish that he suffered an "actual injury" as a result of any of these purported deprivations, *see Benjamin v. Kerik*, 102 F. Supp. 2d 157, 162 (S.D.N.Y. 2000) (noting that the Supreme Court has "held that prisoners do not have a freestanding right to law libraries or legal assistance," and that inmates "must show actual injury" (citing *Lewis v. Casey*, 518 U.S. 343, 353 n.4 (1996) (rejecting "a freestanding right to libraries," and stating that the "[d]enial of access to the courts could not possibly cause the harm of inadequate libraries, but only the harm of lost, rejected, or impeded legal claims") ) ), *aff'd sub nom. Benjamin v. Fraser*, 264 F.3d 175 (2d Cir. 2001); *see also Smith v. Donaher*, No. 12-CV-6035-CJS, 2013 WL 2531750, at *9 (W.D.N.Y. June 10, 2013) ("Plaintiff was not denied access to the courts merely because of the amount of time that it took to make the copies."); *Muhammad v. Hodge*, No. 07-CV-0232(SR), 2010 WL 1186330, at *5 (W.D.N.Y. Mar. 24, 2010) ("Courts in the Second Circuit have repeatedly held that a prisoner does not have a constitutional right to free copies....").

## VIII. Failure to Provide Kosher Meals in Violation of the First Amendment's Free Exercise Clause

"The Free Exercise Clause of the First Amendment is an 'unflinching pledge to allow our citizenry to explore ... religious beliefs in accordance with the dictates of their conscience.' " *Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir. 1999) (quoting *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984) ). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003); *see Jackson*, 196 F.3d

at 320 ("An inmate is therefore entitled to a reasonable accommodation of his religious beliefs."). "The reach of the free exercise clause extends to 'an inmate's diet and participation in religious meals.' " *Riehl v. Martin*, No. 9:13-CV-439 GLS/TWD, 2014 WL 1289601, at *8 (N.D.N.Y. Mar. 31, 2014) (quoting *Johnson v. Guiffere*, No. 9:04-CV-57, 2007 WL 3046703, at *4 (N.D.N.Y. Oct. 17, 2007) ); *see Bass v. Coughlin*, 976 F.2d 98, 99 (2d Cir. 1992) ("[P]rison officials must provide a prisoner a diet that is consistent with his religious scruples."). The right to participate in religious meals includes the right to a kosher diet. *See Thaxton v. Simmons*, No. 9:10-CV-1318 MAD/RFT, 2012 WL 360104, at *5 (N.D.N.Y. Jan. 5, 2012) ("Among those protected rights is the right to receive a kosher diet."), *report and recommendation adopted*, 2012 WL 360141 (N.D.N.Y. Feb. 2, 2012).

"Whether or not brought by prisoners, free exercise claims often test the boundaries of the judiciary's competence, as courts are 'singularly ill-equipped to sit in judgment on the verity of an adherent's religious beliefs.' " *Ford*, 352 F.3d at 588 (quoting *Patrick*, 745 F.2d at 157). "An individual claiming violation of free exercise rights need only demonstrate that the beliefs professed are 'sincerely held' and in the individual's 'own scheme of things, religious.' " *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir. 2002) (quoting *Patrick*, 745 F.2d at 157). However, "scrutiny of the prisoner's sincerity is often essential in 'differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud.' " *Ford*, 352 F.3d at 588 (quoting *Patrick*, 745 F.2d at 157).

**\*26** Plaintiff has alleged that his "religious belief is Jewish" and that his "religion is jews too." (Dkt. 93-5 at ¶ 87; *see* Dkt. 46 at ¶ 182 (alleging that Plaintiff had informed correctional sergeant T. Barber ("Sgt. Barber") "that he was Jewish") ). Plaintiff claims that he was supposed to receive Kosher loaves, but instead he was being fed non-Kosher loaves because Defendants did not care about his religious beliefs. (*See* Dkt. 93-5 at ¶ 103). However, "[n]o where [sic] in the Complaint does Plaintiff allege the sincerity of his beliefs and what role the kosher diet plays therein." *Thaxton*, 2012 WL 360104, at *6; *see Meadows v. Lesh*, No. 10-CV-00223 M, 2010 WL 3730105, at *3 (W.D.N.Y. Sept. 17, 2010) (acknowledging that the sincerity of a religious belief is usually a factual issue, but stating that "the complaint must still assert sufficient allegations necessary to establish that plaintiff's claim is based upon a sincerely

2019 WL 1230778

held religious belief"). Indeed, "[m]ere membership in an established religion is not enough to show that a prisoner has sincerely held religious beliefs." *Thaxton*, 2012 WL 360104, at *6 (citing *Ford*, 352 F.3d at 588). Although Plaintiff alleges that he was not provided Kosher loaves, he fails to allege that his adherence to a Kosher diet is a "sincerely held" religious belief, nor does he explain why a Kosher diet is important to his religion. *See Woodward v. Ali*, No. 9:13-CV-1304 LEK/RFT, 2015 WL 5711899, at *8 (N.D.N.Y. Sept. 29, 2015) (noting that the plaintiff "has not explained why the removal of his name from the Ramadan feed-up list and denial of two meals substantially burdened his exercise of religious beliefs" and finding that "in the absence of any admissible facts with respect to [the p]laintiff's personally held beliefs or how [the d]efendants' conduct impacted those beliefs, we find that [the p]laintiff has failed to meet his burden of showing that his professed religious beliefs are sincerely held and were infringed"); *Turner v. Oakland Police Officers*, No. C 09-03652 SI, 2010 WL 816797, at *4 (N.D. Cal. Mar. 9, 2010) (dismissing the plaintiff's free exercise claim where, "[a]bsent some description of plaintiff's religion, his religious practices, and the role and importance of blessing oil in the religion, it is impossible to determine whether plaintiff's beliefs are sincerely held and whether blessing oil is rooted in that religious belief"); *Evans v. Albany Cty. Corr. Facility*, No. 9:05-CV-1400 GTS/DEP, 2009 WL 1401645, at *8 (N.D.N.Y. May 14, 2009) (granting summary judgment on a free exercise claim where the plaintiff failed to "allege[ ] or establish[ ] how receiving non-vegetarian meals infringed on his sincerely held religious beliefs" (citing *Benjamin v. Coughlin*, 905 F.2d 571, 580 (2d Cir. 1990) ) ); *see also Odom v. Dixon*, No. 04-CV-889F, 2008 WL 466255, at *6 (W.D.N.Y. Feb. 15, 2008) (describing a plaintiff's burden of demonstrating his religious beliefs are sincerely held as "a threshold requirement for any religious freedom claim under either the First Amendment or the [Religious Land Use and Institutionalized Persons Act]").

Recognizing that "the issue of sincerity can rarely be determined on summary judgment," *Snyder v. Murray City Corp.*, 124 F.3d 1349, 1353 (10th Cir. 1997), *opinion vacated in part on reh'g en banc on other grounds*, 159 F.3d 1227 (10th Cir. 1998), and that "courts are not permitted to inquire into the centrality of a professed belief to the adherent's religion or to question its validity in determining whether a religious practice exists," *Fifth Ave. Presbyterian Church*, 293 F.3d at 574, the Court nevertheless concludes that Plaintiff has failed to raise a triable issue of fact as to whether his beliefs are sincerely held, *see generally Ochoa v. Cornell*, No. 9:05-CV-1068 GLSRFT, 2007 WL 3049889, at *7 (N.D.N.Y. Oct. 18, 2007) ("Ochoa fails to allege the nature and content of his beliefs, how he came to hold them, and what difference they have made in his life. Ochoa does not describe his participation in other religious activities such as Sabbath observances, dietary strictures, religious meetings, holy feast days, or other significant religious activities to which he purportedly adheres to so that we may comfortably determine that he has pled enough facts to establish that his beliefs are both religious and sincerely held."). Accordingly, Plaintiff's First Amendment Free Exercise Clause claims are dismissed. *See Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988) ("Because Farid has neither alleged nor submitted any proof that he sincerely holds to any religious belief that mandates the use of Tarot cards, we conclude that summary judgment was appropriate on the free exercise claim.").

## IX. Plaintiff's Equal Protection Clause and Section 1985 Causes of Actions

### A. Equal Protection Claim

"The Equal Protection Clause of the Fourteenth Amendment 'is essentially a direction that all persons similarly situated should be treated alike.' " *Barnes v. Ross*, 926 F. Supp. 2d 499, 506 (S.D.N.Y. 2013) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985) ). "In order to prove a violation of the Equal Protection Clause, a plaintiff must demonstrate evidence of 'purposeful discrimination ... directed at an identifiable or suspect class.' " *Harnage v. Caldonero*, No. 3:16CV1876(AWT), 2017 WL 2190057, at *3 (D. Conn. May 18, 2017) (quoting *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) ).

Plaintiff has failed to allege membership in a protected class and has submitted no evidence demonstrating that he was treated disparately from similarly situated individuals. Indeed, it is well-established that "[p]risoners are not a part of a suspect class." *Tavares v. Amato*, 954 F. Supp. 2d 79, 99 (N.D.N.Y. 2013) (citing *Scott v. Dennison*, 739 F. Supp. 2d 342, 362 (W.D.N.Y. 2010) ); *see Lee v. Governor of State of N.Y.*, 87 F.3d 55, 60 (2d Cir. 1996) ("[P]risoners either in the aggregate or specified by offense are not a suspect class...."); *see also Harvey v. Harder*, No. 9:09-CV-154 TJM/ATB, 2012 WL 4093792, at *7 n.12 (N.D.N.Y. July 31, 2012) (noting that the assertion of an equal protection claim would be meritless because the plaintiff "has not alleged that any other inmates, similarly situated to plaintiff, were treated differently regarding classification"), *report and recommendation adopted*, 2012 WL 4093760 (N.D.N.Y.

Case 9:21-cv-00372-MAD-TWD   Document 61   Filed 06/22/23   Page 143 of 218

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

Sept. 17, 2012). Plaintiff's allegations of discrimination are based "upon information and belief" and acts of verbal harassment or are otherwise too conclusory to demonstrate a triable issue of fact. (*See, e.g.*, Dkt. 46 at ¶¶ 1, 103, 172, 197, 415); *Giano*, 54 F.3d at 1057 (concluding that the plaintiff's "equal protection claim fails" where he "presents no evidence" of discrimination "against a particular class of inmates"); *see generally DeJesus v. Tierney*, No. 9:04-CV-298, 2006 WL 839541, at * 11 (N.D.N.Y. Mar. 28, 2006) (stating that it is "well settled that verbal harassment itself does not rise to the level of a constitutional violation," and that "[v]erbal abuse, vulgarity, and even threats are insufficient to rise to the level of constitutional violations").

**\*27** "When a plaintiff alleges an equal protection violation (without also alleging discrimination based upon membership in a protected class), the plaintiff must plausibly allege that he or she has been intentionally treated differently from others similarly situated and no rational basis exists for that different treatment." *Progressive Credit Union v. City of New York*, 889 F.3d 40, 49 (2d Cir. 2018). This category of equal protection violation is commonly known as a "class of one" claim. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, (2000). "[C]lass-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006). In other words, the Plaintiff must be "*prima facie* identical" to the person or persons who have received different treatment. *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005) (quotation omitted), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008).

Overall, "to succeed on a class-of-one claim, a plaintiff must establish that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake."

*Progressive Credit Union*, 889 F.3d at 49 (quoting *Ruston v. Town Bd. for Skaneateles*, 610 F.3d 55, 59-60 (2d Cir. 2010) ).

It is unclear whether Plaintiff has asserted a "class of one" equal protection claim, but to the extent that he has attempted to do so, Plaintiff "has not alleged sufficient facts to show the requisite degree of similarity to" any other inmate. *Harnage*, 2017 WL 2190057, at \*3; *see Riley v.*

*Roycroft*, No. 16 CV 2227 (VB), 2017 WL 782917, at \*8 (S.D.N.Y. Feb. 28, 2017) (granting motion to dismiss where the plaintiff alleges that he was not given certain medication that "was provided to other inmates with the same medical condition," because he "fails to allege facts that demonstrate a substantial similarity between himself and the other inmates with whom he compares himself"); *Rankel v. Town of Somers*, 999 F. Supp. 2d 527, 545 (S.D.N.Y. 2014) (dismissing the plaintiff's "class of one" equal protection claim because he "has provided no facts from which it may be plausibly inferred that ... any other citizens were similarly situated" and "provides no information about their properties, situations or conduct that would support the conclusory statement that they were similarly (let alone extremely similarly) situated"). In fact, Plaintiff's SAC "does not identify any comparators or similarly situated entities at all," and thus, to the extent Plaintiff raises a "class of one" equal protection claim, it "is deficient as a matter of law." *MacPherson v. Town of Southampton*, 738 F. Supp. 2d 353, 371 (E.D.N.Y. 2010).

### B. Plaintiff's § 1985 Claim

Similarly, Plaintiff's allegations that Defendants unlawfully conspired to violate his constitutional rights in contravention of 42 U.S.C. § 1985(3) also fail to raise a triable issue of fact because "Plaintiff nowhere alleges that he was a victim of a conspiracy due to his membership in some protected class." *Malsh v. Austin*, 901 F. Supp. 757, 764 (S.D.N.Y. 1995). "42 U.S.C. § 1985(3) prohibits conspiracies undertaken 'for the purpose of depriving, either directly or indirectly, any person or class of person of the equal protection of the laws, or of equal privileges or immunities under the laws.' " *Id.* (quoting *Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of N.Y., Inc.*, 968 F.2d 286, 290-91 (2d Cir. 1992) ). "Such a claim requires more than simply a showing that the defendants acted jointly to achieve some end, and that they used unlawful means to do so. Instead, plaintiff must show that defendants were motivated by animus toward plaintiff based on his membership in some protected class." *Robinson v. Allstate*, 706 F. Supp. 2d 320, 328 (W.D.N.Y. 2010) (citations omitted), *aff'd sub nom. Robinson v. Allstate Ins. Co.*, 508 F. App'x 7 (2d Cir. 2013).

**\*28** A conspiracy claim under Section 1985(3) requires a plaintiff to allege: "1) a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and 3) an act in furtherance of the conspiracy; 4) whereby a person is either

Case 9:21-cv-00372-MAD-TWD    Document 61    Filed 06/22/23    Page 144 of 218

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

injured in his person or property or deprived of any right or privilege of a citizen of the United States."

*Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015) (quoting *Britt v. Garcia*, 457 F.3d 264, 269 n.4 (2d Cir. 2006) ).

Because Plaintiff has failed to demonstrate that any conspiracy to violate his constitutional rights arose due to his membership in a protected class, Plaintiff's § 1985(3) claim is without merit. In *Katz v. Klehammer*, 902 F.2d 204 (2d Cir. 1990), the Second Circuit found that the plaintiff's "complaint is completely devoid of any claim of class-based animus, whether economic, political, or otherwise," and found that the § 1985(3) claim "was properly dismissed as frivolous." *Id.* at 208 (noting also that the Supreme Court has "strictly construed" the requirement that plaintiffs demonstrate class-based animus). "The Supreme Court added a 'class-based animus' requirement to § 1985(3) to prevent it from being broadly, and erroneously, interpreted as providing a federal remedy for 'all tortious, conspiratorial interferences with the rights of others.' " *Malsh*, 901 F. Supp. at 764 (quoting *Jews for Jesus, Inc.*, 968 F.2d at 291); *see Dolan*, 794 F.3d at 296 (stating that "the term class 'unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors' " and to hold otherwise would permit "innumerable tort plaintiffs" to raise § 1985 claims "by simply defining the aggrieved class as those seeking to engage in the activity the defendant has interfered with" (quoting *Town of W. Hartford v. Operation Rescue*, 991 F.2d 1039, 1046 (2d Cir. 1993) ) ). Although Plaintiff summarily alleges that the discrimination he suffered was "based on his mental illness, race and ethnicity" (Dkt. 46 at ¶ 1; *see id.* at ¶¶ 103 (alleging discrimination "on the basis of Plaintiff's race, ethnicity, and language"), 197 (alleging discrimination "based on Plaintiff's race"), 415 (alleging discrimination "on the basis of his ethnicity and religion") ), Plaintiff "fails to allege *any facts showing* he was treated differently due to his membership in a protected class," *Klein v. Zugabie*, No. 15 CIV. 9093 (NSR), 2017 WL 374733, at *8 n.12 (S.D.N.Y. Jan. 24, 2017) (emphasis added); *see Hollman v. County of Suffolk*, No. 06-CV-3589 JFB ARL, 2011 WL 2446428, at *11 (E.D.N.Y. June 15, 2011) (granting summary judgment on the plaintiff's § 1985 claim where he "only offers conclusory allegations that the actions involved discriminatory animus," and finding "no evidence of racial or other class-based animus on the record"); *see also Grant v. City of Syracuse*, No. 5:15-CV-445 (LEK/TWD), 2017 WL 5564605, at *9 (N.D.N.Y. Nov. 17, 2017) ("Alonzo's argument in support of his conspiracy claim consists of conclusory statements

that the Arresting Officers' alleged misconduct can only be explained by implicit racial bias. While it is undisputed that Alonzo is African-American, conclusory statements linking officers' actions to race are insufficient to survive summary judgment." (citation omitted) ). Therefore, Plaintiff's § 1985 cause of action is also dismissed. [14]

[14]   While the Second Circuit does not appear to have directly addressed the issue, a number of courts have ruled that "[t]he 'class of one' theory is insufficient to form the basis for a § 1985 action." *Chance v. Reed*, 538 F. Supp. 2d 500, 509 (D. Conn. 2008) (citing *Am. Nat'l Bank & Tr. Co. of Chicago v. Town of Cicero*, No. 01 C 1396, 2001 WL 1631871, at * 12 (N.D. Ill. Dec. 14, 2001) ) ("While the 'class of one' may qualify under a section 1983 equal protection claim, plaintiffs fail to cite, and this Court fails to find, any case stating that such a class qualifies for protection under section 1985."); *see Royal Oak Entm't, LLC v. City of Royal Oak, MI.*, 205 F. App'x 389, 399 (6th Cir. 2006) ("Plaintiffs argue that just as they may comprise a 'class of one' for purposes of their equal protection claim, they are a 'class of one' for purposes of their § 1985(3) claim. Not surprisingly, Plaintiffs provide no authority whatsoever for this claim, and we reject it."); *C & H Co. v. Richardson*, 78 F. App'x 894, 902 (4th Cir. 2003) (affirming summary judgment on § 1985(3) claims where the plaintiff "does not allege that the complained-of discrimination resulted from its membership in any qualifying class"); *McCleester v. Dep't of Labor & Indus.*, No. CIV.A. 3:06-120, 2007 WL 2071616, at * 15 (W.D. Pa. July 16, 2007) ("The emerging consensus among federal authority therefore falls against the 'class of one' theory in the § 1985(3) context."). Although the Court is inclined to agree with the overwhelming consensus of authority that a § 1985(3) conspiracy cannot be sustained by allegations merely sufficient to support a "class of one" equal protection claim, the Court need not decide that issue on the facts presented. Because Plaintiff has failed to allege a "class of one" equal protection claim, he has likewise failed to allege a § 1985(3) based upon a "class of one" theory—assuming such a claim even exists.

## X. Plaintiff's Official Capacity Claims

Case 9:21-cv-00372-MAD-TWD   Document 61   Filed 06/22/23   Page 145 of 218

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

**\*29** Defendants argue that "Plaintiff sues certain defendants in their official and individual capacities" (Dkt. 59-2 at 69), although Defendants do not cite to any allegation suggesting that Plaintiff seeks recourse against any defendant in his or her official capacity. However, to the extent Plaintiff seeks such relief, the Eleventh Amendment bars Plaintiff's official-capacity causes of action. *See Gray-Davis v. New York*, No. 5:14-CV-1490 GTS/TWD, 2015 WL 2120518, at \*7 (N.D.N.Y. May 5, 2015) ("The Eleventh Amendment has been found to bar official capacity claims for money damages against [DOCCS] officials and parole officers."); *Tompkins v. Beane*, No. 9:10-CV-1200 LEK/RFT, 2012 WL 3079537, at \*6 (N.D.N.Y. July 30, 2012) ("Plaintiff's claims against corrections officers in their official capacities are ... barred by the Eleventh Amendment."); *Tolliver v. N.Y. State Corr. Officers*, No. 99CIV.9555(JGK), 2000 WL 1154311, at \*2 (S.D.N.Y. Aug. 14, 2000) (dismissing official capacity claims where "[a]ll of the defendants in this case are state officials because they are employees of [DOCCS]").

## XI. The Failure to Demonstrate the "Personal Involvement" of Several Named Defendants

Plaintiff has also failed to allege the personal involvement of several of the named defendants in any of the purported constitutional violations set forth in his SAC and supplemental papers. "Because Section 1983 imposes liability only upon those who actually cause a deprivation of rights, 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Blyden*, 186 F.3d at 264 (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ).

Correctional officer Matthew Null ("C.O. Null") is only alleged to have instructed Plaintiff to stand back from his prison cell door so that "C.O. Null could observe whether Plaintiff was wearing pants." (Dkt. 46 at ¶ 324). This allegation fails to implicate C.O. Null in an unconstitutional act or any other wrongful conduct. As such, any claim asserted against C.O. Null is dismissed.

Correctional officers Jason Lortus ("C.O. Lortus") and M. Ranger ("C.O. Ranger") are alleged to have denied Plaintiff medical attention after Nurse Cheasman allegedly hit Plaintiff's hands with a bucket. (*Id.* at ¶ 213). Plaintiff alleges that the incident was not recorded in a logbook, which "violat[ed] the doctor's directives, policies, and regulations." (*Id.*). As discussed above, Plaintiff received adequate care and treatment, and the medical records indicate that he was examined on November 22, 2010, but refused to show his hands to the medical staff. (*See* Dkt. 59-10 at 110). Plaintiff's allegations against C.O. Lortus and C.O. Ranger also fail to establish their involvement in any constitutional violation. *See also White v. Rock*, No. 9:13-CV-392 (GTS/CFH), 2016 WL 11478222, at \* 12 (N.D.N.Y. Feb. 23, 2016) ("The claim that a defendant failed to file an injury report is insufficient to satisfy the subjective prong of the deliberate indifference test."), *report and recommendation adopted*, 2016 WL 1248904 (N.D.N.Y. Mar. 29, 2016); *Harris v. Howard*, No. 907-CV-1065 TJM/GJD, 2009 WL 537550, at \*12 (N.D.N.Y. Mar. 3, 2009) ("Failure to complete reports is simply not an Eighth Amendment claim under any view of the facts."); *Mitchell v. Keane*, 974 F. Supp. 332, 342 (S.D.N.Y. 1997) ("Williams' failure to fill out an injury report does not state an Eighth Amendment claim. An injury report is not medically necessary for a minimally civilized life."), *aff'd*, 175 F.3d 1008 (2d Cir. 1999). Accordingly, C.O. Lortus and C.O. Ranger are also dismissed from this action.

Similarly, Plaintiff has named the Assistant Commissioner of DOCCS Mental Health Services, Diane Vanburen, as a defendant, but has not set forth any allegations that plausibly suggest her personal involvement in any constitutional violation. (Dkt. 46 at ¶ 86). The same can be said for defendant Eileen R. Diniston, the Regional Health Services Administrator (*id.* at ¶ 72), as well as Acting Deputy Superintendent Thomas Tanea (Dkt. 93-5 at 3). No allegations of wrongdoing are asserted against these defendants as well. As a result, they too are terminated from this action.

**\*30** Likewise, Plaintiff names the Commissioner of the New York State Office of Mental Health, Michael Hogan, the Director of Mental Health Services for DOCCS, Doris Romero, and the Assistant Commissioner of the New York State Office of Mental Health, Howard Holanchock, as defendants in this action, but fails to make any specific allegations of wrongdoing against them either. Instead, he collectively refers to these individuals as the "MHU Defendants" (Dkt. 46 at ¶ 87), and generally claims "[f]or the abuses and complaints chronicled herein, the MHU Defendants are jointly and severally liable due to their participation in the wrongs against Plaintiff and/or their wrongful refusal to address the issues when brought to their attention through complaints and grievances" (*id.* at ¶ 349). However, because none of these three defendants is alleged to have committed any wrongful act, individually or in the collective, the SAC fails to set forth sufficient facts that plausibly suggest their personal involvement in the harms

Case 9:21-cv-00372-MAD-TWD   Document 61   Filed 06/22/23   Page 146 of 218

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

otherwise set forth therein. Therefore, these three defendants are also dismissed from this action.

Relatedly, insofar as Plaintiff seeks relief for Defendants' failure to take action on his grievances or to process his administrative appeals (*see, e.g.*, Dkt. 46 at ¶¶ 248, 264, 271, 313, 320, 408-09, 413), these allegations fail to state a constitutional claim under § 1983. "Generally, the receipt of a letter is insufficient to establish personal involvement under § 1983. Instead, courts typically require something more before finding personal involvement." *Ward v. Rabideau*, 732 F. Supp. 2d 162, 169 (W.D.N.Y. 2010) (citations omitted); *see Candelaria v. Higley*, No. 04-CV-277A, 2008 WL 478408, at *2 (W.D.N.Y. Feb. 19, 2008) ("Numerous courts have held that merely writing a letter of complaint does not provide personal involvement necessary to maintain a § 1983 claim."); *Johnson v. Wright*, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) ("Personal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint."); *Gayle v. Lucas*, No. 97 CIV. 0883 (MGC), 1998 WL 148416, at *4 (S.D.N.Y. Mar. 30, 1998) ("Generally, the allegation that a supervisory official ignored a prisoner's letter protesting unconstitutional conduct is not itself sufficient to allege the personal involvement of the official so as to create liability under § 1983."). As such, Plaintiff's allegations that Defendants ignored or failed to act upon his grievances or letters do not state a viable § 1983 claim. *See Walker v. Pataro*, No. 99CIV.4607(GBD)(AJP), 2002 WL 664040, at *12 (S.D.N.Y. Apr. 23, 2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose *respondeat superior* liability.").[15]

[15]    Similarly, to the extent Plaintiff alleges that certain supervisory defendants failed to overturn or otherwise rectify the actions of Five Points medical staff (*see, e.g.*, Dkt. 46 at ¶¶ 140-41, 264), this claim fails to establish a viable § 1983 cause of action as well. Initially, insofar as Plaintiff's claim would impose *respondeat superior* liability upon officials in supervisory positions for the actions of their subordinates, Plaintiff's claim is rejected because, as previously discussed, a § 1983 claim must be premised upon the "personal involvement" of the defendant and cannot be based simply upon theories of

vicarious liability. *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) ("[S]upervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior*."); *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002) ("A supervisor may not be held liable under section 1983 merely because his subordinate committed a constitutional tort."). In addition, supervisory officials without any medical training are permitted to rely upon the medical decisions of experienced and credentialed medical personnel. *See Hardy v. Diaz*, No. 908-CV-1352GLSATB, 2010 WL 1633379, at *7 (N.D.N.Y. Mar. 30, 2010) ("The Superintendent cannot be liable under Section 1983 for failure to supervise the prison medical staff, because he lacks the medical training and authority to do so."), *report and recommendation adopted*, 2010 WL 1633390 (N.D.N.Y. Apr. 21, 2010); *see also Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003) (affirming summary judgment where a supervisory official, who "had no medical training," gave "automatic and complete deference" to certain medical decisions made by the medical staff); *Cuoco v. Moritsugu*, 222 F.3d 99, 111 (2d Cir. 2000) (finding it not unreasonable for a "non-medical prison official" to refrain from "dictat[ing] the specific medical treatment to be given to particular prisoners—for whatever reason"). Such reliance does not demonstrate "personal involvement" in a constitutional violation. *See Morales v. Fischer*, 46 F. Supp. 3d 239, 255 (W.D.N.Y. 2014) (dismissing claims against "the Superintendent" of the correctional facility where he had "no medical training, and [was] entitled to rely on the medical decisions of the doctors ... in making his decision affirming the denial of [the p]laintiff's grievances"). Accordingly, insofar as Plaintiff alleges that Deputy Superintendents of Administration Jeffrey Minnerly and Matthew Thomas failed to resolve issues related to Plaintiff's medical treatment, Plaintiff's allegations fail to state a claim pursuant to § 1983.

**\*31** Furthermore, "[g]rievance procedures are the internal procedures and requirements of DOCCS, and as such, prison inmates neither have a constitutionally protected right to a grievance procedure, nor, as a general rule, is there a federal right to have them properly administered." *Gomez v. Sepiol*, No. 11-CV-1017SR, 2014 WL 1575872, at *15 (W.D.N.Y.

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

Apr. 11, 2014) (citations omitted); *see Shell v. Brzezniak*, 365 F. Supp. 2d 362, 370 (W.D.N.Y. 2005) ("If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim."). "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel v. Goord*, No. 00 CIV 2042 LMM, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001). In addition, because "[t]here is no constitutional right to an inmate appeals process," *Dolberry v. Levine*, 567 F. Supp. 2d 413, 416 (W.D.N.Y. 2008) (quoting *Washington v. Early*, No. 103CV05263LJOSMSPC, 2008 WL 795603, at *15 (E.D. Cal. Mar. 24, 2008), *report and recommendation adopted*, 2008 WL 2261399 (E.D. Cal. June 2, 2008) ), any failure to process Plaintiff's administrative appeals does not support a § 1983 cause of action.

## XII. **Plaintiff's Claim for the Failure to Intervene**

Lastly, "because '[t]here can be no failure to intervene ... where there was no constitutional violation,' " *Hardy v. Daly*, No. 17-2906, 2018 WL 4631831, at *1 (2d Cir. Sept. 26, 2018) (quoting *Tavares v. City of New York*, No. 08 Civ. 3782, 2011 WL 5877550, at *7 (S.D.N.Y. Oct. 17, 2011) ), Plaintiff's cause of action for the failure to intervene is dismissed, except insofar as Plaintiff has sufficiently stated such a claim associated with the use of excessive force claims that have been permitted to proceed.

## XIII. **The Matter is Stayed Pending the Resolution of Defendants' Motion to Revoke Plaintiff's IFP Status**

Because some of Plaintiff's claims survive Defendants' motion for partial summary judgment, and Defendants' motion to revoke Plaintiff's IFP status is held in abeyance pending the Second Circuit's decision in *Shepherd*, the Court *sua sponte* considers whether to stay the balance of this action until Defendants' revocation motion can be resolved.

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *see Javier H. v. Garcia-Botello*, 218 F.R.D. 72, 74 (W.D.N.Y. 2003) ("[A] 'federal district court has the inherent power, in the exercise of its discretion, to stay an action.' " (quoting *Twenty First Century Corp. v. LaBianca*, 801 F. Supp. 1007, 1010 (E.D.N.Y. 1992) ) ). "Accordingly, the decision to issue a stay is 'firmly within a district court's discretion.' " *Tradewinds Airlines, Inc. v. Soros*, No. 08 CIV.

5901JFK, 2009 WL 435298, at *3 (S.D.N.Y. Feb. 23, 2009) (quoting *Am. Shipping Line, Inc. v. Massan Shipping Indus.*, 885 F. Supp. 499, 502 (S.D.N.Y. 1995) ); *see Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 97 (2d Cir. 2012) ("[A] court *may* decide in its discretion to stay civil proceedings when the interests of justice seem to require such action." (quoting *Kashi v. Gratsos*, 790 F.2d 1050, 1057 (2d Cir. 1986) ) ). A court may determine that a stay is appropriate and "in the interest of judicial economy, ... pending the outcome of proceedings which bear upon the case, even if such proceedings are not necessarily controlling of the action that is to be stayed." *LaSala v. Needham & Co.*, 399 F. Supp. 2d 421, 427 (S.D.N.Y. 2005).

In determining whether to stay a lawsuit, courts weigh the following factors:

> (1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest.

**\*32** *Luv N'Care, Ltd. v. Regent Baby Prod. Corp.*, No. 10 CIV. 9492, 2014 WL 572524, at *2 (S.D.N.Y. Feb. 13, 2014) (quoting *Kappel v. Comfort*, 914 F. Supp. 1056, 1058 (S.D.N.Y. 1996) ).

Under the facts presented here, a stay would not unduly prejudice Plaintiff. In fact, considering the robust medical documentation submitted by Defendants on this motion, and the law as it currently stands in this Circuit, Plaintiff faces an uphill battle to persuade the Court that he may maintain his IFP status. To be sure, the Second Circuit may solidify the approach presently used by courts in this Circuit to evaluate such motions. However, it may also divert from this approach, or, at the very least, elucidate nuances thereof in a manner favorable to Plaintiff. In other words, it is in Plaintiff's interest to await the Second Circuit's opinion in *Shepherd* because, as it currently stands, Plaintiff's IFP status would likely be revoked. Defendants would also benefit from the issuance of a stay. Indeed, it would be in their interests to avoid wasting limited resources in discovery disputes against a plaintiff who

2019 WL 1230778

may not be entitled to IFP status. A stay is in the interests of judicial economy as well. A premature resolution of Plaintiff's IFP status may result in duplicative proceedings before this Court should the Second Circuit decide to depart from the approach taken by the other circuit courts that have opined on the issue. Lastly, while there is no evidence that any non-parties are specifically interested in the outcome of this matter, it is in the public interest to prevent the limited time and resources of the judiciary, the Office of the New York State Attorney General, and *pro bono* counsel from being unnecessarily diverted to a matter that could possibly be impacted should the Court revoke Plaintiff's IFP status.

Accordingly, the Court finds that it is in the interests of justice to require this action be stayed pending the resolution of Defendants' motion to revoke Plaintiff's IFP status.

## CONCLUSION

For the foregoing reasons, Defendants' motion for partial summary judgment (Dkt. 59) is granted in part and denied in part, and Defendants' motion to revoke Plaintiff's IFP status

(Dkt. 59) is held in abeyance pending the Second Circuit's decision in *Shepherd v. Annucci*, No. 17-2261 (2d Cir. July 21, 2017). To the extent Plaintiff asserts § 1983 excessive use of force and related failure to intervene claims as well as common law causes of action against Barry Countryman, Jacob Smith, Richard Cioffa, Correctional Officer VanHorn, Kimberly Cheasman, Annette Holm, Remy Babineaux, Richard Goodliff, Correctional Sergeant T. Barber, Nurse T. Carroll, and Correctional Sergeant D. Gleason, those claims survive Defendants' motion for partial summary judgment. In addition, Plaintiff's Eighth Amendment conditions-of-confinement claims asserted against Charles Coventry and Eric Farley for unlawful prison cell illumination will also proceed to discovery. The Clerk of Court is directed to terminate all other defendants from this action and is also directed to stay this matter until further order of the Court.

**\*33**  SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2019 WL 1230778

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Buchy v. City of White Plains, Not Reported in Fed. Supp. (2015)

2015 WL 8207492

Case 9:21-cv-00372-MAD-TWD    Document 61    Filed 06/22/23    Page 149 of 218

KeyCite Yellow Flag - Negative Treatment

Disagreed With by Conforti v. City of Franklin, E.D.Wis., September 13, 2021

2015 WL 8207492
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

David BUCHY, Plaintiff,

v.

The CITY OF WHITE PLAINS; Det. John Del Vecchio; and P.O. Ralph Marcallo, Individually and in Their Official Capacities, Defendants.

14 CV 1806 (VB)
|
Signed 12/07/2015

**Attorneys and Law Firms**

Rose Minna Weber, Rose M. Weber Law Office, New York, NY, for Plaintiff.

Joanna Marie Topping, Katrine Aliha Beck, Peter Alexander Meisels, Wilson Elser,Moskowitz Edelman & Dicker LLP, White Plains, NY, John Martin Flannery, Wilson Elser Moskowitz Edelman & Dicker LLP, Stamford, CT, for Defendants.

**OPINION AND ORDER**

Briccetti, United States District Judge

 **\*1** Plaintiff David Buchy brings this action under 42 U.S.C. § 1983 against Detectives John Del Vecchio and Rafael Maracallo (i/s/h/a "P.O. Ralph Marcallo") of the White Plains Police Department, alleging defendants beat him when they arrested him in his home. Against each defendant, plaintiff brings excessive force claims for violation of his Fourth Amendment rights, as well as claims for failure to intervene to prevent the use of excessive force. [1]

[1]   Plaintiff stipulated to the dismissal, with prejudice, of his claims against the City of White Plains, as well as his claims against the detectives for violation of his First, Fifth, Eighth, and Fourteenth Amendment rights. (Doc. #48).

Before the Court is defendants' motion for partial summary judgment, solely on the failure to intervene claims. (Docs. ##45, 50). For the following reasons, the motion is GRANTED as to defendant Del Vecchio but DENIED as to defendant Maracallo.

The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

**BACKGROUND**

The parties have submitted briefs, statements of facts, and affirmations with supporting exhibits, which reflect the following factual background.

On the morning of September 5, 2012, both defendants came to plaintiff's apartment in Yonkers to arrest him. Plaintiff claims when he opened the door, Det. Del Vecchio immediately rushed into his apartment and grabbed his neck, shoulder, and wrist, while Det. Maracallo grabbed his arms and wrists. Plaintiff put on a shirt and shoes, and walked with defendants into the hallway. There, plaintiff alleges, Del Vecchio punched him several times in the head, and Maracallo began punching and kicking him as well. At some point, plaintiff fell to the floor, and both defendants punched and kicked plaintiff for approximately two minutes, while repeatedly shouting at him to stop resisting arrest. Plaintiff claims he was not resisting arrest and neither defendant was trying to handcuff him during this time.

Both defendants claim they were trying to handcuff plaintiff, but he resisted. During the ensuing physical struggle, defendants claim they and plaintiff all ended up on the ground. Neither defendant admits to punching or kicking plaintiff.

Plaintiff brought this case against defendants, alleging they both violated his Fourth Amendment rights by using excessive force to arrest him. Additionally, plaintiff brings a claim against each defendant for failure to intervene to prevent the use of excessive force.

Defendants move for partial summary judgment solely on the failure to intervene claims.

Defendants' argument is as follows: A law enforcement officer who uses excessive force cannot also be held liable for failure to intervene to prevent his own use of excessive force, because the failure to intervene claim merges with

2015 WL 8207492

the excessive force claim; here, because plaintiff claims both officers used excessive force against him, neither officer can also be held liable for failure to intervene. Also, to the extent Del Vecchio's contact with plaintiff immediately after plaintiff opened the apartment door constituted excessive force, defendants argue Maracallo had no reasonable opportunity to prevent it because it happened too quickly.

**\*2** Plaintiff concedes "defendant Del Vecchio's direct involvement in the incident precludes a claim against him for failure to intervene." (Plaintiff's Br. at 1 n.1). As to defendant Maracallo, however, plaintiff responds by saying a reasonable jury, after hearing the evidence, could conclude "defendant Del Vecchio beat plaintiff up while defendant Maracallo did nothing to stop him." (Id. at 3).

Defendants respond that no party or witness maintains Det. Maracallo did nothing while Det. Del Vecchio alone used excessive force. In fact, defendants argue, all three participants in the arrest claim Maracallo was physically involved. Accordingly, the possibility a jury may find Maracallo "stood by and watched" is mere speculation, and summary judgment is appropriate. (Defendants' Reply Br. at 3).

## DISCUSSION

### I. Standard of Review
The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law .... Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See id. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010) (citation omitted). It is the moving party's burden to establish the absence of any genuine issue of

material fact. Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 323. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citations omitted). The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him. Dawson v. Cty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in favor of the non-moving party on the issue on which summary judgment is sought, summary judgment is improper. See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).

In deciding a motion for summary judgment, the Court need only consider evidence that would be admissible at trial. Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).

### II. Failure to Intervene Claim Against Maracallo
**\*3** Summary judgment on the failure to intervene claim against Det. Maracallo is not warranted.

To establish a claim for failure to intervene, a plaintiff must show (i) the officer's failure "permitted fellow officers to violate [plaintiff's] clearly established statutory or constitutional rights," and (ii) it was "objectively unreasonable for him to believe that his fellow officers' conduct did not violate those rights." Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 129 (2d Cir. 1997) (internal quotation marks and citations omitted). The use of force must also have been "of a sufficient duration" to afford the

Case 9:21-cv-00372-MAD-TWD   Document 61   Filed 06/22/23   Page 151 of 218

Buchy v. City of White Plains, Not Reported in Fed. Supp. (2015)
2015 WL 8207492

officer a "reasonable opportunity" to intervene. Jean-Laurent v. Wilkinson, 540 F. Supp. 2d 501, 513 (S.D.N.Y. 2008).

When a law enforcement officer "is a direct participant in the allegedly excessive use of force, the failure to intervene theory of liability is inapplicable." Cuellar v. Love, 2014 WL 1486458, at *8 (S.D.N.Y. Apr. 11, 2014). Therefore, Maracallo may not be held liable both for using excessive force and for failing to prevent the use of excessive force.

Plaintiff may, however, hold Det. Maracallo liable for one or the other. The Federal Rules of Civil Procedure recognize claims may be brought in the alternative, even if they are inconsistent. See Fed. R. Civ. P. 8(d)(2), (3). At least one other court in this District has allowed excessive force and failure to intervene claims to proceed in the alternative beyond the summary judgment stage. See Cumberbatch v. Port Auth. of N.Y. and N.J., 2006 WL 3543670, at *11 (S.D.N.Y. Dec. 5, 2006) ("The Court will thus construe these claims as pleading in the alternative ... i.e., the Officers either used excessive force, or one or both of them failed to intervene while another officer used excessive force.").

The Court will allow the failure to intervene claim against Maracallo as an alternative to the excessive force claim. A reasonable jury could find Maracallo did not use excessive force against plaintiff, but failed to prevent defendant Del Vecchio from doing so.

Plaintiff's testimony, if credited, establishes the following facts: (i) Det. Del Vecchio punched and kicked plaintiff for approximately two minutes; (ii) Det. Maracallo was present the entire time and did not stop Del Vecchio; (iii) plaintiff was not resisting arrest. From these facts, a reasonable jury could conclude Maracallo should have perceived Del Vecchio's use of force was excessive and Maracallo had the opportunity to stop Del Vecchio, yet he allowed it to continue. All the elements of a failure to intervene claim would be met.

Defendants' argument, that summary judgment is appropriate because no single witness gives this exact version of events, is unpersuasive. A jury is free to believe all, some, or none of a plaintiff's testimony—indeed, a plaintiff's ability to bring claims in the alternative presupposes this. In this case, for example, a reasonable jury could listen to plaintiff's account of the incident and believe Del Vecchio punched and kicked him but not believe Maracallo joined in. Likewise, a reasonable jury could listen to the witnesses' descriptions of the arrest and find, although both defendants used some

degree of force against plaintiff, only Del Vecchio's use of force was excessive.

*4 Defendants also argue there is no evidence Det. Maracallo merely watched as Det. Del Vecchio used excessive force because plaintiff and defendants all agree Maracallo was physically involved in the arrest. This is similarly unpersuasive. Maracallo need not have been standing away from plaintiff and Del Vecchio to observe the latter using excessive force. A reasonable jury could find Maracallo was physically involved in the arrest, saw Del Vecchio use excessive force, and failed to stop him, but did not use it himself.

The Court finds there is a question of fact as to whether Det. Maracallo failed to intervene during the time plaintiff alleges he was punched and kicked for two minutes. This is sufficient for the Court to allow the failure to intervene claim to proceed. Therefore, the Court need not consider defendants' argument that Maracallo had no opportunity to intervene when Del Vecchio first entered the apartment and grabbed plaintiff.

III. Failure to Intervene Claim Against Del Vecchio
The court grants summary judgment on the failure to intervene claim against Det. Del Vecchio because plaintiff consents. (Pl.'s Br. at 1 n.1).

CONCLUSION

For the foregoing reasons, defendants' motion is GRANTED as to the failure to intervene claim against defendant Del Vecchio, but DENIED as to the failure to intervene claim against defendant Maracallo.

The Clerk is instructed to terminate the motion. (Docs. ##45, 50).

The parties are directed to submit a joint pretrial order in accordance with the Court's individual practices by January 8, 2016.

Counsel are directed to attend a status conference on January 13, 2016, at 9:30 a.m., at which time the Court will schedule a trial date and set dates for pretrial submissions.

SO ORDERED.

2015 WL 8207492

**All Citations**

Not Reported in Fed. Supp., 2015 WL 8207492

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

2010 WL 1063875
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Terry CICIO, Plaintiff,

v.

R. LAMORA, R. Scott, R. MacWilliams, K. Crossett, E.
Facteau, C.O. Demers, R. Woods, R. Gill, Defendants.

Civ. Action No. 9:08–CV–431 (GLS/DEP).
|
Feb. 24, 2010.

West KeySummary

**1**   **Civil Rights** 🔑 Criminal law enforcement;
prisons

**Summary Judgment** 🔑 Prisons and jails

Genuine issue of material fact existed as to
whether corrections officer repeatedly hit the
inmate after the inmate was subdued and
thus summary judgment was precluded on the
inmate's excessive force claim. The inmate
alleged in his complaint, testified under oath
at his deposition, and stated in a sworn
affidavit that the corrections officer punched him
unnecessarily in the head several times during
the inmate's cell extraction. Although the cell
extraction was supposed to be videotaped, the
video was never recorded. Despite the fact that
the inmate's injuries were slight and were at least
indirectly brought about by his own action of
refusing handcuffs, there were credibility issues
to be determined. U.S.C.A. Const.Amend. 8.

29 Cases that cite this headnote

**Attorneys and Law Firms**

Terry Cicio, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General,
State of New York, C. Harris Dague, Esq., Asst. Attorney
General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1**  Plaintiff Terry Cicio, a New York State prison inmate
who is proceeding *pro se* and *in forma pauperis,* has
commenced this action pursuant to 42 U.S.C. § 1983, alleging
deprivation of his civil rights. In his complaint Cicio, who
refused multiple orders from prison officials to exit his cell
in order to effectuate a transfer to another location, complains
that in the course of the ensuing cell extraction, during
which he was removed through the use of force, one of
the corrections officers who participated exerted excessive
force causing him to suffer injuries, while the others involved
failed to intervene, all in violation of the Eighth Amendment's
protection against cruel and unusual punishment. As relief
for the violation, plaintiff seeks the recovery of compensatory
and punitive damages from defendants.

Currently pending before the court is defendants' motion for
summary judgment seeking dismissal of plaintiff's complaint.
In their motion defendants challenge the legal sufficiency of
plaintiff's excessive force and failure to intervene claims and
additionally assert their entitlement to Eleventh Amendment
immunity from suit in their official capacities and good
faith qualified immunity from suit as individuals. Because
a reasonable factfinder could conclude from the record now
before the court that more force than necessary to subdue
and remove Cicio from his cell was applied maliciously
and sadistically by prison officials, I am constrained to
recommend that defendants' motion be denied, except as to
plaintiff's claims against defendant Woods and those against
defendants in their official capacities, which are subject to
dismissal.

I. *BACKGROUND* [1]

[1]     In light of the procedural posture of this case, the
following recitation is from the record now before
the court, with all inferences drawn and ambiguities
resolved in favor of the plaintiff. *Terry v. Ashcroft,*
336 128, 137 (2d Cir.2003). It should be noted that
while most of the pertinent facts are undisputed,
defendants sharply contest plaintiff's allegation
that he was unnecessarily punched by defendant
MacWilliams during the forcible removal from his
cell.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 1063875

Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"). *See generally* Complaint (Dkt. No. 1); *see also* Dague Decl. (Dkt. No. 35–16) ¶ 3 and Exh. A (Dkt. No. 35–17). At the times relevant to his claims, plaintiff was designated to the Upstate Correctional Facility ("Upstate"), located in Malone, New York. [2] *Id.*

[2]     Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept. 12, 2002).

The events giving rise to the claims in this action were set in motion on December 27, 2007, when plaintiff refused to return a razor given to him by prison officials to permit him to shave. Dague Decl. (Dkt. No. 35–16) Exh. B (Dkt. No. 35–18) (Transcript of Deposition of Terry Cicio, conducted on March 12, 2009, hereinafter cited as "Cicio Dep. Tr.") at pp. 29–30; Gill Aff. (Dkt. No. 35–4) ¶ 5 and Exh. A (Dkt. No. 35–5). According to Cicio, he purposefully withheld the razor in order to prompt a transfer out of the gallery on which his cell was located to another area. Cicio Dep. Tr. at pp. 27–28.

Inmates at Upstate are assigned cells based upon a written protocol designated as the Progressive Inmate Movement System, or "PIMS", intended to provide incentive and encourage behavioral adjustment for SHU inmates. *See* Dague Decl. (Dkt. No. 35–16) ¶ 8. Under the PIMS, there are three designated categories of SHU cells; level three affords the most desirable conditions, while PIMS level one inmates enjoy the least privileges. *Id.; see also* Cicio Dep. Tr. at p. 27. At the time of plaintiff's refusal to surrender his razor, he was assigned to a PMS level three cell. Cicio Dep. Tr. at p. 27.

 **\*2**  On December 27, 2007, following the razor incident, plaintiff was informed that he would be relocated to a PIMS level one cell. Cicio Dep. Tr. at p. 31; Gill Aff. (Dkt. No. 35–4) ¶ 7 and Exh. B (Dkt. No. 35–6). To effectuate the move, prison officials instructed the plaintiff to place his back to the cell door and his hands through the feed up slot in order to permit the application of hand restraints. Gill Aff. (Dkt. No. 35–4) ¶ 8. Plaintiff refused that order as well as several subsequent directives to voluntarily exit his cell. *Id.* at ¶ 9 and Exh. A. Attempts were made to convince plaintiff to reconsider his refusal; those efforts included interventions by clergy and

guidance staff at the facility. *Id.* When those measures proved unsuccessful, orders were given to prepare a cell extraction team. Gill Aff. (Dkt. No. 35–4) ¶ 10.

At 2:30 p.m. on that day Corrections Lieutenant Andrew Lamora issued a final order directing plaintiff to exit his cell, warning that if he persisted in his refusal force would be applied to carry out his removal. Gill Aff. (Dkt. No. 35–4) ¶¶ 11–12; Lamora Aff. (Dkt. No. 35–8) ¶¶ 8–10; *see also* Complaint (Dkt. No. 1) Statement of Facts ¶ 4. Despite that last directive, plaintiff refused to obey defendant Lamora's command. Lamora Aff. (Dkt. No. 35–8) ¶ 9.

Following established facility protocol, prison officials took the first step toward conducting a forcible extraction by administering two one-second bursts of a chemical aerosol into plaintiff's cell, followed by another request for voluntary compliance. Gill Aff. (Dkt. No. 35–4) ¶¶ 12–13 and Exhs. A (Dkt. No. 34–5) and B (Dkt. No. 34–6); Lamora Aff. (Dkt. No. 35–8) ¶ 11. The process was repeated at two minute intervals on four more occasions; each time, corrections officers offered plaintiff the opportunity to comply with their orders before administering another dose. Gill Aff. (Dkt. No. 35–4) ¶¶ 12–14.

When the use of chemicals failed to convince Cicio to exit his cell, the cell extraction team that had been assembled, including Corrections Officers Richard Scott, Richard MacWiliams, Kurt Crossett and Christopher Demers, entered the cell. Gill Aff. (Dkt. No. 35–4) ¶ 17 and Exhs. A (Dkt. No. 35–5) and B (Dkt. No. 35–6); Lamora Aff. (Dkt. No. 35–8) ¶ 15. To accomplish the forced extraction each of those individuals was assigned a specific task. Lamora Aff. (Dkt. No. 35–8) ¶ 16. Corrections Officer Scott was designated to be the first to enter the cell and, through use of a shield, was tasked with attempting to bring Cicio to the ground and assist with the application of handcuffs. *Id.* Corrections Officer MacWilliams' assigned role was to control plaintiff's arms and to assist in the take down and application of handcuffs. *Id.* Corrections Officer Demers was assigned to control Cicio's right leg and assist in the take down and application of ankle restraints, and Corrections Officer Crossett was similarly designated as the person responsible for control of plaintiff's left leg, assisting in the take down, and application of ankle restraints. *Id.* The cell extraction, which proceeded in accordance with this protocol, was successfully completed in approximately two minutes or less. Gill Aff. (Dkt. No. 35–4) ¶ 20; Lamora Aff. (Dkt. No. 35–8) ¶ 18; Scott Aff. (Dkt. No. 35–7) ¶ 13; Demers Aff. (Dkt. No. 35–12) ¶

13; Crossett Aff. (Dkt. No. 35–10) ¶ 13; Facteau Aff. (Dkt. No. 35–11) ¶ 12.

**\*3** Also in accordance with the established protocol, Corrections Officer Eric Facteau was assigned to record the cell extraction using a hand-held camera. Facteau Aff. (Dkt. No. 35–11) ¶¶ 5–6. Unfortunately, however, while Corrections Officer Facteau attempted to videotape the process he later discovered the tape was defective, and none of the cell extraction was recorded. *Id.* at ¶¶ 9, 14.

Following the cell extraction, plaintiff was taken to a decontamination area where his clothes were removed and traces of the chemical aerosol were eliminated. Gill Aff. (Dkt. No. 35–4) Exh. A (Dkt. No. 35–5). Plaintiff was thereafter brought to a holding cell to be medically examined and photographed. *Id.*

During the course of the cell extraction both plaintiff and two of the participating corrections officers suffered injuries. Plaintiff described his injuries as including a scratch to the right side of his face less than an inch long, a contusion above his left eye, a bruise on his left shoulder "the size of a quarter or a little bigger[, n]othing major", and a bruise to the back of his shoulder. Complaint (Dkt. No. 1) Statement of Facts ¶ 6; Cicio Dep. Tr. at pp. 48–52. A medical report prepared following the examination notes the following with regard to plaintiff's injuries:

> Inmate has small abraised/red area to rt. upper/lateral aspect of chest. Has small contused area to left lateral aspect of forehead, has small eccymotic area to rt. lateral aspect of shoulder. No life threatening injuries. No blood present. Alert and oriented. No signs of distress. No treatment necessary.

Gill Aff. (Dkt. No. 35–4) Exh. B (Dkt. No. 35–6). Following the incident plaintiff stated to medical staff that he was "fine" and did not wish to receive treatment. *Id.; see also* Cicio Dep. Tr. at pp. 75–76. During the cell extraction Corrections Officer MacWilliams suffered injury to his right wrist, and Corrections Officer Scott injured his right hip; no other staff members involved reported any injuries. Gill Aff. (Dkt. No. 35–4) Exh. A (Dkt. No. 35–5).

For the most part, the foregoing facts are not disputed by the plaintiff. He does, however, contend that during the course of the extraction he was "repeatedly punched" by Corrections Officer MacWiliams, who asked "you want to play?" Complaint (Dkt. No. 1) Statement of Facts ¶ 5; Cicio Dep. Tr. at pp. 46–47; Cicio Aff. (Dkt. No. 36) ¶¶ 10, 12. Plaintiff further alleges that while the other members of the cell extraction team, including Sergeant R. Gill and Lieutenant R. Lamora, "had ample time to curb the abuse" he suffered, they stood by without intervening. *Id.* at ¶ 11.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on May 7, 2008. Dkt. No. 1. Named as defendants in Cicio's complaint are Robert Woods, the superintendent at Upstate; Corrections Lieutenant Randy Lamora; Corrections Sergeant Robert Gill; and Corrections Officers Richard Scott, Richard MacWillams, Kirk Crossett, Eric Facteau, and Christopher Demers. Plaintiff's complaint asserts a single cause of action, alleging violation of his Eighth Amendment right against cruel and unusual punishment.

**\*4** Following joinder of issue and completion of pretrial discovery, defendants moved on August 6, 2009 for summary judgment dismissing plaintiff's complaint. Dkt. No. 35. In their motion, defendants argue that plaintiff's excessive force and failure to intervene claims are lacking in merit, that his claims against the defendants in their official capacities are barred by the Eleventh Amendment, and that in any event they are entitled to qualified immunity from suit against them for damages as individuals. *Id.* Plaintiff has since responded in opposition defendants' motion,[3] Dkt. No. 36, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York 72.3(c). *See* Fed.R.Civ.P. 72(b).

[3] Plaintiff opposes defendants' motion and, alternatively, requests that he be granted a continuance so that he may pursue additional discovery. In particular, plaintiff seeks discovery regarding the facility's alleged refusal to allow plaintiff to view the DOCS directives regarding use of force, video procedures, chemical agents, and cell extractions. As an initial matter, I note that the deadline for completion of discovery expired on March 13, 2009, Dkt. No. 28, several months

before defendants filed their pending motion, and plaintiff has shown no reason why he did not timely pursue the discovery now requested. In any event, as will be seen, none of the information now sought by plaintiff would impact my recommendation regarding the defendants' motion, especially considering that nearly all of the material facts are undisputed by the plaintiff.

III. *DISCUSSION*

A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see* *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also* *Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party seeking summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see* *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d

Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**\*5** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). [4] The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See* *Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also* *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

[4]    With their motion defendants properly filed a statement of materials facts alleged not to be in dispute, as required under Northern District of New York Local Rule 7.1(a)(3). Dkt. No. 35–2. Under that rule when filing papers in opposition to defendants' motion plaintiff was required to submit a response mirroring defendants' Local Rule 7.1(a)(3) Statement and either admitting or denying each of the assertions contained within it in matching numbered paragraphs. N.D.N.Y.L.R. 7.1(a)(3). In light of plaintiff's failure to provide such a statement, the court could deem the assertions set forth in defendants' Local Rule 7.1(a)(3) Statement, including to the effect that defendant MacWilliams did not punch him as alleged, *see* Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 35–2) ¶¶ 34–35, to have been admitted by him. *Id.; see, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–611, 2000 WL 1264122, at \*1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). In deference to his *pro se* status, and given that he has actively opposed defendants' motion and contested the claim that defendant MacWilliams did not strike him, though without minimizing the importance of Local Rule 7.1(a) (3), I recommend against deeming plaintiff to have admitted the facts set forth in defendants' statement.

B. *Excessive Force*

Plaintiff's complaint asserts a cause of action brought under the Eighth Amendment, which proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084 (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 998–999, 117 L.Ed.2d 156 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320–21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom .,* *John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

Analysis of claims of cruel and unusual punishment requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson,* 503 U.S. at 7–8, 112 S.Ct. at 999 and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). As was recently emphasized by the United States Supreme Court in *Wilkins v. Gaddy,* however, after *Hudson* the "core judicial inquiry" is focused not upon the extent of the injury sustained, but instead whether the nature of the force applied was nontrivial. —— U.S. – – – – , —— S.Ct. ——, — L.Ed.2d – – – – , 2010 WL 596513, at *3 (Feb. 22, 2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

**\*6** [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) (McAvoy, C.J.) (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140 F.Supp.2d 204, 211 (N.D.N.Y.2001) (Kahn, J.). Even a *de minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10, 112 S.Ct. 1000 (citations omitted).

With its focus on the harm done, the objective prong of the inquiry is contextual and relies upon "contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8, 112 S.Ct. at 1000) (internal quotations omitted)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency are always violated .... This is true whether or not significant injury is evident.' " *Wright,* 554 F.3d at 268–69 (quoting *Hudson,* 503 U.S. at 9, 112 S Ct. at 1000).

That is not to say that "every malevolent touch by a prison guard gives rise to a federal cause of action." *Griffen,* 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993)); *see also Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights"). Where a prisoner's allegations and evidentiary proffers, if credited, could reasonably allow a rational factfinder to find that corrections officers used force maliciously and sadistically, however, summary judgment dismissing an excessive use of force claim is inappropriate. *Wright,* 554 F.3d at 269 (citing *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (reversing summary dismissal of prisoner's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the ... incident with [that officer] indicated only a slight injury")) (other citations omitted).

**\*7** In this case, although the injuries sustained by Cicio as a result of the incident in question were admittedly slight and at least indirectly brought about by his own actions, because the governing law requires that the evidence be viewed in the light most favorable to the non-moving party, I am compelled to conclude that issues of fact preclude the entry of judgment as a matter of law in favor of the defendants. Plaintiff has alleged in his complaint, testified under oath at his deposition, and stated in a sworn affidavit that defendant MacWilliams punched him unnecessarily in the head several times during the cell extraction. Complaint (Dkt. No. 1) Statement of Facts ¶ 5; Cicio Dep. Tr. at pp. 52–55; Cicio Aff. (Dkt. No. 36) ¶ 10. According to Cicio, when the defendants entered the cell and hit him with a shield he immediately dropped to the floor. Cicio Dep. Tr. at p. 64. At that point, plaintiff asserts, he could no longer resist because the corrections officers involved had his arms pinned, and could have easily handcuffed him. *Id.* Instead, plaintiff claims, "[MacWilliams] just kept hitting me. He hit me several times.... When I say maliciously and sadistically when he tells me that, when he's asking me if I want to play, he's hitting me. That means he's doing it for his own purpose...." *Id.* at pp. 52, 53–54. One could argue further that from the lack of a videotape recording of the relevant events, despite orders to Corrections Officer Facteau to follow the established protocol and record the cell extraction, a reasonable factfinder could infer that excessive force was applied during the incident and that a videotape of the events would have disclosed the punches thrown by defendant MacWilliams.

Without question, the evidentiary support for plaintiff's claim is far from overwhelming. Plaintiff's assertions are sharply contradicted by defendant MacWilliams who, in a sworn affidavit filed with the court, denies punching or striking Cicio. MacWilliams Aff. (Dkt. No. 35–9) ¶ 13. Each of the co-defendants participating in the removal of the plaintiff from his cell state that they did not see MacWilliams punch or hit him. Additional evidence tending to contradict plaintiff's allegations includes the fact that it took two minutes or less for the corrections officers to perform the cell extraction and the reports of medical examinations conducted of the plaintiff shortly after the incident as well as the photographs of plaintiff's face, both revealing that he sustained only a slight bruise, *see* Gill Aff. (Dkt. No. 35–4) Exh. B (Dkt. No. 35–6), an injury that would also be fully consistent with what would be expected to result when corrections officers must take a resisting inmate to the floor for the purpose of administering arm and leg restraints.[5] Moreover, during his deposition, plaintiff acknowledged that the photographs accurately depict the full extent of the injuries suffered during the cell extraction. Cicio Dep. Tr. at 80–81.

5 Not insignificantly, during his deposition plaintiff acknowledged his realization that his refusal to obey a direct order to leave his cell would result in the use of force to accomplish that end. *See* Cicio Dep. Tr. at p. 37. This evidence could provide some support for a finding that defendants' acted reasonably.

**\*8** Plaintiff's testimony that he was beaten by MacWilliams stands in contrast to the seemingly overwhelming evidence that it did not occur as he alleges. Nonetheless, the weighing of such competing evidence, no matter how weak plaintiff's claim may appear, presents a question of credibility that must be left to the trier of fact. *Griffin,* 193 F.3d at 91 ("Although appellant's excessive force claim is weak and his evidence extremely thin, dismissal of the excessive force claim was inappropriate because there are genuine issues of material fact concerning what transpired after appellant was handcuffed and whether the guards maliciously used force against him."). I view of the foregoing, I am obligated to recommend that defendants' motion be denied as to plaintiff's excessive use of force claim.

### C. *Failure To Intervene*

In addition to asserting that defendant MacWilliams beat him excessively, plaintiff alleges that the various other defendants

Cicio v. Lamora, Not Reported in F.Supp.2d (2010)
Case 9:21-cv-00372-MAD-TWD Document 61 Filed 06/22/23 Page 159 of 218
2010 WL 1063875

observed the incident but stood by without intervening on his behalf .[6] Defendants contend that plaintiff's failure to intervene claim similarly lacks merit.

[6]   Superintendent Wood has submitted an affidavit indicating that he was not present during the course of the incident, and plaintiff has offered no evidence to the contrary. *See* Woods Decl. (Dkt. No. 35–13) ¶ 7. Under these circumstances, defendant Woods is entitled to dismissal of plaintiff's claims against him on the independent basis of his lack of personal involvement in the constitutional violation alleged. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor).

A corrections worker who, though not participating, is present while an assault upon an inmate occurs may nonetheless bear responsibility for any resulting constitutional deprivation. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers. *See Mowry v. Noone,* No. 02–CV–6257 Fe, 2004 WL 2202645, at *4 (W.D.N.Y. Sept.30, 2004); *see also Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted).[7] In order to establish liability on the part of a defendant under this theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration 1) possessed actual knowledge of the use by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *See Curley,* 268 F.3d at 72; *see also Espada v. Schneider,* 522 F.Supp.2d 544, 555 (S.D.N.Y.2007). Mere inattention or inadvertence, it should be noted, does not rise to a level of deliberate indifference sufficient to support liability for failure to intervene. *See, e.g., Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997) (noting that "liability in a § 1983 'excessive force' action cannot be founded on mere negligence") (citing, *inter alia, Daniels v. Williams,* 474 U.S. 327, 335–36, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986)).

[7]   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

**\*9** Although defendants deny that MacWilliams struck plaintiff, I have already determined that material questions of fact exist with respect to this issue. As to the co-defendants, plaintiff testified that "they had plenty of time during the whole incident to actually stop [MacWilliams] from assaulting [him]." Cicio Dep. Tr. at p. 52. Once again, though the evidence in plaintiff's favor is weak, I find that questions of fact preclude summary judgment with respect to plaintiff's failure to intervene claim and therefore recommend that this portion defendants' motion also be denied.

### D. *Eleventh Amendment*

To the extent that damages are sought against them in their official capacities, defendants' motion also seeks dismissal of those claims on the basis of the protection afforded under of the Eleventh Amendment.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057–58, 57 L.Ed.2d 1114 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends both to state agencies, and to state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest. *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89–91, 102 S.Ct. 2325, 2328–29, 72 L.Ed.2d 694 (1982)). To the extent that a state official is sued for damages in his official capacity the official is entitled to invoke the Eleventh Amendment immunity belonging to the state. *Kentucky v. Graham,* 473 U.S. 159, 166–67, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991).

It is unclear from plaintiff's complaint whether he has sued defendants in their individual or official capacities, or both. Insofar as plaintiff's damage claims against the defendants are brought against them in their official government-employee capacity they are the equivalent of claims against the State of New York, and they are subject to dismissal under the Eleventh Amendment state-employee exception. *Daisernia v. State of New York,* 582 F.Supp. 792, 798–

99 (N.D.N.Y.1984) (McCurn, J.). I, therefore, recommend dismissal of plaintiff's damage claims against the defendants in their official capacities.

### E. *Qualified Immunity*

In their motion defendants also rely on the doctrine of qualified immunity, arguing that because their actions were reasonable under the circumstances they are immune from suit and plaintiff's complaint should be dismissed.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. ——, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009).

 **\*10** In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson,* 555 U.S. at ——, 129 S.Ct. at 816. The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[8] *Kelsey,* 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall–On–Hudson Police Dept.,* 577 F.3d 415, 430 n. 9 (citing *Saucier* ).[9] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently retreated from the prior *Saucier* two-step mandate, concluding in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient

disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."[10] *Pearson,* 555 U.S. at——, 129 S.Ct. at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey,* 567 F.3d at 61 (citing *Pearson,* 129 S.Ct. at 821) (emphasis in original).

8     In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151, 150 L.Ed.2d 272.

9     In *Okin,* the Second Circuit clarified that the " 'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Okin,* 577 F.3d at 433, n. 11 (citation omitted).

10     Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability ...", *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* —— U.S. at——, 129 S.Ct. at 815 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 524, 116 L.Ed.2d 589, —— (1991) (per curiam)).

For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs ... should be addressed in light of the circumstances in the particular case at hand.' " *Okin,* 577 F.3d 430 n. 9 (quoting *Pearson* ). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional

violation at all .' " *Kelsey,* 567 F.3d at 61 (quoting *Pearson,* 129 S.Ct. at 818).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. at 2156 (citation omitted). When deciding whether a right was clearly established at the relevant time, a court should consider

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

**\*11** *Wright v. Smith,* 21 F.3d 496, 500 (2d Cir.1994) (quoting *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993)). The objective reasonableness test will be met, and qualified immunity enjoyed, where government officers of reasonable competence could disagree as to whether by his or her alleged conduct the defendant would be violating the plaintiff's rights. *Okin,* 577 F.3d at 433 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). "If, on the other hand, no officer of reasonable competence would conclude that the conduct in question is lawful, there is no immunity." *Okin,* 577 F.3d at 433 (citing *Lennon v. Miller,* 66 F.3d 416, 420–21 (2d Cir.1995)).

Undeniably, the right of a prison inmate to be free from excessive use of force has long been established. *Russo v. City of Bridgeport,* 479 F.3d 196, 212 (2d Cir.), *cert. denied,* 552 U.S. 818, 128 S.Ct. 109, 169 L.Ed.2d 24 (2007). Since I have already determined that, if credited, plaintiff's testimony could support a jury finding that defendants acted intentionally to harm him, it follows that a rational trier of fact could also conclude that defendants' conduct was not objectively reasonable under the circumstances. *See id.; see also Dallio v. Santamore,* No. 9:06–CV–1154, 2010 WL 125774, at \*14 (N.D.N.Y. Jan.7, 2010) (Suddaby, J. and Homer, M.J.) ("As to [plaintiff's] excessive force and

failure to intervene claims, it was clearly established by the incident on November 10, 2003 that inmates had an Eighth Amendment right to be free from excessive force and a failure to intervene. Thus, accepting all of [plaintiff's] allegations about the incident as true, qualified immunity cannot be granted ... since a reasonable person in their position at the time would or should have known that the use of excessive force was a constitutional violation."). As a result, I have determined that material questions of fact exist on the issue of whether defendants are entitled to qualified immunity from suit and therefore recommend that this portion of defendants' motion also be denied.

## IV. *SUMMARY AND RECOMMENDATION*

Given the circumstances leading up to the forcible extraction of Cicio from his cell, it is doubtful that he will be viewed by a jury as a particularly sympathetic plaintiff. Plaintiff placed his own safety as well as that of others in jeopardy by refusing a lawful order to exit his cell, admittedly knowing that his actions would result in the use of force to remove him. Plaintiff's refusal to obey prison officials' commands, however, though plainly indefensible, did not provide corrections officers with a license to exact retribution by needlessly punching him after he was subdued and no longer resisting, as he has alleged. Whether Officer MacWilliams did, in fact, needlessly punch the plaintiff raises a question of credibility given the conflicting accounts now before the court. I am therefore compelled to conclude that the existence material questions of fact preclude the court from granting defendants' motion for summary judgment with respect to plaintiff's excessive use of force and failure to intervene claims and on the issue of qualified immunity. Because defendants are immune from suit in their official capacities, however, and plaintiff has adduced no evidence that defendant Woods was personally involved in the offending conduct, defendants' motion dismissing plaintiff's damage claims against them in their official capacities and all claims against defendant Woods should be granted. Accordingly, it is hereby respectfully

**\*12** RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 35) be GRANTED to the extent that plaintiff's claims against defendants in their official capacities and those against defendant Woods be DISMISSED but that defendants' motion otherwise be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such

2010 WL 1063875

objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1063875

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

2010 WL 1063864

2010 WL 1063864
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Terry CICIO, Plaintiff,
v.
R. LAMORA, R. Scott, R. Macwilliams, K. Crossett, E.
Facteau, C.O. Demers, R.Woods, R. Gill, Defendants.

Civil Action No. 9:08–cv–431 (GLS/DEP).
|
March 22, 2010.

**Attorneys and Law Firms**

Terry Cicio, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State
of New York, C. Harris Dague, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for the Defendants.

***ORDER***

GARY L. SHARPE, District Judge.

 **\*1** The above-captioned matter comes to this court
following a Report–Recommendation by Magistrate Judge

David E. Peebles, duly filed February 24, 2010. Following
ten days from the service thereof, the Clerk has sent the file,
including any and all objections filed by the parties herein.

No objections having been filed, and the court having
reviewed the Magistrate Judge's Report–Recommendation
for clear error, it is hereby

ED, that the Report–Recommendation of Magistrate Judge
David E. Peebles filed February 24, 2010 is ACCEPTED in
its entirety for the reasons state therein, and it is further

ORDERED, that defendants' motion for summary judgment
(Dkt. No. 35) is GRANTED to the extent that plaintiff's
claims against defendants in their official capacities and those
against defendant Woods is DISMISSED but the defendants'
motion otherwise is DENIED, and it is further

ORDERED, that the Clerk of the court serve a copy of this
order upon the parties in accordance with this court's local
rules.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1063864

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 1187871

2017 WL 1187871
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Keith WATERS, Plaintiff,

v.

Albert PRACK, et al., Defendants.

9:13-CV-1437 (LEK/DEP)
|
Signed 03/30/2017

**Attorneys and Law Firms**

Keith Waters, Wallkill, NY, pro se.

Colleen D. Galligan, New York State Attorney General, Albany, NY, for Defendants.

**DECISION AND ORDER**

Lawrence E. Kahn, U.S. District Judge

**I. INTRODUCTION**

 **\*1** This matter comes before the Court following a Report-Recommendation filed on February 24, 2017, by the Honorable David E. Peebles, U.S. Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3. Dkt. No. 123 ("Report-Recommendation"). Pro se plaintiff Keith Waters and Defendants timely filed Objections. Dkt. Nos. 124 ("Plaintiff's Objections"), 125 ("Defendants' Objections").

**II. LEGAL STANDARD**

Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b); L.R. 72.1(c). If no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error. Barnes v. Prack, No. 11-CV-0857, 2013 WL 1121353, at \*1 (N.D.N.Y. Mar. 18, 2013); Farid v. Bouey, 554 F. Supp. 2d 301, 306–07, 306 n.2 (N.D.N.Y. 2008); see also Machicote v. Ercole, No. 06-CV-13320, 2011 WL 3809920, at \*2 (S.D.N.Y. Aug. 25, 2011) ("[E]ven a pro se party's objections to a Report and Recommendation must be specific and clearly aimed

at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument."). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b). Otherwise, a court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." Id.

**III. DISCUSSION**

**A. Defendants' Objections**

Defendants object to Judge Peebles's finding that summary judgment was not appropriate with respect to Waters's First Amendment retaliation claim against defendant A.W. Dirie. Defs.' Objs. at 1. According to Defendants, the evidence is overwhelming that Dirie did not remove Waters from his position in the law library, and that Deputy Superintendent for Programs Marie Hammond, who is not a defendant in this case, was in fact responsible for his removal. Id. Defendants also suggest that because Waters was removed from the position before Dirie received any complaints from Waters, "there [was] no temporal proximity giving rise to a question regarding the reason for the removal." Id. at 2. The question is close, but the Court agrees with Judge Peebles's recommendation that it deny Defendants' motion for summary judgment on this issue.

Defendants point to two pieces of evidence suggesting that Dirie did not remove Waters from the law library position. First, Dirie himself says he was not involved. Id. at 1–2. Second, Waters wrote Dirie a letter on February 28, 2013, complaining that he had been removed from his position at the law library by Hammond. Id. at 2. The only evidence Waters has offered to suggest that Dirie removed him from the position is his own sworn testimony to that effect. Dkt. No. 42 ("Verified Amended Complaint") ¶ 46. [1] Waters's evidence on this point certainly appears weaker than Defendants'. But as Judge Peebles pointed out in a different case, "the weighing of such competing evidence, no matter how weak plaintiff's claim may appear, presents a question of credibility that must be left to the trier of fact." Cirio v. Lamora, No. 08-CV-431, 2010 WL 1063875, at \*8 (N.D.N.Y. Feb. 24, 2010), adopted by 2010 WL 1063864 (N.D.N.Y. Mar. 22, 2010). And while it is true that the only piece of evidence Waters offers on this score is his own self-serving testimony, that "can establish a genuine dispute of fact so long as [it] does not contradict the witness's prior testimony." Dye v. Kopiec, No. 16-CV-2952,

Waters v. Prack, Not Reported in Fed. Supp. (2017)

2017 WL 1187871

Case 9:21-cv-00372-MAD-TWD    Document 61    Filed 06/22/23    Page 165 of 218

2016 WL 7351810, at *3 (S.D.N.Y. Dec. 16, 2016) (collecting cases). The affidavit does differ from the letter in suggesting that Dirie, rather than Hammond, removed Waters from the law library position, but Waters was not testifying when he wrote the letter, so these two pieces of conflicting evidence do not prevent the Court from allowing Waters to establish a genuine dispute of material fact on the basis of his self-serving testimony. [2]

1    "A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist...." Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995).

2    As this Court has previously noted, a plaintiff's self-serving affidavit also need not be credited at the summary-judgment stage if the "plaintiff's factual assertion is contradicted by such overwhelming evidence that no reasonable factfinder could credit the plaintiff's account." Bader v. Special Metals Corp., 985 F. Supp. 2d 291, 321 n.22 (N.D.N.Y. 2013) (Kahn, J.). That is not the case here, because the evidence suggesting that Hammond rather than Dirie removed Waters from the law library position is far from "overwhelming." As discussed above, all the Court has on this score is Dirie's own testimony and a letter written by Waters.

 *2  Defendants also argue that Dirie could not have retaliated against Waters because the alleged adverse action—Waters's removal from the law library position—took place before Waters complained to Dirie. Defs.' Objs. at 2. As Defendants note, the record makes it clear that Waters was removed from the position on February 17, 2013. Id. Indeed, Waters himself concedes as much in his statement of material facts. Dkt. No. 116-2 ("Waters Statement of Material Facts") ¶ 46 ("Plaintiff remained assigned to the law library clerk position at Greene from the period of February 11, 2013 until February 17, 2013 before he was 'REMOVED FOR GOOD OF DEPARTMENT.' "), and his inmate program assignment history confirms this concession, Dkt. No. 116-3 ("Plaintiff's Bates Material") at 59. Defendants emphasize that Waters complained to Dirie on February 28, 2013, and March 18, 2013. Defs.' Objs. at 2. If these were the only two complaints received by Dirie, Defendants would be correct that the Court could not infer that Dirie retaliated against Waters by removing him from the law library position. See Butler v. City of Batavia, 545 F. Supp. 2d 289, 293 (W.D.N.Y. 2008)

(dismissing a First Amendment retaliation claim because "the adverse conduct started before" the plaintiff made her complaint).

Yet Defendants ignore Waters's assertion that he had complained to Dirie around late January 2013 about "the dorm sanction policy" at the prison. Pl.'s SMF ¶¶ 9, 15; Verified Am. Compl. ¶ 16. Since "a temporal gap of less than two months is sufficient to give rise to an inference of causation," Dushane v. Leeds Hose Co. #1 Inc., 6 F. Supp. 3d 204, 212 (N.D.N.Y. 2014) (Kahn, J.), the gap between Waters's complaints to Dirie in January and his removal from the law library position in February raises the inference that Dirie was motivated by retaliatory animus. And while Dirie says he does not remember Waters's complaining to him orally about the dorm sanction policy, conflicting testimony cannot establish the nonexistence of a genuine dispute of material fact. See Molinaro v. Sears, Roebuck & Co., 478 F. Supp. 818, 822–23 (S.D.N.Y. 1979) (noting that summary judgment "cannot be resolved on the basis of conflicting affidavits"). In sum, the Court is not convinced by Defendants' objections.

**B. Waters's Objections**

Waters objects to Judge Peebles's finding that defendant Eric G. Gutwein would have disciplined Waters for providing unauthorized legal assistance even if Gutwein had lacked retaliatory animus. Pl.'s Objs. at 2. [3] Waters challenges the sufficiency of the evidence Gutwein relied on to discipline him, pointing out that Sergeant Melendez could not specify the type of legal assistance Waters provided to the other inmate or the form of compensation he received. Id. at 3. But as Melendez testified, Waters had received a letter from the inmate in which the inmate suggested that "he would compensate [Waters] for assisting him with a legal matter in the same way he had in the past." Rep.-Rec. at 22. When Melendez spoke to the inmate, he "admitted that he had paid [Waters] in the past for legal assistance." Id. Melendez did not testify that Waters advised the inmate about, say, federal habeas law as opposed to municipal liability under 42 U.S.C. § 1983, but that does not mean Gutwein lacked a solid basis for finding that Waters had violated the rule prohibiting the provision of unauthorized legal assistance. The same goes for the kind of compensation Waters received for his legal work. Judge Peebles was therefore correct to conclude that Gutwein would have imposed discipline even in the absence of any retaliatory motive, especially because this kind of inference is "readily drawn in the context of prison administration where

Case 9:21-cv-00372-MAD-TWD    Document 61    Filed 06/22/23    Page 166 of 218

Waters v. Prack, Not Reported in Fed. Supp. (2017)

2017 WL 1187871

we have been cautioned to recognize that 'prison officials have broad administrative and discretionary authority over the institutions they manage.' " Sher v. Coughlin, 739 F.3d 77, 82 (2d Cir. 1984) (quoting Hewitt v. Helms, 459 U.S 460, 467 (1983), abrogated in part on other grounds by Sandin v. Connor, 515 U.S. 472 (1995)); see also Parks v. Blanchette, 144 F. Supp. 3d 282, 331 (D. Conn. 2015) (noting that courts take special care in evaluating First Amendment retaliation claims brought by prisoners "because they can easily be fabricated"). [4]

[3]     The page numbers for Waters's Objections refer to those generated by this Court's electronic filing system ("ECF").

[4]     The Court also disagrees with Waters's claim that it was a "quintessential non sequitur" for him to be found guilty of providing unauthorized legal assistance and not guilty of violating a direct order. Pl.'s Objs. at 3. Perhaps Waters was never directly ordered to refrain from providing legal advice. Yet if he was caught doing just that, it would be appropriate to find him guilty for providing unauthorized legal assistance.

**\*3** As part of his challenge to the sufficiency of the evidence relied on to punish him, Waters appears to assert that his right to procedural due process was violated. Pl.'s Objs. at 3–7. Yet as Judge Peebles pointed out, Waters's due process claim fails because "no reasonable factfinder could conclude that plaintiff was deprived of a cognizable liberty or property interest." Rep.-Rec. at 29. Since the Court agrees with that finding, any argument about the sufficiency of the evidence is irrelevant.

## IV. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 123) is **APPROVED and ADOPTED in its entirety**; and it is further

**ORDERED**, that Waters's Motion for Summary Judgment (Dkt. No. 116) is **DENIED**; and it is further

**ORDERED**, that Defendants' Motion for Summary Judgment (Dkt. No. 110) is **GRANTED in part and DENIED in part** as follows: (1) Waters's due process claims asserted against defendants Gutwein and Prack are **DISMISSED**; (2) Waters's retaliation claim asserted against defendant Gutwein is **DISMISSED**; (3) Waters's retaliation claims asserted against defendant Dirie regarding his failure to undertake a review of the disciplinary hearing determination and his alleged transfer of plaintiff to a different correctional facility are **DISMISSED**; (4) Waters's retaliation claim asserted against defendant Dirie regarding his removal of plaintiff as a law library clerk at Greene Correctional Facility survives Defendants' motion and shall proceed to trial; (5) Waters's retaliation claims asserted against defendant Prack are **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court shall serve a copy of this Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1187871

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Dye v. Kopiec, Not Reported in Fed. Supp. (2016)

2016 WL 7351810

2016 WL 7351810
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Donald DYE, Plaintiff,

v.

Jerzy KOPIEC, Defendant.

16 Civ. 2952 (LGS)
|
Signed 12/16/2016

**Attorneys and Law Firms**

David Mark Rabinowitz, Moses & Singer LLP, New York, NY, for Plaintiff.

Darius Adam Marzec, Marzel Law Firm PC, New York, NY, for Defendant.

## ORDER AND OPINION

LORNA G. SCHOFIELD, District Judge:

**\*1** Plaintiff Donald Dye brings this action against Defendant Jerzy Kopiec to recover money owed under a €1,000,000 promissory note (the "Note") allegedly executed by the parties. Plaintiff moves for summary judgment. For the reasons stated below, the motion is denied.

## I. BACKGROUND

The following facts are taken from the parties' submissions and are undisputed unless otherwise indicated.

Plaintiff commenced this action in New York State Court by filing a motion for summary judgment in lieu of a complaint pursuant to N.Y. C.P.L.R. § 3213. Plaintiff included with his motion an affidavit and a copy of the Note. In the affidavit, Plaintiff states that he paid Defendant €1,000,000 for ownership interests in some of Defendant's business ventures but never received the promised ownership interests. Plaintiff further states that, on or about March 31, 2013, he and Defendant agreed to convert the ownership interests into a non-revocable personal debt obligation of Defendant and executed the Note to memorialize this agreement. The Note, which includes a signature page purportedly signed by Plaintiff and Defendant, provides that Defendant is to make semi-annual payments of principal and interest, each in

the amount of €255,000, beginning on September 25, 2013. According to Plaintiff's affidavit, Defendant made a $4,000 payment on the Note on or about April 20, 2013, but has made no further payments.

Defendant removed the case to federal court based on diversity of citizenship [1] and filed an opposition to Plaintiff's motion. In a declaration submitted with his opposition, Defendant states that he never agreed to pay Plaintiff €1,000,000, never signed the Note, never made a $4,000 payment on the Note nor saw the Note prior to this lawsuit.

[1] According to the Notice of Removal, Plaintiff is a citizen of New York, and Defendant is a citizen of Poland currently domiciled in Florida.

In reply, Plaintiff submitted additional documents that he argues corroborate his allegations. These other documents include purported examples of Defendant's signature; a report by a forensic document examiner concluding, based on a comparison of the purported examples of Defendant's signature and the signature on the Note, that Defendant "probably wrote the questioned signature" on the Note; and various communications Plaintiff and Defendant allegedly exchanged regarding the Note and the underlying debt.

## II. LEGAL STANDARD

Summary judgment is appropriate where the record before the Court establishes that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must construe the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in favor of the nonmoving party. *See id.* at 255.

## III. DISCUSSION

**\*2** Plaintiff's motion for summary judgment is denied because a genuine factual dispute exists regarding the validity of the Note.

Section 3213 states: "When an action is based upon an instrument for the payment of money only or upon any judgment, the plaintiff may serve with the summons a notice of motion for summary judgment and the supporting papers

Case 9:21-cv-00372-MAD-TWD   Document 61   Filed 06/22/23   Page 168 of 218

Dye v. Kopiec, Not Reported in Fed. Supp. (2016)
2016 WL 7351810

in lieu of a complaint." The purpose of § 3213 is to "provide[ ] a speedy and effective means for resolving presumptively meritorious claims." *Banco Popular N. Am. v. Victory Taxi Mgmt., Inc.*, 806 N.E.2d 488, 490 (N.Y. 2004) (internal quotation marks and citation omitted).

To establish a prima facie case under § 3213, a plaintiff must offer proof of "the instrument and a failure to make the payments called for by its terms." *Weissman v. Sinorm Deli, Inc.*, 669 N.E.2d 242, 245 (N.Y. 1996). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to "offer[ ] evidentiary proof sufficient to raise a triable issue of fact." *Banco Popular*, 806 N.E.2d at 490.

Here, Plaintiff established a prima facie case by submitting a copy of the Note and Plaintiff's affidavit stating that Defendant failed to make payments on the Note. *See Weissman*, 699 N.E.2d at 245. In opposition, Defendant raised a genuine dispute regarding the validity of the Note by submitting a declaration that (1) denies Defendant signed the Note or agreed to pay Plaintiff €1,000,000, and (2) bears a signature that appears different from the signature on the Note. *See Kitovas v. Megaris*, 20 N.Y.S.3d 393, 394 (2d Dep't 2015) (finding triable question of fact where Defendant submitted an affidavit denying that he executed the note and a copy of his driver's license, which contained a signature that appeared different from the signature on the note); *Hambrose Reserve Ltd. v. Prete*, No. 88 Civ. 2631, 1989 WL 52345, at *1–2 (S.D.N.Y. May 8, 1989) (finding genuine dispute as to authenticity of the promissory note where defendants submitted an affidavit denying that they signed the note). Because of a genuine dispute as to the material fact of whether the Note is valid, Plaintiff's motion for summary judgment is denied.

Plaintiff's arguments for granting summary judgment in spite of Defendant's denial that he signed the Note are unpersuasive. First, he argues that Defendant's declaration should be rejected. The declaration states: "I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge, information and belief." To qualify as an unsworn declaration made under penalty of perjury under 28 U.S.C. § 1746, an unsworn declaration executed within the United States is to include an affirmation "in substantially the following form": "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct." The slight variation between the affirmation in Defendant's declaration and the affirmation prescribed by 28 U.S.C. § 1746 is not sufficient to reject Defendant's

declaration. *See BMS Entm't/Heat Music LLC v. Bridges*, No. 04 Civ. 2584, 2005 WL 2482493, at *2 n.1 (S.D.N.Y. Oct. 7, 2005) (accepting as a declaration under 28 U.S.C. § 1746 an affidavit that was not notarized but "certified" that "each of the statements contained herein is true to the best of my information and belief" and contained a "penalty of perjury" clause).

**\*3** Second, Defendant's declaration cannot be disregarded merely because it is self-serving. Even a self-serving affidavit can establish a genuine dispute of fact so long as the affidavit does not contradict the witness's prior testimony. *See Hayes v. N.Y.C. Dep't of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."). *See also Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460, n.1 (7th Cir. 2014) ("[A] self-serving affidavit is an acceptable method for a non-moving party to present evidence of disputed material facts."); *C.R. Pittman Constr. Co. v. Nat'l Fire Ins. Co. of Hartford*, 453 Fed.Appx. 439, 443 (5th Cir. 2011) ("A party's own testimony is often 'self-serving,' but we do not exclude it as incompetent for that reason alone."). In the short history of this lawsuit, Defendant has consistently denied the validity of the Note and has not given any testimony that contradicts his declaration.

Third, Defendant's declaration is more than a "bald assertion of forgery," which would be insufficient to create an issue of fact contesting the authenticity of a signature. *Banco Popular*, 806 N.E.2d at 490; *see also Pereira v. Cogan*, 267 B.R. 500, 512 (S.D.N.Y. 2001) ("It is incumbent upon a party claiming the nongenuineness of a signature to produce firsthand proof of the forgery."). Defendant's declaration denies the authenticity of the signature on the Note both explicitly through its words and implicitly through its inclusion of a signature that differs from the one on the Note. More fundamentally, the declaration denies that Defendant agreed to pay Plaintiff €1,000,000. Defendant's unequivocal disclaimer appears to be all that a party could reasonably be expected to say in this circumstance. *See Pereira*, 267 B.R. at 512 ("[T]he validity of the defendant's signature should be deemed put at issue when ... there is apparently nothing more the defendant could say.").

Finally, the additional evidence submitted by Plaintiff in reply to Defendant's declaration does not eliminate the factual dispute over the validity of the Note. " '[C]redibility assessments, choices between conflicting versions of the

Dye v. Kopiec, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00372-MAD-TWD   Document 61   Filed 06/22/23   Page 169 of 218

2016 WL 7351810

events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.' " *Curry v. City of Syracuse,* 316 F.3d 324, 333 (2d Cir. 2003) (quoting *Fischl v. Armitage,* 128 F.3d 50, 55–56 (2d Cir. 1997)). Because resolving the discrepancies between Plaintiff's and Defendant's evidence necessarily involves weighing the evidence and making credibility determinations, Plaintiff's motion for summary judgment is denied.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff Donald Dye's motion for summary judgment is DENIED.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 7351810

---

End of Document                     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 861060
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Lisa SNEAD, Plaintiff,

v.

LOBIANCO, et al., Defendants.

16-cv-09528 (AJN)
|
Signed 03/08/2021

**Attorneys and Law Firms**

Baree Nichole Fett, Gabriel Paul Harvis, Elefterakis, Elefterakis & Panek, New York, NY, for Plaintiff.

Hannah Victoria Faddis, Nana Kwame Sarpong, Stephanie Marie Breslow, New York City Law Department, New York, NY, for Defendants.

MEMORANDUM OPINION & ORDER

ALISON J. NATHAN, District Judge:

 **\*1** Defendant brings a motion for the Court to reconsider its Opinion denying in part Defendant's motion for partial summary judgment. For the reasons that follow, that motion is DENIED.

### I. BACKGROUND

The Court assumes familiarity with the facts, which were summarized in the Court's May 28, 2020 Opinion and Order. Dkt. No. 144. In that Opinion, the Court denied Plaintiff's partial motion for summary judgment on her § 1983 claims in its entirety and granted Defendant's partial motion for summary judgment in part and denied it in part. *Id.* Defendants filed a letter motion for reconsideration pursuant to Local Rule 6.3. Dkt. No. 145. In its motion, Defendants ask the Court to dismiss Plaintiff's malicious prosecution claims and fair trial claims against all defendants. Dkt. No. 145.

### II. DISCUSSION

A motion for reconsideration should be granted only if the movant identifies "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Kolel Beth Yechiel*

*Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013) (quotations and citation omitted). It is not a "vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.' " *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012) (quoting *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998). Moreover, "[t]he decision to grant or deny a motion for reconsideration is within the sound discretion of the district court." *Corines v. Am. Physicians Ins. Tr.*, 769 F. Supp. 2d 584, 594 (S.D.N.Y. 2011). "Reconsideration of a previous order by the court is an 'extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.' " *RST (2005) Inc. v. Research in Motion Ltd.*, 597 F. Supp. 2d 362, 365 (S.D.N.Y. 2009) (quoting *In re Health Mgmt. Sys., Inc. Sec. Litig.*, 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000)).

### A. Fair Trial Claims

Defendant moved for summary judgment on Plaintiff's fair trial claims as to Officer Hanson and Sergeant Barnes only. Dkt. No. 131 at 8-9. In Plaintiff's summary judgment motion, she dropped these claims against Defendants Barnes and Hanson, and thus the Court dismissed them with prejudice. Dkt. No. 144 at 2-3. Plaintiff still moved for summary judgment on her fair trial claim against Defendant Officer LoBianco, but the Court denied that motion. Dkt. No. 144 at 3-5.

Defendants now ask the Court to dismiss Plaintiff's claim for a denial of the right to a fair trial against all remaining defendants because of an intervening change in controlling law. Dkt. No. 145 at 1. In particular, Defendants argue that the Supreme Court held in *McDonough v. Smith*, 139 S. Ct. 2149, 2158 (2019) that a plaintiff cannot bring a federal fair trial claim unless the underlying criminal prosecution was terminated in their favor, and that Plaintiff's fair trial claim must therefore be dismissed because her speedy trial dismissal was not a favorable termination. Dkt. No. 145 at 2-3.

 **\*2** This argument is not properly before the Court. While a "motion for reconsideration may be granted if there is an intervening change of controlling law," *Davidson v. Scully*, 172 F. Supp. 2d 458, 464 (S.D.N.Y. 2001), a party "may not raise a new claim, for the first time, in a motion for reconsideration" under Local Rule 6.3. *Allen v. Costello*, No.

03-CV-4957 RJD LB, 2008 WL 361191, at *2 (E.D.N.Y. Feb. 8, 2008). *See also In re Currency Conversion Fee Antitrust Litig.*, 229 F.R.D. 57, 60 (S.D.N.Y. 2005) (a motion for reconsideration under "cannot assert new arguments or claims which were not before the court on the original motion."); *Humbach v. Canon,* No. 13-CV-2512 (NSR), 2016 WL 3647639, at *3 (S.D.N.Y. June 30, 2016) (denying "new claims for illegal search, intentional harassment, and conspiracy" because plaintiff was not "permitted to allege new claims in a motion for reconsideration."). Defendants did not move for summary judgment on Plaintiff's fair trial claim against these Defendants, and a motion for reconsideration is not a proper vehicle to assert these claims in the first instance.

### B. Malicious Prosecution Claims

In Defendants' motion for partial summary judgment filed on April 30, 2019, Defendants moved for summary judgment on Plaintiff's claim for malicious prosecution against Defendant Officer Hanson only. Dkt. No. 131 at 9. That same day, with leave of Court, *see* Dkt. No. 124, Defendants filed a "supplemental letter regarding Plaintiff's malicious prosecution claim," in which Defendants argued that Plaintiff's malicious prosecution claims should be dismissed as to all Defendants in light of *Lanning v. City of Glens Falls*, 908 F.3d 19, 29 (2d Cir. 2018). Dkt. No. 141. In Plaintiff's summary judgment motion briefings, she dropped her claim for malicious prosecution against Defendant Officer Hanson, which the Court subsequently dismissed with prejudice in its Opinion. Dkt. No. 144 at 2-3. Plaintiff's claims for malicious prosecution as to the remaining Defendants survived. *Id.* at 22.

Defendants are correct that the Court did not address Defendants' supplemental letter arguing that the malicious prosecution claims should be dismissed as to the other defendants in deciding whether to grant Defendants' partial motion for summary judgment. However, to succeed on a motion for reconsideration, Defendants must show not just that the Court "overlooked factual matters or controlling precedent," but that had those matters and precedent been "presented to it on the underlying motion," then the Court "would have changed its decision." *In re Worldcom, Inc. Sec. Litig.,* 308 F. Supp. 2d 214, 224 (S.D.N.Y. 2004) (citing S.D.N.Y. Local Civil Rule 6.3). Here, even if the Court had considered Defendant's additional submission, it would not have changed the outcome.

First, *Lanning* is not dispositive on the issue of whether Plaintiff's speedy trial dismissal constituted a favorable termination. In *Lanning*, the Second Circuit said only that "where a dismissal in the interest of justice leaves the question of guilt or innocence unanswered, it cannot provide the favorable termination required as the basis for that claim." *Lanning,* 908 F.3d at 29. As other courts in the district have recognized, the *Lanning* standard does not automatically preclude speedy trial dismissals as constituting favorable termination. *See Nelson v. City of New York*, No. 18 CIV. 4636 (PAE), 2019 WL 3779420, at *12 (S.D.N.Y. Aug. 9, 2019) ("*Lanning* does not squarely resolve this question" of whether a speedy trial dismissal constitutes favorable termination); *Blount v. City of New York*, No. 15 Civ. 5599 (PKC) (JO), 2019 WL 1050994, at *4–5 (E.D.N.Y. Mar. 5, 2019) (finding that while "Lanning may raise the bar for establishing favorable termination under § 1983 in certain cases, the dismissal of a prosecution on speedy trial grounds in this case easily clears that bar."); *McKeefry v. Town of Bedford*, No. 18-CV-10386 (CS), 2019 WL 6498312, at *8 (S.D.N.Y. Dec. 2, 2019) ("From the face of Plaintiff's SAC, the question of Plaintiff's guilt or innocence is left unanswered," therefore while "[t]here might be situations where a case is dismissed on speedy trial grounds in a context indicating that the prosecution had insufficient evidence to prove its case, [ ] there is no indication that this is one of them."). Therefore, a factual finding that the Plaintiff's speedy trial dismissal was not a determination of her innocence is required in order to resolve this claim.

**\*3** Moreover, the Court concludes that there is a genuine issue of material fact as to whether Plaintiff's underlying criminal case was dismissed on the basis of her innocence. *See* Fed. R. Civ. Proc. Rule 56. Plaintiff alleges that the case against her, though dismissed on speedy trial grounds, was not prosecuted because the prosecutors recognized her innocence and did not have sufficient evidence, citing transcripts from the trial and other exhibits. *See* Dkt. No. 142. Therefore, granting summary judgment on this claim would nonetheless be inappropriate even if the Court had considered Defendants' additional claims in its supplemental letter. *See Speedfit LLC v. Woodway USA, Inc.*, 432 F. Supp. 3d 183, 201 (E.D.N.Y. 2020) ("Summary judgment is appropriate only where 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' ") (citing *Lowe v. City of Shelton*, 128 F. App'x 813, 814 (2d Cir. 2005)).

Snead v. LoBianco, Slip Copy (2021)

2021 WL 861060

SO ORDERED.

**III. CONCLUSION**

For the reasons explained above, Defendants' motion for reconsideration is DENIED. This resolves Dkt. No. 145.

**All Citations**

Slip Copy, 2021 WL 861060

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.    3

2019 WL 7494384
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Isaac K. STROMAN, Plaintiff,

v.

Scott RANZE, et al., Defendants.

9:18-CV-149 (GLS/TWD)
|
Signed 12/13/2019

**Attorneys and Law Firms**

ISAAC K. STROMAN, Plaintiff, pro se, 11-A-0292, Riverview Correctional Facility, P.O. Box 247, Ogdensburg, New York 13669.

HON. LETITIA JAMES, Attorney General of the State of New York, OF COUNSEL: RYAN L. ABEL, Esq., ADRIENNE J. KERWIN, Esq., HELENA O. PEDERSON, Esq., Assistant Attorney Generals, Counsel for Defendants, The Capitol, Albany, New York 12224.

## ORDER AND REPORT-RECOMMENDATION

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**\*1** Isaac Stroman ("Stroman" or "Plaintiff") commenced this civil rights action under 42 U.S.C. § 1983 regarding alleged violations of his constitutional rights. (Dkt. No. 1.) According to Stroman, several correctional officers ("C.O.") at Coxsackie Correctional Facility ("Coxsackie") beat him on February 9, 2015, after he took a shower causing injuries to his head, hand, face, and ribs. (Dkt. No. 1.) Based on these events, Stroman raises the following claims: (1) Eighth Amendment excessive force claims against defendants C.O. Trigllio ("Turriglio"[1]), C.O. Bence ("Bence"), C.O. Steele ("Steele"), and Scott Ranze ("Ranze"); (2) Eighth Amendment failure to intervene claims against C.O. Pasqurillio ("Pasqurillio") and Sgt. Bailey ("Bailey"); and (3) First Amendment retaliation claims against Turriglio and Bence. (Dkt. No. 29.)

[1]    The Court notes Defendants refer to this Defendant as Turriglio. (Dkt. No. 41-2 at 6; Dkt. No. 41-14, 41-15.) The Court assumes this is the correct

spelling of this Defendant's name and therefore adopts this spelling and directs the Clerk of the Court to amend the caption accordingly.

Defendants now move for summary judgement relative to Stroman's (1) excessive force claims against Steele and Ranze; (2) failure to intervene claims against Pasqurillio and Bailey; and (3) retaliation claim against Bence. (Dkt. No. 41-2.) For the reasons that follow, the Court recommends granting Defendants' motion with respect to Plaintiff's retaliation claim against Bence and excessive force claim against Steele and denying the motion in all other respects.

## I. FACTUAL BACKGROUND AND THE CURRENT DISPUTE[2]

[2]    Defendants' statement of material facts largely omits the background of this case presumably because they concede these facts are in dispute. Thus, the following facts are drawn from Stroman's verified complaint. The Court will treat the complaint as an affidavit for purposes of this motion and consider the factual allegations therein to the extent they are nonconclusory. *See Jackson v. Onondaga Cty.*, 549 F. Supp. 2d 204, 210 (N.D.N.Y. 2008) (citations omitted). Where relevant, the Court will indicate facts Defendants assert are material to their motion and undisputed. (*See* Defendants' Statement of Material Facts, Dkt. No. 41-9; Plaintiff's Response to Defendants' Statement of Material Facts, Dkt. No 48-6.)

Plaintiff was a prison inmate being held in Coxsackie at the time the actions in the complaint occurred. (Dkt. No. 1 at ¶ 2.) On or about February 1, 2015, Plaintiff was locked in his cell when Turriglio approached him. *Id.* at ¶ 15. Turriglio questioned Plaintiff about grievances filed against other officers and threatened that Plaintiff would be leaving the facility in a body bag if the grievances were not retracted. *Id.* Plaintiff contacted the area supervisor to make him aware of Turriglio's threats. *Id.* at ¶ 16. Plaintiff was then moved from 2 Company, where he was housed, to 3 Company. *Id.*

On February 9, 2015, Bence asked Plaintiff if he would like his keep-lock shower. *Id.* at ¶ 17. Plaintiff stated that he would. *Id.* Bence then asked Plaintiff if he knew Turriglio. *Id.* Plaintiff confirmed that he did and asked why Bence wanted to know. *Id.* Bence responded "Because that's my brother. That's why." *Id.* Plaintiff was then released from his cell to take his shower. *Id.* at ¶ 18.

**\*2**  Plaintiff entered the caged-in shower stall which Steele had opened. *Id.* at ¶ 19. Later, Bence entered the shower area and stated that showers were over. *Id.* at ¶ 21. Bence and Steele proceeded to release the other inmates from their showers. *Id.* Bence and Steele then re-entered the shower area to release Plaintiff. *Id.*

Bence raised his hand and arm towards Plaintiff's torso, effectively blocking Plaintiff's attempt to leave the caged-in shower. *Id.* at ¶ 22. Plaintiff then took two steps back into the shower. *Id.* Bence followed Plaintiff into the shower stall and began taunting him. *Id.* at ¶ 23. Bence stated Plaintiff was a "pussy" for writing grievances against fellow officers and that Plaintiff would take a swing at Bence now if he was not a "pussy." *Id.* Plaintiff responded that if Bence swung first, he would defend himself. *Id.* Bence then pushed Plaintiff. *Id.* at second ¶ 23. Plaintiff dropped his towel, soap and clothing in his hands to the floor and informed Bence that if he put his hands on him again that Plaintiff would give Bence what he was looking for. *Id.*

Bence responded by head-butting Plaintiff, resulting in a laceration on Plaintiff's forehead. *Id.* Plaintiff then swung and hit Bence in the jaw, causing Bence to fall to the ground. *Id.* Steele entered and attempted to strike Plaintiff. *Id.* at ¶ 24. Plaintiff threw two punches at Steele causing Steele to fall to the floor. *Id.* Plaintiff was the first to strike Steele. (Dkt. No. 41-9 at ¶ 34.) While falling, Steele grabbed onto Plaintiff's shorts. (Dkt. No. 1 at ¶ 24.) Plaintiff struggled to prevent Steele from removing his shorts to avoid being naked and feeling defenseless. *Id.* at ¶ 25. Bence then struck Plaintiff in the shoulder and the chin. *Id.* Steele grabbed Plaintiff by the hair and pulled him to the ground. *Id.* at ¶ 26. Bence got on top of Plaintiff and struck him several times in the abdomen before continuing to strike Plaintiff in the facial area while Steele held down Plaintiff's arms. *Id.* In fear of becoming unconscious, Plaintiff turned over onto his stomach as Bence and Steele continued to strike him. *Id.* at ¶ 27.

A "response team" including Defendants Pasqurillio, Bailey and Turriglio, then arrived and entered the shower area. (Dkt. No. 41-11 at 58; Dkt. No. 1 at ¶ 28.) Turriglio shouted, "This grievance writing mother-fucker" and proceeded to kick Plaintiff under his right eye and in his facial area. *Id.* On the third kick Plaintiff raised his right hand, which was struck by the kick, causing his hand to fracture. (Dkt. No. 1 at ¶ 28.) Plaintiff is not sure whether Pasqurillio or Bailey ever entered the shower stall where the assault occurred but remembers

Bailey saying "that's enough" "seconds" after the response team arrived. (Dkt. No. 41-9 at ¶¶ 19-20.)

Plaintiff was handcuffed and ordered to stand up by Pasqurillio. (Dkt. No. 1 at ¶ 28.) Turriglio used Plaintiff's towel to wipe the blood from Plaintiff's face. *Id.* at ¶ 29. Defendants told Plaintiff he was lucky they did not kill him and that Plaintiff would not be so lucky next time. *Id.* Defendants then twisted Plaintiff's arm, while he was cuffed behind his back, and took him to the infirmary. *Id.*

At the infirmary Ranze had Plaintiff's handcuffs removed and ordered Plaintiff to put both hands on the wall. *Id.* at ¶ 30. Plaintiff informed Ranze that he could not raise his arms high enough to do so. *Id.* Ramsey told Plaintiff he had better find a way. *Id.*

**\*3**  Dr. Miller entered the room to examine Plaintiff. *Id.* Dr. Miller informed Ranze that Plaintiff needed to be taken to an outside hospital based on the seriousness of his injuries. *Id.* Dr. Miller was then escorted out of the examination room. *Id.* at ¶ 31.

Ranze again ordered Plaintiff to place his hands on the wall. *Id.* Plaintiff informed Ranze that he still was not capable. *Id.* Ranze instructed the other Defendants to close the door first and followed by instructing the other Defendants to "beat him down but don't hit him in the face." *Id.* Turriglio and another unidentified individual hit Plaintiff on his back and legs. *Id.* After a few seconds, Plaintiff fell to the floor. *Id.* Ranze then ordered the other Defendants to stop. *Id.*

Plaintiff was handcuffed and taken to Albany Medical Center where it was determined that he suffered from multiple lacerations, contusions and fractured bones. *Id.* at ¶ 32. Plaintiff was given a CAT scan for his shoulder, neck, head and back. *Id.*

Plaintiff filed a grievance related to this incident on March 12, 2015. (Dkt. No. 41-9 at ¶ 10; Dkt. No. 41-4.) His grievance does not allege Bailey, Pasqurillio, or Bence retaliated against him for filing grievances. (Dkt. No. 41-9. at ¶¶ 13, 16, 17, 30).

As discussed above, Plaintiff raises the following claims: (1) Eighth Amendment excessive force claims against defendants Turriglio, Bence, Steele, and Ranze; (2) Eighth Amendment failure to intervene claims against Pasqurillio and Bailey; and (3) First Amendment retaliation claims against Turriglio and Bence. (Dkt. No. 29.) Defendants presumably concede there

2019 WL 7494384

are material factual disputes regarding Plaintiff's excessive force and retaliation claims against Turriglio and excessive force claim against Bence. However, Defendants move for summary judgment as to the other claims.

Specifically, Defendants contend there is no dispute that Plaintiff hit Steele first and Ranze never laid his hands-on Plaintiff. (Dkt. No. 41-2 at 18-19.) Thus, according to Defendants, Plaintiff's excessive force claims fail. *Id.* Furthermore, Defendants assert Plaintiff's grievance did not alert prison officials to the nature of his retaliation claim against Bence and his failure to intervene claims against Pasqurillio and Bailey. *Id.* at 8-10, 13-14. Therefore, Defendants argue the Court should dismiss these claims because Plaintiff failed to exhaust his administrative remedies. *Id.* In any event, Defendants contend Plaintiff's retaliation claim and his failure to intervene claims are meritless. *Id.* at 10-13, 14-17.

Plaintiff responded, asserting he exhausted his claims and they have merit. (Dkt. No. 48.) However, Plaintiff acquiesced to the dismissal of his retaliation claim against Bence. *Id.* at 16.

## II. DISCUSSION

### a. Standard of Review

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

**\*4** Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 273 (citations omitted). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72,

81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and quotation marks omitted). A verified complaint, as Plaintiff has filed in this case (Dkt. No. 1), is to be treated as an affidavit. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist....") (citations omitted).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981, 1999 WL 983876, at \*3 (S.D.N.Y. Oct. 28, 1999 [3]) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

[3]     Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

### b. First Amendment Retaliation

As noted above, Stroman concedes his retaliation claim against Bence should be dismissed. (Dkt. No. 48 at 16.) The Court, likewise has considered this claim and finds Bence is entitled to summary judgment on Stroman's retaliation claim because there is no evidence imputing a retaliatory motive to Bence's actions. (*See, e.g.*, Dkt. No. 41-9 at ¶ 31 (Plaintiff admitting he had never encountered or communicated with Bence prior to the date of the incident).) Accordingly, the Court recommends granting Defendants' motion for summary judgment with respect to Plaintiff's retaliation claim against Bence.

### c. Eighth Amendment Excessive Force

#### 1. Applicable Legal Principles

To state an excessive force claim, a prisoner must allege "two elements, one subjective and one objective." *Harris v.*

*Miller*, 818 F.3d 49, 63 (2d Cir. 2016) (per curiam) (citation omitted). "The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (internal quotation marks omitted) (quoting *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)). For excessive force claims, "the test for wantonness 'is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Harris*, 818 F.3d at 49 (quoting *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003)).

 **5**  "Second, [the inmate] must allege that the conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions." *Harris*, 818 F.3d at 64 (citations omitted). "The objective component of the Eighth Amendment test is also context specific, turning upon 'contemporary standards of decency.' " *Id.* (citations omitted). But "certain actions, including the malicious use of force to cause harm, constitute Eighth Amendment violations *per se.*" *Id.* (citations omitted).

### 2. Steele

Defendants' main argument is focused on the subjective prong of an excessive force claim and asserts Steele did not use excessive force against Stroman because Stroman admits he hit Steele first. (Dkt. No. 41-9 at ¶¶ 33-34.) However, summary judgment does not turn simply on whether Steele was punched first but rather whether—granting Plaintiff's version of events as true—Steele's reaction was reasonable. As Defendants appear to concede, there is a material dispute as to how the incident started, *i.e.*, whether Bence threatened and then headbutted Plaintiff. According to Stroman, he was protecting himself from Bence's aggression and Steele subsequently lunged towards him to help Bence.

Nonetheless, Plaintiff has not alleged Steele ever struck him or did anything but attempt to get him under control. The key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986)); *see also Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973). The undisputed facts establish Steele only helped subdue Plaintiff and did not apply

unnecessary or wanton force. Indeed, Plaintiff's grievance does not even allege Steele hit Plaintiff, only that Steele was holding onto Plaintiff during the altercation with Bence. (Dkt. No. 41-4 at 4.) Thus, the Court finds no reasonable juror could conclude Steele possessed the requisite culpability to have violated Plaintiff's rights. Accordingly, the Court recommends granting Steele's motion for summary judgment.

### 3. Ranze[4]

[4]

As Defendants note, Plaintiff did not specifically address Defendants' arguments with respect to the merits of his excessive force claim against Ranze. However, given Stroman's *pro se* status, the Court has undertaken an independent review of his claim against Ranze.

The allegations in the complaint and Plaintiff's deposition transcript create a dispute of fact with respect to whether Ranze was involved in the use of force incident alleged to have taken place in the infirmary. In the relevant sense, "personal involvement" is defined as "personal participation by one who has knowledge of the facts that rendered the conduct illegal," or indirect participation, such as "ordering or helping others to do the unlawful acts, rather than doing them him- or herself." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001).

Here, Stroman alleges Ranze facilitated his beating in the infirmary. Specifically, Stroman recalls Ranze telling Turriglio to "close the door" and not to hit Plaintiff in the face before giving Turriglio a "nod" before he kneed Plaintiff in the back of the leg and then beat him. (Dkt. No. 41-11 at 76-79.) Thus, contrary to Defendants' suggestion and granting all reasonable inferences in Plaintiff's favor, the evidence establishes Ranze was involved and arguably ordered the attack in the infirmary. If proved, this would render Ranze liable for an excessive force claim as an indirect participant. *See Provost*, 262 F.3d at 155. Accordingly, the Court recommends denying Ranze's motion for summary judgment.

### d. Eighth Amendment Failure to Intervene

#### 1. Exhaustion

**\*6** The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate-plaintiff to exhaust all available administrative remedies prior to bringing a federal civil rights action. The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock*, 549 U.S. 199, 218-19 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)).

In New York, the inmate grievance procedure ("IGP") is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). At step-two, an inmate may appeal an adverse decision of the IGRC to the Superintendent of the Facility. *Id.* at § 701.5(c). Finally, at step-three, an inmate may appeal adverse decisions at the Superintendent's level to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). Grievances involving claims of excessive force, such as the grievance at issue in this case, are subject to an expedited procedure. *Id.* § 701.8; *Torres v. Carry*, 691 F. Supp. 2d 366 (S.D.N.Y. 2009). In those cases, the IGRC step is skipped and the Superintendent is required to investigate and render a decision on the grievance within twenty-five calendar days. N.Y. Comp. Codes R. & Regs., tit. 7 § 701.8.

In this case, Stroman completed the relevant steps as outlined above. He filed a grievance the Superintendent denied. (Dkt. No. 41-5.) He then appealed to CORC, and, similarly received an unfavorable decision. (Dkt. No. 41-6.)

Defendants do not argue Stroman failed to appropriately go through each of the steps. Rather, Defendants contend Stroman did not exhaust his administrative remedies with respect to his failure to intervene claims against Bailey and Pasqurillio because his grievance did not mention Bailey and did not state Bailey or Pasqurillio failed to prevent the use of force against Plaintiff. (Dkt. No. 41-2 at 9-10.) Thus, according to Defendants, "the grievance satisfied none of the purposes of the exhaustion requirement." (Dkt. No. 54-3 at 5.) The Court finds Defendants' arguments relative to exhaustion meritless.

As noted above, exhaustion through the PLRA is a function of state law. In other words, to successfully exhaust administrative remedies, the inmate-plaintiff must adhere to the state's procedure. Thus, for example, if the state requires grievances be served within a certain time-frame, compliance with those rules is necessary to properly exhaust state remedies. The appropriate query for the Court in this case, therefore, is to consider whether New York state regulations require an inmate-plaintiff to name each defendant and state each putative legal theory.

The Second Circuit has previously considered the IGP and held it does not require a prisoner's grievance to name the responsible party or identify relevant legal theories. *See Espinal v. Goord*, 558 F.3d 119, 124, 127-28 (2d Cir. 2009). Indeed, New York's regulations specifically provide only that "the grievance should contain a concise, specific description of the problem and the action requested and indicate what actions the grievant has taken to resolve the complaint[.]" N.Y. Comp. Codes R. & Regs., tit. 7 § 701.7(a)(2). Furthermore, as Plaintiff argues (Dkt. No. 48 at 6), the form provided to inmates to file grievances (Form 2131) merely provides a small space to describe the "Problem" and advises the author to "be as brief as possible." (Dkt. No. 41-4.)

**\*7** Thus, far from imputing a name-all-defendants-and-legal-theories requirement, "a prisoner must [only] allege facts sufficient to alert corrections officials 'to the nature of the claim,' and 'provide enough information about the conduct' at issue 'to allow prison officials to take appropriate responsive measures.' " *Wright v. Potter*, No. 914CV01041, 2016 WL 5219997, at \*5 (N.D.N.Y. June 28, 2016), *report and recommendation adopted*, No. 914CV01041, 2016 WL 5173283 (N.D.N.Y. Sept. 21, 2016) (citing *Singh v. Lynch*, 460 Fed. Appx. 45, 47 (2d Cir. 2012)) (quoting *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004)). For example, in *Espinal*, the plaintiff's grievance alleged the participation of "countless other security officers" in addition to alleging the involvement of two named correctional officers. *Espinal*, 558 F.3d at 127. The plaintiff's grievance in *Espinal* also included the specific date, time, and location of the incident. *Id.* The Second Circuit found the grievance gave officials the necessary information to investigate the complaints and which officers were involved in the incident. *Id.*

Here, the Court is satisfied that Plaintiff's grievance, as well as the other relevant evidence, reveals he properly exhausted his failure to intervene claims against Pasqurillio and Bailey. Indeed, it strains credulity to argue, as Defendants do, that Stroman's grievance did not alert prison officials to the nature of his claims. Stroman's grievance describes that a "response team" arrived including one unnamed officer and Turriglo. (Dkt. No. 41-4 at 4-5.) It also asserts Turriglio, who was the "second" officer in the response team, said

"this grievance writing mother fucker" as soon as he arrived and right before he kicked Plaintiff in his face and hand several times. *Id.* Defendants rightfully concede that Stroman named Pasqurillio as one of the individuals in the response team. Such an acknowledgement is grounds enough to deny Pasqurillio's motion for summary judgment because he was identified as an individual who was present during an allegation of excessive force. Similarly, the Court finds it would have taken little effort to identify Bailey as a member of the response team on the scene during the assault. Indeed, the prison initiated a Tier III disciplinary proceeding where Bailey and Pasqurillio were called as *witnesses* to the incident. (Dkt. No. 54-1 at 5.)

This case is decidedly different than the case Defendants principally rely upon, *Wright v. Potter*, 2016 WL 5219997. In *Potter*, the plaintiff never mentioned the relevant doctor's name—*but more importantly*—never stated he received negligent medical treatment. In other words, the entire basis for the claim was left out of the grievance. Here, in stark contrast, Plaintiff's grievance accuses Bence of headbutting him after which a response team arrived to apply more force and simultaneously allowed the assault to continue. (Dkt. No. 41-4.) Plaintiff's grievance sufficiently alerts prison officials that Bence and Turriglio applied excessive force and other members of the response team failed to intervene.

Accordingly, the Court recommends denying Defendants' motion for summary judgment on exhaustion grounds.

### 2. Merits

A prison official who is present while an assault upon an inmate occurs may bear responsibility for any resulting constitutional deprivation, even if he did not directly participate. *See, e.g., Tafari v. McCarthy*, 714 F. Supp. 2d 317, 342 (N.D.N.Y. 2010); *Cicio v. Graham*, No. 9:08-CV-534 (NAM/DEP), 2010 WL 980272, at *13 (N.D.N.Y. Mar. 15, 2010.). To establish liability under a failure to intervene theory, a plaintiff must prove the use of excessive force by some other individual, and that the defendant under consideration: (1) possessed actual knowledge of the use by another of excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001). Thus, mere inattention or inadvertence does not rise to a level

of deliberate indifference sufficient to support liability for failure to intervene. *Cicio v. Lamora*, No. 9:08-CV-431 (GLS/DEP), 2010 WL 1063875, at *8 (N.D.N.Y. Feb. 24, 2010) (citations omitted). Indeed, officers generally "cannot be held liable for failure to intervene in incidents that happen in a 'matter of seconds.' " *Henry v. Dinelle*, No. 9:10-CV-0456 (GTS/DEP), 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (quoting *Parker v. Fogg*, No. 85-CV-177 (NPM), 1994 WL 49696, at *8 (N.D.N.Y. Feb. 17, 1994)).

**\*8** Moreover, an officer cannot be held liable for failure to intervene if there was not a "reasonable opportunity" to stop the alleged use of excessive force. *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 429 n. 9 (N.D.N.Y. 2009); *Parker*, 1994 WL 49696 at *8. However, this issue can be decided as a matter of law only if "considering all the evidence, a reasonable jury could not possibly conclude" that the officer had a reasonable opportunity to intervene. *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).

Here, the primary issue with respect to the failure to intervene claims centers on Bailey and Pasqurillio's ability to stop Trugillio's alleged assault. As set forth above, Plaintiff claims while he was on the ground a "response team," including Defendants Pasqurillio, Bailey and Turriglio, arrived and entered the shower area. (Dkt. No. 1 at ¶¶ 27-28, 39, 42.) Turriglio shouted, "this grievance writing mother-fucker" and proceeded to kick Plaintiff under his right eye and in his facial area. *Id.* at ¶ 28. On the third kick Plaintiff raised his right hand, which was struck by the kick, causing Plaintiff's hand to fracture. *Id.* For the purposes of this motion, the Court assumes Turriglio's conduct occurred and it constitutes excessive force. The question is thus, whether Bailey and Pasqurillio had an opportunity to recognize and stop Turriglio's assault.

Defendants argue Stroman's failure to intervene claims fail on the merits because Plaintiff cannot establish they had an opportunity to stop Turriglio's use of force. The Court disagrees. Plaintiff alleges Pasqurillio and Bailey arrived at the shower area at the same time as Turriglio who made a defamatory comment *before* kicking Plaintiff in the face. Upon hearing Turriglio state "this grievance writing mother-fucker," Pasqurillio and Bailey would have been alerted to Turriglio's malicious motive. Thus, there is a triable issue of fact regarding whether Pasqurillio and Bailey had an opportunity to stop the alleged assault—at the moment they heard Turriglio's comments. Furthermore, considering Turriglio was able to kick Plaintiff multiple

times, both Pasqurillio and Bailey had a realistic opportunity to intervene and prevent harm from occurring. Though the Court recognizes the incident was over quick and Plaintiff alleges Bailey gave an order to stop, the evidence—viewed in Plaintiff's favor—raises an inference that Bailey and Pasqurillio sat idly during at least part of Turriglio's assault. Accordingly, the Court recommends denying Defendants' motion for summary judgment on these grounds.

## III. CONCLUSION

For the reasons stated above, the Court recommends granting Defendants' motion for summary judgment in part and denying it in part. If the Court accepts the foregoing recommendations, the following claims would remain for trial: (1) Eighth Amendment excessive force claims against Ranze, Turriglio, and Bence; (2) First Amendment retaliation claim against Turriglio; and (3) Eighth Amendment failure to intervene claims against Pasqurillio and Bailey.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 41) be **GRANTED** in part with respect to Plaintiff's retaliation claim against Bence and his excessive force claim against Steele; and it is further

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 41) be denied in all other respects; and it is further

 **\*9 RECOMMENDED** that the Court appoint Plaintiff *pro bono* trial counsel to assist in the preparation for a trial; and it is further

**ORDERED** that the Clerk amend the caption of this case to reflect the correct spelling of Defendant Turriglio; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [5] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

[5]     If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**All Citations**

Slip Copy, 2019 WL 7494384

---

**End of Document**                                                     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 68610
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Isaac K. STROMAN, Plaintiff,

v.

Scott RANZE et al., Defendants.

9:18-cv-149 (GLS/TWD)
|
Signed 01/07/2020

**Attorneys and Law Firms**

FOR PLAINTIFF: ISAAC K. STROMAN, Plaintiff, pro se, 11-A-0292, Riverview Correctional Facility, PO Box 247, Ogdensburg, NY 13669.

FOR DEFENDANTS: HON. LETITIA JAMES, OF COUNSEL: RYAN L. ABEL, ADRIENNE J. KERWIN, HELENA O. PEDERSON, Assistant Attorneys General, New York State Attorney General, The Capitol, Albany, NY 12224.

**ORDER**

Gary L. Sharpe, Senior District Judge

**\*1** The above-captioned matter comes to this court following an Order and Report-Recommendation by Magistrate Judge Thérèse Wiley Dancks duly filed on December 13, 2019. (Dkt. No. 58.) Following fourteen days

from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

No objections having been filed, and the court having reviewed the Report-Recommendation for clear error, it is hereby

**ORDERED** that the Report-Recommendation (Dkt. No. 58) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 41) is **GRANTED IN PART** and DENIED IN PART as follows:

**GRANTED** with respect to plaintiff Isaac K. Stroman's retaliation claim against defendant C.O. Bence and his excessive force claim against defendant C.O. Steele; and

**DENIED** in all other respects; and it is further

**ORDERED** that, when a trial date is scheduled by the court, the Court will appoint Stroman pro bono trial counsel to assist in the preparation for trial; and it is further

**ORDERED** that the Clerk provide a copy of this Order to the parties in accordance with the Local Rules of Practice.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 68610

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 4289515
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jesse D. WEST, Plaintiff,
v.
John HARKNESS, #0304, Police Officer; and
John Harriman, #0463, Police Officer, Defendants.

9:17-CV-0621 (GTS/DJS)
|
Signed 09/21/2021

**Attorneys and Law Firms**

OFFICE OF JARROD W. SMITH, Counsel for Plaintiff, 11 South Main Street, P.O. Box 173, Jordan, NY 13080, OF COUNSEL: JARROD W. SMITH, ESQ.

CITY OF SYRACUSE LAW DEPARTMENT, Counsel for Defendants, 233 East Washington Street, 300 City Hall, Syracuse, NY 13202, OF COUNSEL: PATRICK R. BLOOD, ESQ., TODD M. LONG, ESQ.

GOLDBERG SEGALLA, Co-Counsel for Defendants, 5786 Widewaters Parkway, Syracuse, NY 13214, OF COUNSEL: SHANNON T. O'CONNOR, ESQ., ALEXANDER J. BLOOD, ESQ.

**DECISION and ORDER**

GLENN T. SUDDABY, Chief U.S. District Judge

**\*1** Currently before the Court, in this civil rights action filed by Jesse D. West ("Plaintiff") against City of Syracuse police officers John Harkness and John Harriman ("Defendants"), is Defendants' motion for summary judgment. (Dkt. No. 59.) For the reasons set forth below, Defendants' motion is denied.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Amended Complaint**

Generally, in his Amended Complaint, Plaintiff asserts a claim of "excessive force" and a claim of failure to protect in violation of the Fourth Amendment and 42 U.S.C. § 1983. (Dkt. No. 8 [Pl.'s Am. Compl.].) Specifically, Plaintiff alleges that, on February 24, 2017, while he was in a police vehicle, Defendants Harkness and Harriman, while

conducting a search, pulled down his jeans and boxer briefs and one of them ran a hand between his buttocks, touching his "rectum" barehanded. (*Id.*) Plaintiff additionally alleges that Defendants failed to protect him from the alleged use of excessive force. (*Id.* at 5.)

**B. Undisputed Material Facts on Defendants' Motion for Summary Judgment**

Under N.D.N.Y. Local Rule 56.1, a party opposing summary judgment must file a response to the moving party's Statement of Material Facts that "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs," supported by "a specific citation to the record where the factual issue arises." N.D.N.Y. L.R. 56.1(b). This requirement is not a mere formality; rather "this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties." *LaFever v. Clarke*, 17-CV-1206, 2021 WL 921688, at \*6 (N.D.N.Y. Mar. 11, 2021) (Hurd, J.) (quoting *Frantti v. New York*, 414 F. Supp. 3d 257, 284 [N.D.N.Y. 2019] [Hurd, J.]). Indeed, "[a] proper response to a movant's statement of material facts streamlines the summary judgment analysis 'by allocating responsibility for flagging genuine factual disputes on the participants ostensibly in the best position to do so: the litigants themselves.' " *LaFever*, 2021 WL 921688, at \*7 (quoting *Alke v. Adams*, 16-CV-0845, 2018 WL 5297809, at \*2 [N.D.N.Y. Oct. 25, 2018] [Hurd, J.]). "The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *See* L.R. 56.1(b).

In this case, Plaintiff failed to comply with the Local Rules in that his purported "response" to Defendants' Statement of Material Facts does not mirror Defendants' Statement of Material Facts and does not admit or deny the asserted facts in matching numbered paragraphs supported by specific citations in the record. Rather, Plaintiff's purported response is a mishmash of legal arguments and citations to various portions of his testimony at depositions and other evidence, without any reference to the specifically numbered facts asserted by Defendants. (Dkt. No. 122, Attach. 20.) Furthermore, although the Local Rules permit a respondent to "set forth any assertions that the opposing party contends are in dispute in a short and concise Statement of Additional Material Facts in Dispute," Plaintiff's statement here is also insufficient pursuant to those standards. Specifically, many of Plaintiff's "facts" are legal arguments with generic citations

to exhibits (or no citation at all), while his specific citations to evidence from the deposition testimony are neither "short and concise" nor in "separately numbered paragraphs" as required. L.R. 56.1(b). Indeed, Plaintiff's "response" is nearly identical to his affidavit also submitted with his opposition to Defendants' motion. (*Compare* Dkt. No. 122 *with* Dkt. No. 122, Attach. 20.)

**\*2** The Court has ensured that all of Defendants' asserted facts are supported by the record evidence cited in support of them. In addition, the Court has made a reasonable effort to ensure that Defendants' asserted facts do not conflict with other record evidence cited in support of contrary facts asserted by Plaintiff. However, the Court has not *sua sponte* scoured the considerable record [1] for any and all evidence contradicting those asserted facts, nor does it have a duty to do so. *See Prive v. Johnson*, 04-CV-1024, 2010 WL 3338810, at \*2 (N.D.N.Y. Aug. 23, 2010) (Suddaby, J.) (noting that, "[b]ased on the volume of record evidence presented in this case, and the fact that Plaintiff was represented by experienced counsel when he filed his response to Defendants' motion, the Court declines to scour the record for evidence of material questions of fact"); *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."); *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 291 (2d Cir.2000) (noting that the Local Rules require the parties "to clarify the elements of the substantive law which remain at issue because they turn on contested facts" and the Court "is not required to consider what the parties fail to point out") (internal quotation marks and citations omitted).

---

[1]    The Court notes that the record on Defendants' motion is approximately 680 pages in length. (Dkt. No. 117, Attach. 2-13; Dkt. No. 122, Attach. 1-18.)

Indeed, given the failure of Plaintiff (who is represented by counsel) to respond appropriately to Defendants' Statement of Material Facts, the Court may and does deem admitted any asserted facts that Defendants have supported with evidence that are not specifically controverted. *See* N.D.N.Y. L.R. 56.1(b); *Bryant v. Whitmore*, 14-CV-1042, 2016 WL 7188127, at \*3 (N.D.N.Y. Nov. 4, 2016) (Dancks, M.J.) ("Where a party has failed to respond to the movant's statement of material facts in the manner required by L.R. [56.1], the facts in the movant's statement will be accepted as

true (1) to the extent they are supported by evidence in the record, and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.") report-recommendation adopted by 2016 WL 7187349 (N.D.N.Y. Dec. 9, 2016) (McAvoy, J.). As a result, unless otherwise noted, the following facts were asserted and supported with accurate record citations by Defendants in their Statement of Material Facts and deemed admitted by Plaintiff due to his failure to appropriately respond or cite evidentiary support sufficient to create a genuine dispute of material fact. (*Compare* Dkt. No. 117, Attach. 14 [Defs.' Rule 56.1 Statement] *with* Dkt. No. 122, Attach. 20.) [2]

---

[2]    Given the flagrant lack of compliance with Local Rule 56.1 in this case, Plaintiff's counsel is respectfully reminded that familiarity and compliance with the Local Rules is a prerequisite to practice in this District. *See* N.D.N.Y. L.R. 83.1(a)(1) (indicating that, in a petition for admission to the bar of this Court, the petitioner must state that he or she is familiar with the Local Rules and "shall further affirm faithful adherence to these Rules and responsibilities").

---

**Events Prior to Plaintiff's Arrest**

1. On February 23, 2017, Syracuse Police Department ("SPD") Officer Cody Nellis responded to 217 Aberdeen Terrace in Syracuse, New York, regarding a verbal domestic incident. Upon arrival, Officer Nellis spoke to S.V., who reported that she has "a full stay away order" against Plaintiff, her ex-boyfriend.

2. S.V. explained that Plaintiff had been calling her continuously for the past 24 hours, and she showed Officer Nellis her cell phone, which showed more than 40 unanswered calls from a landline phone number listed as 1313 Grant Boulevard in Syracuse, New York.

3. S.V. reported to Officer Nellis that Plaintiff had been physically violent with her in the past (with numerous physical altercations dating back several years) and that she finally had had enough of the abuse, so she had ended the relationship approximately a month before. S.V. additionally reported that, after she had left Plaintiff, he had started using drugs frequently and had become increasingly hostile towards her.

**\*3** 4. S.V. advised Officer Nellis that she had answered one of these phone calls from Plaintiff in an attempt to direct him to stop calling her. She reported that, during the call, Plaintiff had claimed that he had recently came into possession of a handgun from his cousin and that he was going to kill her, their child, and the police when they came for him, because he had "nothing else to live for" and was adamant about "going out with a bang." S.V. expressed that she believed Plaintiff was "very unstable" and that his threats were sincere.

5. Officer Nellis obtained a sworn statement from S.V. regarding Plaintiff and her desire for prosecution against him.

6. Officer Nellis learned from S.V. that Plaintiff had been staying with family members at 1313 Grant Boulevard in Syracuse, New York,

7. After speaking with S.V., Officer Nellis prepared a warrant application for Plaintiff's arrest based on evidence that he had violated a protective order. As a part of this process, SPD issued notice to the Onondaga County 911 Center to flag any potential calls in connection with Plaintiff.

### SPD's Response to Report of
### Suspicious Person with a Weapon

8. The following day, February 24, 2017, at or around 5:06 PM, Officer Nellis and multiple other SPD units responded to 1313 Grant Boulevard regarding a call from S.V.

9. S.V. had reported to 911 that Plaintiff was standing outside 1313 Grant Boulevard with a gun and threatening to shoot everyone. S.V. had also reported that Plaintiff was on "molly," had threatened to come "mess up her van," and that her friend had seen Plaintiff display a gun, which he had pointed at that friend.

10. Around the time Officer Nellis arrived at 1313 Grant Boulevard, he was joined by SPD Officer Michael Shannon, Sergeant David Hart, and Defendant Harriman. After establishing a perimeter around the residence, the officers approached the front door and ordered the occupants to exit.

11. Three individuals exited the residence, including Plaintiff's father, who gave the officers permission to enter the residence.

12. Officers Nellis and Shannon entered the residence and began clearing rooms. As Officer Nellis entered the kitchen area, he observed a closed door in the rear of the kitchen. When he attempted to open the door, it appeared to be held shut from the other side.

13. Officer Nellis called for assistance and was joined by Officer Shannon and Sergeant Hart, all three of whom drew their SPD-issued weapons (due to the nature of the call indicating that a weapon might be involved) and ordered the individual inside to exit with his hands in the air. When Plaintiff came out from the room, he was placed under arrest, handcuffed, and escorted outside.

14. Outside of the residence, as the officers attempted to place Plaintiff into the back of Defendant Harriman's patrol vehicle, he began to push or "buck" the officers, and also attempted to kick Defendant Harriman. Plaintiff was eventually brought to the ground by officers.

15. Plaintiff was, in his own words, "struggling to get free" because he was in pain.

16. By the time Plaintiff was under control, an SPD prisoner transport van had arrived on scene. The prisoner transfer van is larger than a patrol car and therefore is much easier to place individuals inside.

17. Defendants Harkness and Harriman escorted Plaintiff to the back of the prisoner transport van.

18. Before Defendants Harkness and Harriman brought him to the transport van, officers had been unable to thoroughly search Plaintiff beyond a pat-frisk.

### Defendants' Search of Plaintiff

**\*4** 19. SPD's operations policy titled "Arrest, Processing & Transporting Prisoners" (Art. III, Sec. 9.17) requires that "[a]ll persons taken into custody will be thoroughly searched for weapons, evidence, means of escape, and/or contraband prior to being transported."

20. In Defendant Harriman's and Officer Nellis' estimation, "[i]t is not uncommon for suspects to hide weapons (e.g., handguns, knives or sharp objects) or contraband in or near the waistband of their pants and/or underwear."

2021 WL 4289515

21. A mere "pat down" or "pat-frisk" search may be unable to detect such items; thus, before transport, a more thorough search is required, especially where the individual has exhibited violent behavior and/or is suspected of having weapons.

22. Before the arrival of the prisoner transport van, Plaintiff had not been searched thoroughly.

23. The prisoner transport van is divided roughly in two sections: the front section for the driver and front seat passenger, and the rear section for the prisoners. The rear (or prisoner) section is at least ten feet long with two parallel benches running lengthwise. A metal grate wall separates the driver-and-front passenger section from the prisoner section.

24. Initially, Plaintiff was positioned sitting at the edge of the rear section of the prisoner transport van with the doors open.

25. While still outside the van near the rear doors, Defendant Harriman communicated that Plaintiff had not been searched thoroughly and that he would need to be searched again before transport. [3]

> [3]
>
> In his deposition, Plaintiff testified that he did not hear any officer say they were going to search him. (Dkt. No. 117, Attach. 2, at 83-84 [Pl.'s Dep.].) However, he does not deny that Defendant Harriman made the asserted statement, merely that he did not hear it. Such evidence is insufficient to create a genuine dispute of material fact. *See Genger v. Genger*, 663 F. App'x 44, 49 n.4 (2d Cir. 2016) (summary order) (noting that a statement that one "ha[d] no recollection" of a fact "does not constitute a denial"); *F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66, 75 (2d Cir. 2000) ("[V]ague denials and memory lapses ... do not create genuine issues of material fact."); *Davis v. City of Syracuse*, 12-CV-0276, 2015 WL 1413362, at *2 (N.D.N.Y. Mar. 27, 2015) (Suddaby, J.) ("On a motion for summary judgment, denials of fact that are based on a lack of personal knowledge ... are insufficient to create a genuine dispute.").

26. Upon seeing Defendants coming for him, Plaintiff stated words to the effect of "That's not going to happen," and he "slid" into the prisoner transport van away from the rear doors

and towards the partition between the driver section and the prisoner section. [4]

> [4]
>
> In his deposition, Plaintiff states that he does not recall saying anything to the officers or expressing any verbal objection, but he does not affirmatively deny that he expressed a verbal objection. (Dkt. No. 117, Attach. 2, at 84 [Pl.'s Dep.].) As indicated above in note 3 of this Decision and Order, such a denial of recollection is insufficient to controvert a factual assertion. Additionally, at his previous examination (pursuant to Section 50-h of the N.Y. General Municipal Law), Plaintiff testified that, when they sat him at the edge of the transport van, the officers spoke to him, at which point he stated, "I don't have nothing," before he slid into the wagon. (Dkt. No. 122, Attach. 3, at 54, 58-59 [Pl.'s 50-h Exam.].) As a result, the Court deems this portion of Defendants' asserted fact to be admitted and undisputed.

 **\*5**  27. Plaintiff leaned himself against the metal wall by the front of the van away from Defendants.

28. Accordingly, Defendant Harkness entered the van and began to explain to Plaintiff that he needed to be searched.

29. Plaintiff then stood and charged toward Defendant Harkness. [5]

> [5]
>
> Although Plaintiff does not affirm that this occurred, he offers no testimony or evidence to specifically refute the asserted fact. This asserted fact is therefore deemed admitted.

30. Defendant Harkness used one of his forearms to deflect Plaintiff and push him towards the front of the van into a seated position on the bench.

31. Plaintiff then reached into the rear of his jeans. [6]

> [6]
>
> Plaintiff testified at his Section 50-h examination that (1) he never reached toward the "waistband" of his pants while in the back of the van, and (2) his hands were never near the waistband of his pants because they were "cuffed behind [his] back." (Dkt. No. 122, Attach. 3, at 60 [Pl.'s 50-h Exam.].) However, Defendants have asserted that Plaintiff reached into the rear of his "jeans," not

2021 WL 4289515

the rear of his "waistband." Moreover, Plaintiff's explanation for why he could not have reached near the waistband of his pants is self-contradictory, because he could have done so even if his hands were handcuffed behind him. For all of these reasons, the Court finds that Plaintiff has not controverted the above-stated fact by Defendants.

32. Upon seeing the struggle, Defendant Harriman climbed into the van to assist Defendant Harkness.

33. As Plaintiff began kicking, Defendant Harriman directed his attention to controlling Plaintiff's legs. While doing so, Defendant Harriman observed Plaintiff quickly reaching toward the back of his waist with his left hand.

34. Defendant Harriman yelled at Plaintiff, "[S]top reaching!"

35. Defendants Harriman and Harkness believed that Plaintiff was reaching for a weapon based on reports regarding Plaintiff and the fact that he had not been searched thoroughly by that time.

36. Defendant Harkness undid Plaintiff's belt and pulled his pants down while Defendant Harriman checked the interior of Plaintiff's pants and pockets. That search yielded negative results.

37. In Defendant Harriman's experience, the waistband is a common spot utilized by criminals to carry and conceal weapons, and it is common for weapons to become dislodged from the waistband and fall inside the pants, particularly during or after fleeing from or resisting police officers.

38. After checking Plaintiff's pants and pockets, Defendant Harriman directed his attention to the waistband of Plaintiff's boxer briefs. Defendant Harriman then ran his right hand along Plaintiff's waistband to confirm whether he was concealing anything inside his boxer briefs. This search yielded negative results. [7]

[7]    The Court notes that, at this point of their recitation of the facts, Defendants assert that at no time during this search of Plaintiff's waistband did Defendant Harriman with his barehand make "skin-to-skin" contact with Plaintiff's buttocks area, and that indeed Defendant Harriman would never do such a thing out of concerns for safety and hygiene. (Dkt. No. 117, Attach. 10, at ¶¶ 46-47.) Granted,

Defendants' factual assertion is supported by an accurate record citation. (Dkt. No. 117, Attach. 10, at ¶ 15 [Harriman Decl.].) However, during its general review of the record, the Court has come across record evidence controverting this factual assertion. (Dkt. No. 117, Attach. 2, at 21, 50, 56 [Pl.'s Dep.]; Dkt. No. 122, Attach. 3, at 62, 66 [Pl.'s 50-h Exam.].) For this reason, the Court has omitted this factual assertion from the above statement of undisputed material facts.

*6  39. During the time Plaintiff's pants were down, he was at in the far "back" of the van, at its front wall away from the rear doors. Based on his position, and the fact that Defendants were standing between Plaintiff and the doors, it would have been extremely difficult for any bystander on the street to see him with his pants down.

40. Throughout the search, Plaintiff repeatedly attempted to press the left side of his waist against the front wall, preventing Defendant Harriman from searching him without difficulty.

41. Article III, Section 9.17 of the Syracuse Police Department's operations policy requires that "[a]ll persons taken into custody will be thoroughly searched for weapons, evidence, means of escape, and/or contraband prior to being transported."

42. As Defendant Harriman started to follow Defendant Harkness out of the van, Plaintiff again lunged at him and attempted to headbutt him. In response, Defendant Harriman pushed his right forearm towards Plaintiff to deflect the blow.

43. Defendant Harriman then removed his pepper spray, pointed it at Plaintiff, and informed Plaintiff that he would be sprayed if he did not sit down. Plaintiff obeyed this command and Defendant Harriman exited the van without further incident.

44. Plaintiff was charged with Resisting Arrest and Harassment in the Second Degree with regard to his conduct on February 24, 2017. He was also charged with Aggravated Harassment in the Second Degree and Criminal Contempt in the First Degree for his conduct on February 23, 2017.

45. Plaintiff was further charged in two additional cases involving S.V. with Aggravated Harassment in the First Degree, Criminal Contempt in the First Degree, and Criminal Contempt in the Second Degree.

**Plaintiff's Arrival at Onondaga County Justice Center**

46. At the Justice Center, Plaintiff was met by Onondaga County Custody Department Sergeant Jeffrey Wick.

47. At that time, Sergeant Wick was "familiar" with Plaintiff due to his numerous incarcerations at the Justice Center, and Sergeant Wick estimated that he has interacted with or seen Plaintiff at the Justice Center on 10 to 15 separate occasions.

48. Sergeant Wick was aware that Sheriff's Office personnel have had to use force in gaining Plaintiff's compliance on multiple occasions.

49. Plaintiff reported to Sergeant Wick that SPD officers had made unwanted sexual contact with him.

50. At some point within the months or weeks prior to February 24, 2017, Plaintiff made an unfounded complaint alleging what he perceived to be to be sexual misconduct on the part of Sheriff's Office personnel.

51. In Sergeant Wick's experience, when an inmate arrives at the Justice Center claiming to have been subjected to unwanted sexual contact, a common practice is to arrange for a medical evaluation or "rape kit" at a medical center in Syracuse.

52. Accordingly, in light of Plaintiff's previous unfounded complaint alleging what he perceived to be sexual misconduct on the part of Sheriff's Office personnel, Sergeant Wick believed it particularly appropriate to provide Plaintiff with an opportunity to have a "rape kit" performed at an offsite medical center.

53. Sergeant Wick communicated to SPD officers that, before Plaintiff could be booked into the Justice Center, he would need to be taken to a medical center for evaluation.

**Plaintiff's Deposition Testimony**

 *7  54. Plaintiff does not know what Defendants Harkness and Harriman look like and cannot tell the difference between the two.

55. Plaintiff cannot recall expressing any verbal objection to Defendants searching him in the back of the prisoner transport van.

56. Plaintiff cannot recall whether Defendants said anything to him while he was in the back of the prisoner transport van.

57. Plaintiff was "turned facing the wall" away from Defendants at the time of the search.

58. Plaintiff could not see Defendants during the search.

59. Plaintiff does not know "which officer really pulled my pants down and did what he did."

60. At no time did Defendants or any officer "penetrate" Plaintiff.

61. Plaintiff admitted that his repeated use of the term "rectum" to describe the area allegedly touched by one of the Defendants was "probably" a "mistake," and affirmed that he was referring to the area "outside" of his rectum (that is, his "sphincter" and/or "an[us]"). [8]

> [8]  The Court has added the ten words at the end of the above-stated fact, because, when fairly read, Plaintiff's deposition states that the "mistake" he previously made (in repeatedly asserting that Defendants touched his rectum) was that it was his "rectum" that Defendants touched, not that there was a touching by Defendants of the area outside his rectum. (Dkt. No. 117, Attach. 2, at 54-55.)

62. When Plaintiff arrived at the Justice Center, he refused to get out of the back of the transport van.

63. The SPD officers transporting Plaintiff asked him if he was going to get out of the van "with any problems," but he did not respond.

64. The SPD officers then stated that "they were going to have to get the SERT team of the Justice Center."

65. Thereafter, Sergeant Wick came to the back of the van, opened the doors, and asked Plaintiff what the problem was.

66. Plaintiff knew Sergeant Wick, having seen him "plenty of times" from previous incarcerations at the Justice Center.

67. After Plaintiff explained what had happened, Sergeant Wick told the officers he would not accept Plaintiff at the Justice Center "until he gets checked out by a hospital."

68. Plaintiff did not make any request to go to the hospital.

69. Plaintiff was transported to St. Joseph's Hospital in Syracuse, where he had a "rape kit" examination performed.

70. According to Plaintiff, the "rape kit" examination consisted of a nurse removing his boxer briefs, putting them into an evidence bag, and swabbing his buttocks with a small cotton swab.

71. Plaintiff does not know what the nurse did with the kit after that.

72. Plaintiff has never been told the results of the "rape kit."

73. Plaintiff declined to release the "rape kit" to SPD.

74. Plaintiff cannot recall whether he told the nurse who performed the "rape kit" about what happened to him.

75. Plaintiff does not remember the names of any of the medical personnel he saw at St. Joseph's Hospital.

76. Plaintiff was not prescribed any medications at St. Joseph's Hospital.

77. Plaintiff has never seen or reviewed his medical records from St. Joseph's Hospital from that day.

78. Plaintiff has never received a mental health diagnosis in connection with his arrest on February 24, 2017.

**\*8** 79. Plaintiff has participated in anger management treatment in the past.

80. Plaintiff contacted Vera House in Syracuse in connection with his allegations against Defendant.

81. Plaintiff ultimately complained to Vera House about what he perceived to be gender discrimination because they did not want to help him.

82. Plaintiff acknowledged in his interrogatory answers that he was in violation of an order of protection related to S.V. on February 24, 2017.

83. Plaintiff ultimately pled guilty to Criminal Contempt in the First Degree for his actions on February 23 and February 24, 2017.

### C. Parties' Briefing on Defendants' Motion for Summary Judgment

#### 1. Defendants' Memorandum of Law

Generally, in their motion, Defendants make three arguments. (Dkt. No. 117, Attach. 15, at 8-20 [Defs.' Mem. of Law].) First, Defendants argue that Plaintiff's excessive force claim pursuant to the Fourth Amendment should be dismissed. (*Id.* at 8-16.) [9] More specifically, Defendants argue that the force used (i.e., the nature of the search in the prisoner transport van) was justified by (a) the severity of the crime at issue, which involved not only violence and/or threatened violence (including reports that Plaintiff had a firearm), but also Plaintiff's actions in resisting arrest, (b) the fact that Plaintiff's own resistance prevented them from adequately searching him before the prisoner transport van arrived and that Plaintiff continued to resist in the transport van, and (c) the fact that Plaintiff repeatedly pressed his body against the wall of the van and reached toward his waistband, a place where it is common for individuals to carry or conceal weapons, and thus Defendants had reason to believe he might be hiding a weapon there. (*Id.*) Defendants argue that the search extended to "the interior of [Plaintiff's] pants and his pockets," and "along the waistband of Plaintiff's underwear" or "boxer briefs," but not into the interior of those boxer briefs. (*Id.* at 14. ["At all times, Officer Harriman's hand remained on the exterior surface of Plaintiff's boxer briefs."].) Finally, Defendants argue that Plaintiff has conceded that there was no contact with his "rectum" or any kind of penetration of his body, and he has not provided evidence of any physical or mental injuries resulting from Defendants' alleged excessive force. (*Id.* at 14-15.)

[9]     Page citations in this Decision and Order refer to the page numbers used in the Court's Case Management / Electronic Filing ("CM/ECF") System, not to the page numbers contained in the parties' motion papers.

Second, Defendants argue that any remaining claims predicated upon a theory of failure to intervene in order to stop or prevent excessive force must be dismissed because there can be no such claim where, as here, the plaintiff has

fail to establish a substantive excessive force claim, and, notwithstanding, Plaintiff has failed to identify any steps that either Defendant failed to reasonably take to protect him. (*Id.* at 17-18.)

Third, Defendants argue that, in the event that Plaintiff has established any constitutional violation, they are entitled to qualified immunity because reasonably competent officials could disagree as to whether Defendants' actions were appropriate under the circumstances. (*Id.* at 19-20.)

### 2. Plaintiff's Opposition Memorandum of Law

**\*9** Generally, in his response to Defendants' motion, Plaintiff makes two arguments. (Dkt. No. 122, Attach. 19, at 6-9 [Defs.' Opp'n Mem. of Law].) First, Plaintiff argues that his excessive force and failure-to-intervene claims should not be dismissed because there is admissible record evidence that, by stripping Plaintiff down to his underwear in the van, Defendants violated the SPD's own explicit use-of-force policy (for example, the Defendants' police reports, in which they admit stripping Plaintiff to his underwear). (*Id.* at 6-7.)

Second, Plaintiff argues that Defendants are not entitled to qualified immunity because (a) the question of whether a defendant is entitled to qualified immunity should be resolved before the completion of discovery and before the filing of motions for summary judgment, and (b) their conduct was objectively unreasonable and unlawful based on the evidence, the fact that a thorough search of Plaintiff had already been conducted, and the fact that there is no proof that Plaintiff had a weapon on his person. (*Id.* at 7-9.)

### 3. Defendants' Reply Memorandum of Law

Generally, in their reply memorandum, Defendants make three arguments. (Dkt. No. 123, Attach. 1, at 3-11 [Defs.' Reply Mem. of Law].) First, Defendants argue that their motion should be granted because Plaintiff has failed to respond to Defendants' Statement of Material Facts as required by the Local Rules of this Court in that he has failed to provide a matching numbered response to each of the factual assertions in Defendants' Statement of Material Facts, and has failed to provide record citations for many of the factual assertions he makes in the statement he does provide. (*Id.* at 3-6.)

Second, Defendants argue that Plaintiff has abandoned his excessive force and failure-to-protect claims because he has failed to address Defendants' substantive arguments as to those claims. (*Id.* at 7-10.) Defendants argue that, rather than addressing the substance of those claims, Plaintiff has merely argued that Defendants are liable because the Citizen Review Board found they violated municipal policy. (*Id.*) Defendants argue that such finding does not actually compel a finding of a constitutional violation. (*Id.*) Finally, Defendants argue that Plaintiff's argument that the issue of qualified immunity must be raised before the completion of discovery has no basis under the law. (*Id.*)

Third, Defendants argue that Plaintiff should not be permitted to assert new claims in opposition to Defendants' motion, namely his new claim that Defendants' alleged violation of municipal policy was the product of a failure-to-train that amounts to a constitutional violation. (*Id.* at 10-11.) Defendants explain that, notwithstanding the fact that this claim is improperly being asserted for the first time in Plaintiff's response memorandum of law, Plaintiff has not named the City of Syracuse as a party in his Amended Complaint, and therefore this failure-to-train argument is inapplicable and misplaced. (*Id.*)

## II. LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). [10] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law .... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

[10]    As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**\*10** In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e). [11]

> [11] Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is proceeding *pro se*.[255] (This is because the Court extends special solicitude to the *pro se* litigant by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.). [12] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigant must obey a district court's procedural rules. [13]

> [12] *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

> [13] *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement[14] – even where the non-movant was proceeding *pro se*.[15]

> [14] Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 56.1(b).

> [15] *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases).

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3). [16] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein ...."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

> [16] *See, e.g., Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the

granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

### III. ANALYSIS

**\*11** After careful consideration of whether Defendants are entitled to summary judgment, the Court must answer this question in the negative for the following reasons.

#### A. Substantive Constitutional Violation

As an initial matter, the Court observes that, although Plaintiff is asserting a claim of "excessive force," he appears to have limited it to only Defendants Harkness and Harriman's alleged contact during the search in the SPD prisoner transport van. (Dkt. No. 8 [Pl.'s Am. Compl.].) Notably, there is evidence of some amount of physical struggle between officers and Plaintiff during his arrest before he was placed in the van (the precise nature of which is disputed by the parties); however, Plaintiff does not mention this physical struggle in his Amended Complaint nor does he assert that any force used by the officers during that struggle was excessive or unlawful. As a result, to the extent that the parties dispute the facts related to the struggle before Plaintiff was placed in the SPD prisoner transport van, the Court finds that such a dispute would not warrant the denial of Defendants' motion for summary judgment. [17] Because of the allegations in the Complaint, the Court constrains its analysis to the actions inside the prisoner transport van.

[17]    Of course, an exception to this finding is the extent to which the struggle outside the van is relevant to whether the scope of the search inside the van was necessary.

Additionally, the Court observes that Plaintiff's argument that Defendants committed a constitutional violation because they (in Plaintiff's estimation) violated the SPD's use-of-force policy is unavailing for three reasons. First, to the extent that Plaintiff's argument supports a theory of municipal liability, Plaintiff did not previously assert any claim for municipal liability in his Amended Complaint and cannot do so at this late stage of the proceedings, in response to Defendants'

motion for summary judgment. As Defendants argue, the existence of a municipal policy or a municipality's failure to properly train its employees are considerations when a plaintiff attempts to hold a municipality responsible for the actions of its employees. However, Plaintiff has not named the City of Syracuse as a defendant, but rather has named only the individual two officers he alleges were involved. [18] Second, even construing Plaintiff's argument as asserting that a violation of the use-of-force policy constitutes proof of excessive force, the violation of such a municipal policy does not, by itself, show such a constitutional violation. *See Rizk v. City of New York*, 462 F. Supp. 3d 203, 220 (E.D.N.Y. 2020) (noting that a violation of a departmental policy "does not, in and of itself, amount to a violation of a right protected by the Constitution or federal law"). Third, the only "evidence" that Plaintiff adduces that there has been a violation of the SPD's use-of-force policy (other than his own testimony) is the Citizen Review Board's Findings and Recommendations, which (as argued by Defendant) do not actually compel a finding of a constitutional violation.

[18]    Plaintiff did initially name SPD as a Defendant, but SPD was terminated from this action as a result of previous proceedings in this litigation. (Dkt. No. 5 [Decision and Order filed July 14, 2017].)

**\*12** As to Plaintiff's substantive constitutional claim, the Court begins its analysis by observing that, although Plaintiff has articulated his claim as one for "excessive force" in his Amended Complaint, the factual allegations supporting that claim do not regard a use of force, but rather are more appropriately characterized as supporting a claim for an unreasonable search. Furthermore, this apparent mischaracterization of his claim appears to have been caused by the fact that, although Plaintiff became represented by counsel in January 2020, his Amended Complaint was filed in August 2017, while he was proceeding *pro se*. (Dkt. Nos. 8, 85.) Because Plaintiff's characterization of his claims were therefore made when he was proceeding *pro se*, the Court is required to construe his Amended Complaint as raising the strongest argument that it suggests. *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017) (noting that "[t]he policy of liberally construing *pro se* submissions is driven by the understanding that implicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training"). As a result, because Plaintiff's own factual allegations plausibly suggest that the appropriate basis

for Plaintiff's claim is an unreasonable search rather than excessive force, the Court will assess Plaintiff's claim under the standard for unreasonable search and seizure. The Court notes that both search/seizure and excessive force claims arise under the Fourth Amendment, and both are subject to the Fourth Amendment's reasonableness standard. *See Terranova v. New York*, 676 F.3d 305, 308 (2d Cir. 2012) (noting that excessive force claims, like unlawful search claims, are "judged under the Fourth Amendment's objective reasonableness standard"); *Hudson v. New York City*, 271 F.3d 62, 68 (2d Cir. 2001) (noting that the objective reasonableness standard has been "extended from searches to other types of Fourth Amendment violations, like excessive force"); *Falls v. (Police Officer) Detective Michael Pitt,* 16-CV-8863, 2021 WL 1164185, at *16 (S.D.N.Y. Mar. 26, 2021) (finding that the portion of plaintiff's "excessive force" claim that involved allegations that defendants emptied his pockets, checked his waistline, and reached down into his pants from his underwear to his socks was "more properly analyzed as an unreasonable search claim, rather than a claim based on alleged excessive force"). [19]

[19]    The Court finds that this liberal construction of Plaintiff's claim does not prejudice Defendants with regard to their motion, because, even if the Court were to assess Plaintiff's claim as an excessive force claim, summary judgment would not be warranted. In assessing whether force is excessive under the Fourth Amendment reasonableness standard, the Court would consider "the facts and circumstances of each particular case, especially (1) the severity of the crime at issue, (2) whether the arrestee poses an immediate threat to the officer or passerby, and (3) whether the arrestee is actively resisting arrest or attempting to evade arrest by flight." *Lee v. City of Troy,* 19-CV-0473, 2021 WL 567240, at *9, 520 F.Supp.3d 191 (N.D.N.Y. Feb. 16, 2021) (Hurd, J.) (internal quotation marks omitted). However, "the use of entirely gratuitous force is unreasonable and therefore excessive." *Lee,* 2021 WL 567240, at *9, 520 F.Supp.3d 191 (quoting *Tracy v. Freshwater,* 623 F.3d 90, 99 n.5 [2d Cir. 2010]). Here, the Court finds that the above-described factors generally weigh in favor of a finding of reasonableness given the admissible evidence that (a) Plaintiff was being arrested for violating an order of protection and making threats of violence, (b) officers were aware of reports that Plaintiff was making threats of violence and that

he possessed a firearm, and (c) Plaintiff engaged in physically combative behavior both when he was being arrested and when Defendants attempted to search him. However, because the parties dispute the exact nature of the circumstances surrounding the alleged "use of force" (i.e., that one of the Defendants pulled down Plaintiff's boxer shorts and swiped a bare hand against his anus), and because a reasonable factfinder could conclude that the version of the facts alleged by Plaintiff, if accepted, involved entirely gratuitous "force" in relation to Defendants' need to conduct a protective search for a firearm incident to arrest, the Court would find summary judgment would not be appropriate.

"The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State," and "[t]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Schmerber v. California*, 384 U.S. 757, 767, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1996); *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). "Determining whether a search is reasonable requires balancing 'the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.'" *Towns v. Stannard*, 431 F. Supp. 3d 44, 64 (N.D.N.Y. 2019) (Sannes, J.) (quoting *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 [1979]). Whether a search or seizure is reasonable is an objective inquiry; "an officer's subjective intent is irrelevant under this standard," and reasonableness must be assessed " 'without regard to the underlying intent or motivation of the officers involved.'" *Hudson*, 271 F.3d at 68 (quoting *Scott v. United States*, 436 U.S. 128, 137-39, 98 S.Ct. 1717, 56 L.Ed.2d 168 [1978]); *see Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ("As in other Fourth Amendment contexts ... the reasonableness inquiry ... is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation").

**\*13** Additionally, "the Fourth Amendment generally proscribes unreasonable intrusions on one's bodily integrity, and other harassing and abusive behavior that rises to the level of unreasonable seizure." *Falls*, 2021 WL 1164185, at *29 (finding that claims for "sexual harassment" and "sexual

2021 WL 4289515

abuse" to be duplicative of a claim for an unreasonable search). " 'Unreasonable, non-consensual, inappropriate touching,' for example, 'can constitute unreasonable intrusions into a plaintiff's bodily integrity in violation of the Fourth Amendment.' " *Falls,* 2021 WL 1164185, at *16; *accord, Brown v. City of Utica,* 17-CV-1190, 2020 WL 1046022, at *6 (N.D.N.Y. Mar. 4, 2020) (Sannes, J.).

Here, there is a genuine dispute of material fact as to what occurred during the search. Defendants have presented admissible evidence to support their argument that they lowered Plaintiff's jeans in order to search inside his pants for a firearm and that they felt around the waistband of his boxer shorts, but that they at no time removed his boxer shorts or made contact with his anus. Plaintiff, on the other hand, has presented admissible evidence to support his argument that Defendants removed his boxer shorts and swiped a bare hand between his buttocks, resulting in a touch of his anus. [20]

> [20]    The Court notes that, although Plaintiff's Amended Complaint bases this claim on an allegation that "barehanded" contact was made with his "rectum" (and not his "anus"), it also bases this claim on an allegation that such contact was made "between [Plaintiff's] buttocks." (Dkt. No. 8, at 4.) Because (as previously stated) the factual allegations of a *pro se* pleading should be liberally construed to raise the strongest claim they suggest, the Court finds that Plaintiff's Amended Complaint asserts a claim arising from the unnecessary skin-on-skin contact with his anus, rather than his rectum.

In general, courts in this circuit have been reluctant to grant summary judgment where there is a genuine dispute of material fact as to whether a defendant officer reached into an arrestee's clothes (as opposed to conducting an over-the-clothes pat-down search) during a search incident to arrest and made under-the-clothes or skin-to-skin contact with a private area. *See Falls,* 2021 WL 1164185, at *16 (finding a triable issue of fact about the reasonableness of a search incident to arrest where it was alleged that defendants reached into his clothing as opposed to conducting a pat-down over his clothing) (collecting cases); *Thomas v. City of New York,* 17-CV-8593, 2020 WL 6712306, at *7 (S.D.N.Y. Nov. 16, 2020) (stating that a claim involving skin-to-skin touching of the plaintiff's genitals would be actionable as a unreasonable search); *Brown,* 2020 WL 1046022, at *6 (denying summary judgment due to genuine dispute of material fact as to whether

defendant had more than a "brief contact with [plaintiff's] private area"); *Anderson v. Waterbury Police Dep't,* 14-CV-0829, 2017 WL 1157843, at *11 (D. Conn. Mar. 28, 2017) (denying summary judgment due to issue of fact as to whether search was unreasonable where the parties disagreed about whether defendant officer's action of swiping his hand between plaintiff's butt cheeks under his underwear during the search constituted a sexual assault or a reasonable search); *Thomas v. O'Brien,* 08-CV-0318, 2010 WL 3155817, at *9 (N.D.N.Y. Aug. 9, 2010) (Mordue, C.J.) (denying motion for summary judgment because there was a dispute as to whether Defendant had shoved his gloved hand into plaintiff's pants, groped and squeezed his scrotum, and rammed his fingers between plaintiff's buttocks and scratched his anus roughly).

**\*14** Although, as discussed above in note 19 of this Decision and Order, the undisputed facts establish that Defendants had a reasonable basis for searching Plaintiff for a weapon based on (a) the fact of his arrest for violating an order of protection as to S.V., (b) the facts known to Defendants at the time of the search, including reports that Plaintiff had a firearm and had threatened violence against not only S.V. and her children, but also police officers, and (c) Plaintiff's conduct in resisting arrest to some extent, it is not clear that a search such as Plaintiff recounts would be reasonable. In particular, it is not clear that it would have been objectively reasonable for Defendants to conduct what was essentially a strip search with physical contact with Plaintiff's anus in order to ensure that Plaintiff did not have a firearm or another weapon hidden on his person for the purposes of the search incident to arrest. Even if Defendants had an individualized reasonable suspicion [21] that Plaintiff might be hiding a firearm or other weapon based on the information provided to SPD, it is not established that conducting such a search would have been reasonable under the circumstances, particularly given that weapons like a firearm tend to be much larger than items such as drugs and other contraband and thus much more likely to be discoverable from a thorough over-the-clothes pat-frisk. Although the search was conducted inside of the police van, the doors of the van were open [22] and conducting such a search more or less in a public place (i.e., in a vehicle on a public street) is a far cry from the typical situation where such searches are conducted in a holding facility or police station. *See Illinois v. Lafayette,* 462 U.S. 640, 645, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983) (noting that "the factors justifying a search of the person and personal effects of an arrestee upon reaching a police station but prior to being placed in confinement are somewhat different from the factors justifying an immediate search at

time and place of arrest," and that "[p]olice conduct that would be impractical or unreasonable—or embarrassingly intrusive—on the street can more readily—and privately—be performed at the station"); *Towns*, 431 F. Supp. 3d at 64-65 (noting that "[a] strip search in a public place, even if justified by reasonable suspicion, has been uniformly subject to close scrutiny, and has generally required a clear showing of exigent circumstances to justify such an extreme invasion of privacy") (citing cases); *Thomas*, 2010 WL 3155817, at *9 (noting that the fact that the alleged search inside plaintiff's pants occurred on the front porch of a residence was a factor to consider when assessing whether the search itself was reasonable). As a result, in addition to the genuine dispute of material fact about whether such an invasive search occurred, there is also a genuine dispute of material fact as to whether that search would have been reasonable in terms of the location where it occurred that is more appropriately left for a jury to decide.

21       The Second Circuit has held that the requirement that there be reasonable suspicion to conduct a visual body cavity search applies to situations where the individual searched has been arrested for either a misdemeanor or a felony offense. *See Sloley v. VanBramer*, 945 F.3d 30, 38 (2d Cir. 2019). Although the search alleged by Plaintiff does not fit squarely with the definitions of either a strip search or a visual body cavity search (given that the search involved physical contact but did not involve any looking or probing into a cavity), the Court sees no reason why the same requirement would not apply to the conduct here. *See Monroe v. Gould*, 372 F. Supp. 3d 197, 204 (S.D.N.Y. 2019) (applying the reasonable suspicion standard to a manual body cavity search involving spreading the plaintiff's buttocks and penetrating plaintiff's rectum with a finger for a misdemeanor arrestee).

22       Defendant Harriman swore in his affidavit that, at the time of the search, Plaintiff was "at the front wall away from the rear doors" and both he and Defendant Harkness were "standing between [Plaintiff] and the doors," such that "it would have been extremely difficult for any bystander on the street to see him." (Dkt. No. 117, Attach. 10, at ¶ 16 [Harriman Aff.].)

Because there is a genuine dispute of material fact as to the nature of the search that occurred (i.e., whether Defendants took down Plaintiff's boxer shorts and swiped a bare hand between his buttocks, touching his anus), and because a reasonable factfinder accepting Plaintiff's evidence about this conduct could find that Defendants' search was unreasonable, summary judgment is inappropriate.

**B. Claim of Failure to Intervene**

In addition to the substantive claim, Plaintiff also asserts that Defendants failed to protect him from constitutional violations and/or to intervene to stop or prevent the commission of such violations. "It is widely recognized that law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014). "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used; (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement official." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).

"To establish such a claim of failure to intervene, a plaintiff must prove the following four elements: (1) that a constitutional violation was being committed against the plaintiff; (2) that the officer knew, or deliberately ignored, the fact that the constitutional violation was going to be, or was being, committed; (3) that the defendant had a reasonable opportunity to intervene and prevent the harm; and (4) that the defendant did not take reasonable steps to intervene." *Thomas v. City of Troy*, 293 F. Supp. 3d 282, 296 (N.D.N.Y. 2018) (citing *Curley v. Vill. Of Suffern*, 268 F.3d 65, 72 [2d Cir. 2001]; *Anderson*, 17 F.3d at 557).

**\*15** Here, Plaintiff appears to assert a failure-to-intervene claim against whichever of the two Defendants did not perform the alleged improper search. Granted, regardless of which Defendant was involved in the failure-to-intervene, the available evidence indicates that the allegedly improper search itself took between "only a few seconds" and as long as 20 seconds. (*Compare* Dkt. No. 117, Attach. 10, at ¶ 17 [Harriman Decl.] *with* Dkt. No. 122, Attach. 3, at 63-65 [Pl.'s 50-h Exam., testifying that the swipe of his anus took "I'd say what, 20 seconds," although repeatedly indicating that he did not actually know how long the search took].) However, the Court finds that even this short period of time could permit a reasonable factfinder to conclude that the relevant Defendant had a reasonable opportunity to intervene.

The Court renders this finding given the close proximity of both Defendants at the time of the search (both to each other and to Plaintiff), and the fact that it is reasonable to believe that the Defendant who was not conducting the search would have been paying attention to the actions of the other Defendant and would have reasonably been able, through words and/or action, to intervene. *See* Figueroa v. Mazza, 825 F.3d 89, 108 (2d Cir. 2016) (finding that failure-to-intervene claims were for the jury to decide despite the fact that the assault in question lasted less than 20 seconds based on the close proximity of the defendant officers to the plaintiff at the time of the alleged assault in the back of a police cruiser); Stroman v. Ranze, 18-CV-0149, 2019 WL 7494384, at *7-8 (N.D.N.Y. Dec. 13, 2019) (Dancks, M.J.) (noting that, although "officers generally 'cannot be held liable for failure to intervene in incidents that happen in a matter of seconds,' " the issue of whether an officer had a reasonable opportunity to intervene "can be decided as a matter of law only if 'considering all the evidence, a reasonable jury could not possibly conclude' that the officer had a reasonable opportunity to intervene") report-recommendation adopted by 2020 WL 68610 (N.D.N.Y. Jan. 7, 2020) (Sharpe, J.); Dollard v. City of New York, 408 F. Supp. 3d 231, 236 (E.D.N.Y. 2019) (finding summary judgment to be inappropriate where a reasonable juror could find that an officer had a realistic opportunity to intervene to stop at least some of the alleged conduct in a physical encounter that lasted for approximately nine seconds).

For all of these reasons, the Court finds that summary judgment is inappropriate on Plaintiff's failure-to-intervene claim.

### C. Qualified Immunity

As an initial matter, the Court rejects Plaintiff's argument that Defendants cannot seek the protection of qualified immunity because they were required to do so before discovery was completed and before any motion for summary judgment was filed. Plaintiff cites no legal authority to support such a bright line rule, and his argument is at odds with a multitude of cases from this Circuit in which qualified immunity was resolved either on a motion for summary judgment or at trial. The Supreme Court's indication that it has "repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation" does not support Plaintiff's argument because often questions of qualified immunity cannot be fully considered without a fully developed factual record or resolution of factual disputes. *See* Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)

(considering without admonishment a qualified immunity argument that was raised in a motion for summary judgment). As a result, the Court finds nothing improper in Defendants' request for a ruling on qualified immunity in conjunction with their motion for summary judgment.

Although there has not yet been a finding on whether Defendants committed a constitutional violation, the Court finds it appropriate to consider whether qualified immunity would apply even if Defendants were found to have committed a constitutional violation. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Brown v. City of New York, 862 F.3d 182, 190 (2d Cir. 2017) (citing Reichle v. Howards, 566 U.S. 658, 664, 132 S.Ct. 2088, 182 L.Ed.2d 985 [2012]). In other words, "[a] police officer is entitled to qualified immunity if (1) his conduct does not violate a clearly established constitutional right, or (2) it was 'objectively reasonable' for the officer to believe his conduct did not violate a clearly established right." Hartline v. Gallo, 546 F.3d 95, 102 (2d Cir. 2008). When determining whether the right at issue is clearly established such that "the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right," a court should ask "(1) Was the law defined with reasonable clarity? (2) Had the Supreme Court or the Second Circuit affirmed the rule? and (3) Would a reasonable defendant have understood from the existing law that the conduct was unlawful?" Gonzalez v. City of Schenectady, 728 F.3d 149, 158 (2d Cir. 2013) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 [1987]; Young v. City of Fulton, 160 F.3d 899, 903 [2d Cir. 1998]) (internal alterations and quotation marks omitted).

**\*16** With regard to the second question, the Second Circuit has explained that, to determine whether a right is clearly established, "we generally look to Supreme Court and Second Circuit precedent existing at the time of the alleged violation." Garcia v. Does, 779 F.3d 84, 92 (2d Cir. 2015) (internal quotation marks omitted) (quoting Okin v. Vill. of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 433 [2d Cir. 2009]).

With regard to the first question, the Supreme Court has repeatedly admonished lower courts "not to define clearly established law at a high level of generality." Ashcroft v. al-Kidd, 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). "This inquiry must be undertaken in light of

the specific context of the case, ... [which] is especially important in the Fourth Amendment context, where ... it is sometimes difficult for an officer to determine how the relevant legal doctrine ... will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015) (internal quotation marks and citations omitted). "[A] case directly on point" is not necessarily required, "but existing precedent must have placed the statutory or constitutional question beyond debate." *al–Kidd*, 563 U.S. at 741, 131 S.Ct. 2074. That is, there must be "a case where an officer acting under similar circumstances ... was held to have violated the Fourth Amendment," *White v. Pauly*, –––– U.S. ––––, 137 S. Ct. 548, 552, 196 L.Ed.2d 463 (2017), such that the unlawfulness of the defendant officer's conduct would "follow immediately," *D.C. v. Wesby*, –––– U.S. ––––, 138 S. Ct. 577, 590, 199 L.Ed.2d 453 (2018) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 [1987]).

Here, the Court defines the right in question as the Fourth Amendment right against being subjected to an unreasonable search or intrusion on one's bodily integrity involving a strip search and/or physical contact with a private area during a search incident to arrest before transport to a police station or other facility. There certainly exist district court cases from before the date of the incident in question (i.e., February 24, 2017) recognizing some variation of this right. [23] The Second Circuit recently reiterated that " 'the decisions of other federal lower courts, are relevant and often persuasive' authority on the 'clearly established' issue." *Sloley*, 945 F.3d at 42 (quoting *Charles W. v. Maul*, 214 F.3d 350, 357 [2d Cir. 2000]). As to authority from the Second Circuit, in the case of *Rivera v. United States*, 928 F.2d 592 (2d Cir. 1991), the Second Circuit found that it was error to dismiss claims on summary judgment because there were substantial questions of fact as to whether a strip search of pre-transport arrestees was reasonable where, among other things, there were questions as to whether a pat-down search would have sufficed to reveal any weapons. *Rivera*, 928 F.2d at 607. Additionally, the Supreme Court has noted that "the interests supporting a search incident to arrest would hardly justify disrobing an arrestee on the street." *Illinois*, 462 U.S. at 645, 103 S.Ct. 2605. Without further briefing from the parties, the Court finds that the right in question is sufficiently clearly established to justify the denial of Defendants' request for a grant of qualified immunity for the purposes of this motion for summary judgment. [24]

23    *See, e.g.*, *Santiago v. City of Yonkers*, 13-CV-1077, 2015 WL 6914799, at *6 (S.D.N.Y. Oct. 30, 2015) (finding that "[t]he [post-arrest] search of plaintiff raises two distinct Fourth Amendment questions," one that "bear[s] on plaintiff's rights to be free from sexual assault at the hands of a police officer during an arrest" and one that concerns the right "to be free from an unreasonable search"); *Wright v. City of Waterbury*, 07-CV-0306, 2011 WL 1106217, at *6 & n.9 (D. Conn. March 23, 2011) ("Sexual misconduct by a police officer during a 'seizure' is analyzed under the Fourth Amendment. Wright does not contest that the alleged sexual assault occurred while he was under arrest. Accordingly, the Fourth Amendment reasonableness standard applies rather than the Fourteenth Amendment substantive due process inquiry."); *Thomas*, 2010 WL 3155817, at *9 (denying motion for summary judgment because there was a dispute as to whether, during a search incident to arrest on a front porch, Defendant had shoved his gloved hand into plaintiff's pants, groped and squeezed his scrotum, and rammed his fingers between plaintiff's buttocks and scratched his anus roughly); *cf. Love v. Town of Granby*, 03-CV-1960, 2004 WL 1683159, at *4-6 (D. Conn. July 12, 2004) (recommending the denial of defendants' motion for summary judgment on the plaintiff's Fourth Amendment unreasonable search and sexual assault claim based on the plaintiff's allegations that during pre-arrest pat search one officer grabbed his scrotum, swore at him and "called him a faggot"), adopted, Order (D. Conn. filed July 28, 2004).

24    Defendants will of course be permitted to renew their request for a grant of qualified immunity at trial should they be found to be liable on any of Plaintiff's claims.

**\*17** Moreover, there appears to be a genuine dispute between the parties as to whether it would be clear to a reasonable officer that his conduct was unlawful in the situation that Defendants allegedly confronted, especially given the admissible record evidence that the alleged offensive conduct in question lasted 20 seconds. (Dkt. No. 122, Attach. 3, at 63-65 [Pl.'s 50-h Exam.].) Because genuine disputes of fact remain that directly bear on the issue of whether it would have been objectively reasonable for Defendants to believe their alleged conduct was lawful (and whether the alleged conduct occurred at all), the Court finds it

2021 WL 4289515

inappropriate to render a judgment for Defendants as a matter of law on the issue of qualified immunity at this time. *See Mickle v. Morin*, 297 F.3d 114, 122 (2d Cir. 2002) ("Where circumstances are in dispute, and contrasting accounts present factual issues as to the degree of force actually employed and its reasonableness, a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity."); *Martineau v. Newell*, 17-CV-0983, 2019 WL 7606069, at *8 (N.D.N.Y. Oct. 15, 2019) (Lovric, M.J.) (finding that "[t]he existence of factual disputes precludes a finding on qualified immunity because 'the reasonableness of a police officer's conduct is at issue in both a ... [Fourth Amendment] analysis as well as step two of the qualified immunity test") (internal alterations omitted) report-recommendation adopted by 2019 WL 5883686 (N.D.N.Y. Nov. 12, 2019) (Kahn, J.).

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 117) is **DENIED**; and it is further

**ORDERED** that the Plaintiff is directed to forward a written settlement demand to defendants no later than **October 1, 2021,** and the parties are directed to thereafter engage in meaningful settlement negotiations. The parties are directed to jointly file, on or **October 22, 2021**, regarding their settlement discussions and if a settlement conference would be beneficial or a jury trial date should be scheduled.

**All Citations**

Slip Copy, 2021 WL 4289515

---

**End of Document**                  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   16

Hughes v. Nemier, Not Reported in Fed. Supp. (2016)

2016 WL 7056540

2016 WL 7056540

Only the Westlaw citation is currently available.

United States District Court, W.D. New York.

James HUGHES, Plaintiff,

v.

Matthew D. NEMIER et al., Defendants.

Case # 12-CV-6024-FPG

|

Signed 12/05/2016

**Attorneys and Law Firms**

James D. Hughes, Mastic Beach, NY, pro se.

Hillel David Deutsch, NYS Attorney General's Office, Department of Law, Rochester, NY, for Defendants.

DECISION AND ORDER

HON. FRANK P. GERACI, JR., Chief Judge

### INTRODUCTION

**\*1** *Pro se* Plaintiff James Hughes ("Plaintiff") brings this civil rights action pursuant to 42 U.S.C. § 1983 against Elmira Correctional Facility ("Elmira") Corrections Officers Matthew D. Nemier ("Defendant Nemier"), Joseph A. Blide ("Defendant Blide"), and Joseph H. Comfort ("Defendant Comfort"). [1] ECF No. 1. Plaintiff alleges that while he was an inmate at Elmira, Defendant Nemier subjected him to excessive force by breaking his left arm, and that Defendants Blide and Comfort failed to intervene on his behalf.

[1]
> Defendants Jeffrey A. Powers, Steven Racette, and Donald M. Wilkins were previously dismissed from this case pursuant to a Motion to Dismiss. *See* ECF Nos. 10, 13.

On August 2, 2016, Defendants moved for summary judgment. ECF No. 36. On August 31, 2016, Plaintiff responded in opposition to Defendants' Motion. ECF No. 38. For the reasons that follow, Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

### BACKGROUND [2]

[2]
> Except as otherwise noted, the following undisputed facts are taken from the parties' respective Local Rule 56 Statements. *See* ECF No. 36-1; ECF No. 38, at 14-16.

On December 7, 2010, Plaintiff was involved in an altercation with another Elmira inmate. The two men exchanged punches, fell to the ground, and wrestled with each other. Elmira staff responded to the fight, and Defendants restrained Plaintiff. Specifically, Defendant Nemier held Plaintiff's left arm, Defendant Comfort held his right arm, and Defendant Blide secured his legs. The entire incident, from the time Defendants made contact with Plaintiff until mechanical restraints were placed on him, took a matter of seconds. Plaintiff was taken to the hospital and received x-rays that revealed that he had a broken arm, or, more specifically, a mildly comminuted distal fracture of the shaft of the left humerus.

Plaintiff asserts that Defendant Nemier broke his left arm when he "ben[t] it exceedingly." ECF No. 38, at 4. Defendant Nemier maintains that he did not twist or bend Plaintiff's arm in a manner that could have broken the bone; he "merely used both arms to pull [Plaintiff]'s left arm behind his back while Plaintiff was struggling." ECF No. 39, at ¶ 7.

### LEGAL STANDARD

Summary judgment shall be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). While the court must view the inferences to be drawn from the facts in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), a party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986). The non-moving party may defeat the summary judgment motion by making a showing sufficient to

Hughes v. Nemier, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00372-MAD-TWD   Document 61   Filed 06/22/23   Page 198 of 218

2016 WL 7056540

establish that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). However, "mere conclusory allegations or denials" are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980).

**\*2** Because Plaintiff is proceeding *pro se,* his submissions are read liberally and interpreted "to raise the strongest arguments that they suggest." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (citation omitted). Nevertheless, proceeding *pro se* does not relieve a litigant from the usual summary judgment requirements. *See Wolfson v. Bruno*, 844 F. Supp. 2d 348, 354 (S.D.N.Y. 2011).

## DISCUSSION

### I. Failure to Intervene Claim against Defendants Blide and Comfort

Defendants Blide and Comfort argue that they are entitled to summary judgment because they did not have a reasonable opportunity to intervene in the alleged use of excessive force by Defendant Nemier. This Court agrees.

An officer can be liable under § 1983 for his or her failure to intervene in a situation where excessive force is being used if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Ricciuti v. New York City Transit Auth.,* 124 F.3d 123, 129 (2d Cir. 1997). Whether an officer had sufficient time to intercede is ordinarily an issue for the jury to resolve "unless, considering all the evidence, a reasonable jury could not reasonably conclude otherwise." *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir. 1994). Generally, an officer cannot be liable for failing to intervene in incidents that happen in a "matter of seconds." *Henry v. Dinelle,* No. 9:10-CV-0456 (GTS/DEP), 2011 WL 5975027, at \*4 (N.D.N.Y. Nov. 29, 2011) (citation omitted).

Plaintiff testified at his deposition that the entire incident at issue "happened kind of fast" and lasted only "a few seconds." ECF No. 36-7, at 14. Thus, no reasonable jury could find that Defendants Blide and Comfort had a realistic opportunity to intervene. *See Pattiasina v. Sewalt,* No. 12-CV-6170-FPG, 2015 WL 5725139, at \*2 (W.D.N.Y. Sept. 29, 2015) (noting that no reasonable jury could find that the defendant had an opportunity to intervene where the plaintiff testified that only a "split second" elapsed between when he fell to the ground and was kicked by another corrections officer).

To the extent that Plaintiff attempts to argue that Defendants Blide and Comfort had some kind of "plan" to break his arm (*see* ECF No. 38, at 28 ("[I]t is clear to me that the[ir] intention was to break my arm[.]") and ECF No. 36-7 at 14 ("[I]t was broke just above the elbow, so that was definitely an area as if it was broke on purpose.")), Plaintiff has not presented admissible evidence to show that they knew the fight would occur. *Lawrence v. Rodak,* No. 11-CV-6115-FPG, 2014 WL 4829418, at \*3 (W.D.N.Y. Sept. 29, 2014) (granting summary judgment on a failure to protect claim where "Plaintiff has not presented any admissible evidence to show that [Defendant] had reason to know in advance that the fight would have occurred, and indeed, the Plaintiff and [Defendant] both agree that neither one had any interaction with the other prior to the date in question."). In fact, Plaintiff testified that he had no problems with Defendants Blide and Comfort before the incident at issue. ECF No. 39-1, at 7-8. Thus, Plaintiff's assertion that Defendants intended to break his arm, without any evidentiary support, is insufficient to overcome Defendants' Motion for Summary Judgment. *See Rodriguez v. Hahn,* 209 F. Supp. 2d 344, 348 (S.D.N.Y. 2002) ("[A] *pro se* party's bald assertions unsupported by evidence, are insufficient to overcome a motion for summary judgment.") (citations omitted). Accordingly, Defendants' Motion for Summary Judgment is GRANTED as to the failure to intervene claim against Defendants Blide and Comfort, and they are dismissed from this case.

### II. Excessive Force Claim against Defendant Nemier

**\*3** Defendant Nemier argues that he is entitled to summary judgment on the excessive force claim against him because Plaintiff cannot establish that Defendant Nemier broke his arm. ECF No. 36-8, at 4-8. Instead, Defendant Nemier asserts that Plaintiff's broken arm was more likely the result of Plaintiff's altercation with the other inmate—either due to a punch or falling to the floor before Defendants intervened. *Id.*

An Eighth Amendment excessive force claim requires a plaintiff to prove both an objective element and a subjective element. *Hudson v. McMillian,* 503 U.S. 1, 7-8 (1992); *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir. 1999). The objective element is "contextual and responsive to contemporary standards of decency," *Hudson,* 503 U.S. at 9-10, and requires that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection," *Blyden,*

Hughes v. Nemier, Not Reported in Fed. Supp. (2016)

2016 WL 7056540

186 F.3d at 262. Thus, the Eighth Amendment "necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (internal quotation marks and citation omitted). "Consequently, not every malevolent touch by a prison guard gives rise to a federal cause of action." *Id.* at 9 (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.")). Yet, "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated ... whether or not significant injury is evident." *Id.* (citations omitted).

The subjective component of an excessive force claim requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' " in light of the particular circumstances surrounding the challenged conduct. *Sims v. Artuz*, 230 F.3d 14, 21 (2d Cir. 2000) (citation omitted). Whether conduct in an excessive force case was "wanton" turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Blyden*, 186 F.3d at 262-63.

Defendant Nemier argues that Plaintiff's excessive force claim fails because "to make out a prima facie case under § 1983, a plaintiff must show that a given defendant took some action which caused the injury in question." ECF No. 36-8, at 4 (citing *Morgan v. Dinkins*, No. CV-91-0108, 1991 WL 148499, at *1 (E.D.N.Y. July 22, 1991)). Here, there is no question that Defendant Nemier was involved in the use of force at issue.

Instead, Defendant Nemier argues that Plaintiff cannot prove that he caused Plaintiff's broken arm because the technical question of whether a bending or twisting motion can cause a distal fracture of the humerus shaft is not obvious to a lay juror and cannot be presented at trial without expert testimony. ECF No. 36-8, at 4; *see Barnes v. Anderson*, 202 F.3d 150, 159

(2d Cir. 1999) ("[E]xpert medical opinion evidence is usually required to show the cause of an injury ... because the medical effect on the human system of the infliction of injuries is generally not within the sphere of the common knowledge of the lay person.") (citations omitted). Although this may be true, Plaintiff does not need to prove that Defendant Nemier actually broke his arm to make out an excessive force claim.

**\*4** Although Plaintiff cannot testify to the medical conclusion that his arm was broken, he can testify as to his lay observations and the physical sensations he experienced during the incident at issue. Plaintiff testified at his deposition, for instance, that it felt "as if someone pushed on [his] elbow and then pulled [his] forearm," and he alleged that Defendant Nemier controlled his left hand and arm and held it "away from [his back] before bending it exceedingly." ECF No. 36-7, at 13-14; ECF No. 38, at 4. From such testimony, a reasonable jury could find that Defendant Nemier subjected Plaintiff to excessive force. Accordingly, because material issues of fact exist, Defendants' Motion for Summary Judgment as to the excessive force claim against Defendant Nemier is DENIED.

## CONCLUSION

For the reasons stated, Defendants' Motion for Summary Judgment (ECF No. 36) is GRANTED as to the failure to intervene claim against Defendants Blide and Comfort, and they are dismissed from this case. Defendants' Motion for Summary Judgment as to the excessive force claim against Defendant Nemier is DENIED.

The parties are directed to appear on December 19, 2016 at 2:30 P.M. to set a date for trial.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 7056540

---

**End of Document**                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Smalls v. Rathbum, Not Reported in Fed. Supp. (2019)

2019 WL 2433892

2019 WL 2433892
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Dwight SMALLS, Plaintiff,

v.

Sergeant Dellivan RATHBUM, et al., Defendants.

Case # 16-CV-6503-FPG
|
Signed 06/11/2019

**Attorneys and Law Firms**

Dwight Smalls, Attica, NY, pro se.

Bernard F. Sheehan, NYS Attorney General's Office Department of Law, Rochester, NY, for Defendants.

DECISION AND ORDER

HON. FRANK P. GERACI, JR., Chief Judge

**INTRODUCTION**

**\*1** *Pro se* Plaintiff Dwight Smalls, a prisoner incarcerated at Attica Correctional Facility, commenced this civil rights action seeking relief pursuant to 42 U.S.C. § 1983. He alleges that Defendants subjected him to excessive force while he was confined at Elmira Correctional Facility.

Defendants moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. ECF No. 43. For the reasons that follow, the Court DENIES Defendants' motion as to Plaintiff's excessive force claim but GRANTS the motion as to all remaining claims.

**DISCUSSION**

**I. Procedural History**

Plaintiff asserted the following causes of action in his Complaint: (1) excessive force that fractured his leg and ankle and led to a false misbehavior report; (2) denied medical treatment for Plaintiff's injuries after the excessive force; (3) religious discrimination; and (4) due process violations during a disciplinary hearing. ECF No. 1. The Court previously dismissed Plaintiff's false misbehavior

report, retaliation, religious discrimination, and official-capacity claims. ECF Nos. 5, 25.

Defendants now seek dismissal of Plaintiff's excessive force, racial discrimination, due process, and deliberate indifference claims. ECF No. 43. Plaintiff agrees that his racial discrimination, due process, and deliberate indifference claims should be dismissed but contends that his excessive force claim should proceed to trial. ECF No. 52 at 1-3.

**II. Legal Standard**

A court grants summary judgment when the moving party demonstrates that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a)-(b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010). It is the movant's burden to establish the nonexistence of any genuine issue of material fact. If there is record evidence from which a reasonable inference in the non-moving party's favor may be drawn, a court will deny summary judgment. *See Celotex*, 477 U.S. at 322.

Once a party moving for summary judgment has adequately shown the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to present evidence sufficient to support a jury verdict in its favor, without simply relying on conclusory statements or contentions. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995) (citing Fed. R. Civ. P. 56(e)). "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not genuine issues for trial." *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) (internal quotation marks omitted). Here, in light of Plaintiff's *pro se* status, the Court will construe his opposition papers liberally "to raise the strongest arguments that they *suggest*." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2009) (internal quotation marks omitted) (emphasis in original).

**III. Abandoned Claims**

Plaintiff concedes that summary judgment is appropriate as to his racial discrimination, due process, and deliberate indifference claims and does not oppose Defendants' motion on those issues. ECF No. 52 at 2. Therefore, the Court dismisses these claims as abandoned. *See Anti-Monopoly, Inc. v. Hasbro, Inc.*, 958 F. Supp. 895, 907 n.11 (S.D.N.Y. 1997), *aff'd*, 130 F.3d 1101 (2d Cir. 1997) ("[T]he failure to provide argument on a point at issue constitutes abandonment

Smalls v. Rathbum, Not Reported in Fed. Supp. (2019)
2019 WL 2433892

Case 9:21-cv-00372-MAD-TWD    Document 61    Filed 06/22/23    Page 201 of 218

of the issue."). Accordingly, the only remaining claim is for excessive force against Defendants Harkness, Watts, Rathbum, and Taylor.

**IV. Excessive Force**

**\*2**  It is well-settled that

> [c]orrections officers are given the lawful authority to use such physical force as may be reasonably necessary to enforce compliance with proper instructions and to protect themselves from physical harm from an inmate. However, when corrections officers maliciously and sadistically use force to cause harm to a prisoner, and the prisoner suffers at least some injury, the result is cruel and unusual punishment under the Eighth Amendment, regardless of the seriousness or significance of the injury to the prisoner.

*Henry v. Dinelle*, 929 F. Supp. 2d 107, 117 (N.D.N.Y. 2013) (citing *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)).

Excessive force consists of two components: (1) a subjective component that focuses on the defendant's motive for his conduct; and (2) an objective component that contemplates the seriousness of the harm. *See Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000). The subjective component "requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Id.* at 21 (internal quotation marks omitted). A court can consider the need for force, the relationship between the need for force and the amount of force used, the threat reasonably perceived by responsible corrections officers, any efforts made to temper the severity of the forceful response, and the extent of the plaintiff's injuries. *See Henry*, 929 F. Supp. 2d at 116-17. Summary dismissal of an excessive force claim is "inappropriate" where there are "genuine issues of material fact concerning what transpired after" an inmate was restrained and "whether the guards maliciously used force against him." *Sims*, 230 F.3d at 21 (internal quotation marks

omitted) (citing *Griffin v. Crippen*, 193 F.3d 89 (2d Cir. 1999)).

Plaintiff alleges that he had a confrontation with Defendants Watts and Harkness in the mess hall after Watts verbally berated him and sent him to "keep lock" for "skipping inmates in the mess hall line" to get a spoon. ECF No. 1 at 3. Harkness approached Plaintiff and ordered him to return the spoon and move toward the mess hall door while pushing him "in the waist." *Id.* at 3-4. Plaintiff alleges that the "force of this push caused [him] to stumble," and as he "leaned forward from the force of the push, Defendant Harkness placed Plaintiff in a 'choke hold' (also known as a 'headlock') for no legitimate purpose." *Id.* at 4. Harkness and Plaintiff fell to ground in this position, and the "force of [Harkness's] weight caused a shearing motion and fractured Plaintiff's leg." *Id.* "Harkness then applied a leg bar, while maintaining the chokehold on Plaintiff's neck and stretched Plaintiff's body out until Plaintiff's ankle broke. Plaintiff could not cry out, as he was unable to breathe due to the chokehold." *Id.* Watts and Harkness punched Plaintiff in the face, and "Plaintiff passed out from the chokehold." *Id.* Defendants Taylor and Rathbum beat Plaintiff as they dragged him from the mess hall. *Id.*

**\*3**  Defendants do not dispute that Plaintiff suffered two broken bones, but they contend that the surveillance video of the incident shows "that the officers acted appropriately and quickly to restore order" in a mess hall of 230 inmates "and to protect the safety and security of the facility." ECF No. 43-10 at 9, 17. Plaintiff argues that Defendants' use of force caused "multiple fractures in his leg" "at a time when he was unarmed and had engaged in behavior that was, at most, verbally disruptive and did not necessitate the use of such extreme force." ECF No. 52 at 1.

Upon examination of the record, the Court finds that that Defendants have failed to establish the absence of any genuine issue of material fact concerning their use of force. The record evidence, including the nature and severity of Plaintiff's injuries and the video depicting this incident, establish a triable question of fact as to whether the amount of forced used was applied in a good-faith effort to maintain or restore discipline. The parties have differing accounts of their actions during and after Plaintiff was restrained and taken to the floor. Plaintiff contends that he did not strike or attempt to strike the officers, while Defendants assert that he struggled violently throughout the encounter. Although the video captures some of their interaction, much cannot be seen after Defendants take Plaintiff to the ground. Thus, a material

Smalls v. Rathbum, Not Reported in Fed. Supp. (2019)

Case 9:21-cv-00372-MAD-TWD    Document 61    Filed 06/22/23    Page 202 of 218

2019 WL 2433892

factual dispute remains and precludes summary judgment. *See* *Dineen ex rel. Dineen v. Stramka*, 228 F. Supp. 2d 447, 453 (S.D.N.Y. 2002) ("It is for a jury to determine which of these conflicting accounts ... are to be believed.") (citing *Robison v. Via*, 821 F.2d 913, 924 (2d Cir. 1987)).

**V. Collateral Estoppel**

Alternatively, Defendants contend that collateral estoppel bars Plaintiff's excessive force claim because the issue was previously litigated in the New York Court of Claims. ECF No. 43-10 at 18-19.

In New York, the doctrine of collateral estoppel "precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same." *Burgos v. Hopkins*, 14 F.3d 787, 792 (2d Cir. 1994) (quoting *Ryan v. New York Tel. Co.*, 62 N.Y.2d 494, 500 (1984)). Collateral estoppel requires: (1) an issue that has been decided in a prior action and is decisive of the present action; and (2) that there has been a full and fair opportunity to contest the decision now said to be controlling. *Id.* (citing *Schwartz v. Pub. Adm'r of Bronx Cnty.*, 24 N.Y.2d 65 (1969)). The burden of showing the "identicality and decisiveness of the issue" rests upon the party seeking the benefit of collateral estoppel, while the burden to establish the absence of a full and fair opportunity to litigate the issue in the prior action rests on the party contesting its application. *Ryan*, 62 N.Y.2d. at 502.

Defendants have not carried their burden. While the evidence offered in a trial in this case may be similar to the evidence offered in the Court of Claims, the standard for stating a negligence claim differs from the standard for stating an Eighth Amendment violation. Moreover, the New York Court of Appeals has identified several factors to consider in determining whether a full and fair opportunity to litigate was present in the initial forum, including:

> the nature of the forum and the importance of the claim in the prior litigation, the incentive and initiative to litigate and the actual extent of litigation, the competence and expertise of counsel, the availability of new evidence, the differences in the applicable law and the foreseeability of future litigation.

**\*4** *Id.* at 501.

The papers submitted to the Court do not demonstrate that collateral estoppel applies here. Notably, the Court of Claims' decision indicates that Plaintiff could not present the video of the altercation during that trial and was advised that no such video existed. ECF No. 43-9 at 211 (Court of Claims Decision, dated April 5, 2017, at 4).

**CONCLUSION**

The Court DENIES Defendants' Motion for Summary Judgment (ECF No. 43) as to Plaintiff's excessive force claim but otherwise GRANTS the motion as to all other claims, which are dismissed with prejudice. The Clerk of Court is directed to terminate Defendants Baker and Keller as parties to this action. By separate order, the Court will schedule this matter for a status conference.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 2433892

---

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 137721
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Zachary BUTCHINO, Plaintiff,

v.

CITY OF PLATTSBURG, Chad Welch,
Adam Wood, Joshua Pond, Kristopher
Minogue, Joel Vassar, Levi Ritter, Defendants.

8:20-cv-796 (MAD/CFH)
|
Signed 01/14/2022

**Attorneys and Law Firms**

OF COUNSEL: DOUGLAS EDWARD LIEB, ESQ.,
KAUFMAN LIEB LEBOWITZ & FRICK LLP, 10 East 40th
Street, Suite 3307, New York, New York 10016, Attorneys
for Plaintiff.

OF COUNSEL: STEPHANIE McDERMOTT, ESQ., JOHN
D. ASPLAND, ESQ., FITZGERALD MORRIS BAKER
FIRSH, P.C., 68 Warren Street, Glens Falls, New York 12801,
Attorneys for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, United States District Judge:

**I. INTRODUCTION**

*\*1* On July 15, 2020, Plaintiff Zachary Butchino initiated
this lawsuit against Defendants Chad Welch, Adam Wood,
Joshua Pond, Kristopher Minogue, Joel Vassar, Levi
Ritter (collectively, "Defendant Officers"), and the City
of Plattsburg. *See* Dkt. No. 1. Plaintiff alleges excessive force
and failure to intervene claims against the Defendant Officers,
and *Monell* liability as well as violations of Title II of the
Americans with Disabilities Act ("ADA") and Section 504 of
the Rehabilitation Act against Defendant City. Specifically,
Plaintiff's claims arise out of the force used against him by
Defendant Officers on August 19, 2017, while in custody, in
an effort to remove his shorts as a suicide prevention measure.
Presently before the Court is Defendant's motion for summary
judgment. Dkt. No. 27.

**II. BACKGROUND**

Plaintiff Zachary Butchino enlisted in the United States Army
in 2007 and served in Afghanistan in 2009 and 2010. *See* Dkt.
No. 33-1 at ¶¶ 5-6. In 2013, Plaintiff was diagnosed with post-
traumatic stress disorder ("PTSD"). *Id.* at ¶ 124. On August
19, 2017, Plaintiff was arrested for assault by the Plattsburgh
Police Department following a night of drinking. *Id.* at ¶¶
122, 126. Plaintiff eventually pleaded guilty to a one-year
conditional discharge for the assault charge. *Id.* at ¶ 123.

Following the assault and arrest, Plaintiff arrived at the
Plattsburgh police station at approximately 3:21 a.m. *Id.* at ¶¶
128, 130. Plaintiff was searched for weapons and contraband,
and then placed in Cell 1. *Id.* at ¶ 11. Due to available
surveillance video, most events in the jail are undisputed.
From 3:54 a.m. to 4:06 a.m., while in Cell 1, Plaintiff
repeatedly requested his medication, requested a phone call,
and shook the cell door. *Id.* at ¶¶ 81-91. Plaintiff then began
to sing about the disturbing violence he experienced while
serving in Afghanistan, including "I killed a lot of people/
they almost killed a lot of my people/my friend in Georgia
is dead because [incomprehensible]/you should give me my
medication/to prevent me from killing more people." *Id.* at ¶¶
92, 95.

At 4:20 a.m., Plaintiff began to cry in his cell. *Id.* at ¶ 96.
At 4:41 a.m., Plaintiff removed his shorts, placed one leg of
his shorts over his head and tied the other leg of the shorts
to the cell. *Id.* at ¶ 96-99. Following the apparent suicide
attempt, Plaintiff refused to hand over his shorts to an officer,
and instead put them back on. *Id.* at ¶ 101.

Defendant Officers subsequently moved Plaintiff to Cell
4 so Defendants could more easily monitor his behavior.
*Id.* at ¶ 135. Throughout the transfer to Cell 4, Plaintiff
was combative and struggled with Defendant Officers. *Id.*
at ¶¶ 104-09. Plaintiff, once in Cell 4, still refused to
comply with an order to remove his shorts. *Id.* at ¶ 112.
Approximately fourteen seconds after Plaintiff was secured in
Cell 4, Defendant Welch re-opened Plaintiff's cell, brandished
a taser, and demanded Plaintiff remove his shorts. *Id.* at ¶¶
222-23. Plaintiff, however, attempted to hold the door closed.
*Id.* at ¶ 112. Defendants Welch, Wood, Pond and Minogue
then opened the door and entered the cell. *Id.* at ¶¶ 113-14.
Defendant Vassar stood at the back of the group outside the
door of the cell. *Id.* at ¶ 115. Defendant Ritter observed the

other Defendant Officers from behind a nearby desk in the booking room. *Id.* at ¶¶ 186-87.

**\*2** The next fifty-six seconds, where the four officers were in his cell, are difficult to discern on the video. Defendants Welch, Wood and Pond were all near Plaintiff's torso and face, while Defendant Minogue successfully removed Plaintiff's shorts. *Id.* at ¶ 146. At the end, Plaintiff's face was visibly bloody. *Id.* at ¶ 119. Plaintiff testified that he was punched approximately ten times and was ultimately diagnosed with a deviated septum. *Id.* at ¶¶ 25, 163. Defendant Welch, however, testified that he punched Plaintiff twice, and no other Defendant stated that they punched Plaintiff. *Id.* at ¶ 167. Additionally, it is undisputed that Defendant Wood "pulled on and squeezed" Plaintiff's genitals after Plaintiff's shorts had been removed. *Id.* at ¶ 169.

Following the incident, in a recorded conversation, Defendant Vassar told Plaintiff:

> Ultimately, we don't want anybody getting hurt. We just want you back in the cell; we want you to be safe. We want you to be able to relax if you can —and I get that being in this room is not relaxing, and I understand that— but there's no way prior to this that we could have known that that would have set off PTSD. You know what I mean? We knew of your PTSD because we were informed of that by you. But we didn't know that being in that cell was going to trigger that. OK? Once we realized that it had triggered that, because of your up-and-down-mood and an attempt to hang yourself, we knew we had to act. And that's what we did. That's what our attempt was, was to act—was actually to protect you, not to hurt you.

*Id.* at ¶ 212.

## III. DISCUSSION

### A. Standard of Review

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions on its pleadings. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R. Civ. P. 56 (c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the Court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the Court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

" 'Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.' " *Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005) (quotation omitted). "However, '[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.' " *Id.* (quoting *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505). "To defeat summary judgment, therefore, nonmoving parties 'must do more than simply show that there is some metaphysical doubt as to the material facts', ... and they may not rely on conclusory allegations or unsubstantiated speculation.' " *Id.* (quotations omitted).

### B. Excessive Force

**\*3** Plaintiff brings a Section 1983 claim for use of excessive force under the Fourteenth Amendment's Due Process Clause. "[T]he Due Process Clause protects a pretrial detainee from

2022 WL 137721

the use of excessive force that amounts to punishment." *Graham v. Connor*, 490 U.S. 386, 395 n.10, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The Supreme Court has held that "pretrial detainees (unlike convicted prisoners) cannot be punished at all." *Kingsley v. Hendrickson*, 576 U.S. 389, 400, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015). "An officer's actions can amount to punishment if they are taken with 'an expressed intent to punish.' " *Frost v. New York City Police Dep't*, 980 F.3d 231, 252 (2d Cir. 2020) (quoting *Bell v. Wolfish*, 441 U.S. 520, 538, 99 S.Ct. 1861, 60 L.Ed.2d 447, (1979)). Alternatively, in the absence of an expressed intent to punish, "a pretrial detainee can nevertheless prevail by showing that the actions are not rationally related to a legitimate nonpunitive governmental purpose or that the actions appear excessive in relation to that purpose." *Kingsley*, 576 U.S. at 398, 135 S.Ct. 2466. "[T]he appropriate standard for a pretrial detainee's excessive force claim is solely an objective one." *Id.* at 397, 135 S.Ct. 2466. A pretrial detainee "must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 396–97, 135 S.Ct. 2466. The "objective reasonableness" standard "turns on the facts and circumstances of each particular case." *Frost*, 980 F.3d at 252 (citing *Kingsley*, 576 U.S. at 397, 135 S.Ct. 2466).

First, Plaintiff asks this Court to infer an express intent to punish because Defendants Welch and Wood lied about their behavior in reports and internal interviews. *See* Dkt. No. 33 at 12-13. Plaintiff argues that "[i]t is eminently reasonable to infer that Welch and Wood would not have gone to such great lengths to conceal the force they used if they had used it for legitimate reasons." *Id.* at 13. Such an inference, however, does not relate to whether they acted with an express intent to punish. There is no subjective element to a Fourteenth Amendment excessive force claim. *Kingsley*, 576 U.S. at 396, 135 S.Ct. 2466. "[W]e may only infer that Defendants acted with punitive intent if the challenged conditions were not reasonably related to a legitimate goal—if [they were] arbitrary or purposeless." *Turkmen v. Hasty*, 789 F.3d 218, 238 (2d Cir. 2015), *judgment rev'd and vacated on other grounds Ziglar v. Abbasi*, ––– U.S. ––––, 137 S. Ct. 1843, 198 L.Ed.2d 290 (2017) (internal citation and quotations omitted).

Plaintiff, however, establishes a dispute of a material fact regarding whether "the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 576 U.S. at 396–97, 135 S.Ct. 2466. Following a suicide attempt, Defendant Officers Welch, Wood, Pond and Minogue removed Plaintiff's shorts to alleviate the suicide risk of the short's drawstring. Dkt. No. 33-1 at ¶¶ 60, 64-65. Plaintiff,

however, asserts that the "objectively unreasonable" nature of the force used demonstrates that the true purpose was to "punish and/or retaliate against him." Dkt. No. 33 at 7.

In *Kingsley*, the Supreme Court provided the following non-exhaustive factors to determine whether a defendant applied force reasonably:

> the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* The factfinder must also "take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate." *Frost*, 980 F.3d at 252. Here, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004), the Court finds material issues of fact regarding the amount and necessity of force preclude summary judgment.

**\*4** Plaintiff was alone in a secured environment and had already been searched for weapons. Dkt. No. 33-1 at ¶ 11. Four officers entered Plaintiff's cell to remove his shorts, and two more were present immediately outside. *Id.* at ¶ 114. Although Plaintiff resisted the officers, he did not punch or strike the officers. *Id.* at ¶¶ 160-62. In his testimony, Defendant Welch identified at least two punches that he threw after Plaintiff's shorts had already been removed. Dkt. No. 27-5 at 364. And Defendant Wood testified he grabbed Plaintiff's genitals after Defendant Welch had already punched Plaintiff, and after Plaintiff's shorts had been removed. Dkt. No. 27-6 at 70.

Plaintiff repeatedly testified at his deposition that he was punched approximately ten times, although he did not count

2022 WL 137721

exactly, and that Defendant Wood pulled and squeezed Plaintiff's genitals, causing immense pain. Dkt. No. 33-1 at ¶¶ 163, 166. After the incident, Plaintiff's face was covered in blood, swollen, and bruised. *Id.* at ¶ 119; Dkt. No. 42-1 at 8-11. Plaintiff was eventually diagnosed with a deviated septum. *Id.* at ¶ 25. Following the incident, Chief Ritter stated, "not all" of the force used by Defendants against Plaintiff "was justified." *Id.* at ¶ 178.

Defendants argue that Plaintiff's injuries are *de minimis*, and therefore Defendants' actions cannot be objectively unreasonable. The Second Circuit, however, has held that multiple facial bruises and a ruptured eardrum supported a Fourteenth Amendment excessive force claim. *Frost*, 980 F.3d at 254. The Court finds a deviated septum sufficiently analogous to a ruptured eardrum. Additionally, the *Frost* court weighed the ruptured eardrum despite the plaintiff's previous diagnosis of a ruptured eardrum the year prior. *Id.* Here, Defendants argue "it is unlikely that Plaintiff's deviated septum can be attributed to the incident without engaging in speculation." Dkt. No. 42 at 7. However, "absent undisputed medical evidence to the contrary—which defendants have not offered—a reasonable jury could find that" Defendants were responsible for causing a new injury. *Frost*, 980 F.3d at 254.

Defendants further argue that the officers' safety concerns justify the amount of force used. Plaintiff had been arrested earlier that evening for assault and was singing about killing people while in his cell. Dkt. No. 33-1 at ¶¶ 92, 95, 122. Plaintiff refused the order to remove his shorts and then resisted the Defendant Officers' attempt to remove the shorts. Nonetheless, Plaintiff was alone, had already been searched, and was secured in a cell. When the strikes occurred, Plaintiff was outnumbered four to one and pinned down.

To be sure, safety concerns coupled with refused orders may justify the use of force. *See, e.g.*, *Berman v. Williams*, No. 17-CV-2757, 2019 WL 4450810, *6 (S.D.N.Y. Sept. 17, 2019) (finding use of force justified where defendant refused to remove clothing in the search intake area); *Hilson v. Maltese*, No. 9:09-CV-1373, 2012 WL 6965105, *7 (N.D.N.Y. Dec. 14, 2012), *report and recommendation adopted*, 2013 WL 375489 (N.D.N.Y. Jan. 30, 2013) (finding force to be reasonably necessary to restore order during a strip frisk); *Allaway v. McGinnis*, 473 F. Supp. 2d 378, 382 (W.D.N.Y. 2007) (finding use of force justified where the plaintiff "charged at" officers). But here, unlike *Berman* and *Hilson*, Plaintiff had already been searched and was in a secured environment. Considering the facts in the light most favorable

to Plaintiff, the Court, therefore, finds ten punches resulting in facial bruising and a deviated septum, as well as continued force, including the grabbing of genitals after compliance had been achieved, against a detainee who had already been searched for weapons, was in a secured environment, and did not attempt to punch or kick any officers, to be objectively unreasonable.

**\*5** Defendants also argue that there is no evidence to support the personal involvement of against Defendants Minogue and Pond. [1] In *Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), the Supreme Court made clear that video evidence submitted in connection with a party's summary judgment motion should be considered in determining whether material issues of fact exist. "When opposing parties tell two different stories, one of which is blatantly contradicted by the [video] record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380, 127 S.Ct. 1769; *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 482 (N.D.N.Y. 2017) ("*Scott* is best understood to permit the summary adjudication of a plaintiff's civil rights claim only in those exceptional cases where the video evidence in the record is sufficient to 'blatantly contradict[ ]' one party's version of events"). Here, the video evidence conclusively establishes that Defendant Minogue did not strike Plaintiff in the face. Defendant Minogue is near Plaintiff's legs for the entire fifty-four seconds. The only other alleged injury is to Plaintiff's genitals and the parties agree that action was performed by Defendant Welch. Therefore, the excessive force claim is dismissed against Defendant Minogue. Defendant Minogue did not strike Plaintiff in the face or grab his genitals, the only injuries alleged in the complaint.

[1]     Plaintiff has agreed to voluntarily dismiss the excessive force claim against Defendant Vassar. *See* Dkt. No. 33 at 16 n.3.

The video, however, does not conclusively establish Defendant Pond's actions. It is impossible to discern the amount of force he used or any other actions taken. Accordingly, a reasonable jury could find that Defendant Pond also used excessive force against Plaintiff, including unnecessary and gratuitous punching. *See, e.g.*, *Moore v. Keller*, 498 F. Supp. 3d 335, 351 (N.D.N.Y. 2020) ("Upon review, the video does not conclusively establish much. ... Accordingly, the appropriate course of action is still to permit the jury an opportunity to resolve the competing versions of

events") (quotations omitted). Therefore, Defendant Pond's motion for summary judgment on the excessive force claim is denied.

### *1. Qualified Immunity*

Defendants further assert that Defendants Wood, Welch, Pond, and Minogue are shielded from liability based on qualified immunity.

Qualified immunity is an affirmative defense and, as such, Defendants bear the burden of proving that the privilege of qualified immunity applies. See *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012). "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Tracy v. Freshwater*, 623 F.3d 90, 95-96 (2d Cir. 2010) (quoting *Kelsey v. County of Schoharie*, 567 F.3d 54, 60-61 (2d Cir. 2009)). The Court is mindful that qualified immunity is " 'an entitlement not to stand trial or face the other burdens of litigation,' " and that this privilege is " 'effectively lost if a case is erroneously permitted to go to trial.' " *Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).

Courts engage in a two-part inquiry to determine whether the doctrine of qualified immunity bars a suit against government officials. See *Jones v. Parmley*, 465 F.3d 46, 55 (2d Cir. 2006). First, a court must consider whether the facts, construed in favor of the party asserting the injury, "demonstrate a violation of a constitutional right." *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). Second, a court must also determine "whether the officials' actions violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)). Courts may exercise their discretion in deciding which prong should be considered first. See *Pearson v. Callahan*, 555 U.S. 223, 243, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

"It is well established that qualified immunity may operate as a defense to excessive force claims." *Betts v. Rodriquez*, No. 15-CV-3836, 2017 WL 2124443, *4 (S.D.N.Y. May 15, 2017). "Even if the force is objectively unreasonable, an officer may still be eligible for qualified immunity if it was objectively reasonable for the officer to believe that her action did not violate clearly established law." *Keene v. Schneider*, 350 Fed. Appx. 595, 596 (2d Cir. 2009). "The Supreme Court has made clear that officers who have used excessive force may be entitled—under the qualified immunity doctrine—to an extra layer of protection 'from the sometimes hazy border between excessive and acceptable force.' " *De Michele v. City of New York*, No. 09-CV-9334, 2012 WL 4354763, *17 (S.D.N.Y. Sept. 24, 2012) (quoting *Saucier*, 533 U.S. at 206, 121 S.Ct. 2151).

**\*6** The contested amount and necessity of force in this case makes summary judgment on qualified immunity inappropriate. See, e.g., *Kerman v. City of New York*, 261 F.3d 229, 240 (2d Cir. 2001) (holding that "summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness") (citation omitted). Construing the facts in Plaintiff's favor, Defendants struck Plaintiff in the face and grabbed his genitals after he had been restrained and stopped resisting. It is clearly established law that once "restrained by five police officers inside the familiar terrain and relative safety of a police precinct interrogation room," repeated punches may "constitute excessive force." *Gardner v. Robinson*, No. 16-CIV-1548, 2018 WL 722858, *6 (S.D.N.Y. Feb. 6, 2018); *Lennox v. Miller*, 968 F.3d 150, 157 (2d Cir. 2020) (holding that it is "clearly established by our Circuit caselaw that it is impermissible to use significant force against a restrained arrestee who is not actively resisting"). Even if Plaintiff did initially resist, it is equally well established that "gratuitous force after resistance has stopped and compliance has been secured is unreasonable." *Lee v. City of Troy*, 520 F. Supp. 3d 191, 207 (N.D.N.Y. 2021) (citing *Lennox*, 968 F.3d at 157).

Accordingly, due to the factual dispute over the level of force used by Defendants and Plaintiff's level of resistance, as well as the timing of the alleged excessive force, the Court will not grant Defendants qualified immunity.

### C. Failure to Intervene

Plaintiff alleges that Defendant Officers failed to intervene in the August 19, 2017, incident. "It is widely recognized that law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir.

Butchino v. City of Plattsburg, Slip Copy (2022)
Case 9:21-cv-00372-MAD-TWD     Document 61     Filed 06/22/23     Page 208 of 218
2022 WL 137721

1994)). To establish a claim of failure to intervene a plaintiff must prove:

> (1) that a constitutional violation was being committed against the plaintiff; (2) that the officer knew, or deliberately ignored, the fact that the constitutional violation was going to be, or was being, committed; (3) that the defendant had a reasonable opportunity to intervene and prevent the harm; and (4) that the defendant did not take reasonable steps to intervene. *Curley v. Vil. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001)

*Alexander v. Nolan*, No. 6:17-CV-0725, 2018 WL 6621400, *7 (N.D.N.Y. Dec. 18, 2018). The first element, as discussed above, is met. Defendant Officers argue that they did not have actual knowledge of the force being used by other officers. Indeed, each of these officers testified that they did not know what force was being used. *See* Dkt. No. 27 at 34-35. Additionally, Defendant Officers argue that they did not have a realistic opportunity to intervene given the suddenness of any force.

After review of the video, the Court disagrees. First, a reasonable jury could find that Defendants Wood, Welch, Pond, and Minogue had knowledge of the force and a reasonable opportunity to intervene. The four officers were in close proximity in the cell together for fifty-four seconds as the incident unfolded. A reasonable jury could infer knowledge of force based on the video, despite the officers' testimony. Second, Defendant Vassar, although he was standing immediately outside of the cell, testified that he watched the incident occur. Dkt. No. 27-6 at 148. And third, Defendant Ritter was behind a desk in the booking room, where Cell 4 was visible. Dkt. No. 27-5 at 135-136. Defendant Ritter testified that he watched the incident for "about 45 seconds" from behind the desk. *Id.* Because it is undisputed that each Defendant Officer watched the events transpire, a reasonable jury could infer that they had knowledge of the force being used.

"Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). Defendants argue that Defendant Welch's two punches and Defendant Wood's grabbing of Plaintiff's genitals were too sudden to allow any officer an opportunity to intervene. Plaintiff, however, testified that he was punched approximately ten times over the fifty-four second incident.

**\*7** In *Figueroa v. Mazza*, the Second Circuit held that a factual dispute over the length of an excessive force incident and the amount of punches thrown precluded judgment as a matter of law for the defendants on a failure to intervene claim. 825 F.3d 89, 106-07 (2d Cir. 2016). The court concluded that the plaintiff's "failure-to-intervene claims—even assuming that the assault lasted less than twenty seconds—were for the jury to decide. ... [W]e cannot hold that the assault occurred so quickly that the defendant officers lacked time to intercede as a matter of law." *Id.* at 108. "In light of the officers' placement relative to [plaintiff], the apparent absence of any obstacles that might have hindered their ability to intercede, and the assault's stated duration, a reasonable juror could infer that defendants became, by their inaction, 'tacit collaborator[s]' in the unlawful conduct alleged."

The Court finds *Figueroa* controlling. Whether Defendant Officers had a reasonable opportunity to intervene is a question for the jury. The number of punches or the spontaneity of the force cannot be determined by the Court at this stage. *See also Ross v. Willis*, No. 16-CIV-6704, 2021 WL 3500163, *16 (S.D.N.Y. Aug. 9, 2021). Accordingly, Defendants' motion for summary judgment on the failure to intervene claim is denied. [2]

[2]    Defendants did not argue that qualified immunity should attach to the failure to intervene claim. In general, "[a] police officer is not entitled to qualified immunity if his failure to intervene 'permitted fellow officers to violate a suspect's clearly established statutory or constitutional rights of which a reasonable person would have known' and 'the failure to intercede [occurred].... under circumstances making it objectively unreasonable for him to believe that his fellow officers' conduct did not violate those rights.' " *Tiffany v. Tartaglione*, No. 00 CIV. 2283, 2004 WL 540275, *4 (S.D.N.Y. Mar. 5, 2004) (citing *Riciutti v. New York City Transit Authority*, 941 F.2d 119, 129 (2d Cir. 1991)).

## D. *Monell* Liability

Defendants assert that they are entitled to summary judgment on Plaintiff's *Monell* claim because Plaintiff has not identified a policy or custom regarding the failure to intervene. The Court agrees.

It is well settled that "a municipality cannot be made liable [under § 1983] by application of the doctrine of *respondeat superior*." " *Lucente v. Cty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (quotations omitted). Rather, "[i]n order to hold the County liable under § 1983, plaintiff must put forth sufficient evidence to show that individual defendants' unconstitutional actions were taken pursuant to an official municipal policy, custom, or practice." *Thornton v. Cty. of Albany*, No. 9:14-CV-679, 2016 WL 5793714, *7 (N.D.N.Y. Oct. 4, 2016) (citing *Monell*, 436 U.S. at 690–91, 98 S.Ct. 2018). As a result, to demonstrate *Monell* liability, a plaintiff must allege a violation of constitutional rights by employees of the municipality and "(1) 'the existence of a municipal policy or custom ... that caused his injuries beyond merely employing the misbehaving officer[s]'; and (2) 'a causal connection - an affirmative link - between the policy and the deprivation of his constitutional rights.' " *Harper v. City of New York*, 424 Fed. Appx. 36, 38 (2d Cir. 2011) (quoting *Vippolis v. Vill. Of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985)) (internal quotation marks omitted).

> A plaintiff may plead a municipal policy or custom by alleging: (1) a formal policy, promulgated or adopted by the entity; or, (2) that an official with policymaking authority took action or made a specific decision which caused the alleged violation of constitutional rights; or (3) the existence of an unlawful practice by subordinate officials that was so permanent or well settled so as to constitute a 'custom or usage,' and that the practice was so widespread as to imply the constructive acquiescence of policymaking officials.

**\*8** *Shepherd v. Powers*, No. 11 Civ. 6860, 2012 WL 4477241, *9 (S.D.N.Y. Sept. 27, 2012) (quotation and other citation omitted).

Plaintiff seeks to demonstrate a policy or custom in two ways. First, Plaintiff seeks to proceed with a " 'paradigmatic' *Monell* claim based upon 'formal, written policy.' *Wu v. City of New York*, 934 F. Supp. 581, 591 (S.D.N.Y. 1996)." Dkt. No. 33 at 22. Plaintiff identifies the "Use of Force Policy of the Plattsburgh Police Department" as the written policy, arguing that it "did not require officers to intervene to prevent the use of unreasonable force by others. The policy does not even mention the duty to intervene." *Id.* at 22-23 (citation omitted).

A written-policy-*Monell* claim cannot be buoyed by the absence of a written policy.[3] *See Gerte v. Borough of Naugatuck*, No. 3:19-CV-1511, 2021 WL 1165362, *6 (D. Conn. Mar. 26, 2021) ("Since the absence of policy is not a policy within the meaning of this theory of liability, Plaintiff's Monell claim on the basis of a written policy fails"); *Zachary v. City of Newburgh*, No. 13-CV-5737, 2014 WL 1508705, *5 (S.D.N.Y. Apr. 1, 2014) ("[T]he absence of a policy is not a policy and is not actionable under *Monell* ...."). Instead, a municipal policy exists when "there is a decision by an official with policymaking authority, or a formal enactment by the municipality's governing body." *Scott v. Lazure*, No. 3:19-CV-713, 2020 WL 2615502, *9 (D. Conn. May 22, 2020). Defendants' lack of a policy, therefore, cannot evince a municipal policy that there is no duty to intervene. Municipal policies, of course, cannot preemptively bar every unconstitutional action or else support *Monell* liability.

[3]
> In their motion for summary judgment, Defendants interpret Plaintiff's *Monell* claim regarding the lack of a policy to intervene as a failure to train claim. *See* Dkt. No. 27 at 4-6; *see, e.g.*, *Finch v. City of Stamford*, No. 3:10-CV-748, 2011 WL 5245422, *4 (D. Conn. Nov. 2, 2011) ("[T]he Court cannot imagine a lack-of-policy claim under § 1983 that is not also, and more relevantly, a failure-to-train claim"). In its reply, Plaintiff, however, insists he is not bringing a failure to train claim. Dkt. No. 33 at 22-23.

Second, Plaintiff asserts that there was a custom to not intervene in excessive force cases. *See* Dkt. No. 33 at 23. Plaintiff points to the deposition of Captain Bradley Kiroy, who testified that the Plattsburgh police department has never disciplined an individual for the failure to intervene. Dkt. No. 27-6 at 289. "A municipal policy may be pronounced or tacit and reflected in either action or inaction." *Cash v. County of*

*Erie*, 654 F.3d 324, 334 (2d Cir. 2011). "In order for Plaintiff to succeed on his ... failure to discipline theor[y], there must be a pattern of similar misconduct." *Davis v. City of New York*, No. 12 CIV. 3297, 2018 WL 10070540, *6 (S.D.N.Y. Mar. 30, 2018) (citing *Connick v. Thompson*, 563 U.S. 51, 62, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011)). The instances of failure to intervene must be sufficient to demonstrate that officers' failure to intervene was so pervasive that it established a "custom or policy." *Id.* at *7-8.

**\*9** Captain Kiroy testified that there had been five-to-ten excessive force incidents and that no officer was disciplined for a failure to intervene. Dkt. No. 27-6 at 281, 289. That testimony alone, however, is well short of demonstrating a pattern of failing to intervene. There is nothing in the record about the other excessive force cases—specifically, whether there was an opportunity to intervene. Perhaps there was no discipline because an officer did intervene. The Court cannot assume that every other excessive force case provided an opportunity to intervene, that an officer did not intervene, and that the department chose not to discipline an officer for a failure to intervene. Plaintiff's sole reliance on a lack of failure to intervene discipline within the city does not imply a pervasive pattern of a failure to intervene.

Plaintiff's amended complaint also brings *Monell* causes of actions regarding policies or customs of "using excessive force against arrestees and/or detainees" and "not requiring its police officers to attempt de-escalation before using force against detainees or arrestees, including with respect to persons experiencing mental health issues." Dkt. No. 17 at ¶¶ 137, 139. Defendants moved for summary judgment with respect to these claims, as well. *See* Dkt. No. 27 at 11-14. Plaintiff, however, focused his response entirely on the lack of a policy regarding the duty to intervene. *See* Dkt. No. 33 at 22-24. Because Plaintiff does not oppose Defendants' motion for summary judgment as to the additional policies, the Court finds that Plaintiff has abandoned these claims and grants Defendants' motion for summary judgment. *See Crews v. City of Ithaca*, No. 3:17-CV-213, 2021 WL 257120, *13 (N.D.N.Y. Jan. 26, 2021); *Feacher v. Intercontinental Hotels Group*, 563 F. Supp. 2d 389, 399 (N.D.N.Y. 2008); *see also Stokes v. City of New York*, No. 05-CV-007, 2007 WL 1300983, *14 (E.D.N.Y. May 3, 2007) (collecting cases).

## E. Title II ADA and Section 504 of the Rehabilitation Act

The Second Circuit has recognized that claims made under the ADA and the Rehabilitation Act are so similar that they should be analyzed together. *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 146 n.6 (2d Cir. 2002). To assert a claim under the ADA or Rehabilitation Act, a plaintiff must establish "that (1) they are 'qualified individuals' with a disability; (2) that the defendants are subject to the ADA; and (3) that plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities." [4] *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272-73 (2d Cir. 2003). Additionally, in order to recover damages under Title II of the ADA and the Rehabilitation Act, the plaintiff must show that the discrimination was intentional. *See, e.g.*, *Vassenelli v. State Univ. of New York*, No. 5:17-CV-00082, 2018 WL 1406629, *3 (N.D.N.Y. Mar. 19, 2018).

[4]    In addition, to recover under the Rehabilitation Act, "a plaintiff must show that the defendants receive federal funding." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).

Defendants do not challenge the first prong; that Plaintiff is a qualified individual. A "disability" is defined as a "physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). Defendants state that Plaintiff was first diagnosed with PTSD in 2013, and that PTSD is a qualifying disability under the ADA. *See* Dkt. No. 27 at 16; Dkt. No. 33-1 at ¶ 124. Defendants also do not challenge the second prong. *See* Dkt. No. 27 at 15-16 ("The City of Plattsburgh and the Plattsburgh Police Department are public entities under the ADA"). The Supreme Court has held that state prisons "fall squarely within the statutory definition of 'public entity' " in Title II of the ADA. *Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206, 210, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998); *see also Tardif v. City of New York*, 991 F.3d 394, 404 (2d Cir. 2021) (applying Title II of the ADA to an arrestee's pre-arraignment detention).

**\*10** Under Title II of the ADA, "[a] public entity discriminates against a qualified individual with a disability when it fails to provide 'meaningful access' to its benefits, programs, or services." *Disabled in Action v. Board of Elections of New York*, 752 F.3d 189, 197 (2d Cir. 2014) (citation omitted). Defendants further state that "post-arrest detainment qualif[ies] as a service, activity or benefit of a police department." [5] Dkt. No. 27 at 17; *see Tardif*, 991 F.3d at 404. "The only reasonable interpretation of Title II is that law enforcement officers who are acting in an investigative or custodial capacity are performing 'services, programs, or

activities' within the scope of Title II." *Williams v. City of New York*, 121 F. Supp. 3d 354, 368 (S.D.N.Y. 2015).

5    Because the issue was not contested by the parties, the Court assumes that Plaintiff's detainment qualifies as a service. The Second Circuit, however, has noted that whether "a safe custodial environment" was a "benefit" that the City denied under the ADA is an open question that "has divided our sister circuits." *Tardif v. City of New York*, 991 F.3d 394, 404 n.7 (2d Cir. 2021).

Defendants, however, assert that Plaintiff cannot prove that he was "discriminated against by defendants, by reason of plaintiffs' disabilities[,]" because Defendants did not have knowledge of Plaintiff's disability. *Henrietta D.*, 331 F.3d at 272-73. Additionally, Defendants argue that Plaintiff was not discriminated against because Defendants' actions were reasonable. *See* Dkt. No. 27-3 at 16-24. And lastly, Defendants argue that Plaintiff has failed to demonstrate that the discrimination was intentional, as required for damages under the ADA and Rehabilitation Act. *See Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009).

First, knowledge of a disability is a prerequisite to discriminating by reason of that disability. *See, e.g., Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008) ("Obviously, an employer who acts or fails to act without knowledge of a disability cannot be said to have discriminated based on that disability"). Defendant notes that Plaintiff did not testify that he told any officer he had PTSD before the incident, instead he stated that "I can't be confident in saying that I said something beforehand[.]" Dkt. No. 27-4 at 184. Moreover, Defendants correctly note that there is no audible part of the security videos where Plaintiff can be heard telling an officer of his PTSD diagnosis. *See* Dkt. No. 27-3 at 17.

Defendant Vassar, however, told Plaintiff that, "we knew you had PTSD because you told us." Dkt. No. 27-6 at 171. Although, Defendant Vassar also testified at his deposition that he did not recall whether Plaintiff informed any officer of his PTSD before or after the incident, the court nonetheless finds a triable issue of fact. Defendant Vassar told Plaintiff that, "once we realized that it had triggered [your PTSD] because of your up and down mood and you trying to hang yourself then we had to act." *Id.* at 176. A reasonable inference from that conversation is that the officers knew Plaintiff had PTSD prior to entering his cell. Moreover, Plaintiff was singing about his difficult experience in Afghanistan, and informed Defendant Pond he was on

Setraline, a drug to treat PTSD. Dkt. No. 33-1 at ¶ 217. Drawing all inferences in Plaintiff's favor, a jury could reasonably find that Defendants had knowledge that Plaintiff had PTSD.

Next, Defendants argue that no reasonable accommodation was available because of exigent circumstances. *See* Dkt. No. 27 at 18-20. Under Title II of the ADA, a defendant discriminates when it fails to make a reasonable accommodation that would permit a qualified disabled individual "to have access to and take a meaningful part in public services." *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir. 2004), *opinion corrected on other grounds*, 511 F.3d 238 (2d Cir. 2004). "Whether a disabled individual succeeds in proving discrimination under Title II of the ADA will depend on whether the officers' accommodations were reasonable under the circumstances." *Williams*, 121 F. Supp. 3d at 368. "Title II of the ADA requires police officers to provide reasonable accommodations to arrestees and that any threatening or exigent circumstances should be considered when determining the reasonableness of the proposed accommodation." *Durr v. Slator*, No. 5:20-CV-00662, 2021 WL 3930704, *17 (N.D.N.Y. Sept. 2, 2021).

**\*11** In *Durr*, this Court denied a motion to dismiss for a similar Title II ADA claim. 2021 WL 3930704, at *18. There, the plaintiff alleged that he was "clearly exhibiting signs of an emotionally disturbed person when Defendants Slator and Silverman arrived on the scene." *Id.* "Instead of placing Plaintiff in handcuffs, informing him that he was under arrest, and subsequently kicking him in the knee," the complaint alleged, "Defendants Silverman and Slator should have used de-escalation techniques." *Id.* Despite the plaintiff "yelling in the roadway," "obstructing traffic," and "spitting toward [d]efendant Slator," the Court nonetheless found that a reasonable accommodation may exist, notwithstanding any exigent circumstance posed by the plaintiff. *Id.* at *18-19.

In reaching that conclusion, this Court relied on *Sage v. City of Winooski*, No. 2:16-cv-116, 2017 WL 1100882 (D. Vt. Mar. 22, 2017). In *Sage*

the defendant police officers responded to a report of a person trespassing at a local health club. *See id.* at *1. When the officers arrived, they were informed by the health club employees that the plaintiff had left

the property at their request, but still asked the officers to serve the plaintiff with a notice of trespass. *See id.* When the officers located the plaintiff and asked to see his identification, the plaintiff responded that they should already know him as a resident of Allen House, which is a group home operated for persons with chronic and persistent serious mental illness. *See id.* When the plaintiff declined to provided identification, one of the officers asked the plaintiff if he preferred to be arrested and proceeded to open a handcuff case. *See id.* Seeing the handcuff case, the plaintiff struck the officer in the face. *See id.* When other responding officer attempted to grab the plaintiff, he was able to break away from his grasp. *See id.* At this point, the officers deployed their tasers on the plaintiff. *See id.* While the plaintiff was "flailing" on the ground, one of the officers fired his service weapon, hitting the plaintiff in the leg. *See id.*

*Durr*, 2021 WL 3930704, at \*18. The *Sage* court denied a motion to dismiss because the plaintiff became violent "only after being threatened with arrest and shown a handcuff case." *Sage*, 2017 WL 1100882, at \*4. "[M]aking all reasonable inferences in the [p]laintiff's favor, the violent behavior could arguably have been avoided if the officers had acknowledged and accommodated Mr. Sage's mental illness." *Id.*; *see also Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1232-33 (9th Cir. 2014), *reversed in part on other grounds*, 575 U.S. 600, 135 S.Ct. 1765, 191 L.Ed.2d 856 (2015) (denying summary judgment against a reasonable accommodation claim where the officers could have respected plaintiff's "comfort zone, engaged in non-threatening communications and used the passage of time to defuse the situation rather than precipitating a deadly confrontation").

Here, Plaintiff was secured in a cell where he could be adequately monitored. Similar to *Sheehan* and *Sage*, Plaintiff was not violent until Defendants initiated the interaction. And similarly, Plaintiff argues that Defendants could have

accommodated his disability by allowing him to cool off before forcibly removing his shorts. Whether a reasonable accommodation was available and feasible is a question of fact for the jury. *See, e.g., Morales v. City of New York*, No. 13 Civ. 7667, 2016 WL 4718189, \*6 (S.D.N.Y. Sept. 7, 2016) (availability of accommodation was question of fact, requiring denial of summary); *Wagner v. City of New York*, No. 14 Civ. 2521, 2015 WL 5707326, \*7 (S.D.N.Y. Sept. 28, 2015) (same). With Plaintiff secured in a cell, no exigent circumstance made a reasonable accommodation impossible as a matter of law.

**\*12** Defendants argue that *Tardif v. City of New York*, compels this Court to grant summary judgment. 991 F.3d 394, 407 (2d Cir. 2021). The Court disagrees. In *Tardif*, the plaintiff, a pre-arraignment detainee, was on a strict medication schedule for epilepsy and informed an officer of her medical needs. *Id.* at 399. Although the plaintiff received her first dose, she did not receive her second dose, had a seizure, and was transported to the hospital. *Id.* The Second Circuit held that Tardif's epilepsy did not cause a deprivation of medical services, it was just the motivation for seeking out such services. *Id.* at 405. "The ADA prohibits discrimination because of disability, not inadequate treatment for disability." *Id.* at 406 (quotation and citation omitted). The court concluded that no reasonable jury could find that "Tardif's epilepsy substantially caused the City's delay in administering medication," and therefore upheld summary judgment. *Id.* at 407.

Here, *Tardif* is not instructive. *Tardif* would preclude an ADA claim for the excessive force itself, not the failure to provide a reasonable accommodation, such as a cooling off period. The failure to provide such a reasonable accommodation is squarely cognizable under the ADA. *See e.g., Williams*, 121 F. Supp. 3d at 369 (recognizing a reasonable accommodation claim where police fail to "reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees"). Whereas the failure to provide medical care is a generalized issue that applies beyond the ambit of disability law, the failure to provide reasonable accommodation to a service or benefit—a cooling off period for an individual with PTSD—is a quintessential failure to accommodate disability claim. Plaintiff does not bring an ADA claim to remain free from excessive force, which would likely fail following *Tardif*.

Lastly, Defendants argue that there is no evidence of intentional discrimination. "The standard for intentional violations is deliberate indifference to the strong likelihood [of] a violation[.]" *Loeffler*, 582 F.3d at 275 (quotation omitted). "[C]ourts in this circuit have found that plaintiffs provided sufficient evidence of deliberate indifference when they could point to training deficiencies of which municipal entities were aware and which existed with respect to populations police would necessarily encounter as they did their duties." *Felix v. City of New York*, 344 F. Supp. 3d 644, 666 (S.D.N.Y. 2018) (citing *Williams*, 121 F. Supp. at 374–75).

Plaintiff has produced sufficient evidence to create a question of fact as to whether Defendants were deliberately indifferent to the strong likelihood of a violation of the ADA and Rehabilitation Act. Defendant Ritter testified that they have no departmental policy concerning compliance with the ADA and that he could not recall any ADA-specific training. Dkt. No. 27-5 at 148. Indeed, there are no departmental policies regarding the use of force during a mental health incident. *See* Dkt. No. 33 at 30-31.

Moreover, such a training deficiency relates to a population that police would necessarily encounter as they did their duties, those with a mental disability. *See, e.g.*, *Felix*, 344 F. Supp. 3d at 666; *Williams*, 121 F. Supp. 3d at 374–75. Defendants argue that, because of the small population size of the city of Plattsburgh, approximately 20,000, it is not "morally certain" that its police officers will encounter individuals who require reasonable accommodations for a mental disability. At the summary judgment stage, however, all inferences must be drawn in the nonmoving party's favor. A mere reference to the population of the city is insufficient to grant summary judgment and does not provide the Court with the relevant information to determine whether police officers are likely to encounter individuals with mental disabilities. The Court notes that at least one other recent incident in Plattsburgh involved the use of force and mental health. *See Passino v. City of Plattsburgh*, No. 8:17-CV-1028S, 2020 WL 509129 (N.D.N.Y. Jan. 31, 2020).

**\*13** Questions of fact exist whether Defendants' failure to accommodate Plaintiff's disability directly stems from a "deliberate indifference to the strong likelihood [of] a violation[,]" and is an intentional violation of the ADA and Rehabilitation Act. *Loeffler*, 582 F.3d at 275. Plaintiff has demonstrated that he was "denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities," and that the discrimination was intentional. *Henrietta D.*, 331 F.3d at 272-73. Accordingly, Defendants' motion for summary judgment is denied.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 27) is **GRANTED in part and DENIED in part**; [6] and the Court further

> [6]    Defendants' motion for summary judgment is granted with respect to the excessive force claim against Defendant Minogue and *Monell* liability against Defendant City, and otherwise denied.

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 137721

---

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00372-MAD-TWD   Document 61   Filed 06/22/23   Page 214 of 218

Betts v. Rodriquez, Not Reported in Fed. Supp. (2017)

2017 WL 2124443

2017 WL 2124443
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Kenneth BETTS, Plaintiff,

v.

Ivan RODRIQUEZ, et al., Defendants.

15-CV-3836 (JPO)
|
Signed 05/15/2017

**Attorneys and Law Firms**

Kenneth Betts, Bronx, NY, pro se.

Alexander MacRae Noble, New York City Law Department, New York, NY, for Defendants.

OPINION AND ORDER

J. PAUL OETKEN, United States District Judge

 **\*1** Plaintiff Kenneth Betts, proceeding *pro se*, filed the initial complaint in this action under 42 U.S.C. § 1983 on May 7, 2015. (Dkt. No. 2.) Betts filed the first amended complaint, the operative complaint in this action, on January 12, 2016, naming as defendants Ivan Rodriguez, Kelthlyn Frederick, Glenda Wajer, Sergeant Ricardo Morrison, and the City of New York (collectively, "Defendants"). (Dkt. No. 20 ("Compl")). In an Opinion and Order dated December 12, 2016, the Court granted in part and denied in part Defendants' motion to dismiss. (Dkt. No. 75.) Defendants now move for summary judgment on Betts' remaining claims. (Dkt. No. 78.) For the reasons that follow, the motion is granted in part and denied in part.

**I. Legal Standard**
"A document filed *pro se* is 'to be liberally construed' ...." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). "The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims." *Cruz v. Midwood Ambulance & Oxygen Serv., Inc.*, 136 Fed.Appx. 414, 415 (2d Cir. 2005) (citing *Weixel v. Bd. of Educ.*, 287 F.3d 138, 146 (2d Cir. 2002)).

A party is entitled to summary judgment where "there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party." *Cohen Lans LLP v. Naseman*, No. 14 Civ. 4045, 2017 WL 477775, at \*3 (S.D.N.Y. Feb. 3, 2017) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)).

At the summary judgment stage, the party bearing the burden of proof at trial must provide evidence on each element of its claim or defense. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "If the party with the burden of proof makes the requisite initial showing, the burden shifts to the opposing party to identify specific facts demonstrating a genuine issue for trial, *i.e.*, that reasonable jurors could differ about the evidence." *Clopay Plastic Prods. Co. v. Excelsior Packaging Grp., Inc.*, No. 12 Civ. 5262, 2014 WL 4652548, at \*3 (S.D.N.Y. Sept. 18, 2014). In deciding a motion for summary judgment, courts view the evidence "in the light most favorable to the nonmoving party" and grant summary judgment only if "no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal quotation marks omitted).

**II. Discussion**
Familiarity with this dispute is presumed, and the facts of the case are detailed in the Court's prior Opinion and Order at the motion-to-dismiss stage. *See Betts v. Rodriquez*, No. 15 Civ. 3836, 2016 WL 7192088 (S.D.N.Y. Dec. 12, 2016).

In considering this motion, the Court relies on facts that are undisputed, and where facts are disputed and supported by evidence, takes those facts in the light most favorable to Betts.[1]

---

[1]
> In response to Defendants' motion for summary judgment, Betts submitted a brief in opposition (Dkt. No. 88), and a statement of disputed factual issues, which attaches several exhibits (Dkt. No. 89). Defendants argue that the Court should disregard Betts' opposition due to his failure to comply with the Court's local rules, even after Defendants served Betts with notice of the applicable rules. (Dkt. No. 93 at 1-4.)
>
> While *pro se* litigants are "not excused from meeting the requirements of Local Rule 56.1," the Court nonetheless "retains some discretion

Case 9:21-cv-00372-MAD-TWD    Document 61    Filed 06/22/23    Page 215 of 218

Betts v. Rodriguez, Not Reported in Fed. Supp. (2017)

2017 WL 2124443

to consider the substance of the [*pro se* party's] arguments, where actually supported by evidentiary submissions." *Wali v. One Source Co.,* 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009); *see Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir. 2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules."). Though Betts' factual statement does not directly correspond to Defendants' 56.1 statement, and though it is not supported by citations to evidence, because he is proceeding *pro se,* "this Court has conducted 'an assiduous review of the record' to determine if there is any evidentiary support for his assertions of fact that do not cite to evidence and to determine if there are any other material issues of fact." *Geldzahler v. N.Y. Med. Coll.,* 746 F. Supp. 2d 618, 620 n.1 (S.D.N.Y. 2010) (quoting *Lee v. Coughlin,* 902 F. Supp. 424, 429 (S.D.N.Y. 1995)); *see also, e.g., Anderson v. City of New Rochelle,* No. 10 Civ. 4941, 2012 WL 3957742, at *7 (S.D.N.Y. Sept. 4, 2012). The Court will also "consider the unsworn statements in his 56.1 Response on the assumption that he would have testified to these statements in his Declaration.' *Geldzahler,* 746 F. Supp. 2d at 620 n.1.

**\*2** At this stage, the only claims remaining are Betts' claims for excessive force and for deliberate indifference to serious medical needs.

Defendants argue that they are entitled to summary judgment on the deliberate indifference claim due to Betts' failure to show that he was denied adequate medical care. (Dkt. No. 79 at 10.) Defendants also argue that they are entitled to summary judgment on the excessive force claim because Betts has not adequately alleged Defendants' personal involvement. (*Id.* at 7.) The Court will address these issues in turn.

### A. Deliberate Indifference

As the Court explained at the motion-to-dismiss stage:

> In order to succeed on a deliberate indifference claim, a 1983 plaintiff must plead two elements. "The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir. 2006) (internal quotation marks omitted) (quoting *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)). Determining whether

> a deprivation is objectively serious demands two inquiries. "The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care." *Id.* (citing *Farmer,* 511 U.S. at 844-47). "Second, the objective test asks whether the inadequacy in medical care is sufficiently serious." *Id.* at 280. "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find [it] important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.' " *Id.* (alteration in original) (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998)).

> "The second requirement ... is subjective: the charged official must act with a sufficiently culpable state of mind." *Id.* "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* Such "awareness may be proven 'from the very fact that the risk was obvious.' " *Spavone v. N.Y. State Dep't of Corr. Servs.,* 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Farmer,* 511 U.S. at 842).

*Betts,* 2016 WL 7192088, at *4.

In allowing the deliberate indifference claim to survive Defendants' motion to dismiss, the Court focused on the actions of Defendant Morrison during his encounter with Betts at Manhattan Central Booking. *Id.* However, in his opposition to Defendants' motion for summary judgment, Betts nowhere mentions his claim for deliberate indifference or discusses the incidents that occurred at Central Booking. (Dkt. Nos. 88, 89.) Betts focuses only on the excessive force claim and the facts surrounding his initial arrest. (*Id.*)

Betts' failure to address the circumstances surrounding his deliberate indifference claim is alone sufficient to justify summary judgment for Defendants on this claim. *See, e.g., Turner v. Sidorowicz,* No. 12 Civ. 7048, 2016 WL 3938344, at *4 (S.D.N.Y. July 18, 2016) ("[B]ecause Plaintiff does not address this claim in either his memorandum or affidavits and exhibits submitted in opposition to Defendants' motion for summary judgment, the Court deems him to have abandoned this claim. This result is warranted regardless of Plaintiff's *pro se* status...." (citations omitted)).

**\*3** In any event, Defendants are entitled to summary judgment on the merits of the deliberate indifference claim. Defendants adduce evidence in the form of medical records

2017 WL 2124443

from Harlem Hospital that show that Betts' injuries were not sufficiently severe as to satisfy the objective prong of the deliberate indifference standard. *See Salahuddin,* 467 F.3d at 279-80. Those records show that, though Plaintiff claims that his lips and gums were bleeding following his arrest, his medical records indicate no cuts or bleeding. (Dkt. No. 80 ¶ 21.) Moreover, though Betts had claimed that he suffered serious injuries to his right arm and shoulder, x-rays showed no fracture or dislocation to his shoulder, arm, or elbow. (*Id.* ¶ 22.) Further, one of Betts' chief complaints related to the delay in providing him with pain medication until he was treated at MDC. However, he testified in a deposition that he received pain medication much earlier, while he was at Harlem Hospital before he was transported to the police precinct. (*Id.* ¶ 24.) These injuries are not sufficiently serious for the purposes of deliberate indifference. *See Vargas v. City of N.Y.,* No. 13 Civ. 3188, 2017 WL 1214434, at *11 (E.D.N.Y. Mar. 31, 2017) ("To establish a 'serious medical condition' under the ... 'objective prong,' the plaintiff [i]s required to establish 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' ") (quoting *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir. 1990)).

As the Court predicted at the motion-to-dismiss stage, factual development has "reveal[ed] more details about the nature of Plaintiff's injuries." *Betts,* 2016 WL 7192088, at *5. And these details—along with Betts' failure to contest them or put forward an alternative version of events—are insufficient to support a claim for deliberate indifference.

### B. Excessive Force

Defendants argue that they are entitled to summary judgment on Betts' excessive force claim due to Betts' failure to adequately allege the personal involvement of each Defendant in the use of excessive force against him. (Dkt. No. 79 at 9-10.) The also argue—for the first time in their reply brief— that even assuming Defendants' personal involvement, they are nonetheless entitled to qualified immunity. (Dkt. No. 93 at 9-11.)

"In order to maintain an action ... under ... section 1983, a plaintiff must establish specific facts demonstrating that defendant's personal involvement in the constitutional violations alleged." *Dockery v. Tucker,* No. 97 Civ. 3584, 2006 WL 5893295, at *13 (E.D.N.Y. Sept. 6, 2006) (citing *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977)). Such personal involvement may be demonstrated by "proof of the defendant's direct participation in the alleged violation." *Id.* "A plaintiff seeking to prove that an officer directly

participated in the alleged excessive force need not be able to positively identify, at trial, which defendant took what particular action." *Gonzalez v. Waterbury Police Dep't,* 199 F. Supp. 3d 616, 621 (D. Conn. 2016). "Rather, a jury may use a combination of factors—direct testimony, cross examination, and circumstantial evidence—to infer that a particular defendant took a particular action." *Id.*; *see also Medina v. Donaldson,* No. 10 Civ. 5922, 2014 WL 1010951, at *7 (E.D.N.Y. Mar. 14, 2014) ("Absent direct evidence, a jury may still find for the plaintiff on a theory of direct participation if 'there is sufficient circumstantial evidence from which the trier of fact could make reasonable conclusions concerning who, if anyone, struck [the plaintiff].' ") (alteration in original) (quoting *Lasher v. City of Schenectady,* No. 02 Civ. 1395, 2004 WL 1732006, at *6–7 (N.D.N.Y. Aug. 3, 2004)); *id.* (collecting cases). At the summary judgment stage, the question is whether, viewing the evidence in the light most favorable to the non-moving party, a reasonable juror could find direct participation. *Dockery,* 2006 WL 5893295, at *13 (citing *Provost v. City of Newburgh,* 262 F.3d 146, 154 (2d Cir. 2001)).

Defendants marshal several facts to support their argument that Plaintiff cannot connect them to the allegedly offending acts. The amended complaint does not specify which Defendant took which specific action; it merely speaks of Defendants in the aggregate. (Dkt. No. 80 ¶ 3.) Moreover, in his deposition testimony, Betts testified that he does not know what the individual Defendants look like, that he did not get a good look at them at the time of the incident, and that he was only able to name them as Defendants based on paperwork prepared following his arrest. (*Id.* ¶¶ 12-14.)

*4 But in his Declaration in Opposition to Defendants' Motion for Summary Judgment, Betts is able to specifically describe the role of each Defendant:

> [T]he heavyset Latino person (Rodriquez) had [h]is arms around my body and would not let go. The slender and light-skinned person (Detective Wajer) was hitting me and the black person Keithlyn Frederick was twisting my arm and trying to handc[ ]uff me. He was twisting it as hard as he could until

Case 9:21-cv-00372-MAD-TWD   Document 61   Filed 06/22/23   Page 217 of 218

Betts v. Rodriguez, Not Reported in Fed. Supp. (2017)

2017 WL 2124443

i[t] finally popped of[f] the socket
and the pain was excruciating....

(Dkt. No. 87 ¶ 5.) And in his Statement of Disputed
Factual Issues, filed in opposition to the motion for summary
judgment, Betts asserts that it is, in fact, disputed whether
he was "cognizant enough to recognize" the Defendants
who used physical force in connection with his arrest as
Defendants Rodriguez, Frederick, and Wajer. [2] (Dkt. No. 89
¶¶ 3-5.) Moreover, Betts attaches to that Statement three
documents that appear to be review board interview notes
describing the involvement of each of those three Defendants
in connection with Betts' arrest. (*Id.* Exs. A, B, C.)

[2]  Betts makes no specific reference to Defendant
Morrison in connection with his excessive force
claim, beyond naming him in the list of Defendants
at the beginning of his declaration. (Dkt. No.
87 ¶ 1.) Morrison, it seems, had no role in
Betts' apprehension and arrest—and the claim
of excessive force arising from that interaction.
Accordingly, summary judgment is granted as to
Defendant Morrison on that claim.

In the face of these representations, Defendants argue that, in
light of Betts' earlier deposition testimony, his submissions
are insufficient to create a genuine
dispute of material fact for trial. (Dkt. No 93 at 7.) *See
Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 43 (2d Cir.
2000). However, Defendants' reliance on the so-called "sham
affidavit" principle—that a party who has been examined
on deposition cannot raise an issue of fact by submitting
a contradictory affidavit—is misplaced where the affidavit
in question is corroborated by other evidence. *See Buie v.
City of N.Y.*, No. 12 Civ. 4390, 2015 WL 6620230, at *3
(E.D.N.Y. Oct. 30, 2015) (citing *Palazzo*, 232 F.3d at 43). This
is especially so in light of the special solicitude due to *pro se*
parties. *See Erickson*, 551 U.S. at 94.

Here, the detailed descriptions of each Defendant's role in the
alleged violation laid out in Betts' submission is corroborated
by the CCRB interview notes. Considering together Betts'
filings (including the corroborating evidence), Betts' *pro se*
status, and the Court's obligation at this stage to viewing
the evidence in the light most favorable to Betts, the Court
concludes—even despite Betts' deposition testimony—that
a reasonable jury could find direct participation by each

defendant in the alleged violation. This is sufficient to defeat
summary judgment.

Defendants further argue that, even assuming their personal
involvement, they are nonetheless entitled to qualified
immunity. (Dkt. No. 93 at 9-11.)

"It is well established that qualified immunity may operate
as a defense to excessive force claims." *Mesa v. City of New
York*, No. 09 Civ. 10464, 2013 WL 31002 (S.D.N.Y. Jan.
3, 2013). "In the excessive force context, 'the question for
the purposes of qualified immunity is whether a reasonable
officer could have believed that the use of force alleged
was objectively reasonable in light of the circumstances.'
" *Read v. Town of Suffern Police Dep't*, No. 10 Civ. 9042,
2013 WL 3193413, at *7 (S.D.N.Y. June 25, 2013) (internal
quotation marks omitted) (quoting *Lennon v. Miller*, 66 F.3d
416, 425 (2d Cir. 1995)). In analyzing the reasonableness of
force used in connection with an arrest, courts consider three
factors: (1) "the severity of the crime at issue," (2) "whether
the suspect poses an immediate threat to the safety of the
officers or others," and (3) "whether he is actively resisting
arrest or attempting to evade arrest by flight." *Graham v.
Connor*, 490 U.S. 386, 396 (1989). "The 'reasonableness' of
a particular use of force must be judged from the perspective
of a reasonable officer on the scene, rather than with the
20/20 vision of hindsight." *Id.* "If a genuine issue of material
fact exists regarding the reasonableness of the officers'
conduct, summary judgment must be denied." *Read*, 2013
WL 3193413, at *4 (citing *Azrielli v. Cohen Law Offices*, 21
F.3d 512, 516 (2d Cir. 1994)).

**\*5**  Defendants claim that their use of force was reasonable
under the circumstances because "no force was used
against plaintiff until plaintiff attempted to punch defendant
Rodriguez in the face and flee in order to evade arrest,"
and because Betts "was constantly kicking and punching,
resisting attempts to place his arms in handcuffs." (Dkt. No.
93 at 10.) As such, Defendants claim they only used force
that was "reasonably related to the nature of the resistance
and the force used, threatened, or reasonably perceived to be
threatened, against the officer[s]." *Sullivan v. Gagnier*, 225
F.3d 161, 166 (2d Cir. 2000).

Though "[t]he fact that a person whom a police officer
attempts to arrest resists, threatens, or assaults the officer no
doubt justifies the officer's use of *some* degree of force, ... it
does not give the officer license to use force without limit."
*Id.* at 165-66. And Betts' submissions tell a different story

Betts v. Rodriguez, Not Reported in Fed. Supp. (2017)

2017 WL 2124443

—one in which Defendants' use of force was not reasonably calibrated to the nature of the threat. First, Betts claims that Defendants initiated the incident with the use of force when he was "aggressively approached and attac[k]ed by the Defendants ... without them having identified themselves as officers of the law." (Dkt. No. 87 ¶ 4.) Betts' submissions suggest, contrary to Defendants' claim, that Defendants used force *before* Betts attempted to flee. Second, Betts does not claim that he physically resisted arrest in the way Defendants describe. While Betts acknowledges that he attempted to flee ("because of the Fear of being killed by [Defendants]"), he disputes aggressively resisting Defendants. (*Id.*) And third, even if Betts did resist Defendants, the extent of force used may have been objectively unreasonable under the circumstances as Betts describes them. For example, Betts contends that Defendants "hit him numerous times on various parts of his body; while simultaneously ... twisting his right arm until it popped out of the socket." (Dkt. No. 88 at 2.)

If a jury finds the facts to be as Betts describes them, it could reasonably conclude that the officers' actions were objectively unreasonable under the circumstances. Alternately, if the jury finds the facts to be as Defendants describe, they are likely to succeed. *See Weather v. City of Mount Vernon,* No. 08 Civ. 192, 2011 WL 1046165, at *9 (S.D.N.Y. Mar. 22, 2011) ("In excessive force cases the qualified immunity and Fourth Amendment analyses often 'converge on one question: Whether in the particular circumstances faced by the officer, a reasonable officer would believe that the force employed would be lawful.' ") (quoting *Cowan v. Breen,* 352 F.3d 756, 764, n.7 (2d Cir. 2003)), *aff'd,* 474 Fed.Appx. 821 (2d Cir. 2012). Thus, given these conflicting narratives of what happened and when, there are genuine issues of fact that preclude the Court from granting summary judgment for Defendants on this claim. *See Cowan,* 352 F.3d at 764 ("Because in this case genuine, material, factual disputes overlap both the excessive force and qualified immunity issues, summary judgment must be denied."). The question of what really happened is one for the jury.

### III. Conclusion

For the foregoing reasons, the motion is GRANTED IN PART and DENIED IN PART. Defendants' motion to for summary judgment is granted as to the claim for deliberate indifference and any claim against Defendant Morrison; the motion is denied as to the claim for excessive force.

The Clerk of Court is directed to close the motion at Docket Number 78.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2017 WL 2124443

---

© 2023 Thomson Reuters. No claim to original U.S. Government Works.